**VOLUME I OF II, PAGES APPX1-1157**

# United States Court of Appeals
# for the Federal Circuit

**Case No. 23-2007**

MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., MICRON TECHNOLOGY TEXAS, LLC, STATE OF IDAHO,
*Plaintiffs-Appellees*

v.

LONGHORN IP, LLC,
*Defendant-Appellant.*

Interlocutory Appeal from the United States District Court for the District of Idaho, No. 1:22-cv-00273-DCN (Judge David C. Nye)

**Case No. 23-2095**

KATANA SILICON TECHNOLOGIES LLC,
*Plaintiff-Appellant,*

v.

MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., MICRON TECHNOLOGY TEXAS, LLC, STATE OF IDAHO,
*Defendants-Appellees.*

Interlocutory Appeal from the United States District Court for the District of Idaho, No. 1:22-cv-00282-DCN (Judge David C. Nye)

**JOINT APPENDIX**

Scott W. Breedlove
Joshua Bennett
Omer Salik
CARTER ARNETT BENNETT &
PEREZ PLLC
8150 N. Central Expressway, Suite 500
Dallas, Texas 75206

*Counsel for Appellants*

Amanda Tessar
PERKINS COIE LLP
1900 Sixteenth Street
Denver, Colorado 80202

Andrew T. Dufresne
PERKINS COIE LLP
33 East Main Street, Suite 201
Madison, Wisconsin 53703

Jonathan I. Tietz
PERKINS COIE LLP
700 Thirteenth Street N.W., Suite 800
Washington, D.C. 20005

*Counsel for Appellees Micron Technology,
Inc., Micron Semiconductor Products, Inc.
and Micron Technology Texas LLC*

Raul R. Labrador
Alan Hurst
Michael Zarian
James Simeri
Idaho Office of the Attorney General
P.O. Box 83720
Boise, ID 83720
Chief, Consumer Protection Division

*Counsel for Appellee State of Idaho*

July 5, 2024

# TABLE OF CONTENTS

| Ex. Or Paper Number | Filing Date | Document Name | Appx. No. |
|---|---|---|---|
| 50 | 5/3/2023 | Memorandum Decision and Order | 1 |
| | | USRE38806E | 31 |
| | | US6,352,879 | 56 |
| | | US6,731,013 | 80 |
| | | Docket Sheet for Micron v. Longhorn | 115 |
| | | Docket Sheet for Katana v. Micron | 118 |
| 1 | 7/5/2022 | Longhorn's Notice of Removal, including Exhibits 1-10 (Micron's Idaho State Court Filings) | 133 |
| 7 | 7/12/2022 | Longhorn's Motion to Dismiss, including Attachment 1(Memorandum in Support) | 353 |
| 15 | 7/21/2022 | Micron's Memorandum in Support re 3 Motion for Bond, including attachments (1-38) | 384 |
| 17 | 7/21/2022 | Sealed Exhibit 36 (Dkt. 15-39) to Micron's Memorandum in Support re 3 Motion for Bond | 1096 |
| 21 | 7/28/2022 | Longhorn Motion to Stay re 3 Motion for Bond, including Attachment 1 (Memorandum in Support) | 1115 |
| 26 | 8/1/2022 | Micron's Memorandum in Opposition to 7 Longhorn's Motion to Dismiss | 1131 |
| 29 | 8/4/2022 | Longhorn's Reply in support of 21 Longhorn Motion to Stay | 1167 |
| 32 | 8/8/2022 | Memorandum Decision and Order Denying 21 Longhorn's Motion to Stay | 1175 |
| 35 | 8/11/2022 | Longhorn's Response to 3 Micron's Motion for Bond, including attachments (1-15) | 1182 |
| 39 | 9/6/2022 | State of Idaho – Motion to Intervene, including attachment 1 (Memorandum in Support) | 1497 |
| 42 | 9/27/2022 | Order Granting State of Idaho's Motion to Intervene | 1510 |
| 48 | 2/14/2023 | Transcript of Motion Hearing Proceedings held on 1/10/2023 | 1544 |
| | 1/10/2023 | Katana and Longhorn's Slides from Hearing on Katana and Longhorn's Motions to Dismiss and Micron's Motion for Bond | 1612 |
| | 1/10/2023 | Micron's Slides from Hearing on Katana and Longhorn's Motions to Dismiss and Micron's Motion for Bond | 1654 |
| 56 | 6/30/2023 | Longhorn and Katana's Motion to Stay, including Attachments 1-6 | 1707 |

| 59 | 8/2/2023 | Micron's Opposition To Longhorn And Katana's Motion To Stay | 1991 |
|----|----------|-------------------------------------------------------------|------|
| 61 | 11/2/23 | Memorandum Decision and Order | 2326 |
| 1 | 3/4/2022 | Katana Complaint, including Attachments 1-4 | 2340 |
| 13 | 6/6/2022 | Micron Answer and Counterclaim | 2469 |
| 14 | 6/6/2022 | Micron's Opposed Motion to Transfer, including Attachments 1-21 | 2531 |
| 21 | 7/6/2022 | Katana Response in Non-Opposition to 14 Micron's Motion to Transfer | 2747 |
| 22 | 7/8/2022 | Order Granting 14 Micron Motion to Transfer | 2749 |
| 27 | 7/11/2022 | Katana Motion to Dismiss Counterclaim, including Attachment 1 (Memorandum in Support) | 2770 |

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KATANA SILICON TECHNOLOGIES LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>MICRON TECHNOLOGY, INC, et al.,<br><br>                    Defendants. | Case No. 1:22-cv-00282-DCN<br>Case No. 1:22-cv-00273-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |
| MICRON TECHNOLOGY, INC., et al.,<br><br>                    Plaintiffs,<br><br>    v.<br><br>LONGHORN IP, LLC,<br><br>                    Defendants. | |

## I. INTRODUCTION

Before the Court are three motions from two connected actions: Micron's Motion for Bond (Longhorn Dkt. 3), Longhorn's Motion to Dismiss (Longhorn Dkt. 7), and Katana's Motion to Dismiss (Katana Dkt. 27). On January 10, 2023, the Court held oral argument and took the motions under advisement. Upon review, and for the reasons below, the Court DENIES Longhorn and Katana's Motions to Dismiss and GRANTS Micron's Motion for Bond.

## II. BACKGROUND

### 1. The Act

The Idaho Bad Faith Assertions of Patent Infringement Act (the "Act") is designed

to discourage patent trolls. It makes it "unlawful for a person to make a bad faith assertion of patent infringement in a demand letter, a complaint, or any other communication." Idaho Code § 48-1703(1). It also creates a private cause of action for those targeted by bad-faith demand letters, empowering courts to grant equitable relief, costs and fees, and significant punitive damages. Idaho Code § 48-1706.

The Act contains a bond provision:

> Upon motion by a target and a finding by the court that a target has established a reasonable likelihood that a person has made a bad faith assertion of patent infringement in violation of this chapter, *the court shall require the person to post a bond* in an amount equal to a good faith estimate of the target's costs to litigate the claim and amounts reasonably likely to be recovered under this chapter, conditioned upon payment of any amounts finally determined to be due to the target . . . .

Idaho Code § 48-1707 (emphasis added).

### 2. The Parties

Micron Technology, Inc.[1] ("Micron") is a major manufacturer of semiconductors headquartered in Boise, Idaho. Longhorn IP, LLC ("Longhorn") is a patent licensing company headquartered in Texas. It does not create products or offer services. Instead, it makes money by asserting a portfolio of patents against companies that do. Through a network of affiliates,[2] it acquires and enforces patents on, among other things, semiconductors. One of its many affiliates is Katana Silicon Technologies, LLC ("Katana"), which owns patents covering semiconductor manufacturing.

---

[1] Two Micron subsidiaries are also parties: Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC.

[2] Micron alleges that this affiliate structure allows Longhorn to aggressively pursue judgments against other companies while remaining judgment-proof itself.

MEMORANDUM DECISION AND ORDER - 2

### 3. The Katana Case

On March 4, 2022, Katana sued Micron for patent infringement in the U.S. District Court for the Western District of Texas (the "Katana case"). Katana alleged certain Micron products infringed on three of its patents: No. RE38,806 (the "'806 patent"), No. 6,352,879 (the "'879 patent,"), and No.6,731,013 (the "'013 patent"). The '806 patent and the '879 patent cover miniaturized devices that allow for many semiconductor chips to be contained in a small space. These patents expired on December 30, 2018. The '013 patent covers a special wiring substrate for semiconductor devices that relieves connection failure between the semiconductor chip and the terminal section. It expired on July 5, 2021.

Micron, which had previously been sued by a different Longhorn affiliate, perceived Katana's suit to be a bad-faith assertion of patent infringement. It filed an Answer (Katana Dkt. 13) asserting a counterclaim under the Act and seeking equitable relief, costs and fees, and damages. Katana countered with a motion to dismiss Micron's counterclaim, arguing that the Act is preempted because the federal government, not the states, regulates patents. Katana Dkt 27. Micron then asked the U.S. District Court for the Western District of Texas to transfer the Katana case to the District of Idaho and the court agreed. Once the case was in Idaho, the State of Idaho exercised its right to intervene and defend the Act, filing a memorandum in opposition to Katana's Motion to Dismiss. Katana Dkt. 43.

### 4. The Longhorn Case

The same day Micron filed its Answer and counterclaim in Texas, it sued Longhorn, which allegedly controls Katana, in Idaho state court (the "Longhorn case"). The Longhorn

case alleges that the patent infringement asserted in the Katana case violated the Act. Under Section 48-1707, Micron asked the court to impose a $15 million bond on Longhorn and Katana, asserting that this amount was a good faith estimate of its costs to litigate the claim and the amount reasonably likely to be recovered. *See* Longhorn Dkt. 1-6, at 2–3. Longhorn removed the case here and then moved to dismiss, raising the same constitutional arguments it did in the Katana case. Once again, the State intervened to defend the Act.

Both the Katana and Longhorn cases are now before the Court.

## III. LEGAL STANDARD

### A. Motion to Dismiss

Federal Rule of Civil Procedure 8 requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The *Iqbal/Twombly* "facial plausibility" standard is met when a complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, citing *Twombly*, 550 U.S. at 556. Accordingly, to avoid dismissal for failure to state a claim, a complaint must provide sufficient factual allegations to show that there is "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

A court "need not assume the truth of legal conclusions cast in the form of factual allegations." *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). Rule 8 "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. If a complaint fails to state a plausible claim, "'[a] district court

should grant leave to amend even if no request to amend the pleading was made, unless it

determines that the pleading could not possibly be cured by the allegation of other facts.'"

*Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (cleaned up).

**B. Motion for Bond**

The Act gives courts nine factors to consider in determining whether a patent is

asserted in bad faith:

> (a) [A] person sends a demand letter to a target without first
> conducting an analysis comparing the claims in the patent to
> the target's products, services or technology.
> (b) The demand letter does not contain the following
> information:
>> (i) The patent number;
>> (ii) The name and address of the patent owner or owners
> and assignee or assignees, if any; and
>> (iii) The factual allegations concerning the specific
> areas in which the target's products, services and technology
> infringe the patent or are covered by the claims in the patent.
> (c) The demand letter does not identify specific areas in which
> the products, services and technology are covered by the
> claims in the patent.
> (d) The demand letter demands payment of a license fee or
> response within an unreasonably short period of time.
> (e) The person offers to license the patent for an amount that is
> not reasonably based on the value of a license to the patent.
> (f) The person asserting a claim or allegation of patent
> infringement acts in subjective bad faith, or a reasonable actor
> in the person's position would know or reasonably should
> know that such assertion is meritless.
> (g) The claim or assertion of patent infringement is deceptive.
> (h) The person or its subsidiaries or affiliates have previously
> filed or threatened to file one (1) or more lawsuits alleging
> patent infringement based on the same or similar claim, the
> person attempted to enforce the claim of patent infringement
> in litigation and a court found the claim to be meritless.
> (i) Any other factor the court finds relevant.

Section 48-1703. The Act provides another four factors a court may consider in

determining a patent is *not* asserted in bad faith:

> (a) The person engages in a good faith effort to establish that the target has infringed the patent and to negotiate an appropriate remedy.
> (b) The person makes a substantial investment in the use of the patent or in the production or sale of a product or item covered by the patent.
> (c) The person has:
> > (i) Demonstrated good faith in previous efforts to enforce the patent, or a substantially similar patent; or
> > (ii) Successfully enforced the patent, or a substantially similar patent, through litigation.
> (d) Any other factor the court finds relevant.

*Id.*

## IV. ANALYSIS

The motions at issue raise three major questions. First, is the Act preempted by federal law? Second, has the applicable statute of limitations run? Finally, has Micron pleaded enough facts to state a plausible claim under the Act, and on those facts, is a bond warranted?

### A. Federal Preemption

Longhorn and Katana argue that the Act "cannot exist alongside U.S. patent laws in our federal system" and so is preempted under the Supremacy Clause. Longhorn Dkt. 7-1, at 15. The Supremacy Clause dictates that federal law is "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Thus, federal law preempts incompatible state laws. *See Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015). Preemption comes in three forms: express preemption, field preemption, and conflict preemption. *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1113–14 (9th Cir. 2022). Field and conflict

preemption are types of implied preemption. *Id.* at 1114.

### 1. *Express Preemption*

Congress may expressly preempt a state law by passing targeted federal legislation. *Id.* Here, no party has submitted—and the Court has not found—any federal statute expressly preempting the Act. Further, the Federal Circuit has held that federal patent law does not generally preempt state unfair competition law, which the Act could be read to be. *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1332–33 (Fed. Cir. 1998), overruled on other grounds by *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999). For these reasons, the Court finds that the Act is not expressly preempted.

### 2. *Implied Preemption*

Federal statutes may impliedly preempt state ones. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). The Supreme Court, however, has sometimes applied a presumption against implied preemption. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009). In *Wyeth*, the Court applied the presumption and upheld a state law regulating drug labelling, despite noting that the Federal government had historically regulated this field. *Id.* (establishing an "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."). *But see Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) (refusing to apply the presumption to a fraud case against a federal agency because the relationship between federal agencies and regulated parties is "inherently federal in character"); *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 14 (2013)

MEMORANDUM DECISION AND ORDER - 7

(declining to apply the presumption to a state law governing voter-registration officials because state regulation of congressional elections "has always existed subject to the express qualification that it terminates according to federal law").

Patent law is quintessentially federal. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156 (1989). States have no authority to issue patents or protect intellectual property in similar ways. *Id.* But they do have authority to protect businesses and regulate unfair competition. *See Hunter Douglas*, 153 F.3d at 1332–33.

This case pits the federal government's exclusive right to issue and regulate patent protections against Idaho's police power to protect its businesses from harassment. Though the question is close, the Court finds that the fundamentally federal nature of patents weighs against applying the presumption. Thus, because of the inherently federal subject matter at issue here, the Court will address the implied preemption arguments without applying any presumption.

Implied preemption can be divided into two general categories: field preemption and conflict preemption. *Association des Eleveurs de Canards*, 33 F.4th at 1114. The Court will address each one in turn.

### a. Field Preemption

Field preemption occurs "when the scope of a federal statute indicates that Congress intended federal law to occupy a field exclusively." *Kurns v. R.R. Friction Prod. Corp.*, 565 U.S. 625, 630 (2012) (cleaned up). Here, the federal government occupies the field of patent issuance. *See Bonito Boats*, 489 U.S. at 156 (1989). Still, state law is not displaced just because it relates to intellectual property. *Id.* "[T]he states are free to regulate the use

of . . . intellectual property in any manner not inconsistent with federal law." *Id.* (quoting *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979)). "The case for federal preemption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Wyeth*, 555 U.S. at 575 (quoting *Bonito Boats*, 489 U.S. at 166–167).

Here, more than half of the states[3] have adopted statutes outlawing bad-faith patent assertion. These state laws do not establish quasi-patent protections. Instead, they allow damages against those who abuse the federal patent system. Congress, by contrast, has neither passed legislation outlawing bad faith patent assertion nor established a standard for finding bad faith.[4]

By choosing not to legislate on the issue of bad-faith patent assertion, Congress has created a policy vacuum. Many states have stepped into that vacuum to protect local businesses from shakedowns at the hands of patent trolls. Considering there are more than 30 state acts prohibiting bad faith patent assertion, it is reasonable to assume that Congress knows about these acts and that its continued silence constitutes acquiescence. *See Wyeth*, 555 U.S. at 575. Thus, the Court finds that field preemption does not render the Act

---

[3]  *Guide to State Patent Legislation*, Patent Progress, (May 1, 2019), https://web.archive.org/web/20190911174618/https://www.patentprogress.org/patent-progress-legislation-guides/patent-progresss-guide-state-patent-legislation/ (identifying thirty-three states with bad faith patent assertions statutes) (accessed via the Wayback Machine as the site appeared on Sep. 11, 2019).

[4]  The federal standard for finding bad faith is the product of caselaw, not legislation. *See Globetrotter Software, Inc. v. Elan Comput. Grp., Inc.*, 362 F.3d 1367, 1375–77 (Fed. Cir. 2004) (holding that bad faith has both an objective and subjective component).

unconstitutional.

### b. Conflict Preemption

"[C]onflict preemption arises when state law conflicts with a federal statute." *Ass'n des Éleveurs de Canards*, 33 F.4th at 1114. Conflict preemption has at least two subcategories of its own: impossibility preemption and obstacle preemption. *See id.*

### i. Impossibility Preemption

Impossibility preemption occurs "where it is impossible for a private party to comply with both state and federal law." *Crosby*, 530 U.S. at 372. Here, Longhorn and Katana argue that the Act conflicts with federal law in at least two ways. Both arguments involve the way courts apply allegedly competing standards, not the way private parties comply with them. The Court will nevertheless consider whether the Act makes it impossible for courts to apply both state and federal standards.

First, Longhorn and Katana argue the Act contradicts Federal law because it improperly substitutes a set of decision-making factors for the federal standard—a simple presumption of good faith. Federal law dictates that "[a] patent shall be presumed valid." 35 U.S.C.A. § 282; *see also C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998) ("the assertion of a duly granted patent is [presumed to be] made in good faith."). "This presumption is overcome only by affirmative evidence of bad faith." *C.R. Bard, Inc.*, 157 F.3d at 1369. The Act, on the other hand, supplies courts with a series of factors to consider in determining whether a patent is being asserted in bad faith. The list is open ended: it includes the catch-all "[a]ny other factor the court finds relevant." Idaho Code §§ 48-1703(2)(i); 48-1703(3)(d).

MEMORANDUM DECISION AND ORDER - 10

The Act does not make compliance with federal law impossible. In fact, it plays in close harmony with the federal standard. By providing examples of evidence that might overcome the presumption of good faith, the state legislature has not supplanted that presumption. If anything, the Act facilitates the application of the federal standard by illustrating what kinds of behavior could constitute bad faith. The list of factors, which includes "any other factor the court finds relevant," leaves courts free to consider and follow federal guidance. Idaho Code §§ 48-1703(2)(i); 48-1703(3)(d).

It is true that the Act contains factors a court may consider "as evidence that a person has *not* made a bad faith assertion of patent infringement." Idaho Code § 48-1703(3)(3) (emphasis added). The inclusion of these factors, however, does not negate the presumption of good faith, nor does the Act require courts to make an affirmative finding of good faith before a patent may be enforced. The Act is concerned only with bad faith patent assertion, not general patent enforcement, and the language of Section 48-1703 is remarkably permissive. It offers factors that courts *may* consider, including—twice—a sweeping catch-all that invites courts to consider whatever other factors they find relevant. *See* Idaho Code §§ 48-1703(2)(i); 48-1703(3)(d). How, (and whether), a court applies the factors is left to the judge's discretion.

Because a court must follow federal law, the factors in Section 48-1703 are best viewed as a supplement to the federal standard, not an obstacle to it. Courts must apply the factors in a manner consistent with the federal presumption of good faith, and nothing in the Act prevents them from doing so. For these reasons, the Court finds that the factors in Section 48-1703 are compatible with federal law and do not engage

impossibility preemption.

Second, Longhorn and Katana argue the Act impermissibly allows courts to find that patents are being asserted in bad faith without specifically finding evidence of both objective and subjective bad faith, as Federal law requires. State laws creating liability for asserting a patent "are preempted by federal patent laws, unless the claimant can show that the patent holder acted in bad faith." *Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1304 (Fed. Cir. 2018). Bad faith requires a showing that the claims of infringement are both objectively baseless and asserted in subjective bad faith. *Globetrotter Software, Inc. v. Elan Comput. Grp., Inc.*, 362 F.3d 1367, 1375–77 (Fed. Cir. 2004).

Here, in a single factor, the Act provides that courts may consider whether "[t]he person asserting a claim or allegation of patent infringement acts in subjective bad faith, or a reasonable actor in the person's position would know or reasonably should know that such assertion is meritless." Idaho Code § 48-1703(2)(f).

Unlike the Federal standard, which requires a specific finding of both objective and subjective bad faith, the Act's factor could be read to permit consideration of only one or the other. The problem is the difference between "and" and "or." This inconsistency in conjunctions might create an issue, were it not for the catch-all clauses in Section 48-1703, which allow courts to consider any other factor they find relevant. *See* Idaho Code §§ 48-1703(2)(i); 48-1703(3)(d). Courts applying the Act must consider the federal standard—requiring both objective and subjective findings—as a relevant factor, and the Act allows them to do so. The Act and federal law are not mutually exclusive, and so impossibility preemption does not apply.

MEMORANDUM DECISION AND ORDER - 12

### ii. Obstacle Preemption

Obstacle preemption occurs where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373. "[S]tate regulation of intellectual property must yield to the extent that it clashes with the balance struck by Congress in our patent laws." *Bonito Boats,* 489 U.S. at 152. In *Bonito Boats*, a Florida statute barred people from duplicating a proprietary molding process used for making boat hulls, or selling duplicated hulls, effectively granting this unpatented molding process greater protection than it would have received under federal patent laws. *Id.* at 144–45. The Supreme Court held that this state law improperly upset the balance of interests Congress struck in its patent laws, and so was preempted. *Id.* at 152. The Court held that, when it is clear how patent laws strike the balance between "the desire to freely exploit the full potential of our inventive resources and the need to create an incentive to deploy those resources," the states may not second guess Congress' judgment by passing more stringent intellectual property protections. *See id.*

Similarly, at least one federal court has found that a state may not disrupt the "congressionally chosen calculus of litigation incentives and disincentives" by providing for attorneys' fees in patent cases other than those available under federal law. *Bldg. Innovation Indus., LLC v. Onken*, 473 F. Supp.2d 978, 986–88 (D. Ariz. 2007).

The Federal Patent Act ("Patent Act") is Congress' primary effort to balance what *Bonito Boats* called "the desire to freely exploit the full potential of our inventive resources" against "the need to create an incentive to deploy those resources." 489 U.S. at 152. To discourage patent infringement, the Patent Act sets a floor for the damages a

MEMORANDUM DECISION AND ORDER - 13

successful patentee can receive: nothing less "than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C.A. § 284. It also sets a ceiling: "the court may increase the damages up to three times the amount found or assessed." *Id.*

The Patent Act discourages egregious abuse of the patent system. It provides that courts may, "in exceptional cases," award reasonable attorney fees to a prevailing party. 35 U.S.C. § 285. This provision, which Congress added in 1945, "enabled courts to address unfairness or bad faith in the conduct of the losing party." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 548 (2014) (cleaned up); *see also Pennsylvania Crusher Co. v. Bethlehem Steel Co.*, 193 F.2d 445, 451 (3rd Cir. 1951) (listing "vexatious or unjustified litigation" as adequate justification for awarding attorneys' fees). Congress recodified the provision in 1952, adopting its current language, but the change did not substantively alter its meaning. *See Octane Fitness*, 572 U.S. at 549. In *Octane Fitness*, the Supreme Court expanded the applicability of this provision, holding that "something less than bad faith" could warrant fee shifting. *Id.* at 555.

Here, the Act strikes a similar balance to the one struck by Congress. It expresses a strong policy against patent infringement:

> (b) . . . Patent holders have every right to enforce their patents when they are valid and infringed, to solicit interest from prospective licensees and to initiate patent enforcement litigation as necessary to protect intellectual property.

> (c) The legislature does not wish to interfere with the good faith enforcement of patents or good faith patent litigation. The legislature also recognizes that Idaho is preempted from passing any law that conflicts with federal patent law.

MEMORANDUM DECISION AND ORDER - 14

**Appx14**

Idaho Code § 48-1701(b)–(c). Though it does not set a floor, it does set a ceiling for the damages a successful party may be entitled to if it proves a patent has been asserted in bad faith. A court may grant a successful plaintiff his actual costs and damages, plus exemplary damages of fifty thousand dollars or three times the total of his damages, costs and fees, whichever is greater. Idaho Code § 48-1706(1).

Longhorn and Katana complain that the Act unfairly chills patentees' ability to enforce their rights: "[b]y regulating federal lawsuits and allowing for quadruple damages, an up-front bond, and injunctive relief, [the Act] strikes a lopsided balance of the rights of patentees and apparent infringers and poses an obstacle to the 'full purposes and objectives' of federal patent laws." Longhorn Dkt. 71, at 19. The Court disagrees.

The Act does not stand as an obstacle to the policy goals Congress expressed in the Patent Act. Both the state Act and the federal Patent Act have the end goal of protecting valid patents without enabling bad-faith or vexatious litigation.

The fee-shifting provision in the Patent Act—which the Supreme Court recently expanded and emphasized in *Octane Fitness*, is especially relevant. Through that provision, Congress intended to allow courts to penalize abusive or bad-faith patent litigation—the identical aim the Idaho Legislature had in passing the Act. Remarkably, the fee-shifting provision in the Patent Act requires a lower evidentiary threshold than the threshold in the Act. Compare 35 U.S.C. § 285 (allowing fee-shifting in "exceptional cases") with Idaho Code Section 48-1703 (allowing damages when a court finds affirmative evidence of bad faith); *Octane Fitness*, 572 U.S. at 555 (holding that the federal Patent Act requires

"something less than bad faith") with *Globetrotter Software,* 362 F.3d at 1375–77 (holding that state laws creating liability for patent assertion require a showing that the claims of infringement are both objectively baseless and asserted in subjective bad faith). The Act has the same essential purposes as the Patent Act and goes no further than its federal counterpart in pursuing them. There is no conflict of purpose or objective here.

Longhorn and Katana nevertheless assert that there is a conflict of method and execution. They argue that the Act threatens to upset at least one federal policy balance by allowing higher damages for successful defendants than the Patent Act allows successful plaintiffs. The Federal Patent Act allows a court to give successful plaintiffs treble damages. Functionally, the state Act allows a court to grant successful defendants quadruple damages. This disparity allows the inference that the Idaho legislature views bad-faith patent assertion as a bigger problem than Congress does and has attempted to alter the "congressionally chosen calculus of litigation incentives" accordingly. *Onken*, 473 F. Supp.2d at 987.

*Bonito Boats* held this type of alteration would be inappropriate in the context of a state law providing quasi-patent protections. And *Onken* suggests it would be inappropriate in the context of a state law creating new fee shifting provisions separate from those already in the federal Patent Act. Neither decision, however, fits neatly with the facts here.

Besides addressing mirror-opposite state activity (in *Bonito Boats,* Florida was trying to protect IP owners from infringement by businesses; here, Idaho is trying to protect businesses from harassment by IP owners), *Bonito Boats* forbade states from upsetting Congress' solution to the problem of how to motivate creators without stifling creativity.

MEMORANDUM DECISION AND ORDER - 16

Unlike that high-level, strategic compromise, this case implicates a more tactical compromise: should the risks and potential rewards of litigation favor IP owners or businesses?

Congress has not directly addressed this issue in the context of bonds and damages. *Onken* expressly addresses this tactical compromise, but only in the context of attorneys' fees, which are already provided for by the Patent Act. By contrast, there is no federal statute on bad faith assertion of patent infringement. The distinction is important because fee shifting alone does not address the entire calculus of litigation incentives: it may not be an effective deterrent against patent trolls who have compartmentalized their liability and assets to avoid the potential negative consequences of litigation.[5] Damages and bonds are a developing part of the calculus, which Congress has yet to weigh in on. As discussed, this is an area where Congress has been content to let states do the legislating—and courts asked to review those state acts have upheld their constitutionality. *See NAPCO, Inc. v. Landmark Tech. A, LLC*, 555 F. Supp. 3d 189, 212 (M.D.N.C. 2021) (upholding a North Carolina bad-faith patent assertion statute providing for quadruple damages); *Landmark Tech., LLC v. Azure Farms, Inc.*, 2020 WL 1430088, at *5 (D. Or. Mar. 24, 2020)

---

[5] At least one state legislature has made such a finding:

> In lawsuits involving abusive patent assertions, an accused infringer prevailing on the merits may be awarded costs and, less frequently, fees. These awards do not serve as a deterrent to abusive patent assertion entities who have limited liability, as these companies may hold no cash or other assets. North Carolina has a strong interest in making sure that prevailing North Carolina companies sued by abusive patent assertion[] entities can recover what is awarded to them.

N.C. Gen. Stat. § 75-141(9).

MEMORANDUM DECISION AND ORDER - 17

(upholding a similar Oregon statute); *Washington v. Landmark Tech. A, LLC*, No. 2:21-cv-00728-RSM (ECF No. 35), slip op. at 12 (W.D. Wash. Oct. 28, 2022) (upholding a similar Washington statute).

The Act does not intrude on Congress' exclusive right to grant patents. Nor does it alter any policy line that Congress has expressly drawn. Without more guidance from Congress, the Court will not strike down the Act just because of the difference between triple and quadruple damages. Because the Act is not inconsistent with Congress' express policies, the Court finds that it is not an obstacle to them. *See Aronson*, 440 U.S. at 262 (upholding a contract that had the effect of a patent because it was not inconsistent with express congressional policy).

### 3. The Noerr-Pennington Doctrine

Longhorn and Katana argue that, by making it unlawful to assert bad-faith patent infringement in a complaint, the Act impermissibly interferes with the ability to sue in federal court. The *Noerr–Pennington doctrine* immunizes defendants against antitrust liability for engaging in conduct aimed at influencing decision-making by the government, including litigation. *Octane Fitness*, 572 U.S. at 555–56. Courts have applied the *Noerr-Pennington* doctrine to bar "any claim, federal or state, common law or statutory, that has as its gravamen constitutionally-protected petitioning activity." *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 955 (S.D. Cal. 1996) (collecting cases and finding that *Noerr* immunity is "constitutional and rooted in the First Amendment right to petition").

The *Noerr-Pennington* doctrine, however, does not protect defendants engaged in "sham litigation." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49,

51 (1993). Sham litigation is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Globetrotter Software*, 362 F.3d at 1376. "In other words, the plaintiff must have brought baseless claims in . . . [subjective] bad faith." *Octane Fitness*, 572 U.S. at 556. The fundamental question is one of reasonableness. *See Globetrotter Software*, 362 F.3d at 1376.

Because application of the *Noerr-Pennington* Doctrine requires a fact-intensive reasonableness determination, it is impractical to consider at the motion-to-dismiss stage. *Washington v. Landmark Tech. A, LLC*,  No. 2:21-cv-00728-RSM (ECF No. 35), slip op. at 12 (W.D. Wash. Oct. 28, 2022) (declining to decide whether Washington's bad faith patent assertion statute violated the *Noerr–Pennington* doctrine at the motion-to-dismiss stage); *see also NAPCO, Inc.*, 555 F. Supp. 3d at 215 (declining to find *Noerr-Pennington* immunity on a motion to dismiss because "reasonableness is a question of fact").

Here, the Court is asked to determine whether the Act unconstitutionally interferes with Longhorn and Katana's First Amendment right to petition the government for redress of grievances, which requires it to determine whether they are engaged in sham litigation. Both questions are fact intensive and premature at the motion-to-dismiss stage. The Court may take up these arguments upon the completion of discovery, but it will not dismiss any complaints on *Noerr-Pennington* grounds before then.

## B.  Time Bars

Longhorn and Katana argue that Micron's claims under the Act have been barred since 2021. The Act, in creating a private cause of action, also creates a limitations period:

> No private action may be brought under the provisions of this chapter more than three (3) years after the cause of action accrues. A cause of action shall be deemed to have accrued when the party bringing an action under the provisions of the chapter knows, or in the exercise of reasonable care should have known, about the violation of the provisions of this chapter. *Each bad faith assertion of patent infringement constitutes a separate violation of this chapter.*

Idaho Code § 48-1706(3) (emphasis added). The Act prohibits bad-faith assertions of patent infringement "in a demand letter, a complaint, or any other communication." Idaho Code § 48-1703(1).

Here, Micron knew about Katana and Longhorn's intent to assert their patents as early as 2018, when Katana sent demand letters and met with Micron at its Boise headquarters. Katana filed its complaint on March 4, 2022, some three years after first threatening to do so. Micron made its first claim under the Act on June 6, 2022.

It is undisputed that, for purposes of the statute of limitations, a cause of action accrued in 2018 when Micron first knew of Longhorn and Katana's intent to assert their patents. The issue is whether the Katana complaint constituted a new "assertion" of the Katana patents, or merely another step in an ongoing assertion that began in 2018. The Katana complaint, Longhorn argues, was an escalation of an existing assertion, not a new assertion that triggered a new limitations period. Micron counters that each demand letter and complaint constituted an independent assertion that triggered a distinct limitation period.[6]

---

[6] Micron also argues that Longhorn and Katana's actions constituted a continuing tort such that the statute of limitations should be tolled. The Court does not decide this question here because, at this stage of the proceedings, it is moot.

Micron is within the statute of limitations. The Act lists complaints as unlawful acts distinct from demand letters. *See* Idaho Code § 48-1703(1)) (making it "unlawful for a person to make a bad faith assertion of patent infringement *in a demand letter, a complaint, or any other communication*.") (emphasis added). Because a demand letter usually precedes a complaint, this language is redundant if a complaint that follows a demand letter does not constitute a separate assertion. Further, "[e]ach bad faith assertion of patent infringement constitutes a separate violation." Idaho Code § 48-1706(3). This provision suggests that, in commencing patent litigation against a target, a person may commit a separate violation at each step or escalation of the process, rather than committing one extended violation that begins with the demand letter and ends three years later, no matter what escalatory tactics are employed in between.

Finally, Longhorn's reading of the limitations provision would allow bad actors to defeat the Act through gamesmanship: if a patent troll can escape the Act by waiting three years between sending a demand letter and commencing litigation, the limitations provision swallows the Act. For these reasons, the Court finds that by sending a complaint, Longhorn and Katana made a new assertion that triggered a new limitations period, which has not yet run.

## C. Adequacy of the Pleadings

Longhorn and Katana argue that Micron has failed to plead a plausible claim for bad-faith patent assertion and that the Court must therefore dismiss Micron's complaint in the Longhorn case and counterclaim in the Katana case under Rules 8 and 12(b)(6).

To escape dismissal under Rule 12(b)(6), a complaint must "contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (cleaned up). This "facial plausibility" standard is met when a complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, citing *Twombly*, 550 U.S. at 556. Thus, the issue here is whether Micron's complaint contains enough factual content to state a facially plausible claim that Longhorn and Katana are liable under the Act. The Court presumes that Longhorn and Katana have asserted their patents in good faith, though this presumption may be overcome by affirmative evidence. 35 U.S.C.A. § 282; *C.R. Bard, Inc.*, 157 F.3d at 1369.

*1. Factors for Bad Faith*

The Act allows a court to make a determination of bad faith using factors including the analysis that led to sending a demand letter, Idaho Code Section 48-1703(2)(a), the nature of the demand letter and the information it contained, Section 48-1703(2)(b)–(c), the sum of money sought in the demand letter, Section 48-1703(2)(d)–(e), the subjective and objective good faith of the patentee, Section 48-1703(2)(f), the patentee's history of assertion, and any deception present in the assertion. Idaho Code § 48-1703(2)(g)–(h).

a. Section 48-1703(2)(a)

Under Section 48-1703(2)(a), Micron has pleaded enough facts to support a conclusion that Katana sent a demand letter without first conducting an adequate analysis comparing its patents to Micron's products. Micron's complaint distinguishes the subject matter of the Katana patents from that of the allegedly infringing Micron products. For example, the asserted '806 patent covers a semiconductor device sealed with a resin, which

the allegedly infringing Micron product does not contain, being sealed instead with a "thermoplastic encapsulant." Micron asserts that, had Longhorn and Katana properly compared the patents against the allegedly infringing products, it would have discovered such a critical difference.

### b.  Section 48-1703(2)(b)–(c)

There is no information in the pleadings about whether the demand letters contained the patent number, name and address of the patent owner, or the specific areas in which Micron's products infringed on covered claims. Without this information, the factors in Section 48-1703(2)(b)–(c) do not weigh either for or against bad faith.

### c.  Section 48-1703(2)(d)–(e)

The pleadings do not mention the sum of money that Longhorn and Katana sought from Micron in the demand letters. Thus, the factors in Section 48-1703(2)(d)–(e) are not probative either.

### d.  Section 48-1703(2)(f)

Micron has pleaded sufficient facts to support a conclusion that Longhorn and Katana acted in subjective bad faith. In its initial demand letter, Katana "in what can only be characterized as a thinly-veiled threat . . . pointed out that its . . . patents had been asserted against other companies." Dkt. 1-4, at 12. When the parties later met at Micron's Boise headquarters, "Longhorn communicated that the amounts demanded would increase as time passed because Longhorn was only just beginning its campaign of seeking licensing fees from companies based on the Katana portfolio. In [the Longhorn's principal]'s words, they were offering Micron an 'early bird special.'" Dkt. 1-4, at 14–15. Later, Longhorn's

MEMORANDUM DECISION AND ORDER - 23

representative suggested that Micron look over the patents in the portfolio of another Longhorn affiliate, Carthage Silicon Innovations, LLC. Micron took this suggestion to mean that Longhorn intended to pursue every available avenue to assert patent infringement claims against Micron, no matter which affiliate held the patents or how applicable those patents were.

Further, Micron has pleaded sufficient facts to support a conclusion that Longhorn and Katana's claims are objectively meritless. Micron pleads that the asserted patents are invalid. First, according to Micron's complaint, the asserted patents have expired. The '879 and '806 patents expired on December 30, 2018, and the '013 patent expired on July 5, 2021.

Micron further alleges that these patents are invalid "because the technology claimed in [them] was known, discussed in literature, described in other patents, and used in multiple commercially available products, all prior to the priority dates of the Katana patents." Dkt. 1-4, at 15. Micron's complaint takes pains to list, for each asserted patent, preexisting inventions and literature describing the same innovations that Longhorn and Katana claim their patents cover. For example, as early as 1998, Intel Corporation had developed a semiconductor package with the same key elements as the subject matter of the '879 patent. Thus, Micron has adequately pleaded that Longhorn and Katana have acted in objective and subjective bad faith.

e.   <u>Section 48-1703(2)(g)</u>

Micron has pleaded enough facts to support a conclusion that Longhorn and Katana's assertion of patent infringement is deceptive. Micron's complaint says that

"Longhorn purports to assert claims of ongoing, current infringement for expired patents"—in other words, that it engages in deception. Micron's complaint further alleges that Katana is a mere puppet of Longhorn, which drives the bad-faith patent assertion through its affiliates. Though Longhorn otherwise portrays itself as a completely separate entity, it lists its affiliates' patent portfolios on its website in a manner suggesting it considers those patents to be its own assets. The sole manager and member of Longhorn is also the sole member and manager of each of its affiliates. Longhorn is represented by the same counsel as Katana and appears to have identical interests. Katana informed Micron that, to escape liability, it would need to secure licenses from two other Longhorn affiliates: Hamilcar Barca IP, LLC, and Trenchant Blade Technologies, LLC. On these facts, it is plausible that Longhorn and Katana have portrayed both their patents and themselves deceptively.

      f.   Section 48-1703(2)(h)

Micron has pleaded enough facts to indicate that Longhorn and Katana have filed or threatened to file lawsuits based on a similar claim that was meritless. Micron claims to have a history with one of Longhorn's affiliates, Lone Star Silicon Solutions, LLC, ("Lone Star") who sued Micron for patent infringement in 2016. In that case, the Patent Trial and Appeal Board ruled the disputed patents were invalid—the covered inventions were not patentable because "the subject matter as a whole would have been obvious to a person of ordinary skill in the art at the time of the invention of the patents." Dkt. 1-4, at 10. Judge Alsup, of the Northern District of California, dismissed the district court litigation and "criticized Lone Star for having incorrectly stated that it was the sole owner of the asserted

patents and having engaged in a 'litigation gimmick.'" Dkt 1-4, at 10. Micron agreed to pay Lone Star a sum in exchange for a promise not to appeal.

In its Complaint, Micron alleges that Longhorn is a non-practicing entity with a pattern of asserting patents in bad faith through a network of affiliates. Longhorn and Katana do not use their patents in commerce. Their only business is litigation. Longhorn and Katana may have made a substantial investment in purchasing the patents, but it was not an investment in research or development.

### 2. *Factors Against Finding Bad Faith*

As factors to consider in finding that the patentee *is not acting in bad faith*, the Act lists the patentee's good-faith efforts to negotiate an appropriate remedy, Idaho Code Section 48-1703(3)(a), the patentee's investment in the use of the patent or use of it in manufacturing, Section 48-1703(3)(b), the patentee's history of successfully enforcing the patent in good faith, Section 48-1703(3)(c), and any other factor the court finds relevant. Idaho Code § 48-1703(3)(d). Because patents are already presumed to be asserted in good faith, the Court does not consider these factors to be probative and will not analyze them. *See infra* section A2(b)(*i*) (discussing the federal presumption of good faith and its interplay with the factors in Idaho Code Section 48-1703(3)(a)–(d)).

The bottom line is that Micron's complaint pleads enough facts to allow a finding under the statutory factors that Longhorn and Katana acted in bad faith. This is enough affirmative evidence, if accepted as true, to overcome the presumption of good faith. Thus, Micron has stated a claim under the Act and dismissal is inappropriate. For all the reasons above, Longhorn and Katana's motions to dismiss are DENIED.

*1. Bond*

As an initial matter, the Court is constitutionally empowered to impose a bond. When sitting in diversity—as this Court is in the Longhorn case—federal courts apply state substantive law and federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). In *Ice Castles, LLC, v. LaBelle Lake Ice Palace, LLC*, 2021 WL 3085479, at *3 (D. Idaho July 21, 2021), the Court declined to wade into the "vexing question" of whether the Act's bond provision was substantive or procedural. After a review of similar statutes from other states, however, the Court is satisfied that the bond is not merely procedural—it is a substantive provision that discourages bad-faith patent assertion in and of itself.

North Carolina's equivalent statute, for instance, provides for both damages and a bond because patent trolls "may hold no cash or other assets" to pay a damages award and the state "has a strong interest in making sure that prevailing . . . companies sued by abusive patent assertion[] entities can recover what is awarded to them." N.C. Gen. Stat. § 75-141(9). The bond provision thus serves a similar purpose to the damages provisions and furthers the purpose of the statute. Though the Act does not explicitly list such a finding, the Court is persuaded that the same rationale applies. Further, if the Court were to find that the provision was procedural, it would create a forum shopping problem: plaintiffs would favor the state courts where the bond provision was available, while defendants would favor the federal courts. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 839 (9th Cir. 2020) (holding that, in distinguishing substantive and procedural laws, courts must be cognizant of *Erie*'s dual aims: "discouragement of forum-shopping and avoidance of inequitable administration of the laws"). Because the bond provision is substantive, it is

MEMORANDUM DECISION AND ORDER - 27

within the power of the Court to impose a bond.

The Act provides the standard for imposing a bond. Idaho Code § 48-1707. If, using the Section 48-1703 factors, a court determines there is a reasonable likelihood that a patent is being asserted in bad faith, it must require the party asserting the patent to "post a bond in an amount equal to a good faith estimate of the target's costs to litigate the claim and amounts reasonably likely to be recovered" under the Act. *Id.*

Unlike the 12(b)(6) standard, which requires facial plausibility, the Act requires merely "a reasonable possibility." Thus, the Court must determine whether there is a reasonable possibility that Longhorn and Katana asserted infringement in bad faith.

Because the higher 12(b)(6) standard has been satisfied, the lower statutory standard is also necessarily satisfied. The above analysis on the motion to dismiss serves also to show that, under the Act, a bond is required.

Micron asserts that the Court should require a bond of $15 million. It reached this number by using the American Intellectual Property Law Association's report on the cost of defending patent suits. This report estimates that the cost to litigate against a non-practicing entity over one patent from motion practice through to appeal is $4,558,000, assuming that more than $25 million is at stake. Dkt. 15-37, at 17. Micron acknowledges that Longhorn has not yet made a specific demand for damages. Nevertheless, Micron relies on this $25-million-plus estimate from the report to calculate that the cost of defending a three-patent case is $3.75 million. That amount, plus treble damages, brings its estimate to $15 million.

There is no reason to find that this estimate is made in bad faith. The Act, however,

MEMORANDUM DECISION AND ORDER - 28

does not obligate the Court to reflexively accept a party's good faith estimate—in fact, it does not specify who, between the parties and the Court, is responsible for making such an estimate. *See* Idaho Code § 48-1707 (providing for a bond "in an amount equal to a good faith estimate of the target's costs to litigate the claim and amounts reasonably likely to be recovered . . .").

The Court accepts Micron's estimate as it relates to litigation over a single patent. That is, a conservative estimate of litigating a single-patent suit from pre-trial through to appeal is $1.25 million. The Court rejects, however, the assumption that, by tripling that sum, one can accurately predict the cost of litigating a three-patent suit. Although patent litigation does become more expensive the more patents are at issue, there are significant efficiencies inherent in bundling disputed patents together into a single suit. For instance, depositions need only be taken once—not three times—and pleadings likewise need only be filed once. Thus, for purposes of this suit, the Court finds that the additional two patents could be reasonably expected to increase Micron's cost of litigation by a total of $.75 million. Two million dollars, therefore, is a good-faith estimate of Micron's costs to litigate the claims and an amount reasonably likely to be recovered under the Act. That sum, plus treble damages, yields an $8 million bond. The Court will impose a bond in that amount. Micron's Motion for Bond is GRANTED.

## V. CONCLUSION

The Court finds that the Act is not preempted by federal law, that its limitations period has not run, and that Micron has adequately pleaded a claim under it. Accordingly, the Court will DENY Longhorn and Katana's Motions to Dismiss and GRANT Micron's

Motion for Bond.

## IV. ORDER

1. Longhorn's Motion to Dismiss (Case 1:22-cv-00273, Dkt. 7) is DENIED.

2. Katana's Motion to Dismiss (Case 1:22-cv-00282, Dkt. 27) is DENIED.

3. Micron's Motion for Bond (Case 1:22-cv-00273, Dkt. 3) is GRANTED.

   a. Longhorn or Katana must post a bond of $8 million before the Katana case (1:22-cv-00282) may proceed further.

4. This order will be entered in both cases.

DATED: May 3, 2023

David C. Nye
Chief U.S. District Court Judge



US00RE38806E

(19) **United States**

(12) **Reissued Patent** (10) Patent Number: **US RE38,806 E**

Fukui et al. (45) **Date of Reissued Patent:** **Oct. 4, 2005**

(54) **SEMICONDUCTOR DEVICE AND METHOD OF MANUFACTURING THE SAME**

(75) Inventors: **Yasuki Fukui**, Tenri (JP); **Yoshiki Sota**, Nara (JP); **Yuji Matsune**, Tenri (JP); **Atsuya Narai**, Yamatokoriyama (JP)

(73) Assignee: **Sharp Kabushiki Kaisha**, Osaka (JP)

(21) Appl. No.: **10/428,013**

(22) Filed: **May 2, 2003**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **6,229,217**
     Issued: **May 8, 2001**
     Appl. No.: **09/604,079**
     Filed: **Jun. 27, 2000**

U.S. Applications:
(63) Continuation of application No. 09/223,272, filed on Dec. 30, 1998, now Pat. No. 6,100,594.

(30) **Foreign Application Priority Data**

Jan. 14, 1998    (JP) ................................................. 10-5221

(51) Int. Cl.[7] .......................... **H01L 23/48**; H01L 23/52
(52) U.S. Cl. ........................ **257/777**; 257/685; 257/686
(58) Field of Search ................................. 257/777, 685, 257/686, 723, 724, 778; 438/108, 109, 110, 107

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,077,724 A  *  6/2000  Chen ........................... 438/107

FOREIGN PATENT DOCUMENTS

JP          5-90486      *  4/1993
JP          9-121002     *  5/1997

* cited by examiner

*Primary Examiner*—S. V. Clark
(74) *Attorney, Agent, or Firm*—Nixon & Vanderhye, P.C.

(57) **ABSTRACT**

A first semiconductor chip is produced by affixing a thermo-compression sheet to the back surface of a wafer having a circuit formed on its front surface. The first semiconductor chip is mounted on a circuit board including an insulating substrate and a wiring layer provided on the insulating substrate so that the back surface of the first semiconductor chip faces the circuit board. A second semiconductor chip produced in the same manner as the first semiconductor chip is mounted on the first semiconductor chip with its back surface facing the first semiconductor chip. Each of the first and second semiconductor chips is wire-bonded to the wiring layer with a wire. The first and second semiconductor chips and the wire are sealed with a sealing resin. The wiring layer is connected to external connection terminals through via holes provided in the insulating substrate.

**33 Claims, 15 Drawing Sheets**



FIG.1



FIG.2(a)



FIG.2(b)



FIG.3(a)



FIG.3(b)



FIG.4





FIG.5(a)

FIG.5(b)

FIG.5(c)

FIG.5(d)

FIG.5(e)

FIG.5(f)

FIG.5(g)

FIG.6 (a)



FIG.6 (b)



FIG.7(a)



FIG.7(b)



FIG.8(a)



FIG.8(b)



FIG.9(a)



FIG.9(b)



FIG.10





FIG.11(a)

FIG.11(b)

FIG.11(c)

FIG.11(d)

FIG.11(e)

FIG.11(f)

FIG.11(g)

FIG.12(a)



FIG.12(b)



FIG.13(a)



FIG.13(b)



FIG.14(a)



FIG.14(b)



FIG.15



US RE38,806 E

1

# SEMICONDUCTOR DEVICE AND METHOD OF MANUFACTURING THE SAME

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

This is a continuation of application Ser. No. 09/223,272, filed Dec. 30, 1998, now U.S. Pat. No. 6,100,594, the entire content of which is hereby incorporated by reference in this application.

## FIELD OF THE INVENTION

The present invention relates to a semiconductor device and a method of manufacturing the same, and more particularly relates to a semiconductor device having a structure substantially miniaturized to a chip size, i.e., a CSP (Chip Size Package) structure, and a method of manufacturing such a semiconductor device.

## BACKGROUND OF THE INVENTION

Miniaturization of a semiconductor device is in progress so as to achieve a high-density semiconductor device for use on a printed circuit board. Recently, a semiconductor device substantially miniaturized to a chip size has been developed. The structure of such a miniaturized semiconductor device is called a CSP structure. Japanese Publication of Unexamined Patent Application No. 121002/1997 (Tokukaihei 9-121002) discloses a semiconductor device having the CSP structure shown in FIG. 13(a). This semiconductor device includes a semiconductor chip 42 disposed with its circuit formed surface facing up, and wires 43 for electrically connecting the semiconductor chip 42 to a wiring pattern 47. The above publication discloses another semiconductor device having the CSP structure shown in FIG. 13(b). This semiconductor device includes a semiconductor chip 64 disposed with its circuit formed surface facing down, and a bump electrode 70 for electrically connecting the semiconductor chip 64 to a wiring pattern 66.

In FIG. 13(a), 41 is a wiring component, 42 is a semiconductor chip, 43 is a wire, 44 is a resin sealing member, 45 is a substrate, 46 is a throughhole, 47 is a wiring pattern, 48 is an insulating material, 49 is an external connection-use terminal, 50 is an external connection area, 51 is an electrode, 52 is a window opening section, and 53 is an inner connection area. In FIG. 13(b), 61 is a throughhole, 62 is a wiring component, 63 is an electrode, 64 is a semiconductor chip, 65 is a resin sealing member, 66 is a wiring pattern, 67 is an inner connection area, 68 is an external connection area, 69 is an external connection-use terminal, and 70 is a bump electrode.

In some devices such as portable devices, a plurality of semiconductor chips are mounted in a package so as to increase the added value and capacity of memory, etc. For example, a multi-chip module is provided with a plurality of semiconductor chips arranged parallel to each other in a package. However, such an arrangement makes it impossible to produce a package smaller than the total area of the semiconductor chips to be mounted. In order to solve the problem, a stacked package including a plurality of semiconductor chips laminated in a package to achieve a high packaging density is disclosed in Japanese Publication of Unexamined Patent Application No. 90486/1993 (Tokukaihei 5-90486).

Specifically, the semiconductor devices disclosed in the above publication are each packaged in ceramic packages

2

and arranged in the following manner. In one of the semiconductor devices, a pair of semiconductor chips are adhered to each other with their back surfaces where a circuit is not formed facing each other, and are mounted on another pair of semiconductor chips via metal bumps. In the other semiconductor device, a pair of semiconductor chips are adhered to each other with the circuit formed surface of one semiconductor chip facing the back surface of the other semiconductor chip.

The above-mentioned stacked package is a small high-density semiconductor device. However, a semiconductor device smaller than such a stacked package has been required. For that reason, a semiconductor device having a CSP structure as well as a stacked package structure is required to be produced.

In a semiconductor device having a CSP structure where the semiconductor chips are laminated, an adhesive agent (paste) potting method and a method using a thermo-compression sheet are utilized for bonding the semiconductor chip to the substrate, and for bonding the laminated semiconductor chips to each other.

In the potting method, if the amount of the adhesive agent is excessive, a large amount of adhesive agent spreads beyond the outer edge of the semiconductor chip. For example, as shown in FIG. 14(a), when bonding semiconductor chips 81 and 82 to each other with their back surfaces facing each other, an adhesive agent 87 between the semiconductor chips 81 and 82 overflows. In addition, as shown in FIG. 15, in the step of wire-bonding the semiconductor chip 82 disposed on the top to an electrode section of a wiring layer 84 (before a sealing resin 89 and packaging-use external terminals 90 are formed), wiring on an insulating substrate 83 must be provided far from the side surfaces of the semiconductor chips 81 and 82 so as to keep the overflown adhesive agent 87a from coming into contact with a jig 92 of a wire bonder. Such an arrangement causes the package size to be increased in the end. Furthermore, as shown in FIG. 14(b), when bonding the back surface of the semiconductor chip 82 to the circuit formed surface of the semiconductor chip 81, the overflown adhesive agent 87a may stick to an electrode pad provided on the semiconductor chip 81.

On the other hand, if the amount of the adhesive agent is too small, a gap is produced between the semiconductor chips 81 and 82. This gap cannot be filled with the sealing resin 89, thereby causing problems such as separation of the semiconductor chip 82 from the semiconductor chip 81.

The method using a thermo-compression sheet requires the steps of placing members at the right locations. Specifically, a thermo-compression sheet having the same size as the semiconductor chip 82 must be placed accurately at a specific location on the semiconductor chip 81. In addition, the semiconductor chip 82 must be bonded to the thermo-compression sheet so as to be located exactly on the top of the thermo-compression sheet.

In FIGS. 14(a) and 14(b), 85 is an insulating sheet, 86 is a metal bump, and 91 is an adhesive sheet.

## SUMMARY OF THE INVENTION

An object of the present invention is to provide a further-miniaturized semiconductor device having a stacked package structure as well as a CSP structure.

In order to achieve the above object, a semiconductor device in accordance with the present invention has a

US RE38,806 E

3

stacked package structure and a chip size package structure and is characterized in including:

an insulating substrate including a wiring layer having electrode sections;

a first semiconductor chip having a first insulating adhesion layer adhered to its back surface where a circuit is not formed, the first semiconductor chip being mounted on the wiring layer through the first insulating adhesion layer; and

a second semiconductor chip having a second insulating adhesion layer adhered to its back surface where a circuit is not formed, the second semiconductor chip being mounted on a circuit-formed front surface of the first semiconductor chip through the second insulating adhesion layer;

each of the first and second semiconductor chips being wire-bonded to the electrode section with a wire, the first and second semiconductor chips and the wire being sealed with a resin.

In the above structure, the first semiconductor chip and the second semiconductor chip are each wire-bonded to the electrode section provided on the wiring layer with the wires, and the second insulating adhesion layer is used for affixing the second semiconductor chip to the first semiconductor chip. This structure eliminates the need for wire-bonding the first and second semiconductor chips to points on the wiring layer, far from the side surfaces of the first and second semiconductor chips, considering a situation in which the excessively applied adhesive agent overflows the space between the first and second semiconductor chips. Therefore, a miniaturized, high-density semiconductor device can be realized.

Furthermore, in the case of using a thermo-compression sheet, when mounting the first or second semiconductor chip at a desired location, accurate positioning is required twice, i.e., positioning the thermo-compression sheet, etc., and positioning the first or second semiconductor chip on the thermo-compression sheet. In contrast, the second insulating adhesion layers according to the present invention are in advance disposed on the back surfaces of the first and second semiconductor chips, respectively. Therefore, the first or second semiconductor chip can be mounted at a desired location by accurately positioning it once. It is thus possible to miniaturize the semiconductor device without complicating its manufacturing process.

A semiconductor device in accordance with the present invention can be arranged to include:

an insulating substrate including a wiring layer having electrode sections;

a first semiconductor chip having a circuit formed on its front surface and an insulating adhesion layer adhered to its back surface;

a metal bump, disposed between the first semiconductor chip and the wiring layer, for bump-bonding the front surface of the first semiconductor chip to the wiring layer so that the front surface faces the wiring layer; and

a second semiconductor chip whose back surface where a circuit is not formed is mounted on the back surface of the first semiconductor chip through the insulating adhesion layer;

the second semiconductor chip being wire-bonded to the electrode section of the wiring layer with a wire, the first and second semiconductor chips and the wire being sealed with a resin.

In the above arrangement, the first semiconductor chip is connected to the wiring layer through the metal bump, the

4

second semiconductor chip is wire-bonded to the electrode sections on the wiring layer with wires, and the back surfaces of the first and second semiconductor chips are adhered to each other by the insulating layer. This arrangement eliminates the need for wire-bonding the second semiconductor chip to points on the wiring layer, far from the side surfaces of the first and second semiconductor chips, considering a situation in which the excessively applied adhesive agent overflows the space between the first and second semiconductor chips. Therefore, a miniaturized, high-density semiconductor device can be realized.

In the case of using the thermo-compression sheet, when mounting the second semiconductor chip on the first semiconductor chip, accurate positioning is required twice in a conventional manufacturing method, i.e., positioning the thermo-compression sheet on the first semiconductor chip, and positioning the second semiconductor chip on the thermo-compression sheet. However, the insulating adhesion layer according to the present invention is disposed on the back surface of the second semiconductor chip in advance. Therefore, the second semiconductor chip can be mounted at a desired location on the first semiconductor chip by accurately positioning it once. It is thus possible to miniaturize the semiconductor chip without complicating its manufacturing process.

A method of manufacturing a semiconductor device in accordance with the present invention includes the steps of:

(a) forming a first insulating adhesion layer on a back surface of a first wafer having a circuit formed on its front surface;

(b) producing separate first semiconductor chips from the first wafer by dicing;

(c) mounting the first semiconductor chip on a wiring layer with its back surface facing the wiring layer;

(d) forming a second insulating adhesion layer on a back surface of a second wafer having a circuit formed on its front surface;

(e) producing separate second semiconductor chips from the second wafer by dicing;

(f) mounting the second semiconductor chip on the first semiconductor chip with its back surface facing the first semiconductor chip;

(g) wire-bonding the first semiconductor chip to an electrode section of the wiring layer with a wire;

(h) wire-bonding the second semiconductor chip to an electrode section of the wiring layer with a wire; and

(i) sealing the first and semiconductor chips and the wires.

With the above manufacturing method, since the first or second semiconductor chip has the first or second insulating adhesion layer adhered to its back surface in advance when being in the wafer state, the first or second semiconductor chip can be mounted at a desired location without the step of accurately positioning the first or second insulating adhesion layer on the first or second semiconductor chip. It is thus possible to simplify the process of manufacturing the semiconductor chip.

Moreover, in the above manufacturing method, the adhesive agent does not overflow the space between the first and second semiconductor chips, the first and second semiconductor chips can be wire-bonded to the wiring layer at a location closer to the edges of the first and second semiconductor chips. It is thus possible to realize a miniaturized, high-density semiconductor device.

A method of manufacturing a semiconductor device in accordance with the present invention including the steps of:

(a) forming an insulating layer and a metal bump on a wiring layer;

US RE38,806 E

5

(b) mounting a first semiconductor chip on the wiring layer with its circuit-formed surface facing the wiring layer;

(c) forming an insulating adhesion layer on a back surface of a wafer having a circuit formed on its front surface;

(d) producing separate second semiconductor chips from the wafer by dicing;

(e) mounting the second semiconductor chip on the first semiconductor chip with its back surface facing the first semiconductor chip;

(f) wire-bonding the second semiconductor chip to the wiring layer with a wire; and

(g) sealing the first and second semiconductor chips and the wire.

In this manufacturing method, like the above-mentioned method of the present invention, since the second semiconductor chip has the insulating adhesion layer adhered to its back surface in advance when being in the wafer state, the second semiconductor chip can be mounted at a desired location without the step of accurately positioning the insulating adhesion layer on the second semiconductor chip. It is thus possible to simplify the process of manufacturing the semiconductor chip.

Furthermore, in the above manufacturing method, the adhesive agent does not overflow the space between the first and second semiconductor chips, the second semiconductor chip can be wire-bonded to the wiring layer at a location closer to the edges of the first and second semiconductor chips. It is thus possible to realize a miniaturized, high-density semiconductor device.

For a fuller understanding of the nature and advantages of the invention, reference should be made to the ensuing detailed description taken in conjunction with the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a cross-sectional view of a semiconductor device in accordance with the first embodiment of the present invention.

FIG. 2(a) is a plan view of a circuit board before being cut, and FIG. 2(b) is a partially enlarged view of the circuit board shown in FIG. 2(a).

FIG. 3(a) is an explanatory view showing an arrangement of ball-like external connection-use terminals, and FIG. 3(b) is an explanatory view showing an arrangement of trapezoidal external connection-use terminals.

FIG. 4 is an explanatory view showing how laminated semiconductor chips are each wire-bonded to the circuit board.

FIGS. 5(a) to 5(g) show one example of a process of manufacturing the semiconductor device.

FIG. 6(a) is a partially enlarged view of the circuit board including a wiring layer disposed on one surface of an insulating substrate, and FIG. 6(b) is a partially enlarged view of a circuit board including a wiring layer disposed on each surface of the insulating substrate.

FIG. 7(a) is an explanatory view showing a wiring state when two laminated semiconductor chips are connected to the same electrode section, and FIG. 7(b) is an explanatory view showing another state that the two laminated semiconductor chips are connected to the same electrode section.

FIG. 8(a) is an explanatory view showing a wiring state that the two laminated semiconductor chips are connected to different electrode sections, and FIG. 8(b) is an explanatory view showing another wiring state that the two laminated semiconductor chips are connected to different electrode sections.

6

FIG. 9(a) is an explanatory view showing one example of an arrangement of dummy pads formed on a first semiconductor chip, and FIG. 9(b) is an explanatory view showing another example of the arrangement of the dummy pads disposed on the first semiconductor chip.

FIG. 10 is a cross-sectional view of a semiconductor device in accordance with the second embodiment of the present invention.

FIGS. 11(a) to 11(g) show one example of a process for manufacturing the semiconductor device.

FIG. 12(a) is a perspective view showing that a second semiconductor chip in the semiconductor device in accordance with the first embodiment or the second embodiment protrudes from a first semiconductor chip, and FIG. 12(b) is a perspective view showing that the second semiconductor chip is reinforced.

FIG. 13(a) is a cross-sectional view showing a semiconductor device having a CSP structure manufactured by a conventional wire bonding method, and FIG. 13(b) is a cross-sectional view showing a semiconductor device having a CSP structure manufactured by a conventional face-down bonding method.

FIGS. 14(a) and 14(b) are cross-sectional views of conventional semiconductor devices having a stacked package structure.

FIG. 15 is a cross-sectional view of the semiconductor device shown in FIG. 14(a) during manufacturing.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

Embodiment 1

The following descriptions will explain one embodiment of the present invention with reference to FIGS. 1 to 9.

As shown in FIG. 1, in a semiconductor device according to this embodiment, a first semiconductor chip 1 and a second semiconductor chip 2 are laminated in this order on a circuit board 5 including an insulating substrate 3 and a wiring layer 4 mounted on the insulating substrate 3. Regarding the first semiconductor chip 1 and the second semiconductor chip 2, the surface (front surface) on which an element is formed is hereinafter referred to as a "circuit formed surface", and the surface opposite thereto is referred to as a "back surface".

The semiconductor chip 1 is disposed with its back surface facing the insulating substrate 3. The second semiconductor chip 2 is mounted on the circuit formed surface of the first semiconductor chip 1 through a thermo-compression sheet (adhesion layer) 6 so that its back surface is adhered to the thermo-compression sheet 6.

The semiconductor device in accordance with the present embodiment is arranged so that the second semiconductor chip 2 is mounted on the circuit formed surface of the first semiconductor chip 1. With this arrangement, the second semiconductor chip 2 on the top of the first semiconductor chip 1 does not influence (interfere with) electrode pads of the first semiconductor chip 1. The circuit formed surface of the first semiconductor chip 1 is in advance coated with an insulating-resin, etc. Namely, the coating is applied to the circuit formed surface of the first semiconductor chip 1 by a spin coating method, etc. when the first semiconductor chip 1 is in a wafer state before subjected to dicing. In this case, the coating material on the electrode pads (not shown) disposed on the circuit formed surface of the first semiconductor chip 1 is removed.

US RE38,806 E

7

The first semiconductor chip **1** and the second semiconductor chip **2** are each connected (wire-bonded) to electrode sections of the wiring layer **4** on the insulating substrate **3** with wires **7**.

The first semiconductor chip **1**, the second semiconductor chip **2** and the wires **7**, arranged as above, are covered by a sealing resin **8**.

The insulating substrate **3** includes via holes **9** at the locations corresponding to below-described land sections **12** constituting the wiring layer **4**. Ball-like packaging-use external terminals **10** are connected in an area-array-like arrangement to the land sections **12** through the via holes **9** from the side of the insulating substrate **3**, on which side the first semiconductor chip **1** and the second semiconductor chip **2** are not formed.

Next, the following descriptions will explain in further detail the above-mentioned members constituting the semiconductor device in accordance with the present embodiment.

FIG. 2(a) is a plan view of the circuit board **5** before being cut in the process of manufacturing the semiconductor device. As shown in FIG. 2(a), four guide holes **11** are formed in both side sections of the insulating substrate **3** (the upper part and the lower part of the insulating substrate **3** in FIG. 2(a)) of circuit board **5** before being cut. The guide holes **11**a formed in one of the side section and the guide holes **11**b formed in the other side section have different shapes. These guide holes **11** are used for transporting the semiconductor device during its manufacturing process.

The material of the insulating substrate **3** is not particularly limited, and a resin substrate or a film having excellent heat resistance is acceptable. The insulating material **3** may be a resin substrate, etc. made of, for example, polyimide, epoxy resin containing glass fiber, bismaleid triazine (BT) resin, polyester, polyamide, fluororesin, ceramic, and polyester containing glass fiber. Polyimide is the most preferable of the above materials.

FIG. 2(b) is a partially enlarged view of the circuit board **5** shown in FIG. 2(a), showing the structure of the wiring layer **4**. As shown in FIG. 2(b), the wiring layer **4** includes the land sections **12**, electrode sections **13**, and wiring sections **14**, disposed on the insulating substrate **3**. Each of the wiring sections **14** connects the land section **12** to the electrode section **13**.

The electrode sections **13** are formed on both ends of the wiring layer **4** (the left part and the right part of the wiring layer **4** in FIG. 2(b)). As explained in detail later, each of the electrode section **13** is connected to the first semiconductor chip **1** or the second semiconductor chip **2** by the wire **7**. Therefore, the electrode sections **13** are located outside the area of the wiring layer **4**, where the first semiconductor chip **1** and the second semiconductor chip **2** are mounted.

The land section **12** is a packaging-use external terminal forming section for connecting the packaging-use external terminal **10** and the wiring layer **4** through the via hole **9** of the insulating substrate **3**.

The first semiconductor chip **1** can be completely insulated from the wiring layer **4** by, for example, providing a sheet of an insulating resin on an area of the wiring layer **4** where the first semiconductor chip **1** is to be mounted or applying an insulating resin coating to the area of the wiring layer **4**. The wiring layer **4** is made of copper (Cu), aluminum (Al), gold (Au), nickel (Ni), and other materials. Cu is particularly preferable because it is less costly. Methods of forming the wiring layer **4** on the insulating substrate **3** include a vapor deposition method and a plating method. In

8

order to pattern the wiring layer **4** to form a desired pattern, a conventional photolithography method can be utilized.

FIG. 3(a) is a view seen from the back side of the semiconductor device shown in FIG. 1, i.e., the side where the packaging-use external terminals **10** are disposed. As shown in FIG. 3(a), ball-like packaging-use external terminals **10** are disposed in an area-array-like arrangement, and connected to the land sections **12** provided on the wiring layer **4**. The packaging-use external terminals **10** are not limited to a ball-like shape, and may have a trapezoidal shape as shown in FIG. 3(b).

Each of the wires **7** is used for connecting the electrode pad disposed on the first semiconductor chip **1** or the second semiconductor chip **2** to the electrode section **13** of the wiring layer **4**. In a conventional semiconductor device, a gold ball provided on only one end of the wire is in contact with the electrode pad of the first semiconductor chip or the second semiconductor chip, and the other end of the wire is connected to the electrode section of the wiring layer on the insulating substrate. Here, the gold ball can be provided on only one end of the wire. The gold ball is brought into contact with the electrode pad by imposing a load lighter than the load applied in connecting, by thermo-compression bonding, the wire to the electrode section of the wiring layer on the insulating substrate. This is because connecting the wires to the semiconductor chips by thermo-compression bonding, i.e., by application of a heavy load, increases the possibility of damaging the semiconductor chips.

However, the above conventional arrangement has the following problem. Namely, the wires, especially those connected to the second semiconductor chip, are connected to the electrode sections of the wiring layer provided on the circuit board at a small angle with respect to the circuit board. Therefore, the wire is connected to the circuit board, far from the end of the first semiconductor chip.

In order to solve the problem, in the semiconductor device according to the present embodiment, the first semiconductor chip **1** and the second semiconductor chip **2** are each wire-bonded to the circuit board **5** as shown in FIG. **4**. The first semiconductor chip **1** and the circuit board **5** are wire-bonded in the same manner as the conventional semiconductor device. Then, the wire **7** is connected to the circuit board **5** with a gold ball **7**a provided on one end of the wire **7**. Thereafter, the other end of the wire **7** is connected, by thermo-compression boding, to a gold bump **16** formed on the electrode pad of the second semiconductor chip **2** in advance so as to connect the second semiconductor chip **2** to the circuit board **5**.

Since wire-bonding between the second semiconductor chip **2** and the circuit board **5** is performed as above, the wire **7** connected to the second semiconductor chip **2** is connected to the circuit board **5** at an angle closer to 90° with respect to the circuit board **5**. Therefore, the wire **7** is connected to the circuit board **5** at a closer location to the end of the first semiconductor chip **1**, thereby enabling further miniaturization of the semiconductor device in accordance with the present embodiment.

The wire **7** is connected to the gold bump **16** by thermo-compression bonding by a load nearly equal to the load applied when connecting the wire **7** to the electrode section of the wiring layer **4** on the insulating substrate **3** by thermo-compression bonding. However, by using the gold bump **16**, the stress applied to the second semiconductor chip **2** can be lowered. It is thus possible to reduce the possibility that the second semiconductor chip **2** is damaged by a heavy load applied thereto.

US RE38,806 E

**9**

The gold bump 16 is formed by connecting a gold ball, provided on the end of the wire by the conventional method, to the electrode pad on the second semiconductor chip 2, and then cutting the wire 7. Thereafter, by making the upper surface of the gold bump 16 flat with a stamping jig, the wire 7 can be surely affixed to the gold bump 16 by thermo-compression bonding.

Note that the first semiconductor chip 1 and the circuit board 5 can be wire-bonded to each other in the same manner as the above-mentioned wire-bonding of the second semiconductor chip 2 and the circuit board 5.

The following descriptions will explain one example of the process (including steps (1) to (5)) for manufacturing the semiconductor device in accordance with the present embodiment with reference to FIGS. 5(a) to 5(g).

(1) First, the first semiconductor chip 1 is mounted on the circuit board 5 (see FIG. 5(a)). When the first semiconductor chip 1 is in a wafer state, the insulating thermo-compression sheet 6 is adhered to the back surface of the wafer. Then, the wafer is cut to produce separate pieces of first semiconductor chips 1. The first semiconductor chip 1 is mounted on the circuit board 5 at a location inside a mount location recognition-use mark 15 provided on the circuit board 5. Here, instead of providing the thermo-compression sheet 6 in advance when the first semiconductor chip 1 is in the wafer state, an insulating paste made of epoxy resins, etc. may be applied onto the circuit board 5 before the first semiconductor chip 1 is mounted on the circuit board 5.

(2) Next, the second semiconductor chip 2 is mounted on the circuit formed surface of the first semiconductor chip 1 (see FIG. 5(b)). When the second semiconductor chip 2 is in the wafer state, the insulating thermo-compression sheet 6 is adhered to the back surface of the wafer, and then the wafer is cut to produce separate pieces of second semiconductor chips 2. The second semiconductor chip 2 is accurately positioned at a specific location on the circuit formed surface of the first semiconductor chip 1.

By affixing the thermo-compression sheet 6 to the back surface of the second semiconductor chip 2 in advance, accurate positioning is necessary only when mounting the second semiconductor chip 2 on the first semiconductor chip 1. Therefore, since one step requiring accurate positioning is omitted in the process for manufacturing the semiconductor device in accordance with the present embodiment, this manufacturing process is simplified compared with the conventional process in which the thermo-compression sheet 6 is disposed on the circuit formed surface of the first semiconductor chip 1, and then the second semiconductor chip 2 is adhered to the thermo-compression sheet 6.

(3) Then, each of the electrode pads (not shown) disposed on the first semiconductor chip 1 and the second semiconductor chip 2 is connected, with the wire 7 made of Au, to the electrode section 13 formed in the wiring layer 4 on the circuit board 5. More specifically, the first semiconductor chip 1 and the wiring layer 4 are first electrically connected to each other (see FIG. 5(c)), and then the second semiconductor chip 2 and the wiring layer 4 are electrically connected to each other (see FIG. 5(d)). Since the first semiconductor chip 1 and the second semiconductor chip 2 are each electrically connected to the wiring layer 4 in the above order, it is possible to avoid such a problem that the wire 7 for connecting the first semiconductor chip 1 to the circuit board 5 and the wire 7 for connecting the second semiconductor chip 2 to the circuit board 5 across each other, and prevent connection of the first semiconductor chip 1 to the circuit board 5.

**10**

(4) Thereafter, each of the packaging-use external terminals 10 is disposed on the location where the via hole 9 is provided on the insulating substrate 3 on the circuit board 5 (see FIG. 5(f)). Here, positioning the packaging-use external terminal 10 is performed in such a manner that a solder ball is temporarily fixed to each via hole 9, heated in a reflow furnace, and then joined to the land section 12. Methods of temporarily fixing the solder ball to the via hole 9 include a method in which the solder ball is affixed to the via hole 9 after applying a flux to the via hole 9, and a method in which the solder ball is affixed to the via hole 9 after adhering the flux to the solder ball.

(5) Finally, a plurality of semiconductor devices produced on the circuit board 5 are divided into pieces of semiconductor devices (see FIG. 5(d)) by cutting the insulating substrate 3 along its unnecessary part, i.e., along the outer edge of the sealing resin 8 of each semiconductor device. Methods of cutting the insulating substrate 3 include a punching method using die, and an eximer laser cutting method.

As shown in FIG. 6(a), the semiconductor device in accordance with the present embodiment includes the wiring layer 4 on only one of the surfaces of the insulating substrate 3. However, the wiring layer 4 can be provided on both surfaces of the insulating substrate 3 as shown in FIG. 6(b).

When the wiring layer 4 is formed on both surfaces of the insulating substrate 3, as shown in FIG. 6(b), the wiring layers 4 on the respective surfaces are electrically connected to each other through the plated via holes 9 as shown in FIG. 6(b). Regarding the wiring layer 4 on the side of the insulating substrate 3, the side where the first semiconductor chip 1 is not mounted, the area where the packaging-use external terminals 10 are not to be formed are covered with a solder resist 20, etc. In the area which is not covered with the solder resist 20, i.e., the area where the packaging-use external terminals 10 are to be provided, the packaging-use external terminals 10 are arranged in an area-array-like pattern.

When connecting the first semiconductor chip 1 and the second semiconductor chip 2 to the electrode sections 13 of the wiring layer 4 with the wires 7, if the wires 7 become too close to each other because of the layout of the electrode pads of the first semiconductor chip 1 and the second semiconductor chip 2, the wires 7 can be arranged as below.

When connecting the first semiconductor chip 1 and the second semiconductor chip 2 to the same electrode section 13 of the wiring layer 4, two arrangements shown in FIGS. 7(a) and 7(b) are acceptable. In the arrangement shown in FIG. 7(a), the electrode section 13 of the wiring layer 4, to which two wires 7 are connected, is arranged to have two parts. In the arrangement shown in FIG. 7(b), an electrode pad 17a of the first semiconductor chip 1 is connected to an electrode pad 17b of the second semiconductor chip 2 with the wire 7, and the electrode pad 17a is connected to the electrode section 13 of the wiring layer 4 with the wire 7, thereby connecting each of the electrode pads 17a and 17b to the electrode section 13.

When connecting the first semiconductor chip 1 and the second semiconductor chip 2 to different electrode sections 13 of the wiring layer 4, two arrangements shown in FIGS. 8(a) and 8(b) are acceptable. In the arrangement shown in FIG. 8(a), the electrode pad 17a of the first semiconductor chip 1 and the electrode pad 17b of the second semiconductor chip 2 are each connected directly to the electrode section 13 of the wiring layer 4 with the wire 7. In the arrangement shown in FIG. 8(b), dummy pads 18 are

US RE38,806 E

**11**

provided on the first semiconductor chip **1**, and the electrode pad **17**b disposed on the second semiconductor chip **2** is connected to the electrode section **13** of the wiring layer **4** via the dummy pad **18**. This arrangement shown in FIG. **8**(b) is more preferable because the overhanging part of the wire **7** is shorter than that in the arrangement shown in FIG. **8**(a).

FIGS. **9**(a) and **9**(b) show examples of the arrangement of the dummy pads **18** provided on the first semiconductor chip **1**.

### Embodiment 2

With reference to FIGS. **10** to **12**, the following descriptions will explain the second embodiment of the present invention. The members having the same structure as those in the above-mentioned first embodiment will be designated by the same reference numbers and their description will be omitted.

A semiconductor device in accordance with the present embodiment is arranged as shown in FIG. **10**. Specifically, a first semiconductor chip **21** is mounted on a circuit board **5** with its circuit formed surface facing the circuit board **5**, i.e., facing down. The circuit board **5** includes an insulating substrate **3**, and a wiring layer **4** formed on the insulating substrate **3**. A second semiconductor chip **22** is mounted on the back surface of the first semiconductor chip **21** through a thermo-compression sheet **6**. The back surface of the second semiconductor chip **22** faces the first semiconductor chip **21**. Namely, the back surfaces of the first semiconductor chip **21** and the second semiconductor chip **22** are adhered to each other through the thermo-compression sheet **6**. The thermo-compression sheet **6** is provided as an adhesion layer for holding the second semiconductor chip **22** on the first semiconductor chip **21**.

The first semiconductor chip **21** is electrically connected to first electrode sections (not shown) provided in the wiring layer **4** through metal bumps **23**. The first electrode sections are disposed inside an area of the wiring layer **4**, where the first semiconductor chip **21** is mounted.

Meanwhile, the second semiconductor chip **22** is electrically connected to second electrode sections (not shown) provided in the wiring layer **4** with wires **7**. Since the second electrode sections are used for wire-bonding the second semiconductor chip **22** to the wiring layer **4**, they are disposed outside the area of the wiring layer **4**, where the first semiconductor chip **21** and the second semiconductor chip **22** are mounted.

A resin sheet **24** is provided between the first semiconductor chip **21** and the wiring layer **4**. The resin sheet **24** is formed by extending a resin sheet used in the step of connecting the first semiconductor chip **21** to the wiring layer **4** through the metal bumps **23**.

If electrode pads provided on the circuit formed surface of the first semiconductor chip **21** are made of Al, the metal bumps **23** are preferably made of Au which is easily alloyed with Al. With this arrangement, the metal bumps **23** can be more firmly affixed to the electrode pads.

The material for forming the resin sheet **24** may be a thermoplastic resin or a thermosetting resin. However, the thermoplastic resin is more favorable than the thermosetting resin because the resin sheet **24** is used for the following purpose. Namely, it is used so that the resin extends by heat applied in connecting the first semiconductor chip **21** to the wiring layer **4** with the metal bumps **23**, covers the metal bumps **23** as junctions, and prevents degradation of the junctions caused by shock, etc.

The resin sheet **24** can be a three-layer resin sheet including a layer of a light blocking material such as metallic

**12**

foil. With this arrangement, it is possible to prevent a malfunction of the first semiconductor chip **21** due to a light incident from the surface where the packaging-use external terminals **10** are mounted passing through the semiconductor device. In this case, the size of the metallic foil must be such that the metallic foil is out of contact with the metal bumps **23**.

Although the semiconductor device in accordance with the present embodiment uses the resin sheet **24**, the following arrangement is also acceptable. Namely, the semiconductor chip **21** is mounted without using the resin sheet **24**, and then the space produced at a junction of the first semiconductor chip **21** and the wiring layer **4** is filled with a liquid resin, etc., thereby covering the metal bumps **23** as the junctions.

Next, referring to FIGS. **11**(a) to **11**(g), the following descriptions will explain the process (including steps (1) to (7)) for manufacturing the semiconductor device in accordance with the present embodiment.

(1) First, the resin sheet **24** and the metal bumps **23** are disposed on the circuit board **5** (see FIG. **11**(a)). In this case, each of the metal bumps **23** is disposed on the first electrode section provided in the wiring layer **4** on the circuit board **5**. The resin sheet **24** is disposed on the circuit board **5** at the location where the first semiconductor chip **21** and the second semiconductor chip **22** are to be mounted.

(2) Next, the first semiconductor chip **21** is connected to the wiring layer **4** on the circuit board **5** by a flip chip method in a face-down mode (see FIG. **11**(b)).

(3) Then, the second semiconductor chip **22** is mounted on the back surface of the first semiconductor chip **21** (see FIG. **11**(c)). When the second semiconductor chip **22** is in a state of wafer, the insulating thermo-compression sheet **6** is adhered to the back surface of the wafer, and then the wafer is cut to produce chips, i.e., separate pieces of second semiconductor chips **22**. The second semiconductor chip **22** is accurately positioned at a specific location on the circuit formed surface of the first semiconductor chip **21**.

Like the manufacturing process described in the first embodiment, the process for manufacturing the semiconductor device in accordance with the present embodiment is simplified by adhering the thermo-compression sheet **6** to the back surface of the second semiconductor chip **22** in advance.

(4) Then, the second semiconductor chip **22** is electrically connected to the wiring layer **4** on the circuit board **5** (see FIG. **11**(d)). more specifically, each of the electrode pads disposed on the circuit formed surface of the second semiconductor chip **22** is connected to the second electrode section of the wiring layer **4** with the wire **7**.

(5) Thereafter, the first semiconductor chip **21**, the second semiconductor chip **22**, and the wires **7**, provided on the circuit board **5**, are sealed with a sealing resin **8** (see FIG. **11**(e)). The method of forming the sealing resin **8** is similar to that described in the first embodiment.

(6) Then, each of the packaging-use external terminals **10** is disposed at a location of a via hole **9** formed in the insulating substrate **3** of the circuit board **5** (see FIG. **11**(f)).

(7) Finally, a plurality of semiconductor devices produced on the circuit board **5** are divided into pieces of semiconductor devices by cutting the insulating substrate **3** along the unnecessary part of the insulating substrate **3** of the circuit board **5**, i.e., along the outer edge of the sealing resin **8** of each semiconductor device unnecessary parts (see FIG. **11**(d)). The methods of cutting the insulating substrate **3** including a punching method using a die, and an eximer laser method.

US RE38,806 E

**13**

In the above-described first embodiment (and in the second embodiment), when mounting the second semiconductor chips **2** (**22**) on the first semiconductor chips **1** (**21**), if the first semiconductor chips **1** (**21**) and the second semiconductor chips **2** (**22**) have different shapes, the second semiconductor chips **2** (**22**) may protrude from the first semiconductor chips **1** (**21**) as shown in FIG. **12**(a). In this case, since the protruded part of the second semiconductor chip **2** (**22**) is of low strength, the second semiconductor chip **2** (**22**) may be possibly destroyed by shock produced when, for example, wire-bonding the electrode pads **17**b of the second semiconductor chip **2** (**22**) to the wiring layer **4**.

In order to solve the problem, as shown in FIG. **12**(b), a support member **19** having the same height and the same shape as the first semiconductor device **1** (**21**) is fixed under the protruded part of the second semiconductor chip **2** (**22**). By reinforcing the second semiconductor chip **2** (**22**) with the support member **19**, destruction thereof can be prevented. The support member **19** is preferably made of Silicon (Si) in order to reduce generation of stress, etc. against a heat load applied during and after manufacturing the semiconductor device with the CSP structure. In addition, the support member **19** has the same coefficient of linear expansion as the second semiconductor chip **2** (**22**).

The above-mentioned semiconductor devices in accordance with Embodiments 1 and 2 include two laminated semiconductor chips. However, the present invention can be arranged to include three or more laminated semiconductor chips. In this case, the third semiconductor chip can be mounted on the top of the two semiconductor chips with its circuit formed surface facing up and wire-bonded to the wiring layer **4**. Alternatively, the third semiconductor chip can be mounted on the top of the two semiconductor chips with its circuit formed surface facing down through metal bumps by providing electrode pads for disposing the metal bumps on the circuit formed surface of the second semiconductor chip **2** (**22**).

The invention being thus described, it will be obvious that the same may be varied in many ways. Such variations are not to be regarded as a departure from the spirit and scope of the invention, and all such modifications as would be obvious to one skilled in the art are intended to be included within the scope of the following claims.

What is claimed is:

**1**. A semiconductor device including a stacked package structure and a chip size package structure, comprising:
   an insulating substrate including a wiring layer having electrode sections;
   a first semiconductor chip having a first adhesion layer adhered to its back surface where a circuit is not formed, said first semiconductor chip being mounted on said wiring layer through the first [insulating] adhesion layer; and
   a second semiconductor chip having a second adhesion layer adhered to its back surface where a circuit is not formed, said second semiconductor chip being mounted on a circuit-formed front surface of said first semiconductor chip through the second [insulating] adhesion layer;
   each of said first and second semiconductor chips being wire-bonded to the electrode section with a wire, said first and second semiconductor chips and the wire being sealed with a resin.

**2**. A semiconductor device including a stacked package structure and a chip size package structure, comprising:
   an insulating substrate including a wiring layer having electrode sections;

**14**

   a first semiconductor chip having a paste applied to its back surface where a circuit is not formed, said first semiconductor chip being mounted on said wiring layer through said paste; and
   a second semiconductor chip having a second adhesion layer adhered to its back surface where a circuit is not formed, said second semiconductor chip being mounted on a circuit-formed front surface of said first semiconductor chip through the second adhesion layer;
   each of said first and second semiconductor chips being wire-bonded to the electrode section with a wire, said first and second semiconductor chips and the wire being sealed with a resin.

**3**. A semiconductor device comprising:
   an insulating substrate including a wiring layer having electrode sections;
   a first semiconductor chip having a circuit forming on its front surface and an adhesion layer adhered to its back surface;
   a metal bump, disposed between said first semiconductor chip and said wiring layer, for bump-bonding the front surface of said first semiconductor chip to said wiring layer so that the front surface faces said wiring layer; and
   a second semiconductor chip whose back surface where a circuit is not formed is mounted on the back surface of said first semiconductor chip through the adhesion layer;
   second semiconductor chip being wire-bonded to the electrode section of said wiring layer with a wire, said first and second semiconductor chips and the wire being sealed with a resin.

**4**. The semiconductor device as set forth in claim **3**, wherein the back surfaces of said first and second semiconductor chips have a same shape.

**5**. The semiconductor device as set forth in claim **3**, further comprising a light blocking layer, disposed between said first semiconductor chip and said wiring layer, for blocking a light incident from said insulating substrate.

**6**. The semiconductor device as set forth in claim **1**, wherein, when said first and second semiconductor chips have different shapes, a support member is used for supporting and fixing a protruding part of the back surface of said second semiconductor chip, which is not facing said first semiconductor chip, said support member having a same shape as the protruding part.

**7**. The semiconductor device as set forth in claim **2**, wherein, when said first and second semiconductor chips have different shapes, a support member is used for supporting and fixing a protruding part of the back surface of said second semiconductor chip, which is not facing said first semiconductor chip, said support member having a same shape as the protruding part.

**8**. The semiconductor device as set forth in claim **3**, wherein, when said first and second semiconductor chips have different shapes, a support member is used for supporting and fixing a protruding part of the back surface of said second semiconductor chip, which is not facing said first semiconductor chip, said support member having a same shape as the protruding part.

**9**. The semiconductor device as set forth in claim **6**, wherein said support member has a same coefficient of linear expansion as said second semiconductor chip.

**10**. The semiconductor device as set forth in claim **7**, wherein said support member has a same coefficient of linear expansion as said second semiconductor chip.

**15**

**11**. The semiconductor device as set forth in claim **8**, wherein said support member has a same coefficient of linear expansion as said second semiconductor chip.

**12**. The semiconductor device as set forth in claim **1**, wherein one end of the wire for connecting said first semiconductor chip to said wiring layer and the wire for connecting said second semiconductor chip to said wiring layer are connected in a first electrode pad disposed on said first semiconductor chip and a second electrode pad disposed on said second semiconductor chip, respectively, and the other ends of the wires are connected to the electrode sections of said wiring layer.

**13**. The semiconductor device as set forth in claim **2**, wherein one end of the wire for connecting said first semiconductor chip to said wiring layer and the wire for connecting said second semiconductor chip to said wiring layer are connected to a first electrode pad disposed on said first semiconductor chip and a second electrode pad disposed on said second semiconductor chip, respectively, and the other ends of the wires are connected to the electrode sections of said wiring layer.

**14**. The semiconductor device as set forth in claim **12**, wherein the wire connected to the first electrode pad in one end is a first wire and the wire connected to the second electrode pad in one end is a second wire and when the other ends of the first and second wires are bonded to the same electrode section, the electrode section is arranged to have a first electrode portion to which the first electrode pad is connected with the first wire and a second electrode portion to which the second electrode pad is connected with the second wire.

**15**. The semiconductor device as set forth in claim **13**, wherein the wire connected to the first electrode pad in one end is a first wire and the wire connected to the second electrode pad in one end is a second wire, and when the other ends of the first and second wires are bonded to the same electrode section, the electrode section is arranged to have a first electrode portion to which the first electrode pad is connected with the first wire and a second electrode portion to which the second electrode pad is connected with the second wire.

**16**. The semiconductor device as set forth in claim **12**, wherein the wire connected to the first electrode pad in one end is a first wire and the wire connected to the second electrode pad in one end is a second wire, and when the first and second electrode pads are bonded to the same electrode section, the first and second electrode pads are connected to each other by connecting the other end of the second wire to the first electrode pad, and the first electrode pad is connected to the electrode section with the first wire.

**17**. The semiconductor device as set forth in claim **13**, wherein the wire connected to the first electrode pad in one end is a first wire and the wire connected to the second electrode pad in one end is a second wire, and when the first and second electrode pads are bonded to the same electrode section, the first and second electrode pads are connected to each other by connecting the other end of the second wire to the first electrode pad, and the first electrode pad is connected to the electrode section with the first wire.

**18**. The semiconductor device as set forth in claim **12**, wherein the wire connected to the first electrode pad in one end is a first wire and the wire connected to the

**16**

second electrode pad in one end is a second wire, and when the other ends of the first and second wires are bonded to different electrode sections, a dummy pad is provided on the first semiconductor chip so as to connect the second electrode pad to said wiring layer with the second wire via the dummy pad.

**19**. The semiconductor device as set forth in claim **13**, wherein the wire connected to the first electrode pad in one end is a first wire and the wire connected to the second electrode pad in one end is a second wire, and when the other ends of the first and second wires are bonded to different electrode sections, a dummy pad is provided on the first semiconductor chip so as to connect the second electrode pad to said wiring layer with the second wire via the dummy pad.

**20**. The semiconductor device as set forth in claim **3**, further comprising an insulating layer for preventing degradation of said metal bump, said insulating layer being disposed between said first semiconductor chip and said wiring layer.

**21**. The semiconductor device as set forth in claim **20**, wherein said insulating layer includes a layer having a light blocking property and a size arranged so as not to come into contact with said metal bump.

**22**. The semiconductor device as set forth in claim **3**, further comprising a filling material for preventing degradation of said metal bump, said filling material being filled between said first semiconductor chip and said wiring layer.

**23**. A semiconductor device comprising:

an insulating substrate including a wiring layer on its surface and a packaging-use external terminal on its back surface, the wiring layer having an electrode section, the packaging-use external terminal being electrically connected to said wiring layer through a via hole;

a first semiconductor chip produced by forming a first adhesion layer on a back surface of a wafer having a desired circuit formed on its front surface and by dicing the wafer, said first semiconductor chip being mounted on said insulating substrate through the first adhesion layer; and

a second semiconductor chip produced by forming a second adhesion layer on a back surface of a wafer having a circuit formed on its front surface and by dicing the wafer, said second semiconductor chip being mounted on a circuit-formed surface of said first semiconductor chip through the second adhesion layer;

said first and second semiconductor chips being connected to the electrode section of the wiring layer with a wire, said first and second semiconductor chips and the wire being sealed with a resin.

**24**. A semiconductor device comprising:

an insulating substrate including a wiring layer on its front surface and a packaging-use external terminal on its back surface, the wiring layer having an electrode section, the packaging-use external terminal being electrically connected to said wiring layer through a via hole;

a first semiconductor chip having a desired circuit formed on its front surface, said first semiconductor chip being mounted through an insulating paste; and

a second semiconductor chip produced by forming [a] *an* [second insulating] adhesion layer on a back surface of a wafer having a desired circuit formed on its front surface and by dicing the wafer, said second semiconductor chip being mounted on a circuit-formed surface

**17**

of said first semiconductor chip through the [second insulating] adhesion layer;

said first and second semiconductor chips being connected to the electrode section of the wiring layer with a wire,

said first and second semiconductor chips and the wire being sealed with a resin.

**25**. The semiconductor device as set forth in claim **23**,

wherein, when an outer edge of said second semiconductor chip protrudes from an outer edge of said first semiconductor chip, a support member having a same thickness as said first semiconductor chip is provided under a protruding part of said second semiconductor chip.

**26**. The semiconductor device as set forth in claim **24**,

wherein, when an outer edge of said second semiconductor chip protrudes from an outer edge of said first semiconductor chip, a support member having a same thickness as said first semiconductor chip is provided under said second semiconductor chip.

**27**. A semiconductor device comprising:

a first semiconductor chip;

an insulating substrate including on its front surface a wiring layer having an electrode section; an insulating layer disposed in an area where said first semiconductor chip is to be mounted, except for a part to be connected to said first semiconductor chip; and a metal bump for making electrical connection to said first semiconductor chip, said insulating substrate including on its back surface a packaging-use external terminal electrically connected to said wiring layer through a via hole, said first semiconductor chip being mounted on the front surface of said insulating substrate by face-down bonding through said metal bump; and

a second semiconductor chip produced by forming a first adhesion layer on a back surface of a wafer having a desired circuit formed on its front surface and by dicing the wafer, said second semiconductor chip being mounted on a surface of said first semiconductor chip on which surface a circuit is not formed, through the first adhesion layer;

said second semiconductor chip being connected to the electrode section of the wiring layer with a wire, said first and second semiconductor chips and the wire being sealed with a resin.

**28**. The semiconductor device as set forth in claim **27**,

wherein the insulating layer includes a light blocking layer.

**29**. The semiconductor device as set forth in claim **27**,

wherein, when an outer edge of said second semiconductor chip protrudes from an outer edge of said first semiconductor chip, a support member having a same thickness as said first semiconductor chip is provided under a protruding part of said second semiconductor chip.

**30**. A method of manufacturing a semiconductor device comprising the steps of:

(a) forming a first insulating adhesion layer on a back surface of a first wafer having a circuit formed on its front surface;

(b) producing separate first semiconductor chips from first wafer by dicing;

**18**

(c) mounting said first semiconductor chip on a wiring layer with its back surface facing said wiring layer;

(d) forming a second insulating adhesion layer on a back surface of a second wafer having a circuit formed on its front surface;

(e) producing separate second semiconductor chips from said second wafer by dicing;

(f) mounting said second semiconductor chip on said first semiconductor chip with its back surface facing said first semiconductor chip;

(g) wire-bonding said first semiconductor chip to an electrode section of said wiring layer with a wire;

(h) wire-bonding said second semiconductor chip to an electrode section of said wiring layer with a wire; and

(i) sealing said first and second semiconductor chips and the wires.

**31**. A method of manufacturing a semiconductor device comprising the steps of:

(a) forming an insulating layer and a metal bump on a wiring layer;

(b) mounting a first semiconductor chip on said wiring layer with its circuit-formed surface facing said wiring layer;

(c) forming an insulating adhesion layer on a back surface of a wafer having a circuit formed on its front surface;

(d) producing separate second semiconductor chips from the wafer by dicing;

(e) mounting said second semiconductor chip on said first semiconductor chip with it back surface facing said first semiconductor chip;

(f) wire-bonding said second semiconductor chip to said wiring layer with a wire; and

(g) sealing said first and second semiconductor chips and the wire.

**32**. The method of manufacturing the semiconductor device as set forth in claim **30**, further comprising the steps of:

(j) forming a metal ball on each end of the wire for connecting said second semiconductor chip to the electrode section of the wiring layer;

(k) connecting one of the metal balls to said second semiconductor chip;

(l) cutting said wire; and

(m) making a surface of the metal ball connected to said second semiconductor chip flat;

said steps (j) to (m) being included between said steps (g) and (h).

**33**. The method of manufacturing the semiconductor device as set forth in claim **31**, further comprising the steps of:

(h) forming a metal ball on each end of the wire;

(i) connecting one of the metal balls to said second semiconductor chip;

(j) cutting the wire; and

(k) making a surface of the metal ball connected to said second semiconductor chip flat;

said steps (h) to (k) being included between said steps (e) and (f).

*   *   *   *   *



US006352879B1

(12) **United States Patent**
Fukui et al.

(10) Patent No.: **US 6,352,879 B1**
(45) Date of Patent: **Mar. 5, 2002**

(54) **SEMICONDUCTOR DEVICE AND METHOD OF MANUFACTURING THE SAME**

(75) Inventors: **Yasuki Fukui**, Tenri; **Yoshiki Sota**, Nara; **Yuji Matsune**, Tenri; **Atsuya Narai**, Yamatokoriyama, all of (JP)

(73) Assignee: **Sharp Kabushiki Kaisha**, Osaka (JP)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/604,081**

(22) Filed: **Jun. 27, 2000**

**Related U.S. Application Data**

(62) Division of application No. 09/223,272, filed on Dec. 30, 1998, now Pat. No. 6,100,594.

(30) **Foreign Application Priority Data**

Jan. 14, 1998 (JP) .............................................. 10-5221

(51) Int. Cl.$^7$ ........................ **H01L 21/44**; H01L 21/48; H01L 21/50

(52) U.S. Cl. ...................... **438/106**; 438/107; 438/109; 438/118; 438/127

(58) Field of Search ........................ 438/110, 107–109, 438/114, 118, 124, 458, 106; 257/777, 738, 778

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,366,933 A | * | 11/1994 | Golwalkar et al. | 438/107 |
| 5,422,435 A | * | 6/1995 | Takiar et al. | 174/52.4 |
| 5,527,740 A | * | 6/1996 | Golwalkar et al. | 438/107 |
| 5,766,986 A | * | 6/1998 | Weber et al. | 438/124 |
| 5,898,220 A | * | 4/1999 | Ball | 257/723 |
| 5,930,599 A | * | 7/1999 | Fujimoto et al. | 438/113 |
| 6,093,584 A | * | 7/2000 | Fjelstad | 438/127 |
| 6,130,483 A | * | 10/2000 | Shizuki et al. | 257/778 |
| 6,133,067 A | * | 10/2000 | Jeng et al. | 438/110 |
| 6,133,637 A | * | 10/2000 | Hikita et al. | 257/777 |
| 6,157,080 A | * | 12/2000 | Tamaki et al. | 257/738 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 5-90486 A | 4/1993 |
| JP | 9-121002 A | 5/1997 |

* cited by examiner

*Primary Examiner*—Matthew Smith
*Assistant Examiner*—Chuong A Luu
(74) *Attorney, Agent, or Firm*—Nixon & Vanderhye P.C.

(57) **ABSTRACT**

A first semiconductor chip is produced by affixing a thermo-compression sheet to the back surface of a wafer having a circuit formed on its front surface. The first semiconductor chip is mounted on a circuit board including an insulating substrate and a wiring layer provided on the insulating substrate so that the back surface of the first semiconductor chip faces the circuit board. A second semiconductor chip produced in the same manner as the first semiconductor chip is mounted on the first semiconductor chip with its back surface facing the first semiconductor chip. Each of the first and second semiconductor chips is wire-bonded to the wiring layer with a wire. The first and second semiconductor chips and the wire are sealed with a sealing resin. The wiring layer is connected to external connection terminals through via holes provided in the insulating substrate.

**15 Claims, 15 Drawing Sheets**



## FIG.1



FIG.2(a)



FIG.2(b)



FIG.3(a)



FIG.3(b)



FIG.4





FIG.5(a)

FIG.5(b)

FIG.5(c)

FIG.5(d)

FIG.5(e)

FIG.5(f)

FIG.5(g)

FIG.6 (a)



FIG.6 (b)



## FIG.7(a)



## FIG.7(b)



FIG.8(a)



FIG.8(b)



FIG.9(a)



FIG.9(b)



FIG.10





FIG.11(a)

FIG.11(b)

FIG.11(c)

FIG.11(d)

FIG.11(e)

FIG.11(f)

FIG.11(g)

Case: 23-2007    Document: 70-1    Page: 72    Filed: 07/05/2024

FIG.12(a)



FIG.12(b)



FIG.13(a)



FIG.13(b)



FIG.14(a)



FIG.14(b)

# FIG.15



US 6,352,879 B1

1

# SEMICONDUCTOR DEVICE AND METHOD OF MANUFACTURING THE SAME

This is a divisional of application Ser. No. 09/223,272, filed Dec. 30, 1998, the entire content of which is hereby incorporated by reference in this application now U.S. Pat. No. 6,100,594.

## FIELD OF THE INVENTION

The present invention relates to a semiconductor device and a method of manufacturing the same, and more particularly relates to a semiconductor device having a structure substantially miniaturized to a chip size, i.e., a CSP (Chip Size Package) structure, and a method of manufacturing such a semiconductor device.

## BACKGROUND OF THE INVENTION

Miniaturization of a semiconductor device is in progress so as to achieve a high-density semiconductor device for use on a printed circuit board. Recently, a semiconductor device substantially miniaturized to a chip size has been developed. The structure of such a miniaturized semiconductor device is called a CSP structure. Japanese Publication of Unexamined Patent Application No. 121002/1997 (Tokukaihei 9-121002) discloses a semiconductor device having the CSP structure shown in FIG. 13(a). This semiconductor device includes a semiconductor chip 42 disposed with its circuit formed surface facing up, and wires 43 for electrically connecting the semiconductor chip 42 to a wiring pattern 47. The above publication discloses another semiconductor device having the CSP structure shown in FIG. 13(b). This semiconductor device includes a semiconductor chip 64 disposed with its circuit formed surface facing down, and a bump electrode 70 for electrically connecting the semiconductor chip 64 to a wiring pattern 66.

In FIG. 13(a), 41 is a wiring component, 42 is a semiconductor chip, 43 is a wire, 44 is a resin sealing member, 45 is a throughhole, 46 is a substrate, 47 is a wiring pattern, 48 is an insulating material, 49 is an external connection-use terminal, 50 is an external connection area, 51 is an electrode, 52 is a window opening section, and 53 is an inner connection area. In FIG. 13(b), 61 is a throughhole, 62 is a wiring component, 63 is an electrode, 64 is a semiconductor chip, 65 is a resin sealing member, 66 is a wiring pattern, 67 is an inner connection area, 68 is an external connection area, 69 is an external connection-use terminal, and 70 is a bump electrode.

In some devices such as portable devices, a plurality of semiconductor chips are mounted in a package so as to increase the added value and capacity of memory, etc. For example, a multi-chip module is provided with a plurality of semiconductor chips arranged parallel to each other in a package. However, such an arrangement makes it impossible to produce a package smaller than the total area of the semiconductor chips to be mounted. In order to solve the problem, a stacked package including a plurality of semiconductor chips laminated in a package to achieve a high packaging density is disclosed in Japanese Publication of Unexamined Patent Application No. 90486/1993 (Tokukaihei 5-90486).

Specifically, the semiconductor devices disclosed in the above publication are each packaged in ceramic packages and arranged in the following manner. In one of the semiconductor devices, a pair of semiconductor chips are adhered to each other with their back surfaces where a circuit is not formed facing each other, and are mounted on another pair of semiconductor chips via metal bumps. In the other semiconductor device, a pair of semiconductor chips are adhered to each other with the circuit formed surface of one semiconductor chip facing the back surface of the other semiconductor chip.

The above-mentioned stacked package is a small, high-density semiconductor device. However, a semiconductor device smaller than such a stacked package has been required. For that reason, a semiconductor device having a CSP structure as well as a stacked package structure is required to be produced.

In a semiconductor device having a CSP structure where the semiconductor chips are laminated, an adhesive agent (paste) potting method and a method using a thermo-compression sheet are utilized for bonding the semiconductor chip to the substrate, and for bonding the laminated semiconductor chips to each other.

In the potting method, if the amount of the adhesive agent is excessive, a large amount of adhesive agent spreads beyond the outer edge of the semiconductor chip. For example, as shown in FIG. 14(a), when bonding semiconductor chips 81 and 82 to each other with their back surfaces facing each other, an adhesive agent 87 between the semiconductor chips 81 and 82 overflows. In addition, as shown in FIG. 15, in the step of wire-bonding the semiconductor chip 82 disposed on the top to an electrode section of a wiring layer 84 (before a sealing resin 89 and packaging-use external terminals 90 are formed), wiring on an insulating substrate 83 must be provided far from the side surfaces of the semiconductor chips 81 and 82 so as to keep the overflown adhesive agent 87a from coming into contact with a jig 92 of a wire bonder. Such an arrangement causes the package size to be increased in the end. Furthermore, as shown in FIG. 14(b), when bonding the back surface of the semiconductor chip 82 to the circuit formed surface of the semiconductor chip 81, the overflown adhesive agent 87a may stick to an electrode pad provided on the semiconductor chip 81.

On the other hand, if the amount of the adhesive agent is too small, a gap is produced between the semiconductor chips 81 and 82. This gap cannot be filled with the sealing resin 89, thereby causing problems such as separation of the semiconductor chip 82 from the semiconductor chip 81.

The method using a thermo-compression sheet requires the steps of placing members at the right locations. Specifically, a thermo-compression sheet having the same size as the semiconductor chip 82 must be placed accurately at a specific location an the semiconductor chip 81. In addition, the semiconductor chip 82 must be bonded to the thermo-compression sheet so as to be located exactly on the top of the thermo-compression sheet.

In FIGS. 14(a) and 14(b), 85 is an insulating sheet, 86 is a metal bump, and 91 is an adhesive sheet.

## SUMMARY OF THE INVENTION

An object of the present invention is to provide a further-miniaturized semiconductor device having a stacked package structure as well as a CSP structure.

In order to achieve the above object, a semiconductor device in accordance with the present invention has a stacked package structure and a chip size package structure and is characterized in including:

an insulating substrate including a wiring layer having electrode sections;

a first semiconductor chip having a first insulating adhesion layer adhered to its back surface where a circuit is

US 6,352,879 B1

3

not formed, the first semiconductor chip being mounted on the wiring layer through the first insulating adhesion layer; and

a second semiconductor chip having a second insulating adhesion layer adhered to its back surface where a circuit is not formed, the second semiconductor chip being mounted on a circuit-formed front surface of the first semiconductor chip through the second insulating adhesion layer;

each of the first and second semiconductor chips being wire-bonded to the electrode section with a wire, the first and second semiconductor chips and the wire being sealed with a resin.

In the above structure, the first semiconductor chip and the second semiconductor chip are each wire-bonded to the electrode section provided on the wiring layer with the wires, and the second insulating adhesion layer is used for affixing the second semiconductor chip to the first semiconductor chip. This structure eliminates the need for wire-bonding the first and second semiconductor chips to points on the wiring layer, far from the side surfaces of the first and second semiconductor chips, considering a situation in which the excessively applied adhesive agent overflows the space between the first and second semiconductor chips. Therefore, a miniaturized, high-density semiconductor device can be realized.

Furthermore, in the case of using a thermo-compression sheet, when mounting the first or second semiconductor chip at a desired location, accurate positioning is required twice, i.e., positioning the thermo-compression sheet, etc., and positioning the first or second semiconductor chip on the thermo-compression sheet. In contrast, the first and second insulating adhesion layers according to the present invention are in advance disposed on the back surfaces of the first and second semiconductor chips, respectively. Therefore, the first or second semiconductor chip can be mounted at a desired location by accurately positioning it once. It is thus possible to miniaturize the semiconductor device without complicating its manufacturing process.

A semiconductor device in accordance with the present invention can be arranged to include:

an insulating substrate including a wiring layer having electrode sections;

a first semiconductor chip having a circuit formed on its front surface and an insulating adhesion layer adhered to its back surface;

a metal bump , disposed between the first semiconductor chip and the wiring layer, for bump-bonding the front surface of the first semiconductor chip to the wiring layer so that the front surface faces the wiring layer; and

a second semiconductor chip whose back surface where a circuit is not formed is mounted on the back surface of the first semiconductor chip through the insulating adhesion layer;

the second semiconductor chip being wire-bonded to the electrode section of the wiring layer with a wire, the first and second semiconductor chips and the wire being sealed with a resin.

In the above arrangement, the first semiconductor chip is connected to the wiring layer through the metal bump, the second semiconductor chip is wire-bonded to the electrode sections on the wiring layer with wires, and the back surfaces of the first and second semiconductor chips are adhered to each other by the insulating layer. This arrangement eliminates the need for wire-bonding the second semi-

4

conductor chip to points on the wiring layer, far from the side surfaces of the first and second semiconductor chips, considering a situation in which the excessively applied adhesive agent overflows the space between the first and second semiconductor chips. Therefore, a miniaturized, high-density semiconductor device can be realized.

In the case of using the thermo-compression sheet, when mounting the second semiconductor chip on the first semiconductor chip, accurate positioning is required twice in a conventional manufacturing method, i.e., positioning the thermo-compression sheet on the first semiconductor chip, and positioning the second semiconductor chip on the thermo-compression sheet. However, the insulating adhesion layer according to the present invention are disposed on the back surface of the second semiconductor chip in advance. Therefore, the second semiconductor chip can be mounted at a desired location on the first semiconductor chip by accurately positioning it once. It is thus possible to miniaturize the semiconductor chip without complicating its manufacturing process.

A method of manufacturing a semiconductor device in accordance with the present invention includes the steps of:

(a) forming a first insulating adhesion layer on a back surface of a first wafer having a circuit formed on its front surface;

(b) producing separate first semiconductor chips from the first wafer by dicing;

(c) mounting the first semiconductor chip on a wiring layer with its back surface facing the wiring layer;

(d) forming a second insulating adhesion layer on a back surface of a second wafer having a circuit formed on its front surface;

(e) producing separate second semiconductor chips from the second wafer by dicing;

(f) mounting the second semiconductor chip on the first semiconductor chip with its back surface facing the first semiconductor chip;

(g) wire-bonding the first semiconductor chip to an electrode section of the wiring layer with a wire;

(h) wire-bonding the second semiconductor chip to an electrode section of the wiring layer with a wire; and

(i) sealing the first and semiconductor chips and the wires.

With the above manufacturing method, since the first or second semiconductor chip has the first or second insulating adhesion layer adhered to its back surface in advance when being in the wafer state, the first or second semiconductor chip can be mounted at a desired location without the step of accurately positioning the first or second insulating adhesion layer on the first or second semiconductor chip. It is thus possible to simplify the process of manufacturing the semiconductor chip.

Moreover, in the above manufacturing method, the adhesive agent does not overflow the space between the first and second semiconductor chips, the first and second semiconductor chips can be wire-bonded to the wiring layer at a location closer to the edges of the first and second semiconductor chips. It is thus possible to realize a miniaturized, high-density semiconductor device.

A method of manufacturing a semiconductor device in accordance with the present invention including the steps of:

(a) forming an insulating layer and a metal bump on a wiring layer;

(b) mounting a first semiconductor chip on the wiring layer with its circuit-formed surface facing the wiring layer;

US 6,352,879 B1

5

(c) forming an insulating adhesion layer on a back surface of a wafer having a circuit formed on its front surface;

(d) producing separate second semiconductor chips from the wafer by dicing;

(e) mounting the second semiconductor chip on the first semiconductor chip with its back surface facing the first semiconductor chip;

(f) wire-bonding the second semiconductor chip to the wiring layer with a wire; and

(g) sealing the first and second semiconductor chips and the wire.

In this manufacturing method, like the above-mentioned method of the present invention, since the second semiconductor chip has the insulating adhesion layer adhered to its back surface in advance when being in the wafer state, the second semiconductor chip can be mounted at a desired location without the step of accurately positioning the insulating adhesion layer on the second semiconductor chip. It is thus possible to simplify the process of manufacturing the semiconductor chip.

Furthermore, in the above manufacturing method, the adhesive agent does not overflow the space between the first and second semiconductor chips, the second semiconductor chip can be wire-bonded to the wiring layer at a location closer to the edges of the first and second semiconductor chips. It is thus possible to realize a miniaturized, high-density semiconductor device.

For a fuller understanding of the nature and advantages of the invention, reference should be made to the ensuing detailed description taken in conjunction with the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a cross-sectional view of a semiconductor device in accordance with the first embodiment of the present invention.

FIG. 2(a) is a plan view of a circuit board before being cut, and

FIG. 2(b) is a partially enlarged view of the circuit board shown in FIG. 2(a).

FIG. 3(a) is an explanatory view showing an arrangement of ball-like external connection-use terminals, and

FIG. 3(b) is an explanatory view showing an arrangement of trapezoidal external connection-use terminals.

FIG. 4 is an explanatory view showing how laminated semiconductor chips are each wire-bonded to the circuit board.

FIGS. 5(a) to 5(g) show one example of a process for manufacturing the semiconductor device.

FIG. 6(a) is a partially enlarged view of the circuit board including a wiring layer disposed on one surface of an insulating substrate, and FIG. 6(b) is a partially enlarged view of a circuit board including a wiring layer disposed on each surface of the insulating substrate.

FIG. 7(a) is an explanatory view showing a wiring state when two laminated semiconductor chips are connected to the same electrode section, and

FIG. 7(b) is an explanatory view showing another state that the two laminated semiconductor chips are connected to the same electrode section.

FIG. 8(a) is an explanatory view showing a wiring state that the two laminated semiconductor chips are connected to different electrode sections, and

FIG. 8(b) is an explanatory view showing another wiring state that the two laminated semiconductor chips are connected to different electrode sections.

6

FIG. 9(a) is an explanatory view showing one example of an arrangement of dummy pads formed on a first semiconductor chip, and

FIG. 9(b) is an explanatory view showing another example of the arrangement of the dummy pads disposed on the first semiconductor chip.

FIG. 10 is a cross-sectional view of a semiconductor device in accordance with the second embodiment of the present invention.

FIGS. 11(a) to 11(g) show one example of a process for manufacturing the semiconductor device.

FIG. 12(a) is a perspective view showing that a second semiconductor chip in the semiconductor device in accordance with the first embodiment or the second embodiment protrudes from a first semiconductor chip, and

FIG. 12(b) is a perspective view showing that the second semiconductor chip is reinforced.

FIG. 13(a) is a cross-sectional view showing a semiconductor device having a CSP structure manufactured by a conventional wire bonding method, and

FIG. 13(b) is a cross-sectional view showing a semiconductor device having a CSP structure manufactured by a conventional face-down bonding method.

FIG. 14(a) and FIG. 14(b) are cross-sectional views of conventional semiconductor devices having a stacked package structure.

FIG. 15 is a cross-sectional view of the semiconductor device shown in FIG. 14(a) during manufacturing.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

Embodiment 1

The following descriptions will explain one embodiment of the present invention with reference to FIGS. 1 to 9.

As shown in FIG. 1, in a semiconductor device according to this embodiment, a first semiconductor chip 1 and a second semiconductor chip 2 are laminated in this order on a circuit board 5 including an insulating substrate 3 and a wiring layer 4 mounted on the insulating substrate 3. Regarding the first semiconductor chip 1 and the second semiconductor chip 2, the surface (front surface) on which an element is formed is hereinafter referred to as a "circuit formed surface", and the surface opposite thereto is referred to as a "back surface".

The semiconductor chip 1 is disposed with its back surface facing the insulating substrate 3. The second semiconductor chip 2 is mounted on the circuit formed surface of the first semiconductor chip 1 through a thermo-compression sheet (adhesion layer) 6 so that its back surface is adhered to the thermo-compression sheet 6.

The semiconductor device in accordance with the present embodiment is arranged so that the second semiconductor chip 2 is mounted on the circuit formed surface of the first semiconductor chip 1. With this arrangement, the second semiconductor chip 2 on the top of the first semiconductor chip 1 does not influence (interfere with) electrode pads of the first semiconductor chip 1. The circuit formed surface of the first semiconductor chip 1 is in advance coated with an insulating-resin, etc. Namely, the coating is applied to the circuit formed surface of the first semiconductor chip 1 by a spin coating method, etc. when the first semiconductor chip 1 is in a wafer state before subjected to dicing. In this case, the coating material on the electrode pads (not shown) disposed on the circuit formed surface of the first semiconductor chip 1 is removed.

US 6,352,879 B1

7

The first semiconductor chip 1 and the second semiconductor chip 2 are each connected (wire-bonded) to electrode sections of the wiring layer 4 on the insulating substrate 3 with wires 7.

The first semiconductor chip 1, the second semiconductor chip 2 and the wires 7, arranged as above, are covered by a sealing resin 8.

The insulating substrate 3 includes via holes 9 at the locations corresponding to below-described land sections 12 constituting the wiring layer 4. Ball-like packaging-use external terminals 10 are connected in an area-array-like arrangement to the land sections 12 through the via holes 9 from the side of the insulating substrate 3, on which side the first semiconductor chip 1 and the second semiconductor chip 2 are not formed.

Next, the following descriptions will explain in further detail the above-mentioned members constituting the semiconductor device in accordance with the present embodiment.

FIG. 2(a) is a plan view of the circuit board 5 before being cut in the process of manufacturing the semiconductor device. As shown in FIG. 2(a) four guide holes 11 are formed in both side sections of the insulating substrate 3 (the upper part and the lower part of the insulating substrate 3 in FIG. 2(a)) of the circuit board 5 before being cut. The guide holes 11a formed in one of the side section and the guide holes 11b formed in the other side section have different shapes. These guide holes 11 are used for transporting the semiconductor device during its manufacturing process.

The material of the insulating substrate 3 is not particularly limited, and a resin substrate or a film having excellent heat resistance is acceptable. The insulating material 3 may be a resin substrate, etc. made of, for example, polyimide, epoxy resin containing glass fiber, bismaleid triazine (BT) resin, polyester, polyamide, fluororesin, ceramic, and polyester containing glass fiber. Polyimide is the most preferable of the above materials.

FIG. 2(b) is a partially enlarged view of the circuit board 5 shown in FIG. 2(a), showing the structure of the wiring layer 4. As shown in FIG. 2(b), the wiring layer 4 includes the land sections 12, electrode sections 13, and wiring sections 14, disposed on the insulating substrate 3. Each of the. wiring sections 14 connects the land section 12 to the electrode section 13.

The electrode sections 13 are formed on both ends of the wiring layer 4 (the left part and the right part of the wiring layer 4 in FIG. 2(b)). As explained in detail later, each of the electrode section 13 is connected to the first semiconductor chip 1 or the second semiconductor chip 2 by the wire 7. Therefore, the electrode sections 13 are located outside the area of the wiring layer 4, where the first semiconductor chip 1 and the second semiconductor chip 2 are mounted.

The land section 12 is a packaging-use external terminal forming section for connecting the packaging-use external terminal 10 and the wiring layer 4 through the via hole 9 of the insulating substrate 3.

The first semiconductor chip 1 can be completely insulated from the wiring layer 4 by, for example, providing a sheet of an insulating resin on an area of the wiring layer 4 where the first semiconductor chip 1 is to be mounted or applying an insulating resin coating to the area of the wiring layer 4. The wiring layer 4 is made of copper (Cu), aluminum (Al), gold (Au), nickel (Ni), and other materials. Cu is particularly preferable because it is less costly. Methods of forming the wiring layer 4 on the insulating substrate 3 include a vapor deposition method and a plating method. In

8

order to pattern the wiring layer 4 to form a desired pattern, a conventional photolithography method can be utilized.

FIG. 3(a) is a view seen from the back side of the semiconductor device shown in FIG. 1, i.e., the side where the packaging-use external terminals 10 are disposed. As shown in FIG. 3(a), ball-like packaging-use external terminals 10 are disposed in an area-array-like arrangement, and connected to the land sections 12 provided on the wiring layer 4. The packaging-use external terminals 10 are not limited to a ball-like shape, and may have a trapezoidal shape as shown in FIG. 3(b).

Each of the wires 7 is used for connecting the electrode pad disposed on the first semiconductor chip 1 or the second semiconductor chip 2 to the electrode section 13 of the wiring layer 4. In a conventional semiconductor device, a gold ball provided on only one end of the wire is in contact with the electrode pad of the first semiconductor chip or the second semiconductor chip, and the other end of the wire is connected to the electrode section of the wiring layer on the insulating substrate. Here, the gold ball can be provided on only one end of the wire. The gold ball is brought into contact with the electrode pad by imposing a load lighter than the load applied in connecting, by thermo-compression bonding, the wire to the electrode section of the wiring layer on the insulating substrate. This is because connecting the wires to the semiconductor chips by thermo-compression bonding, i.e., by application of a heavy load, increases the possibility of damaging the semiconductor chips.

However, the above conventional arrangement has the following problem. Namely, the wires, especially those connected to the second semiconductor chip, are connected to the electrode sections of the wiring layer provided on the circuit board at a small angle with respect to the circuit board. Therefore, the wire is connected to the circuit board, far from the end of the first semiconductor chip.

In order to solve the problem, in the semiconductor device according to the present embodiment, the first semiconductor chip 1 and the second semiconductor chip 2 are each wire-bonded to the circuit board 5 as shown in FIG. 4. The first semiconductor chip 1 and the circuit board 5 are wire-bonded in the same manner as the conventional semiconductor device. Then, the wire 7 is connected to the circuit board 5 with a gold ball 7a provided on one end of the wire 7. Thereafter, the other end of the wire 7 is connected, by thermo-compression bonding, to a gold bump 16 formed on the electrode pad of the second semiconductor chip 2 to connect the second semiconductor chip 2 to the circuit board 5.

Since wire-bonding between the second semiconductor chip 2 and the circuit board 5 is performed as above, the wire 7 connected to the second semiconductor chip 2 is connected to the circuit board 5 at an angle closer to 90° with respect to the circuit board 5. Therefore, the wire 7 is connected to the circuit board 5 at a closer location to the end of the first semiconductor chip 1, thereby enabling further miniaturization of the semiconductor device in accordance with the present embodiment.

The wire 7 is connected to the gold bump 16 by thermo-compression bonding by a load nearly equal to the load applied when connecting the wire 7 to the electrode section of the wiring layer 4 on the insulating substrate 3 by thermo-compression bonding. However, by using the gold bump 16, the stress applied to the second semiconductor chip 2 can be lowered. It is thus possible to reduce the possibility that the second semiconductor chip 2 is damaged by a heavy load applied there to.

US 6,352,879 B1

9

10

The gold bump 16 is formed by connecting a gold ball, provided on the end of the wire by the conventional method, to the electrode pad on the second semiconductor chip 2, and then cutting the wire 7. Thereafter, by making the upper surface of the gold bump 16 flat with a stamping jig, the wire 7 can be surely affixed to the gold bump 16 by thermo-compression bonding.

Note that the first semiconductor chip 1 and the circuit board 5 can be wire-bonded to each other in the same manner as the above-mentioned wire-bonding of the second semiconductor chip 2 and the circuit board 5.

The following descriptions will explain one example of the process (including steps (1) to (5)) for manufacturing the semiconductor device in accordance with the present embodiment with reference to FIGS. 5(a) to 5(g).

(1) First, the first semiconductor chip 1 is mounted on the circuit board 5 (see FIG. 5(a)) When the first semiconductor chip 1 is in a wafer state, the insulating thermo-compression sheet 6 is adhered to the back surface of the wafer. Then, the wafer is cut to produce separate pieces of first semiconductor chips 1. The first semiconductor chip 1 is mounted on the circuit board 5 at a location inside a mount location recognition-use mark 15 provided on the circuit board 5. Here, instead of providing the thermo-compression sheet 6 in advance when the first semiconductor chip 1 is in the wafer state, an insulating paste made of epoxy resins, etc. may be applied onto the circuit board 5 before the first semiconductor chip 1 is mounted on the circuit board 5.

(2) Next, the second semiconductor chip 2 is mounted on the circuit formed surface of the first semiconductor chip 1 (see FIG. 5(b)). When the second semiconductor chip 2 is in the wafer state, the insulating thermo-compression sheet 6 is adhered to the back surface of the wafer, and then the wafer is cut to produce separate pieces of second semiconductor chips 2. The second semiconductor chip 2 is accurately positioned at a specific location on the circuit formed surface of the first semiconductor chip 1.

By affixing the thermo-compression sheet 6 to the back surface of the second semiconductor chip 2 in advance, accurate positioning is necessary only when mounting the second semiconductor chip 2 on the first semiconductor chip 1. Therefore, since one step requiring accurate positioning is omitted in the process for manufacturing the semiconductor device in accordance with the present embodiment, this manufacturing process is simplified compared with the conventional process in which the thermo-compression sheet 6 is disposed on the circuit formed surface of the first semiconductor chip 1, and then the second semiconductor chip 2 is adhered to the thermo-compression sheet 6.

(3) Then, each of the electrode pads (not shown) disposed on the first semiconductor chip 1 and the second semiconductor chip 2 is connected, with the wire 7 made of Au, to the electrode section 13 formed in the wiring layer 4 on the circuit board 5. More specifically, the first semiconductor chip 1 and the wiring layer 4 are first electrically connected to each other (see FIG. 5(c)), and then the second semiconductor chip 2 and the wiring layer 4 are electrically connected to each other (see FIG. 5(d)). Since the first semiconductor chip 1 and the second semiconductor chip 2 are each electrically connected to the wiring layer 4 in the above order, it is possible to avoid such a problem that the wire 7 for connecting the first semiconductor chip 1 to the circuit board 5 and the wire 7 for connecting the second semiconductor chip 2 to the circuit board 5 cross each other, and prevent connection of the firs t semiconductor chip 1 to the circuit board 5.

(4) Thereafter, each of the packaging-use external terminals 10 is disposed on the location where the via hole 9 is provided on the insulating substrate 3 on the circuit board 5 (see FIG. 5(f)). Here, positioning the packaging-use external terminal 10 is performed in such a manner that a solder ball is temporarily fixed to each via hole 9, heated in a reflow furnace, and then joined to the land section 12. Methods of temporarily fixing the solder ball to the via hole 9 include a method in which the solder ball is affixed to the via hole 9 after applying a flux to the via hole 9, and a method in which the solder ball is affixed to the via hole 9 after adhering the flux to the solder ball.

(5) Finally, a plurality of semiconductor devices produced on the circuit board 5 are divided into pieces of semiconductor devices (see FIG. 5(d)) by cutting the insulating substrate 3 along its unnecessary part, i.e., along the outer edge of the sealing resin 8 of each semiconductor device. Methods of cutting the insulating substrate 3 include a punching method using die, and an eximer laser cutting method.

As shown in FIG. 6(a), the semiconductor device in accordance with the present embodiment includes the wiring layer 4 on only one of the surfaces of the insulating substrate 3. However, the wiring layer 4 can be provided on both surfaces of the insulating substrate 3 as shown in FIG. 6(b).

When the wiring layer 4 is formed on both surfaces of the insulating substrate 3, as shown in FIG. 6(b) the wiring layers 4 on the respective surfaces are electrically connected to each other through the plated via holes 9 as shown in FIG. 6(b) Regarding the wiring layer 4 on the side of the insulating substrate 3, the side where the first semiconductor chip 1 is not mounted, the area where the packaging-use external terminals 10 are not to be formed are covered with a solder resist 20, etc. In the area which is not covered with the solder resist 20, i.e., the area where the packaging-use external terminals 10 are to be provided, the packaging-use external terminals 10 are arranged in an area-array-like pattern.

When connecting the first semiconductor chip 1 and the second semiconductor chip 2 to the electrode sections 13 of the wiring layer 4 with the wires 7, if the wires 7 become too close to each other because of the layout of the electrode pads of the first semiconductor chip 1 and the second semiconductor chip 2, the wires 7 can be arranged as below.

When connecting the first semiconductor chip 1 and the second semiconductor chip 2 to the same electrode section 13 of the wiring layer 4, two arrangements shown in FIGS. 7(a) and 7(b) are acceptable. In the arrangement shown in FIG. 7(a), the electrode section 13 of the wiring layer 4, to which two wires 7 are connected, is arranged to have two parts. In the arrangement shown in FIG. 7(b), an electrode pad 17a of the first semiconductor chip 1 is connected to an electrode pad 17b of the second semiconductor chip 2 with the wire 7, and the electrode pad 17a is connected to the electrode section 13 of the wiring layer 4 with the wire 7, thereby connecting each of the electrode pads 17a and 17b to the electrode section 13.

When connecting the first semiconductor chip 1 and the second semiconductor chip 2 to different electrode sections 13 of the wiring layer 4, two arrangements shown in FIGS. 8(a) and 8(b) are acceptable. In the arrangement shown in FIG. 8(a), the electrode pad 17a of the first semiconductor chip 1 and the electrode pad 17b of the second semiconductor chip 2 are each connected directly to the electrode section 13 of the wiring layer 4 with the wire 7. In the arrangement shown in FIG. 8(b), dummy pads 18 are

US 6,352,879 B1

11                                                          12

provided on the first semiconductor chip 1, and the electrode pad 17b disposed on the second semiconductor chip 2 is connected to the electrode section 13 of the wiring layer 4 via the dummy pad 18. This arrangement shown in FIG. 8(b) is more preferable because the overhanging part of the wire 7 is shorter than that in the arrangement shown in FIG. 8(a).

FIGS. 9(a) and 9(b) s how examples of the arrangement of the dummy pads 18 provided on the first semiconductor chip 1.

Embodiment 2

With reference to FIGS. 10 to 12, the following descriptions will explain the second embodiment of the present invention. The members having the same structure as those in the above-mentioned first embodiment will be designated by the same reference numbers and their description will be omitted.

A semiconductor device in accordance with the present embodiment is arranged as shown in FIG. 10. Specifically, a first semiconductor chip 21 is mounted on a circuit board 5 with its circuit formed surface facing the circuit board 5, i.e., facing down. The circuit board 5 includes an insulating substrate 3, and a wiring layer 4 formed on the insulating substrate 3. A second semiconductor chip 22 is mounted on the back surface of the first semiconductor chip 21 through a thermo-compression sheet 6. The back surf ace of the second semiconductor chip 22 faces the first semiconductor chip 21. Namely, the back surfaces of the first semiconductor chip 21 and the second semiconductor chip 22 are adhered to each other through the thermo-compression sheet 6. The thermo-compression sheet 6 is provided as an adhesion layer for holding the second semiconductor chip 22 on the first semiconductor chip 21.

The first semiconductor chip 21 is electrically connected to first electrode sections (not shown) provided in the wiring layer 4 through metal bumps 23. Those first electrode sections are disposed inside an area of the wiring layer 4, where the first semiconductor chip 21 is mounted.

Meanwhile, the second semiconductor chip 22 is electrically connected to second electrode sections (not shown) provided in the wiring layer 4 with wires 7. Since the second electrode sections are used for wire-bonding the second semiconductor chip 22 to the wiring layer 4, they are disposed outside the area of the wiring layer 4, where the first semiconductor chip 21 and the second semiconductor chip 22 are mounted.

A resin sheet 24 is provided between the first semiconductor chip 21 and the wiring layer 4. The resin sheet 24 is formed by extending a resin sheet used in the step of connecting the first semiconductor chip 21 to the wiring layer 4 through the metal bumps 23.

If electrode pads provided on the circuit formed surface of the first semiconductor chip 21 are made of Al, the metal bumps 23 are preferably made of Au which is easily alloyed with Al. With this arrangement, the metal bumps 23 can be more firmly affixed to the electrode pads.

The material for forming the resin sheet 24 may be a thermoplastic resin or a thermosetting resin. However, the thermoplastic resin is more favorable than the thermosetting resin because the resin sheet 24 is used for the following purpose. Namely, it is used so that the resin extends by heat applied in connecting the first semiconductor chip 21 to the wiring layer 4 with the metal bumps 23, covers the metal bumps 23 as junctions, and prevents degradation of the junctions caused by shock, etc.

The resin sheet 24 can be a three-layer resin sheet including a layer of a light blocking material such as metallic

foil. With this arrangement it is possible to prevent a malfunction of the first semiconductor chip 21 due to a light incident from the surface where the packaging-use external terminals 10 are mounted passing through the semiconductor device. In this case, the size of the metallic foil must be such that the metallic foil is out of contact with the metal bumps 23.

Although the semiconductor device in accordance with the present embodiment uses the resin sheet 24, the following arrangement is also acceptable. Namely, the semiconductor chip 21 is mounted without using the resin sheet 24, and then the space produced at a junction of the first semiconductor chip 21 and the wiring layer 4 is filled with a liquid resin, etc., thereby covering the metal bumps 23 as the junctions.

Next, referring to FIGS. 11(a) to 11(g), the following descriptions will explain the process (including steps (1) to (7)) for manufacturing the semiconductor device in accordance with the present embodiment.

(1) First, the resin sheet 24 and the metal bumps 23 are disposed on the circuit board 5 (see FIG. 11(a)). In this case, each of the metal bumps 23 is disposed on the first electrode section provided in the wiring layer 4 on the circuit board 5. The resin sheet 24 is disposed on the circuit board 5 at the location where the first semiconductor chip 21 and the second semiconductor chip 22 are to be mounted.

(2) Next, the first semiconductor chip 21 is connected to the wiring layer 4 on the circuit board 5 by a flip chip method in a face-down mode (see FIG. 11(b)).

(3) Then, the second semiconductor chip 22 is mounted on the back surface of the first semiconductor chip 21 (see FIG. 11(c)). When the second semiconductor chip 22 is in a state of wafer, the insulating thermo-compression sheet 6 is adhered to the back surface of the wafer, and then the wafer is cut to produce chips, i.e., separate pieces of second semiconductor chips 22. The second semiconductor chip 22 is accurately positioned at a specific location on the circuit formed surface of the first semiconductor chip 21.

Like the manufacturing process described in the first embodiment, the process for manufacturing the semiconductor device in accordance with the present embodiment is simplified by adhering the thermo-compression sheet 6 to the back surface of the second semiconductor chip 22 in advance.

(4) Then, the second semiconductor chip 22 is electrically connected to the wiring layer 4 on the circuit board 5 (see FIG. 11(d)). More specifically, each of the electrode pads disposed on the circuit formed surface of the second semiconductor chip 22 is connected to the second electrode section of the wiring layer 4 with the wire 7.

(5) Thereafter, the first semiconductor chip 21, the second semiconductor chip 22, and the wires 7, provided on the circuit board 5, are sealed with a sealing resin 8 (see FIG. 11(e)). The method of forming the sealing resin 8 is similar to that described in the first embodiment.

(6) Then, each of the packaging-use external terminals 10 is disposed at a location of a via hole 9 formed in the insulating substrate 3 of the circuit board 5 (see FIG. 11(f)).

(7) Finally, a plurality of semiconductor devices produced on the circuit board 5 are divided into pieces of semiconductor devices by cutting the insulating substrate 3 along the unnecessary part of the insulating substrate 3 of the circuit board 5, i.e., along the outer edge of the sealing resin 8 of each semiconductor device unnecessary parts (see FIG. 11(d)). The methods of cutting the insulating substrate 3 include a punching method using a die, and an eximer laser method.

US 6,352,879 B1

13

In the above-described first embodiment (and in the second embodiment), when mounting the second semiconductor chips **2 (22)** on the first semiconductor chips **1 (21)**, if the first semiconductor chips **1 (21)** and the second semiconductor chips **2 (22)** have different shapes, the second semiconductor chips **2 (22)** may protrude from the first semiconductor chips **1 (21)** as shown in FIG. **12**(*a*). In this case, since the protruded part of the second semiconductor chip **2 (22)** is of low strength, the second semiconductor chip **2 (22)** may be possibly destroyed by shock produced when, for example, wire-bonding the electrode pads **17***b* of the second semiconductor chip **2 (22)** to the wiring layer **4**.

In order to solve the problem, as shown in FIG. **12**(*b*), a support member **19** having the same height and the same shape as the first semiconductor device **1 (21)** is fixed under the protruded part of the second semiconductor chip **2 (22)**. By reinforcing the second semiconductor chip **2 (22)** with the support member **19**, destruction thereof can be prevented. The support member **19** is preferably made of Silicon (Si) in order to reduce generation of stress, etc. against a heat load applied during and after manufacturing the semiconductor device with the CSP structure. In addition, the support member **19** has the same coefficient of linear expansion as the second semiconductor chip **2 (22)**.

The above-mentioned semiconductor devices in accordance with Embodiments 1 and 2 include two laminated semiconductor chips. However, the present invention can be arranged to include three or more laminated semiconductor chips. In this case, the third semiconductor chip can be mounted on the top of the two semiconductor chips with its circuit formed surface facing up and wire-bonded to the wiring layer **4**. Alternatively, the third semiconductor chip can be mounted on the top of the two semiconductor chips with its circuit formed surface facing down through metal bumps by providing electrode pads for disposing the metal bumps on the circuit formed surface of the second semiconductor chip **2 (22)**.

The invention being thus described, it will be obvious that the same may be varied in many ways. Such variations are not to be regarded as a departure from the spirit and scope of the invention, and all such modifications as would be obvious to one skilled in the art are intended to be included within the scope of the following claims.

What is claimed is:

**1**. A method of manufacturing a semiconductor device comprising:

(a) forming a first adhesion layer on a back surface of a first wafer on which no circuit is formed, a circuit being formed on a front surface of the first wafer;

(b) producing separate first semiconductor chips from said first wafer by dicing;

(c) mounting said first semiconductor chip on a wiring layer with its back surface facing said wiring layer;

(d) forming a second adhesion layer on a back surface of a second wafer on which no circuit is formed, a circuit being formed on a front surface of the first wafer;

(e) producing separate second semiconductor chips from said second wafer by dicing; and

(f) mounting said second semiconductor chip on said first semiconductor chip with its back surface facing said first semiconductor chip.

**2**. The method of manufacturing the semiconductor device as set forth in claim **1**, further comprising the steps of:

(g) wire-bonding an electrode section of said first semiconductor chip to an electrode section of said wiring layer with a first wire;

14

(h) wire-bonding an electrode section of said second semiconductor chip to an electrode section of said wiring layer with a second wire; and

(i) sealing said first and second semiconductor chips and said first and second wires,
said steps (g) to (i) being included after said step(f).

**3**. The method of manufacturing the semiconductor device as set forth in claim **2**, further comprising the steps of:

(j) forming a metal ball on each end of said second wire;

(k) connecting one of the metal balls to the electrode section of said second semiconductor chip;

(l) cutting said second wire; and

(m) making a surface of the metal ball connected to said second semiconductor chip flat;
said steps (j) to (m) being included between said steps (g) and (h).

**4**. The method of manufacturing the semiconductor device as set forth in claim **1**, further comprising the steps of:

(g) wire-bonding an electrode section of said first semiconductor chip to an electrode section of said wiring layer with a first wire;

(h) forming a metal ball on each end of a second wire;

(i) connecting one of the metal balls to the electrode section of said second semiconductor chip;

(j) cutting said second wire;

(k) wire-bonding an electrode section of said second semiconductor chip to an electrode section of said wiring layer with said second wire; and

(l) sealing said first and second semiconductor chips and said first and second wires.

**5**. The method of manufacturing the semiconductor device as set forth in claim **1**, further comprising the steps of:

(g) forming a metal ball on each end of a first wire;

(h) connecting one of the metal balls to an electrode section of said first semiconductor chip;

(i) cutting said first wire;

(j) wire-bonding the electrode section of said first semiconductor chip to an electrode section of said wiring layer with said first wire;

(k) wire-bonding the electrode section of said first semiconductor chip to an electrode section of said second semiconductor chip with a second wire; and

(l) sealing said first and second semiconductor chips and said first and second wires.

**6**. The method of manufacturing the semiconductor device as set forth in claim **1**, further comprising the steps of:

(g) forming a metal ball on each end of a first wire;

(h) connecting one of the metal balls to a dummy pad providing on said first semiconductor chip;

(i) cutting said first wire;

(j) wire-bonding the dummy pad of said first semiconductor chip to an electrode section of said wiring layer with said first wire;

(k) wire-bonding the dummy pad of said first semiconductor chip to an electrode section of said second semiconductor chip with a second wire; and

(l) sealing said first and second semiconductor chips and said first and second wires.

**7**. A method of manufacturing a semiconductor device comprising:

(a) forming an insulating layer and a metal bump on a wiring layer;

US 6,352,879 B1

15

(b) mounting a first semiconductor chip on said wiring layer with its circuit-formed surface facing said wiring layer;

(c) forming an adhesion layer on a back surface of a wafer on which no circuit is formed, whereby a circuit is formed on a front surface of the wafer;

(d) producing separate second semiconductor chips from the wafer by dicing;

(e) mounting said second semiconductor chip on said first semiconductor chip with the back surface of the second semiconductor chip facing said first semiconductor chip;

(f) wire-bonding an electrode section of said second semiconductor chip to an electrode section of said first wiring layer with a wire; and

(g) sealing said first and second semiconductor chips and said wire.

**8.** The method of manufacturing the semiconductor device as set forth in claim **7**, further comprising the steps of:

(h) forming a metal ball on each of said wire;

(i) connecting one of the metal balls to the electrode section of said semiconductor chip;

(j) cutting said wire; and

(k) making a surface of the metal ball connected to said second semiconductor chip flat;
said steps (h) to (k) being including between said steps (e) and (f).

**9.** The method of manufacturing the semiconductor device as set forth in claim **7**, further comprising the steps of:

(h) forming a metal ball on each of said wire;

(i) connecting one of the metal balls to the electrode section of said semiconductor chip; and

(j) cutting said wire;
said steps (h) to (j) being including between said steps (e) and (f).

**10.** A method of manufacturing a semiconductor device comprising:

(a) applying an adhesive paste on a wiring layer, and thereafter, mounting a first semiconductor chip on said wiring layer with a back surface of said semiconductor chip facing said wiring layer, the back surface having no circuit formed thereon;

(b) forming an adhesion layer on a back surface of a wafer on which no circuit is formed, whereby a circuit is formed on a front surface of the wafer;

(c) producing separate second semiconductor chips from the wafer by dicing; and

(d) mounting said second semiconductor chip on said first semiconductor chip with the back surface of the second semiconductor chip facing said first semiconductor chip.

**11.** The method of manufacturing the semiconductor device as set forth in claim **10**, further comprising the steps of:

(e) wire-bonding an electrode section of said first semiconductor chip to an electrode section of said wiring layer with a first wire;

(f) wire-bonding an electrode section of said second semiconductor chip to an electrode section of said wiring layer with a second wire; and

(g) sealing said first and second semiconductor chips and said wires,
said steps (e) to (g) being included after said step (d).

**12.** The method of manufacturing the semiconductor device as set forth in claim **10**, further comprising the steps of:

16

(e) wire-bonding an electrode section of said first semiconductor chip to an electrode section of said wiring layer with a first wire;

(f) forming a metal ball on each end of a second wire;

(g) connecting one of the metal balls to the electrode section of said second semiconductor chip; and

(h) cutting said second wire;

(i) wire-bonding an electrode section of said wiring layer to the electrode section of said second semiconductor chip with said second wire;

(j) sealing said first and second semiconductor chips and said first and second wires,
said steps (e) to (j) being included after said step (d).

**13.** The method of manufacturing the semiconductor device as set forth in claim **10**, further comprising the steps of:

(e) forming a metal ball on each end of a first wire;

(f) connecting one of the metal balls to the electrode section of said first semiconductor chip; and

(g) cutting said first wire;

(h) wire-bonding an electrode section of said wiring layer to the electrode section of said first semiconductor chip with said first wire;

(i) wire-bonding the electrode section of said first semiconductor chip to an electrode section of said second semiconductor chip with a second wire;

(j) sealing said first and second semiconductor chips and said first and second wires,
said steps (e) to (j) being included after said step (d).

**14.** The method of manufacturing the semiconductor device as set forth in claim **10**, further comprising the steps of:

(e) forming a metal ball on each end of a first wire;

(f) connecting one of the metal balls to a dummy pad providing on said first semiconductor chip;

(g) cutting said first wire;

(h) wire-bonding the dummy pad of said first semiconductor chip to an electrode section of said wiring layer with said first wire;

(i) wire-bonding the dummy pad of said first semiconductor chip to an electrode section of said second semiconductor chip with a second wire; and

(j) sealing said first and second semiconductor chips and said first and second wires,
said steps (e) to (j) being included after said step (d).

**15.** A method of manufacturing a semiconductor device comprising:

(a) forming a first adhesion layer on a back surface of a first wafer, no circuit being formed on the back surface of the first wafer;

(b) producing separate first semiconductor chips from said first wafer by dicing;

(c) mounting at least one of said first semiconductor chips on a wiring layer with the back surface of the at least one first semiconductor chip facing said wiring layer;

(d) forming a second adhesion layer on a back surface of a second wafer, no circuit being formed on the back surface of the second wafer;

(e) producing separate second semiconductor chips from said second wafer by dicing; and

(f) mounting at least one of said second semiconductor chips on said at least one of said first semiconductor chip with the back surface of the at least one second semiconductor chip facing said at least one of said first semiconductor chips.

\* \* \* \* \*



US006731013B2

(12) **United States Patent**
    Juso et al.

(10) **Patent No.:**    **US 6,731,013 B2**
(45) **Date of Patent:**    **May 4, 2004**

(54) **WIRING SUBSTRATE, SEMICONDUCTOR DEVICE AND PACKAGE STACK SEMICONDUCTOR DEVICE**

(75) Inventors: **Hiroyuki Juso**, Gose (JP); **Yasuki Fukui**, Sakai (JP); **Yuji Yano**, Tenri (JP); **Seiji Ishihara**, Tenri (JP)

(73) Assignee: **Sharp Kabushiki Kaisha**, Osaka (JP)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 30 days.

(21) Appl. No.: **09/873,338**

(22) Filed: **Jun. 5, 2001**

(65) **Prior Publication Data**

    US 2002/0000327 A1 Jan. 3, 2002

(30) **Foreign Application Priority Data**

    Jun. 28, 2000    (JP) ...................................... 2000-194732

(51) **Int. Cl.**[7] .............................................. **H01L 23/48**
(52) **U.S. Cl.** ...................... **257/779**; 257/780; 257/783; 257/784; 257/786; 257/787; 174/52.2; 174/52.4; 361/772; 361/777; 361/808
(58) **Field of Search** ................................ 257/780, 782, 257/783, 784, 786, 700, 701, 737, 738, 787, 778, 779; 174/52.2, 52.3, 52.4; 361/767, 807, 808, 809, 810, 772, 777

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,581,122 A * 12/1996 Chao et al. ................. 257/691

| | | | | | |
|---|---|---|---|---|---|
| 5,677,575 | A | * | 10/1997 | Maeta et al. ................. | 257/778 |
| RE36,773 | E | * | 7/2000 | Nomi et al. ................. | 361/760 |
| 6,107,679 | A | * | 8/2000 | Noguchi ..................... | 257/678 |
| 6,127,724 | A | * | 10/2000 | DiStefano ................... | 257/675 |
| 6,291,895 | B1 | * | 9/2001 | Taniguchi et al. .......... | 257/782 |

FOREIGN PATENT DOCUMENTS

| JP | 07273243 | A | * | 10/1995 | ........... | H01L/23/12 |
|---|---|---|---|---|---|---|
| JP | 8-288316 | | * | 11/1996 | | |
| JP | 9-121002 | | | 5/1997 | | |
| JP | 1999-39245 | | | 6/1999 | | |
| JP | 11-204720 | | | 7/1999 | | |
| JP | 2002319648 | A | * | 10/2002 | ........... | H01L/23/12 |

OTHER PUBLICATIONS

Korean Notice of Rejection mailed Jun. 30, 2003 and translation thereof in corresponding Korean Application No. 10–2001–33941.

* cited by examiner

*Primary Examiner*—Alonzo Chambliss
(74) *Attorney, Agent, or Firm*—Nixon & Vanderhye

(57)    **ABSTRACT**

A wiring substrate of the present invention includes a terminal section, provided on a first surface of an insulating substrate, for wire or flip-chip bondings; a land section, provided on the insulating substrate, for an external connection terminal; wiring patterns, respectively provided on the first surface and a second surface on the other side of the first surface, for making electrical connection between the terminal section and the land section; and a support pattern, provided on the second surface corresponding in position to the terminal section, for improving bondings. The wiring substrate can relieve connection failure in bondings.

**25 Claims, 23 Drawing Sheets**



FIG.1



FIG.2 (a)



FIG.2 (b)



FIG.2 (c)



## FIG.3 (a)



## FIG.3 (b)



## FIG.3 (c)



Case: 23-2007     Document: 70-1     Page: 88     Filed: 07/05/2024

## FIG.4 (a)



## FIG.4 (b)



## FIG.4 (c)



FIG.5 (a)



FIG.5 (b)



FIG.5 (c)



FIG.5 (d)



FIG.5 (e)



# FIG.6



FIG.7 (a)



FIG.7 (b)





FIG.8



FIG.9

FIG.10 (a)



FIG.10 (b)



FIG.11 (a)



TERMAINAL 5A

FIG.11 (b)



CHIP SELECTER CORRESPONDING TO FIRST CHIP

CHIP SELECTER CORRESPONDING TO SECOND CHIP

CHIP SELECTER CORRESPONDING TO THIRD CHIP

CHIP SELECTER CORRESPONDING TO FOURTH CHIP

TERMAINAL FOR SELECTING CHIPS

# FIG.12



# FIG.13



## FIG.14 (a)



## FIG.14 (b)



## FIG.14 (c)



# FIG.15



**FIG.16 (a)**



**FIG.16 (b)**



FIG.17





FIG.18

FIG.19





FIG.20



FIG.21

FIG.22



# FIG.23



US 6,731,013 B2

1

# WIRING SUBSTRATE, SEMICONDUCTOR DEVICE AND PACKAGE STACK SEMICONDUCTOR DEVICE

## FIELD OF THE INVENTION

This invention relates to a semiconductor device which is miniaturized to almost chip size to be suitable particularly for density packaging, and relates to a wiring substrate (printed circuit board) therefor, and to a package stack semiconductor device having a plurality of such a semiconductor device.

## BACKGROUND OF THE INVENTION

Recently QFP (Quad Flat Package) type, BGA (Ball Grid Array) type, and CSP (Chip Size package) type semiconductor devices have been widely used as what meets the needs of miniaturizing electronic equipment.

These semiconductor devices need more and more external connection terminals since signal processing of a semiconductor chip (semiconductor-element) mounted therein has been highly speeded and highly facilitated. In such case, the BGA type whose external connection terminals are provided on a bottom face of a semiconductor device in a two-dimensional manner is widely adopted.

Of these BGA type semiconductor devices, conventionally known is a semiconductor device whose semiconductor chip and wiring substrate are connected to each other by wire bonding with a circuit forming surface of the semiconductor chip facing upward, wherein the semiconductor chip is conducted to external connection terminals through the wiring pattern of the wiring substrate. "Upward" means that the circuit forming surface is on the other side of the surface of semiconductor chip facing the wiring substrate.

Such a conventional resin-sealed semiconductor device is disclosed in Japanese Unexamined Patent Publication No. 121002/1997 (Tokukaihei 9-121002) (published date: May 6, 1997).

A semiconductor device which has a structure like this, as shown in FIG. 20, has a wiring substrate 67, a semiconductor chip 52 which is mounted on the wiring substrate 67, an Au wire 53 which connects the semiconductor chip 52 to a terminal section 55 of the wiring substrate 67, a resin sealing section 61 which seals the semiconductor chip 52 and the Au wire 53 with resin by transfer molding.

The wiring substrate 67 has an insulating substrate 63, an insulating material 62 as an insulating layer on the chip side, and a wiring pattern provided between the insulating substrate 63 and the insulating material 62. That is, the wiring substrate 67 has a metallic wiring pattern which is formed on the insulating substrate 63 provided with a through hole 58, and the insulating material 62 is bonded with the metallic wiring pattern thereon.

Further, the wiring substrate 67 is provided with the through hole 58 through the insulating substrate 63 in a direction of thickness according to the wiring pattern. Thus, the wiring pattern is partially exposed on the through hole 58, and the exposed portion of the wiring pattern makes up a land section 56 in FIG. 20.

In addition, the wiring substrate 67 includes an external connection terminal 60 which is formed as a solder ball by reflow soldering. Thus, through the through hole 58, the external connection terminal 60 is connected to the land section 56 provided on the upper side of the through hole 58, and hangs down like a ball from the lower side of the through hole 58.

2

Among such semiconductor devices, there has been known a semiconductor device having a plurality of semiconductor chips mounted therein in order to increase added values and capacity of a memory and the like in portable devices. For example, a multi-chip module which is provided with a plurality of board-shaped semiconductor chips side by side (in a direction of surface) is known.

However, since semiconductor chips are provided side by side, it is impossible to make a semiconductor device whose area (the area of bottom surface) is smaller than the total area of these semiconductor chips.

In view of this drawback, there has been proposed a semiconductor device (hereinbelow, referred to as stacked package) which improves packaging density by stacking a plurality of semiconductor chips in a direction of thickness and putting these chips in a semiconductor device.

An example of such a stacked package is disclosed in Japanese Unexamined Patent Publication No. 204720/1999 (Tokukaihei 11-204720) (published date: Jul. 30, 1999). The stacked package mentioned above, as shown in FIG. 21, has semiconductor chips 52a and 52b which are stacked together to be mounted on the wiring substrate 67 which insulates electricity. Further, an external connection terminal 60 is provided in a matrix pattern on a land section 56 in the stacked package so that the external connection terminal 60 hangs down from the lower surface of the wiring substrate 67. Thus, the stacked package has the CSP structure which has almost the same size as the semiconductor chip 52a and 52b.

The method of fabricating the stacked package like this is as follows. In the first place, the first semiconductor chip 52b is die-bonded on the wiring substrate 67 with its circuit forming surface facing upward, and then the second semiconductor chip 52a is die-bonded thereon.

Thereafter, each semiconductor chip 52a, 52b is connected to the terminal section 55 of the wiring substrate 67 with an Au wire 53 by wire bonding. In addition, each semiconductor chip 52a, 52b, and the Au wire 53 are sealed with a resin sealing section 61 by transfer molding. Then, a solder ball is provided as the external connection terminal 60 on the land 56 by reflow soldering. The ball is used as the external connection terminal 60. The stacked package mentioned above is produced this way.

Depending on the type of the semiconductor chips 52a and 52b and the position where the external connection terminals 60 are drawn, it is sometimes impossible to form wiring patterns freely on the wiring substrate 67 which has a single layer wiring pattern like the semiconductor device mentioned above. Thus, as shown in FIG. 22, a multi-layer wiring substrate 68 whose wiring pattern, made of Cu, is provided on its both surfaces is sometimes used.

The wiring pattern of the multi-layer wiring substrate is provided not only on the surface of the insulating substrate 63, which is a base material, where the semiconductor chip is mounted (hereinbelow referred to as side A), but also on the surface where the external connection terminal 60 is formed (hereinbelow referred to as side B). The wiring pattern of side B is usually protected with a solder resist 57.

Further, conduction is ensured between the land section 56 of the wiring pattern on side A and the land section 56 of the wiring pattern on side B which faces side A through the through hole 58, by filling the through hole 58 with a conductor 59 such as a conductive paste.

However, there is a problem. As shown in FIG. 23, in the foregoing conventional wiring substrate 68 which is provided with the wiring patterns on side A and side B,

US 6,731,013 B2

3

inadequate wire bonding is incurred between the semiconductor chip 52 and the terminal section 55.

That is, when the semiconductor chip 52 and the terminal section 55 are connected by wire bonding, the load applied on the terminal section 55 in a direction of thickness of the insulating substrate 63 to make connection causes deformation of the insulating substrate 63. As a result, a load cannot be applied sufficiently on the terminal section 55, and consequently, inadequate wire bonding tends to occur, which, in turn, may cause electrical connection failure between the semiconductor chip 52 and the terminal section 55.

Meanwhile, as shown in FIG. 20, the wiring substrate 67 which is provided with a wiring pattern only on one surface can avoid wire bonding problem mentioned above. That is, side B of the wiring substrate 67 does not have any wiring pattern, or any solder resist to protect wiring patterns, and thus the surface of side B is flat.

Therefore, since the wiring substrate 67 provided with the wiring pattern only on one surface has side B which is flat, the load applied on the terminal section 55 for wire bonding, while side B of the wiring substrate 67 placed on a stage of wire-bonder facing downward, does not cause deformation of the wiring substrate 67 since the load applied to the terminal section 55 can be held by sufficiently the stage.

However, in the case of the multi-layer wiring substrate 68 used in a semiconductor device shown in FIG. 22, side B of the wiring substrate 68 also has the wiring pattern and the solder resist 57 thereon. In such case, side B comes to have protrudent parts depending on areas having or not having the wiring pattern or the solder resist 57 are formed or not formed.

When the insulating substrate 63 of the wiring substrate 68 is comparatively thick, or not less than 0.2 mm thick, the protrudent parts do not pose any problem. But when the substrate is less than 0.2 mm thick, particularly not more than 0.1 mm thick, stiffness of the insulating substrate 63 can becomes weak. It brings about the following problems in assembling the semiconductor device.

Specifically, after providing the semiconductor chip 52 on the insulating substrate 63 by die bonding, the semiconductor chip 52 and the terminal section 55 on the wiring substrate 68 are connected electrically by wire bonding.

Here, if the protrudent part is formed on side B, which is on the other side of the semiconductor chip 52 disposed on side A of the insulating substrate 63, as shown in FIG. 23, the insulating substrate 63 deforms in a direction of thickness when a load is applied on the terminal section 55 for wire bonding in an arrowhead direction (in a direction of thickness of the insulating substrate 63) in wire bonding. Because of this, it was impossible conventionally to apply enough load in wire bonding, posing the problem of inadequate wire bonding which may cause electrical connection failure between the semiconductor chip 52 and the wiring substrate 68.

SUMMARY OF THE INVENTION

The object of the present invention is to provide a wiring substrate, a semiconductor device, and a package stack semiconductor device, all with improved reliability of connection by suppressing occurrence of inadequate electrical connection.

A wiring substrate of the present invention, in order to achieve the foregoing object, includes an insulating substrate, a terminal section for wire bonding or flip-chip

4

connection and a support pattern, provided on a surface of the other side of the surface where the terminal section is provided, and on a position corresponding to the terminal section, for improving reliability of connection of wire bonding.

Therefore, this structure can suppress deformation of the insulating substrate by the support pattern, even when the terminal section is pressed in wire bonding or other connection methods. As a result, reliability of connection in wire bonding or other connection methods, can be improved than conventionally.

A semiconductor device of the present invention, in order to achieve the foregoing object, includes the wiring substrate. Therefore, this structure can provide a thinner semiconductor device with improved reliability of connection in wire bonding or flip-chip connection than conventionally.

A package stack semiconductor device of the present invention, in order to achieve the object mentioned above, comprises the foregoing semiconductor devices which are stacked to each other. Therefore, this structure ensures electrical connection between the semiconductor devices, even when they are stacked using external terminal connections which are provided on land sections which are exposed.

Other objects, characteristics and advantages of the present invention will become apparent from the detailed description taken in conjunction with the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a cross sectional view showing a wiring substrate and a semiconductor device using it in the first embodiment according to the present invention.

FIG. 2(a) to FIG. 2(c) are explanatory drawings concerning surfaces on the both sides of the wiring substrate, in which FIG. 2(a) shows a layout on side A, and FIG. 2(b) shows a layout on side B, and FIG. 2(c) shows a modified example of the layout on side B.

FIG. 3(a) to FIG. 3(c) are explanatory drawings showing a wiring substrate and a semiconductor device using it in the second embodiment according to the present invention, in which FIG. 3(a) is a cross sectional view, and FIG. 3(b) is a top view, and FIG. 3(c) is a bottom view.

FIG. 4(a) to FIG. 4(c) are explanatory drawings showing a wiring substrate and a semiconductor device using it in the third embodiment according to the present invention. FIG. 4(a) is a cross sectional view, and FIG. 4(b) is a top view, and FIG. 4(c) is a bottom view.

FIG. 5(a) to FIG. 5(e) are a flow diagram which shows manufacturing steps of the semiconductor device.

FIG. 6 is a schematic cross sectional view showing a wiring substrate used in the semiconductor device.

FIG. 7(a) and FIG. 7(b) are explanatory drawings showing the wiring substrate mentioned above, in which FIG. 7(a) is a top view, and FIG. 7(b) is a bottom view.

FIG. 8 is an explanatory drawing showing a package stack semiconductor device according to the present invention.

FIG. 9 is an explanatory drawing showing how to manufacture the package stack semiconductor device.

FIG. 10(a) and FIG. 10(b) are explanatory drawings showing other examples of the package stack semiconductor device, in which FIG. 10(a) is a schematic cross sectional view showing four stacked semiconductor devices, and FIG. 10(b) is a schematic cross sectional view of the package

US 6,731,013 B2

5                                                          6

stack semiconductor device which fixing resin is injected between the semiconductor devices.

FIG. 11(a) and FIG. 11(b) are explanatory drawings showing layouts of chip selectors in each semiconductor device of the package stack semiconductor device, in which FIG. 11(a) is a plan view of a main portion of the semiconductor device which shows wiring for selection in the semiconductor device, and FIG. 11(b) is a plan view of a main portion of the semiconductor device which shows an example where terminal section has the chip selector function in the semiconductor device.

FIG. 12 is a schematic plan view showing another modified example of the wiring substrate.

FIG. 13 is a schematic plan view showing yet another modified example of the wiring substrate.

FIG. 14(a) to FIG. 14(C) are explanatory drawings showing another modified example of the package stack semiconductor device, in which FIG. 14(a) is a front view, and FIG. 14(b) is a side view, and FIG. 14(c) is a plan view.

FIG. 15 is a plan view of a wiring substrate used in the package stack semiconductor device.

FIG. 16(a) and FIG. 16(b) are explanatory drawings showing yet another modified example of the wiring substrate, in which FIG. 16(a) is a front view, and FIG. 16(b) is a cross sectional view taken along both dotted lines and arrows of the FIG. 16(a).

FIG. 17 is a cross sectional view of yet another modified example of the semiconductor device.

FIG. 18 is a cross sectional view of yet another modified example of the semiconductor device.

FIG. 19 is a cross sectional view of yet another modified example of the semiconductor device.

FIG. 20 is a cross sectional view of a conventional semiconductor device.

FIG. 21 is a cross sectional view of another conventional semiconductor device.

FIG. 22 is a cross sectional view of yet another conventional semiconductor device.

FIG. 23 is a cross sectional view of a main portion which shows deformation of an insulating substrate of the semiconductor device in wire bonding.

DESCRIPTION OF THE EMBODIMENTS

The following describes embodiments of the present invention with reference to FIG. 1 through FIG. 19.

The First Embodiment

FIG. 1 is a cross sectional view of a semiconductor device in accordance with the first embodiment of the present invention. FIG. 2(a) to FIG. 2(c) are explanatory drawings showing a wiring substrate 1 used in the semiconductor device of the first embodiment in accordance with the present invention, in which FIG. 2(a) shows a wiring pattern 4 of side A 13a of an insulating substrate 13, and FIG. 2(b) shows a wiring pattern 4' of side B 13b of an insulating substrate 13, FIG. 2(c) shows a modification example of the wiring pattern 4'.

The semiconductor device according to the first embodiment, as shown in FIG. 1, has the wiring substrate 1, a semiconductor chip 2, Au wires (bonding wire section) 3, a solder resist 7, an external connection terminal 10, and a resin sealing section 11. Examples of the semiconductor chip 2 include a CPU (Central Processing Unit) and an integrated circuit (L.S.I:Large Scaled Integrated circuit) such as a memory.

The semiconductor chip 2 is mounted on the wiring substrate 1 by die bonding. The Au wires 3 are to electrically connect terminal sections 5 on the wiring substrate 1 to the semiconductor chip 2 by wire bonding. The resin sealing section 11 is to protect the semiconductor chip 2 and the Au wires 3 by covering them with a sealing resin by transfer molding.

The external connection terminal section (conductive member) 10 is provided in the form of solder balls by reflow soldering on land sections 6 (described later), which are formed on a surface (hereinbelow, referred to as side B 13b) on the other side of a surface on which the semiconductor chip 2 is provided (hereinbelow, referred to as side A 13a). The land section 6 is provided on side b 13b.

The wiring substrate 1, as shown in FIG. 1, FIG. 2(a) and FIG. 2(b), has the insulating substrate 13 made of, for example, a 0.06 mm thick glass epoxy material, and the plurality of conductive land sections 6 to connect the semiconductor chip 2 to the external device, are provided, as many as input/output terminals of the semiconductor chip 2, on side B 13b, for example, in a matrix pattern.

Further, the wiring substrate 1 has the plurality of conductive terminal sections 5 made of, for example, Cu foil for wire bonding, which are to be electrically connected to terminals on the upper surface of the semiconductor chip 2 and provided side by side, as many as input/output terminals of the semiconductor chip 2, on the periphery of the side A 13a on which the semiconductor chip 2 is mounted.

Further, on the side A 13a of the wiring substrate 1 is formed the wiring pattern 4, made of conductive metallic foil, for example, such as Cu foil, to electrically connect the land sections 6 to the corresponding terminal sections 5. Thus, in order to connect the ends of the wiring pattern 4 to the land sections 6 electrically, through hole sections 8 are provided through the insulating substrate 13 between the ends of the wiring pattern 4 and the land sections 6, and connection sections 17 which are plated with silver, gold and the like, or are filled with a conductive paste are provided on the through hole section 8.

Further, in the side B 13b, on the other side of the side A 13a of the wiring substrate 1, the wiring pattern 4' is provided to electrically connect the land sections 6, which cannot be connected completely through the wiring pattern 4, to the corresponding terminal sections 5. The wiring pattern 4' is made of conductive metallic foil such as Cu foil.

In order to connect this wiring pattern 4' to the corresponding land sections 6 via the wiring pattern 4 on side A 13a, through hole sections 8a are provided according to the wiring pattern 4'. The through hole sections 8a enable the wiring pattern 4 and the wiring pattern 4' which lead to the through hole sections 8a to be connected electrically in accordance with an electrical conductor (not shown) such as a metal eyelet, for example, made of Cu, the plating mentioned above, or a conductive paste. Thus, the wiring pattern 4 of side A 13a includes a wiring pattern which connects the terminal sections 5 to the corresponding land sections 6 via the through hole sections 8.

Further, on the side B 13b of the wiring substrate 1, a support pattern 9 having almost the same, or preferably the same height as the wiring pattern 4' or land sections 6 is provided on a position corresponding to or facing to the position where the terminal sections 5 are formed. The support pattern 9 is provided on substantially in the form of strips opposing each other on the sides of the side B 13b corresponding to the terminal sections 5. Further, the support pattern 9 may be provided according to, or at the same height as, the height of the highest protrudent part on side B 13b.

US 6,731,013 B2

7

The support pattern 9 is preferred to be made of the same material as the land sections 6 or the wiring pattern 4', because this makes it easy to produce them at once, and to match their heights, using the etching pattern for forming the terminal sections 5 on side A 13a when forming the wiring pattern 4' by etching, etc.

In the wiring substrate 1, a semiconductor chip 2 is mounted on side A 13a of the insulating substrate 13, and the input/output terminals (not shown) on the circuit forming surface on the upper surface of the semiconductor chip 2 (the underside of the semiconductor chip 2 is connected to the insulating substrate 13 by die bonding) are respectively connected to the terminal sections 5 electrically via the Au wires 3 by wire bonding.

As a rule, wire bonding employs fixing on a stage of a wire bonder by suction, or fixing by the pressure of a clamper. If the wiring substrate 1 has enough stiffness, deformation of the wiring substrate 1 can be prevented when a load is applied on the wiring substrate 1 in wire bonding to make connection, even when there are irregularities such as the wiring pattern 4' on side B 13b of the wiring substrate 1, and fixing is not enough. This enables the electrical connection by wire bonding to be highly reliable.

On the other hand, as in the wiring substrate 1 mentioned in the first embodiment, when the insulating substrate 13 is as thin as, for example, 0.06 mm and the stiffness is not enough, the terminal sections 5 may be able to be fixed or supported sufficiently. In such a case, the insulating substrate 13 deforms in a direction of thickness when a load is applied on each terminal sections 5 on the insulating substrate 13 in a direction of thickness of the insulating substrate 13 in wire bonding. This brings about inadequate wire-bond connection due to failure in applying a load.

When the wiring pattern 4 is provided on only side A 13a, and when side B 13b is flat, the wiring substrate 1 like this can avoid inadequate wire bonding because it allows the insulating substrate 13 to be sufficiently fixed even when the insulating substrate 13 of the wiring substrate 1 is thin.

However, the wiring substrate 1 of the first embodiment is thin, and the wiring pattern 4' and the like is formed on side B 13b. Thus, there are irregularities in height on side B 13b. Not the whole area of the wiring substrate 1 may be supported and fixed, but at least the side B 13b in position corresponding to the terminal sections 5 to be wire bonded needs to be fixed.

As such is the case, the wiring substrate 1 according to the present invention has the support pattern 9 which is provided on side B 13b corresponding in position to the terminal sections 5, taking into consideration the height of other sections such as the wiring pattern 4' on side B 13b. This allows the load to be supported on the support pattern 9 in wire bonding, thus preventing deformation of the wiring substrate 13 (elastic deformation or plastic deformation) when applying a load.

Therefore, the wiring substrate 1 allows a load to be accurately applied at a pre-set value, thereby ensuring electrical connection between the Au wires 3 and the terminal sections 5.

Note that, in the wiring substrate 1, the support pattern 9 which is formed on the side B 13b corresponding in position to the terminal sections 5 is provided so that the insulating substrate 13 can be supported on a wire bonder stage to prevent deformation of the insulating substrate 13 at the point of applied pressure. Thus, not only the dummy pattern but also the wiring pattern 4' which is connected to the land sections 6 can be used as the support pattern 9. Either as

8

shown in FIG. 2(c), the support pattern 9 may be divided into plural parts, for example, according to the layout of the terminal sections 5.

The Second Embodiment

FIG. 3(a) to FIG. 3(c) are explanatory drawings showing a semiconductor device of the second embodiment in accordance with the present invention, in which FIG. 3(a) is a cross sectional view, FIG. 3(b) is a top view, and FIG. 3(c) is a bottom view. In the semiconductor device of the second embodiment, as shown in FIG. 3(a) to FIG. 3(c), a semiconductor chip 2 and a wiring substrate 1 are connected electrically and fixed by each other, by connecting the semiconductor chip 2 in flip-chip with terminal sections 5', using, for example, an anisotropy conductive film 19.

In this semiconductor device, external connection terminal sections 10 are provided by connecting solder balls by reflow soldering on land sections 6 of external connection terminals of the surface on which the semiconductor chip 2 is mounted, i.e., side A 13a. Thus, a wiring pattern 4 is provided on side A 13a so as to respectively connect the terminal sections 5' to the land sections 6 electrically.

The wiring substrate 1 according to the second embodiment of the present invention has land sections 6' for connecting semiconductor devices. The land sections 6' are provided on side B 13b of an insulating substrate 13 which is made of a material, for example, such as glass epoxy with a thickness of not more than 0.1 mm, on a position facing land sections 6. The land sections 6 and the land sections 6' for connecting semiconductor devices are connected electrically through connection sections 17 of the through hole sections 8. Therefore, the land sections 6' and the land sections 6 facing each other are provided such that they have the same electrical signal.

The wiring substrate 1 a support pattern 9', similar to the support pattern 9 mentioned above, on side B 13b of the insulating substrate 13 on the other side of the area on which the semiconductor chip 2 is mounted in flip-chip, taking into consideration the height of the land sections 6' for connecting semiconductor devices, so that pressure of flip-chip connection can be sufficiently applied to each point of connection between the semiconductor chip 2 and the terminal sections 5' of the wiring substrate 1. This ensures that the surface of the side B 13b is flat in connecting based on flip-chip.

In short, by the provision of the support pattern 9', electrical connection between the semiconductor chip 2 and each terminal section 5' of the wiring substrate 1 is ensured.

The Third Embodiment

FIG. 4(a) to FIG. 4(c) are explanatory drawings showing a semiconductor device according to the third embodiment of the present invention, in which FIG. 4(a) is a cross sectional view, FIG. 4(b) is a top view, and FIG. (c) is a bottom view. The members which have the same functions as those described in the first and second embodiments are given the same reference numerals thereof are omitted as long as they are not needed.

In the semiconductor device of the third embodiment, as shown in FIG. 4(a) to FIG. 4(c), FIG. 6 and FIG. 7(a) to FIG. 7(c), a wiring substrate 1 having an opening section 13c in which a semiconductor chip 2 is mounted is connected to the semiconductor chip 2 via Au wires 3, and the Au wires 3 and a circuit forming surface of the semiconductor chip 2 are sealed with a resin sealing section 11, and external connection terminal sections 10 are mounted on the same surface as the resin-sealed surface.

A method of fabricating the semiconductor device of the third embodiment shown in FIG. 4(a) to FIG. 4(b) is described below, based on FIG. 5(a) to FIG. 5(e).

US 6,731,013 B2

9                                                                          10

In the first place, the wiring substrate **1** is prepared by forming the opening section **13**c of a substantially rectangular shape in substantially the middle of the insulating substrate **13** where the semiconductor chip **2** is to be mounted. A film **12** which has an adherent is pasted on the adherent to one surface of the wiring substrate **1** which has the opening section **13**c.

Next, the semiconductor chip **2** is mounted on the film **12** in the opening section **13**c. In mounting the semiconductor chip **2**, the surface of the semiconductor chip on the other side of the surface where input/output terminals are formed (hereinbelow referred to as a back surface) is pasted to the film **12** (see FIG. **5**(a)).

Thereafter, the semiconductor chip **2** is connected to the terminal sections **5** of the insulating substrate **13** electrically via the Au wires **3** by wire bonding (see FIG. **5**(b)), and the resin sealing section **11** is formed to seal over the circuit forming surface of the semiconductor chip **2** and the Au wires **3** (see FIG. **5**(c)).

Next, land sections **6** of an external connection terminals are soldered by reflow after printing a soldering paste thereon so as to form the external connection terminal sections **10** (see FIG. **5**(d)). Then, the wiring substrate **1** is divided into individual semiconductor devices at cutting grooves **13**d using a dicing cutting device (see FIG. **5**(e)). Each divided semiconductor device is picked up and put on a tray.

More concrete description of production process is given below. FIG. **5**(a) to FIG. **5**(e) show manufacturing steps of the semiconductor device according to the third embodiment. FIG. **6** is a cross sectional view of the wiring substrate **1** having wiring on both surfaces, which is used for the foregoing semiconductor device. FIG. **7**(a) and FIG. **7**(b) show an example of wiring patterns **4** on the both surfaces.

The insulating substrate **13** of the wiring substrate **1** is made of a 0.06 mm to 0.1 mm thick epoxy which contains glass fibre cloth, has the opening section **13**c, in which the semiconductor chip is mounted, is provided by boring by means of a router or a die.

The wiring substrate **1** is provided with wiring patterns **4** and **4'**, which are made of Cu, on both sides, and these corresponding wiring patterns **4** and **4'** are connected to each other by connection sections **17** of through hole sections **8**. Further, land sections **6**, which are external connection terminals, are provided on the surface of the insulating substrate **13** where the terminal sections **5** are formed, and land sections **6'** for connecting semiconductor devices are provided on the other side of the insulating substrate **13**.

Further, a support pattern **9**, similar to the foregoing support pattern **9**, is provided on the other side of the surface where the terminal sections **5** for wire bonding is formed, so as to improve wire bonding.

For example, the land sections **6** are disposed with 0.5 mm and the diameter of 0.2 mm to 0.3 mm. The through hole sections **8** may be provided just under the land sections **6** in a pad-on manner, or may be provided on a different position from the land sections **6** so as to make connection by the wiring pattern **4**. All the wiring except the land sections **6**, **6'** and terminal sections **5** for the wire bonding is covered with a solder resist **7** for protection. The finished wiring substrate **1** is about 0.1 mm to 0.2 mm thick.

The following describes a manufacturing process of the semiconductor device mentioned above based on FIG. **5**(a) to FIG. **5**(e). The film **12** to be a mount of the semiconductor chip **2** is pasted on the semiconductor chip mounting opening section **13**c of the wiring substrate **1** having the wiring

patterns **4** and **4'** on the both surfaces of the insulating substrate **13**, so that the semiconductor chip **2** is mounted on the film **12** in opening section **13**c. Preferably, the film **12** has enough heat resistance with respect to the heat history of each assembling steps of the semiconductor device. Also, the film **12** preferably includes an adhesive component on one of its surfaces so that it can anchor the semiconductor chip **2** and can easily be pasted on the insulating substrate **13** (see FIG. **5**(a)).

Then, the wiring substrate **1** and the semiconductor chip **2** are connected by wire bonding, i.e., by the Au wires **3**. In order to provide a thin semiconductor device, extremely low loop wire bonding is employed. Wire bonding enables the semiconductor chip **2** and the wiring substrate **1** to be connected flexibly.

Employing other connection method such as flip-chip bonding or single point bonding requires redesigning of the wiring substrate **1** needs according to the type of the semiconductor chip **2**. However, with the use of wire bonding, redesigning of the wiring substrate **1** is not needed. Even when pad pitch of the semiconductor chip **2** is changed by chip shrink, or when a semiconductor chip **2** with a standardized terminal sequence of an element such as a memory is used (referred in FIG. **5**(b)).

Thereafter, the semiconductor chip **2** and the Au wires **3** are sealed with resin, so as to form the resin sealing section **11**. Only the circuit forming surface of the semiconductor chip **2** is sealed by transfer molding. The method of sealing is not just limited to transfer molding, and other methods such as wiring by potting or printing using a screen mask may be employed as well. (see FIG. **5**(c)).

The external connection terminal sections **10** are formed in the form of semi-spheres by reflow soldering after printing a solder paste on the land sections **6** which is on the same surface as the mold-sealed surface of the wiring substrate **1**. The external connection terminal sections **10** may be made with a solder ball instead of a solder paste by a ball mount method, in the same manner as the usual BGA (see FIG. **5**(d)).

After forming the external connection terminal sections **10**, a cutting grooves **13**d are provided by dicing, so as to divide the semiconductor device into individual pieces (see FIG. **5**(e)). The method of dicing the semiconductor device is not just limited to dicing but it may be cut using a looter or a die. Alternatively, if slits are provided between semiconductor devices of the wiring substrate **1** in advance, the device can be effectively cut at the slits.

In the semiconductor device of the third embodiment, by setting the thickness of the external connection terminal sections **10** to about 0.1 mm to 0.15 mm, the semiconductor device can be manufactured with the thickness of about 0.2 mm to 0.3 mm.

The Fourth Embodiment

A stacked semiconductor device (hereinbelow referred to as a package stack semiconductor device) as the fourth embodiment according to the present invention is described below.

The semiconductor devices according to the first to third embodiments include the land sections **6** and the land sections **6'** for connecting semiconductor devices, which are provided on the both surfaces of the wiring substrate **1**. This allows the semiconductor devices to be connected electrically by stacking them, regardless of the size and the type of the semiconductor chip **2**, taking into consideration or, for example, by matching the external sizes of the semiconductor devices and the layout of the external connection termi-

US 6,731,013 B2

11

nal sections **10**. Two or more semiconductor devices can be used as the one package stack semiconductor device this way.

The package stack semiconductor device includes stacked semiconductor devices as shown in FIG. **8**. On a semiconductor device $21_1$ placed in the top position, semiconductor device $21_2$ and $21_3$ are stacked in this order, with the external connection terminal sections **10** facing upward (toward an installation opening) in a tray **14**. Thereafter, the semiconductor devices $21_1$ to $21_3$ are connected to each other by reflow soldering.

The package stack semiconductor device of this type may be used as a stacked semiconductor device as it is, or, after reflow soldering, fixing resin (mentioned below) may be injected into gaps between each semiconductor device, so as to bring about reliability of the semiconductor device.

If the position of each semiconductor device **21** in the package stack semiconductor device is decided in advance before assemblage, it is preferable that a usually employed Sn—Pb solder is used for the external connection terminal sections **10** of a semiconductor device $21_N$ (N is the number of stacked semiconductor devices) which is placed in the bottom position (i.e., a semiconductor device having the external connection terminal sections **10** which are exposed for extend connection), and a solder having a higher melting point than that of the Sn—Pb solder is used for the semiconductor devices $21_1$ to $21_{N-1}$ above the semiconductor device $21_N$.

In short, the reflow soldering for electrically connecting the stacked semiconductor devices **21** are carried out under temperature conditions according to the solder having a higher melting point, and the reflow soldering of the substrate mounted on the semiconductor device $21_N$ is carried out under normal conditions. As a result, this method of soldering can minimize melting and bleed of solder when connecting the semiconductor device $21_1$ to $21_{N-1}$.

As shown in FIG. **9**, the semiconductor device **21** may be stacked in the form of a collection of semiconductor devices **22** in a frame before being divided into individual pieces. These stacked semiconductor devices may be cut according to the sectional lines shown in FIG. **9**, or, alternatively, gaps between each semiconductor device may be filled with fixing resin, so as to eliminate gaps between the semiconductor devices **21** where they are cut, thus cutting the semiconductor devices more stably and effectively.

FIG. **10**(*a*) shows a cross sectional view of a package stack semiconductor device which is made up of four of the semiconductor devices **21** mentioned above. FIG. **10**(*b*) is a cross sectional view of a form injected with the fixing resin **15**.

In the case where semiconductor devices which have the same type of semiconductor chip **2** are stacked, by setting the external connection terminal sections **10** at the same position between the semiconductor devices **21**, except terminals for chip selection. The signals of the semiconductor devices **21** of the upper stages can be conveyed to an external substrate via the land sections **6'** of the semiconductor devices **21** of the lower stage.

Preferably, each semiconductor device **21** should be provided with terminals for chip selection in order to be identified when used in a package stack semiconductor device.

If the number of the chip selector terminals in the wiring substrate **1** is the same as or more than the number of stacked semiconductor devices **21**, it is possible to stack semiconductor devices **21** manufactured with the same wiring sub-

12

strate **1** only by changing wire connection. FIG. **11**(*b*) shows an example of four stacked semiconductor devices (for convenience, the lowest semiconductor devices is called "the first" and the second lowest "the second" and the like).

When the semiconductor devices **21** stacked in a package stack have the same type of the semiconductor chip **2**, redesigning of the substrate of each semiconductor device will not be required, and the position of stacking can be changed only by changing a wire bonding position.

If the semiconductor chip **2** and the wiring substrate **1** are connected electrically by a method other than wire bonding, such as the flip-chip connection or inner lead bonding, the connection terminals cannot be changed using the same wiring substrate **1** as in wire bonding.

While, as shown in FIG. **11**(*a*), by providing and setting wiring **23** near the terminal sections **5** for connecting the chip selector terminals on the side of the wiring substrate **1**, a package stack position can be set by providing a cut-out section or a through hole section in the wiring substrate **1** of each semiconductor device **21** and by disconnecting the wiring **23**.

A terminal section **5A** in the figure is wire bonded and the wiring **23** at point C is disconnected when the semiconductor device **21** is used as a tip selector A. On the other hand, the terminal section **5A** is connected and the wiring is disconnected at point D when the semiconductor device **21** is used as a tip selector B.

So, even when the semiconductor devices **21** which have the same type of semiconductor chip **2** and the wiring substrate **1** are stacked, it is possible to identify each semiconductor device **21** in terms of electricity and appearance. The cut-out section or the through hole section may be provided on the wiring substrate **1** while the wiring substrate **1** is being processed, or while the semiconductor device **21** is being divided, or after the semiconductor device **21** is divided.

The wiring substrate **1** like this enables the chips to be identified with fewer terminals than the number of stacked semiconductor devices **21**. Thus, the number of the terminal sections **5** for wire bonding can be decreased. Different appearance of the semiconductor devices **21** also makes it easy to identify the chips.

Where there exist chips which are greatly different in size but having a similar terminal layout, the wiring substrate **1** as shown in FIG. **12** is used and the size of the opening section **13***c* where the chip is mounted is changed. This makes it possible to increase the type of the semiconductor chip **2** which can be adapted to the same wiring substrate **1**, without requiring redesigning of the substrate.

When the size of the semiconductor chip **2** is small, a square surrounded by a solid line in the figure is cut out as the opening section **13***c* and inner terminal sections **5** are used for wire bonding. When the size of the semiconductor chip **2** is large, a square surrounded by a broken line (larger than the square surrounded by solid line) is cut out as the opening section **13***c* and outer terminal sections **5** are used.

As shown in FIG. **13**, one or more reinforcing terminals (reinforcing projection) **16** are provided on the periphery of the wiring substrate **1** where the land sections **6** are not provided. The reinforcing terminals **16** are according to the size (height) which is set for the connection sections of the external connection terminal sections **10** on the land sections **6**, or preferably at the same height as the external connection terminal sections **10**. By this, reliability of connection between each stacked semiconductor device **21** or between the semiconductor device **21** and the mounting substrate can be further improved.

US 6,731,013 B2

13

FIG. 14(a) to FIG. 14(c) show a different pattern of stack as in the case of a semiconductor chip 2 for a logic circuit and a semiconductor chip 2 for a memory circuit, wherein the number of the external connection terminal sections 10 differ greatly and the external size of the chip is different as well. FIG. 14(a) is a front view, FIG. 14(b) is a side view, and FIG. 14(c) is a top view. Each figure is a description of the stack mentioned above.

When the semiconductor chip 2 having different terminal layout or different numbers of terminals are stacked as in the combination of the semiconductor chip 2 for a logic circuit and the semiconductor chip 2 for a memory circuit, for example, the wiring substrate 1 as shown in FIG. 7(a) and FIG. 7(b) and a wiring substrate 1 which is larger than the one mentioned above, as shown in FIG. 16(a) and FIG. 16(b) are used together.

Incidentally, the semiconductor chip 2 for a logic circuit has more external connection terminal sections 10 than the semiconductor chip 2 for a memory circuit. Thus, in the semiconductor device which has the semiconductor chip 2 mentioned above, the wiring substrate 1 is provided with the external connection terminal sections 10 on every side of the surface as shown in FIG. 15. The external connection terminal sections 10 on two of four sides are used only for the logic circuit, and the external connection terminal sections 10 on the other two sides are used for both memory circuit and the logic circuit or used only for the memory circuit.

As shown in FIG. 14(a) to FIG. 14(c), the package stack semiconductor device has a stack structure of a semiconductor device $21_4$ of the wiring substrate 1 which has the semiconductor chip 2 for the logic circuit placed on the lowest position, and semiconductor device $21_1$ to $21_3$ which have the semiconductor chip 2 for the memory circuit provided above the semiconductor chip 2 on the wiring substrate $21_4$. Thus, the external connection terminal sections 10 of the wiring substrate 1 for the memory circuit are connected to the external mounting substrate via the wiring substrate 1 for the logic circuit.

Another method of fabricating the semiconductor device according to the present invention is described below. After providing the opening section 13c where the semiconductor chip is mounted, opening section 13c on one side (on side B 13b) is covered with the same Cu foil (metallic foil) as the foil used in providing the wiring pattern 4. FIG. 16(b) shows a cross sectional view of this wiring substrate 1. The Cu foil 20 is used instead of the film 12 mentioned above. The Cu foil 20 is also provided on the other side of the terminal sections 5 for wire bonding, so as to improve wire bonding.

A process of fabricating the wiring substrate 1 which has the Cu foil 20 is described below. In the first place, the semiconductor chip 2 is mounted on the Cu foil 20 of the opening section 13c, and after connecting the semiconductor chip 2 and the terminal sections 5 of the wiring substrate 1 via the Au wires 3 by the wire bonding, the circuit forming surface of the semiconductor chip 2 and the Au wires 3 are sealed with resin. Thereafter, the external connection terminal sections 10 are provided on the land sections 6 making up the external connection terminals.

After that, the wiring substrate 1 in the form of a frame is pasted to a film for dicing connection and is cut into pieces. The Cu foil 20 remains on the back of the semiconductor chip 2 of the semiconductor device which was divided by dicing. The Cu foil 20 not only has the advantage of not requiring the film 12 in assemblage of the semiconductor device, but also has the effect of protecting the back of the

14

semiconductor chip 2, among other effects such as shielding electromagnetic wave and releasing heat.

Yet another method of fabricating the semiconductor device according to the present invention is described below. A wire bonder equipped with a chip supply device is used in this method, which is described more concretely below, based on FIG. 5(a) to FIG. 5(e).

In the first place, with respect to the wiring substrate 1 which is fixed on a stage section of the wire bonder, the semiconductor chip 2 is supplied to a portion of the stage which is exposed through the opening section 13c where the semiconductor chip is to be mounted, and wire bonding is carried out after fixing the semiconductor chip 2 on the stage by vacuum suction. Since the semiconductor chip 2 used in the semiconductor device mentioned above is thin (150 μm or less), it can be held by only the Au wires 3 until they are sealed with resin after wire bonding.

In the first through fourth embodiments, the glass epoxy was used as a material of the wiring substrate 1. However, not only the glass epoxy but also resin such as polyimide, BT (bismaleimide•etriazine) resin, and aramid can be used.

The Fifth Embodiment

FIG. 17 is a cross sectional view of a semiconductor device according to the fifth embodiment of the present invention. The semiconductor device of the present invention has a structure including two semiconductor chip 2a and 2b in the semiconductor device of the third embodiment. Each semiconductor chip 2a and 2b used in the semiconductor device is thinner than the semiconductor chip 2 used in the semiconductor device of the third embodiment.

In the semiconductor device according to the fifth embodiment, the first semiconductor chip 2a is provided on the film 12 as in the third embodiment, and the second semiconductor chip 2b having a film of a heat bonding type pasted on the back surface is die bonded with the circuit forming surface of the first semiconductor chip 2a. Thereafter, each semiconductor chip 2a and 2b is connected to the wiring substrate 1 via Au wires 3 by wire bonding. Then, they are sealed with resin, and external connection terminal section 10 is provided, and the semiconductor device is cut into pieces.

The second semiconductor chip 2b may wire bonded with the wiring substrate 1 directly, or may be electrically connected to the wiring substrate 1 via the first semiconductor chip 2a wire bonded with the second semiconductor chip 2b. The number of stacked semiconductor chips is not just limited to two stages but they can be stacked in the same manner in three or more stages.

Further, as shown in FIG. 18, instead of laminating the semiconductor chips 2, they may be placed side by side on the same plane two-dimensionally. Further, as shown in FIG. 19, additional semiconductor chips 2a and 2b may be stacked in a direction of thickness with respect to the semiconductor chips 2a and 2c which are placed side by side on the same plane. Further, in the wiring substrate 1 of the present invention, the number of layers of the wiring pattern 4 is not just limited to two, but the wiring substrate 1 may have a larger number of layers.

As described, a wiring substrate of the present invention, includes an insulating substrate, a terminal section, provided on a first surface of the insulating substrate by wire bonding; a land section, provided on the insulating substrate, for an external connection terminal; wiring patterns, respectively provided on the first surface and a second surface on the other side of the first surface, for making electrical connection between the terminal section and the land section; and

US 6,731,013 B2

15

a support pattern, provided on the second surface corresponding in position to the terminal section, for improving wire bonding.

Another wiring substrate of the present invention, as described above, includes an insulating substrate, a terminal section provided on a first surface of the insulating substrate, for making connection by wire bonding; a first land section provided on the first surface for an external connection terminal; a second land section provided on a second surface on the other side of the first surface, for interconnecting semiconductor devices; wiring patterns, respectively provided on the first surface and the second surface, for making electrical connection between the terminal section, the first land section, and the second land; and a support pattern provided on the second surface corresponding in position to the terminal section for improving wire bonding.

Yet another wiring substrate of the present invention, as described above, includes an insulating substrate, a terminal section, provided on a first surface of the insulating substrate, for making flip-chip connection; a first land section, provided on the first surface, for an external connection terminal; a second land section, provided on the second surface on the other side of the first surface, for interconnecting semiconductor devices; wiring patterns, respectively provided on the first surface and the second surface, for making electrical connection between the terminal section, the first land section, and the second land section; a support pattern, provided on the second surface corresponding in position to the terminal section, for improving reliability of connection.

Yet another wiring substrate of the present invention, as described above, includes an insulating substrate having an opening section for mounting a semiconductor chip in the middle of the insulating substrate; a terminal section, provided on the first surface of the insulating substrate, for connecting to a semiconductor chip by wire bonding; a first land section, provided on the first surface, for an external connection terminal; a second land section, provided on a second surface on the other side of the first surface, for interconnecting semiconductor devices; wiring patterns, respectively provided on the first surface and the second surface, for making electrical connection between the terminal section, the first land section, and the second land section; a support pattern, provided on the second surface corresponding in position to the terminal section for improving wire bonding.

According to the arrangements mentioned above, the wiring patterns for making electrical connection between the terminal section and the first and second land sections are provided on the first and second surface, respectively. Thus, the wiring patterns ensure to connect the terminal section and the first and second land sections, even when the semiconductor chip which has many input/output terminals is mounted.

Further, with the foregoing arrangements, when the terminal section is connected by wire bonding or by flip-chip, even when a load is applied on the terminal section in a direction of thickness of the insulating substrate, the support pattern provided on a position corresponding to the terminal section can hold the pressure.

Therefore, with the foregoing arrangement, the support pattern can avoid deformation of the insulating substrate mentioned above. Thus, a load can be applied to the insulating substrate sufficiently in wire bonding and in flip-chip connecting. As a result, reliability of the connection based on wire bonding and flip-chip can be improved.

16

The wiring substrate which has the opening section may be provided with a heat resistant film for mounting a semiconductor chip, provided so as to cover an opening of the opening section on the second surface. The film makes it easier to provide the opening section with the semiconductor chip.

The wiring substrate which has the opening section may be provided with a metallic foil for mounting the semiconductor chip, provided so as to cover an opening of the opening section on the second surface.

With this arrangement, the metallic foil makes it easier to provide the opening section with the semiconductor chip. Besides, the metallic foil can protect the backside of the semiconductor chip, and can shield electromagnetic wave, and can improve radiating heat.

Preferably, the shape of the support pattern corresponds to the shape of the terminal section in the wiring substrate mentioned above. According to this arrangement, it is further ensured that deformation of the insulating substrate by the support pattern can be avoided in making connection based on wire bonding or flip-chip connection.

In the wiring substrate mentioned above, the support pattern may be connected to the second land section. According to this arrangement, the support pattern can be used as one of the wiring patterns. This simplifies manufacture of the wiring substrate.

The wiring substrate mentioned above may have the wiring patterns in multi-layers. With this arrangement, by the multi-layered wiring pattern, for example, connection among the terminal section, the first land section, and the second land section can be ensured by the wiring patterns, even when the number of input/output terminals of the semiconductor chip is increased.

Preferably, the support pattern is provided according to the height of the wiring pattern on the second surface in the insulating substrate mentioned above. With this arrangement, the support pattern can support the insulating substrate more securely in making connection based on wire bonding and flip-chip connection. As a result, reliability of connection based on wire bonding and flip-chip connection can be improved further.

As described, a semiconductor device of the present invention includes any one of the wiring substrates having the terminal section connected by wire bonding, a semiconductor chip mounted on the wiring substrate, a bonding wire section for making electrical connection between the wiring substrate and the semiconductor chip, a resin sealing section for sealing a circuit forming surface of the semiconductor chip and the bonding wire section, and a conductive member provided on the second land section for connecting the semiconductor chip to outside.

According to the arrangement mentioned above, by the provision of the wiring substrate having the support pattern on a position corresponding to the terminal section, reliability of connection based on wire bonding by the bonding wire section can be improved, thereby improving reliability of the device.

Yet another semiconductor device of the present invention, as described above, includes any one of the wiring substrate for flip-chip connection, a semiconductor chip which is mounted on the wiring substrate by being electrically connected thereto by flip-chip connection, a resin sealing section for sealing the circuit forming surface of the semiconductor chip, and a conductive member, provided on the second land section, for connecting the semiconductor chip to outside.

US 6,731,013 B2

17

According to the arrangement mentioned above, by the provision of the wiring substrate having a support pattern on a position corresponding to the terminal section, reliability of connection based on flip-chip connection can be improved, thereby improving reliability of the device.

In the semiconductor device mentioned above, a plurality of semiconductor chips may be provided two dimensionally or three dimensionally. With this arrangement, the wiring patterns are provided respectively on the both surfaces of the insulating substrate. Thus, even when the number of the input/output terminals is increased due to the plurality of the semiconductor chips, it is easy to cope with the increased input/output terminals, and connect the semiconductor chips to the external device, and reliability of electrical connection between the semiconductor chip and outside can be improved.

In the semiconductor device mentioned above, a support projection which corresponds to the external connection terminal may be provided on the wiring substrate.

According to the arrangement mentioned above, when a plurality of semiconductor devices are stacked in a direction of thickness of the wiring substrate, and when the adjoining semiconductor devices are connected by the external connection terminals, the support projection enables the electrical connection of the semiconductor devices to be maintained. As a result, reliability of connection of the semiconductor devices can be improved.

The package stack semiconductor device of the present invention, as described above, has a plurality of semiconductor devices which are stacked by soldering connection.

According to the arrangement mentioned above, a plurality of semiconductor devices are stacked, for example, in a direction of thickness of the wiring substrate, and the external connection terminal sections as the conductive member of the respective semiconductor devices are connected by soldering to each other, thus connecting the semiconductor devices in a stacked form.

Further, since the foregoing arrangement uses the semiconductor device having the wiring substrate with the improved reliability of wire bond connection, reliability of connection can be improved.

In the foregoing package stack semiconductor device, it is preferable that a solder used for an external connection terminal of a semiconductor device which is exposed to outside has a lower melting point than that used for external connection terminals of stacked semiconductor devices to each other.

According to the arrangement mentioned above, the electrical connection between the stacked semiconductor devices can be carried out by reflow soldering at a melting point according to the solder of the electrical connection terminals of the other semiconductor devices.

While, according to the foregoing arrangement, when the exposed external connection terminals of the semiconductor device which are exposed to outside are to be electrically connected, for example, to the external mounting substrate (external device), they can be soldered at lower melting point than terminals of other semiconductor devices. Thus, this can prevent melting of solder between other stacked semiconductor devices, and can connect them electrically.

In the package stack semiconductor device mentioned above, fixing resin may be injected into gaps between adjoining semiconductor devices. With this arrangement, fixing resin prevents deformation and vibration of each semiconductor device, thus further improving reliability of connection.

18

In the foregoing package stack semiconductor device, it is preferable that the layout of the external connection terminals of each semiconductor device, at least the common external connection terminals, are designed according to the position of each terminal.

According to this arrangement, at least common external connection terminals are set, taking into consideration their positions. This further ensures electrical connection between stacked semiconductor devices, in addition to making manufacture of the device easier.

In the foregoing package stack semiconductor device, at least two of the plurality of semiconductor devices have different external size.

According to this arrangement, the semiconductor chip for the logic circuit which has more input/output terminals can be provided on a semiconductor device having a larger external size, and the semiconductor chip for the memory circuit which has fewer input/output terminals can be provided on a semiconductor device having a smaller external size.

It is preferable in the foregoing package stack semiconductor device that a semiconductor device with its external connection terminal exposed to outside is a larger external size than that of other semiconductor devices.

In the arrangement mentioned above, the semiconductor chip for the logic circuit which has more input/output terminals can be provided on the semiconductor device whose external connection terminals are exposed to outside, and the semiconductor chip for the memory circuit which has fewer input/output terminals can be provided on other semiconductor devices.

With this arrangement, a semiconductor device having a larger external size, which can have many terminals, can be exposed to outside, thus ensuring electrical connection between the stacked semiconductor devices and outside.

The invention may be embodied in other specific forms without departing from the spirit or the appended claims thereof. The present embodiment is therefore to be considered in all respects as illustrative and not restrictive.

What is claimed is:

1. A wiring substrate comprising:

an insulating substrate;

a terminal section, provided on a first surface of the insulating substrate, for making connection by wire bonding;

a land section, provided on the insulating substrate, for an external connection terminal;

wiring patterns, respectively provided on the first surface and a second surface on the other side of the first surface, for making electrical connection between the terminal section and the land section; and

a support pattern, provided on the second surface corresponding in position to the terminal section, for improving wire bonding connection, wherein the support pattern is not electrically connected to one of the terminal section and first and second land section.

2. The wiring substrate as set forth in claim 1, wherein a shape of the support pattern corresponds to a shape of the terminal section.

3. The wiring substrate as set forth in claim 1, wherein the support pattern is connected to the land section.

4. The wiring substrate as set forth in claim 1, wherein wiring patterns are provided in multi/layers.

5. The wiring substrate as set forth in claim 1, wherein the support pattern is provided according to a height of the

US 6,731,013 B2

19

wiring pattern on the second surface of the insulating substrate on the second surface.

6. A wiring substrate comprising:

an insulating substrate;

a terminal section, provided on a first surface of the insulating substrate, for making connection by wire bonding;

a first land section, provided on the first surface, for an external connection terminal;

a second land section, provided on a second surface on the other side of the first surface, for interconnecting semi-conductor devices;

wiring patterns, respectively provided on the first surface and the second surface, for making electrical connection between the terminal section, the first land section, and the second land section; and

a support pattern, provided on the second surface corresponding in position to the terminal section, for improving wire bonding connection, wherein the support pattern is not electrically connected to one of the terminal section and first and second land sections.

7. A wiring substrate comprising:

an insulating substrate;

a terminal section, provided on a first surface of the insulating substrate, for making flip-chip connection;

a first land section, provided on the first surface, for an external connection terminal;

a second land section, provided on a second surface on the other side of the first surface, for interconnecting semi-conductor devices;

wiring patterns, respectively provided on the first surface and the second surface, for electrical connection between the terminal section, the first land section, and the second land section; and

a support pattern, provided on the second surface corresponding in position to the terminal section, for improving reliability of connection, wherein the support pattern is not electrically connected to one of the terminal section and first and second land sections.

8. A wiring substrate comprising:

an insulating substrate having an opening section for mounting a semiconductor chip in the middle of said insulating substrate;

a terminal section, provided on a first surface of the insulating substrate, for connecting to the semiconductor chip by wire bonding;

a first land section, provided on the first surface, for an external connection terminal;

a second land section, provided on a second surface on the other side of the first surface, for interconnecting semi-conductor devices;

wiring patterns, respectively provided on the first surface and the second surface, for making electrical connection between the terminal section, the first land section, and the second land section for interconnecting semi-conductor devices; and

a support pattern, provided on the second surface corresponding in position to the terminal section, for improving wire bonding connection, wherein the support pattern is not electrically connected to one of the terminal section and first and second land sections.

9. The wiring substrate as set forth in claim 8, wherein a heat resistant film for mounting the semiconductor chip is provided so as to cover an opening of an opening section on the second surface.

20

10. The wiring substrate as set forth in claim 8, wherein a metallic foil for mounting the semiconductor chip is provided so as to cover an opening of the opening section on the second surface.

11. A semiconductor device comprising:

an insulating substrate;

a terminal section, provided on a first surface of the insulating substrate, for making connection by wire bonding;

a land section, provided on the insulating substrate, for an external connection terminal;

wiring patterns, respectively provided on the first surface and a second surface on the other side of the first surface, for making electrical connection between the terminal section and the land section;

a support pattern, provided on the second surface corresponding in position to the terminal section, for improving wire bonding connection, wherein the support pattern is not electrically connected to one of the terminal section and land section;

a semiconductor chip mounted on the insulating substrate;

a bonding wire section for making electrical connection between the terminal section and the semiconductor chip;

a resin sealing section for sealing a circuit forming surface of the semiconductor chip and the bonding wire section; and

a conductive member, provided on the land section, for connecting the semiconductor chip to outside.

12. The semiconductor device as set forth in claim 11, wherein said semiconductor chip is provided in plurality on the insulating substrate two-dimensionally or three dimen-sionally.

13. A semiconductor device comprising:

an insulating substrate;

a terminal section, provided on a first surface of the insulating substrate, for making connection by wire bonding;

a first land section, provided on the first surface, for an external connection terminal;

a second land section, provided on a second surface on the other side of the first surface, for interconnecting semi-conductor devices;

wiring patterns, respectively provided on the first surface and the second surface, for making electrical connection between the terminal section, the first land section, and the second land section;

a support pattern, provided on the second surface corresponding in position to the terminal section, for improving wire bonding connection, wherein the support pattern is not electrically connected to one of the terminal section and first and second land sections;

a semiconductor chip mounted on the insulating substrate;

a bonding wire section for making electrical connecting between the terminal section and the semiconductor chip;

a resin sealing section for sealing a circuit forming surface of the semiconductor chip and the bonding wire section; and

a conductive member, provided on the second land section, for connecting the semiconductor chip to out-side.

14. A semiconductor device comprising:

an insulating substrate having an opening section in the middle of the insulating substrate;

US 6,731,013 B2

21

a terminal section, provided on a first surface of the insulating substrate, for connecting by wire bonding;

a first land section, provided on the first surface, for an external connection terminal;

a second land section, provided on a second surface on the other side of the first surface for interconnecting semiconductor devices;

wiring patterns, respectively provided on the first surface and the second surface, for making electrical connection between the terminal section, the first land section, and the second land section;

a support pattern, provided on the second surface corresponding in position to the terminal section, for improving wire bonding connection, wherein the support pattern is not electrically connected to one of the terminal section and first and second land sections;

a semiconductor chip mounted in the opening section;

a bonding wire section for making electrical connection between the terminal section and the semiconductor chip;

a resin sealing section for sealing a circuit forming surface of the semiconductor chip and the bonding wire section; and

a conductive member, provided on the second land section, for connecting the semiconductor chip to outside.

**15**. The semiconductor device as set forth in claim **14**, further comprising a heat resistant film for mounting the semiconductor chip which covers a second-surface opening of the opening section.

**16**. The semiconductor device as set forth in claim **14**, further comprising a metallic foil for mounting the semiconductor chip, which is provided so as to cover an opening of the opening section on the second surface.

**17**. The semiconductor device set forth in claim **14**, further comprising a support projection, provided on the insulating substrate, corresponding to the external connection terminal.

**18**. A semiconductor device comprising:

an insulating substrate;

a terminal section, provided on a first surface of the insulating substrate, for making flip-chip connection;

a first land section, provided on the first surface, for an external connection terminal;

a second land section, provided on a second surface on the other side of the first surface, for interconnecting semiconductor devices;

wiring patterns, respectively provided on the first surface and the second surface, for making electrical connection between the terminal section, the first land section, and the second land section;

a support pattern, provided on the second surface corresponding in position to the terminal section, for improving reliability of connection, wherein the support pattern is not electrically connected to one of the terminal section and first and second land sections;

a semiconductor chip connected to the terminal section electrically by flip-chip connection;

22

a resin sealing section for sealing a circuit forming surface of the semiconductor chip; and

a conductive member, provided on the second land section, for connecting the semiconductor chip to outside.

**19**. The semiconductor device as set forth in claim **18**, wherein said semiconductor chip is provided in plurality on the insulating substrate two dimensionally or three dimensionally.

**20**. A package stack semiconductor device which includes a plurality of semiconductor devices, which are stacked by soldering,

each of semiconductor device, comprising:

an insulating substrate;

a terminal section, provided on a first surface of the insulating substrate, for making connection by wire bonding;

a land section, provided on the insulating substrate, for an external connection terminal;

wiring patterns, respectively provided on the first surface and a second surface on the other side of the first surface, for making electrical connection between the terminal section and the land section;

a support pattern, provided on the second surface corresponding in position to the terminal section, for improving wire bonding connection, wherein the support pattern is not electrically connected to one of the terminal section and land section;

a semiconductor chip mounted on the insulating substrate;

a bonding wire section for making electrical connection between the terminal section and the semiconductor chip;

a resin sealing section for sealing a circuit forming surface of the semiconductor chip and the bonding wire section; and

a conductive member, provided on the land section, for connecting the semiconductor chip to outside.

**21**. The package stack semiconductor device as set forth in claim **20**, wherein a solder used for an external connection terminal of a semiconductor device which is exposed to outside has a lower melting point than that used for external connection terminals of other semiconductor devices.

**22**. The package stack semiconductor device as set forth in claim **20**, wherein fixing resin is injected to gaps between adjoining semiconductor devices.

**23**. The package stack semiconductor device as set forth in claim **20**, wherein external connection terminals of respective semiconductor devices are positioned, taking into consideration their positions, at least for those external terminals which are common among the semiconductor devices.

**24**. The package stack semiconductor device as set forth in claim **20**, wherein at least two of said plurality of semiconductor devices have different external size.

**25**. The package stack semiconductor device as set forth in claim **24**, wherein a semiconductor device with its external connection terminal exposed to outside has a larger external size than that of other semiconductor devices.

* * * * *

Query    Reports ▾    Utilities ▾    Help    Log Out

**1:22-cv-00273-DCN** Micron Technology, Inc., et al. v. Longhorn IP, LLC
David C. Nye, presiding
**Date filed:** 07/05/2022
**Date of last filing:** 11/02/2023

# History

| Doc. No. | Dates | | Description |
|---|---|---|---|
| | *Filed:*  07/05/2022  *Entered:*  07/06/2022 | | Return of Service/Process Assumed |
| 1 | *Filed & Entered:*  07/05/2022 | | Notice of Removal |
| 2 | *Filed & Entered:*  07/05/2022 | | Corporate Disclosure Statement |
| 3 | *Filed:*  07/05/2022  *Entered:*  07/06/2022  *Terminated:*  05/03/2023 | | Motion for Bond |
| | *Filed & Entered:*  07/06/2022 | | Notice to file Corporate Disclosure Statement |
| | *Filed & Entered:*  07/06/2022 | | Corrective Entry |
| 4 | *Filed & Entered:*  07/06/2022 | | Notice of Assignment Setting Deadline |
| 5 | *Filed & Entered:*  07/06/2022 | | Order Reassigning Case |
| 6 | *Filed & Entered:*  07/06/2022 | | Notice of Availability Setting Deadline |
| 7 | *Filed & Entered:*  07/12/2022  *Terminated:*  05/03/2023 | | Motion to Dismiss |
| 8 | *Filed & Entered:*  07/13/2022 | | Order |
| 9 | *Filed & Entered:*  07/15/2022  *Terminated:*  07/19/2022 | | Motion for Pro Hac Vice Appearance |
| 10 | *Filed & Entered:*  07/18/2022 | | Notice (Other) |
| 11 | *Filed & Entered:*  07/19/2022 | | Order on Motion for Pro Hac Vice Appearance |
| 12 | *Filed & Entered:*  07/21/2022 | | Notice of Appearance |
| 13 | *Filed & Entered:*  07/21/2022  *Terminated:*  07/22/2022 | | Motion for Pro Hac Vice Appearance |
| 14 | *Filed & Entered:*  07/21/2022 | | Corporate Disclosure Statement |
| 15 | *Filed & Entered:*  07/21/2022 | | Memorandum in Support of Motion |
| 16 | *Filed & Entered:*  07/21/2022  *Terminated:*  08/05/2022 | | Motion to Seal |
| 17 | *Filed & Entered:*  07/21/2022 | | Sealed Document |
| 18 | *Filed & Entered:*  07/22/2022 | | Order on Motion for Pro Hac Vice Appearance |
| 19 | *Filed & Entered:*  07/22/2022  *Terminated:*  07/25/2022 | | Motion for Pro Hac Vice Appearance |
| 20 | *Filed & Entered:*  07/25/2022 | | Order on Motion for Pro Hac Vice Appearance |
| 21 | *Filed & Entered:*  07/28/2022 | | Motion to Stay |

| | | | |
|---|---|---|---|
| | *Terminated:* | 08/08/2022 | |
| 22 | *Filed & Entered:* *Terminated:* | 07/28/2022 07/29/2022 | Motion to Expedite |
| 23 | *Filed & Entered:* | 07/28/2022 | Notice (Other) |
| | *Filed & Entered:* | 07/29/2022 | Set Motion and R&R Deadlines/Hearings |
| 24 | *Filed & Entered:* | 07/29/2022 | Order on Motion to Expedite |
| 25 | *Filed & Entered:* *Terminated:* | 08/01/2022 08/02/2022 | Motion for Pro Hac Vice Appearance |
| 26 | *Filed & Entered:* | 08/01/2022 | Memorandum in Opposition to Motion |
| 27 | *Filed & Entered:* | 08/02/2022 | Order on Motion for Pro Hac Vice Appearance |
| 28 | *Filed & Entered:* | 08/03/2022 | Response to Motion |
| 29 | *Filed & Entered:* | 08/04/2022 | Reply to Response to Motion |
| 30 | *Filed & Entered:* | 08/04/2022 | Notice (Other) |
| 31 | *Filed & Entered:* | 08/05/2022 | Order on Motion to Seal |
| 32 | *Filed & Entered:* | 08/08/2022 | Order on Motion to Stay |
| 33 | *Filed & Entered:* *Terminated:* | 08/09/2022 08/09/2022 | Motion for Pro Hac Vice Appearance |
| 34 | *Filed:* *Entered:* | 08/09/2022 08/10/2022 | Order on Motion for Pro Hac Vice Appearance |
| 35 | *Filed & Entered:* | 08/11/2022 | Response to Motion |
| 36 | *Filed & Entered:* | 08/15/2022 | Reply to Response to Motion |
| 37 | *Filed & Entered:* | 08/25/2022 | Reply to Response to Motion |
| 38 | *Filed:* *Entered:* | 08/29/2022 08/30/2022 | Request for Reassignment to a District Judge |
| 39 | *Filed & Entered:* *Terminated:* | 09/06/2022 09/27/2022 | Motion to Intervene |
| 40 | *Filed & Entered:* | 09/09/2022 | Notice (Other) |
| 41 | *Filed & Entered:* | 09/23/2022 | Notice (Other) |
| 42 | *Filed & Entered:* | 09/27/2022 | Order on Motion to Intervene |
| 43 | *Filed & Entered:* | 09/28/2022 | Memorandum in Opposition to Motion |
| 44 | *Filed & Entered:* | 10/12/2022 | Reply to Response to Motion |
| 45 | *Filed & Entered:* | 10/13/2022 | Notice of Hearing on Motion |
| 46 | *Filed & Entered:* | 10/31/2022 | Notice (Other) |
| 47 | *Filed:* *Entered:* | 01/10/2023 01/11/2023 | Terminate Hearings |
| 48 | *Filed & Entered:* | 02/14/2023 | Transcript |
| 49 | *Filed & Entered:* | 02/15/2023 | Transcript Request |
| 50 | *Filed & Entered:* | 05/03/2023 | Order on Motion for Bond |
| 51 | *Filed & Entered:* | 05/17/2023 | Answer to Complaint |
| 52 | *Filed & Entered:* | 05/25/2023 | Notice of Appeal |
| 53 | *Filed & Entered:* | 06/07/2023 | Answer to Counterclaim |
| 54 | *Filed & Entered:* | 06/08/2023 | Appeal Transcript Request |

| 55 | *Filed:* 06/13/2023<br>*Entered:* 06/20/2023 | 🌐 Notice (Other) |
|----|----|----|
| 56 | *Filed & Entered:* 06/30/2023<br>*Terminated:* 11/02/2023 | 🌐 Motion to Stay |
| 57 | *Filed & Entered:* 07/14/2023<br>*Terminated:* 07/17/2023 | 🌐 Motion for Extension of Time to File Response/Reply |
| 58 | *Filed & Entered:* 07/17/2023 | 🌐 Order on Motion for Extension of Time to File Response/Reply |
| 59 | *Filed & Entered:* 08/02/2023 | 🌐 Memorandum in Opposition to Motion |
| 60 | *Filed & Entered:* 08/16/2023 | 🌐 Reply to Response to Motion |
| 61 | *Filed:* 11/02/2023<br>*Entered:* 11/03/2023 | 🌐 Order on Motion to Stay |

| PACER Service Center | | | |
|----|----|----|----|
| **Transaction Receipt** | | | |
| 01/26/2024 15:00:48 | | | |
| **PACER Login:** | ELCarter | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | 1:22-cv-00273-DCN |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

**Appx117**

APPEAL,LC12,STAYED

# U.S. District Court
## District of Idaho (LIVE) NextGen 1.7 (Boise - Southern)
## CIVIL DOCKET FOR CASE #: 1:22-cv-00282-DCN

| | |
|---|---|
| Katana Silicon Technologies LLC v. Micron Technology, Inc., et al. | Date Filed: 07/08/2022 |
| Assigned to: Judge David C. Nye | Jury Demand: Both |
| related Case: 1:22-cv-00273-DCN | Nature of Suit: 830 Patent |
| Case in other court: Texas Western, 1:22-cv-00214 | Jurisdiction: Federal Question |
| USCA Federal Circuit, 23-02095 | |
| Cause: 35:271 Patent Infringement | |

**Plaintiff**

**Katana Silicon Technologies LLC**                represented by   **Keely E. Duke**
Duke Evett, PLLC
P.O. Box 7387
1087 West River Street, Suite 300
Boise, ID 83707
(208) 342-3310
Fax: (208) 342-3299
Email: ked@dukeevett.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mallam John Prior**
Rossman Law Group
350 N. 9th Street
Suite 500
Boise, ID 83702
208-331-2030
Email: mprior@rossmanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott W. Breedlove**
Carter Arnett, PLLC
8150 N. Central Expressway
Ste 500
Dallas, TX 75206
214-550-8188
Fax: 214-550-8185
Email: sbreedlove@carterarnett.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley David Liddle**
Carter Arnett PLLC
8150 N Central Expressway
Suite 500

**Appx118**

Dallas, TX 75206
214-431-4990
Fax: 214-550-8185
Email: bliddle@carterarnett.com
*ATTORNEY TO BE NOTICED*

**Daniel L. Schmid**
Carter Arnett PLLC
8150 N. Central Expressway
Suite 500
Dallas, TX 75206
(214) 550-8188
Fax: (214) 550-8185
Email: dschmid@carterarnett.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**E. Leon Carter**
Carter Arnett PLLC
8150 N. Central Expressway
Suite 500
Dallas, TX 75206
214-550-8160
Fax: 214-550-8185
Email: lcarter@carterarnett.com
*ATTORNEY TO BE NOTICED*

**Michael C. Pomeroy**
Carter Arnett PLLC
8150 N. Central Expressway
Suite 500
Dallas, TX 75206
214-550-8188
Fax: 214-550-8188
Email: mpomeroy@carterarnett.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathan I. Cox**
Carter Arnett LLC
8150 N. Central Expressway
Suite 500
Dallas, TX 75206
214-550-8188
Fax: 214-550-8185
Email: ncox@carterarnett.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth A. Lindner**
Carter Arnett PLLC
8150 N. Central Expy, Suite 500
Dallas, TX 75206
214-550-8188

**Appx119**

Email: slindner@carterarnett.com
*ATTORNEY TO BE NOTICED*

**Theresa M. Dawson**
CarterArnett PLLC
8150 N. Central Expressway, Suite 500
Dallas, TX 75206
(214) 550-8188
Fax: (214) 550-8185
Email: tdawson@carterarnett.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Micron Technology Inc**                   represented by **Amanda Tessar**
                                              Perkins Coie LLP
                                              1900 Sixteenth Street
                                              Suite 1400
                                              Denver, CO 80202
                                              303-291-2357
                                              Email: atessar@perkinscoie.com
                                              *LEAD ATTORNEY*
                                              *PRO HAC VICE*
                                              *ATTORNEY TO BE NOTICED*

                                              **Amy E. Simpson**
                                              Holland & Knight LLP
                                              1901 Avenue of the Starts
                                              Suite 1200
                                              Los Angeles, CA 90067
                                              858-720-5702
                                              Email: amy.simpson@hklaw.com
                                              *LEAD ATTORNEY*
                                              *PRO HAC VICE*
                                              *ATTORNEY TO BE NOTICED*

                                              **Daniel Graham**
                                              Perkins Coie LLP
                                              1900 Sixteenth Street, Suite 1400
                                              Denver, CO 80202
                                              303-291-2300
                                              Email: dgraham@perkinscoie.com
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

                                              **David T Krueck**
                                              Perkins Coie LLP
                                              1111 W. Jefferson Street
                                              Suite 500
                                              Boise, ID 83702
                                              208-343-3434
                                              Fax: 208-343-3232
                                              Email: dkrueck@perkinscoie.com

**Appx120**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Craig Tyler**
Perkins Coie LLP
405 Colorado Street
Suite 1700
Austin, TX 78701
737.256.6100
Fax: 737.256.6300
Email: CTyler@perkinscoie.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Trevor Jonathan Bervik**
Perkins Coie LLP
1900 Sixteenth Street
Suite No. 1400
Denver, CO 80202
303-291-2390
Fax: 303-291-2490
Email: tbervik@perkinscoie.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Micron Semiconductor Products Inc**                represented by    **Amanda Tessar**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amy E. Simpson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Graham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David T Krueck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Craig Tyler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Trevor Jonathan Bervik**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Micron Technology Texas, LLC**          represented by   **Amanda Tessar**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amy E. Simpson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Graham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David T Krueck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Craig Tyler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Trevor Jonathan Bervik**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**State of Idaho**          represented by   **Brett T DeLange**
OFFICE OF ATTORNEY GENERAL
PO Box 83720
Boise, ID 83720-0010
(208) 334-2424
Fax: 334-4151
Email: brett.delange@ag.idaho.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Micron Technology Texas, LLC**                    represented by **Amanda Tessar**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amy E. Simpson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Graham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David T Krueck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Craig Tyler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Trevor Jonathan Bervik**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Micron Semiconductor Products Inc**          represented by **Amanda Tessar**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amy E. Simpson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Graham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David T Krueck**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**M. Craig Tyler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Trevor Jonathan Bervik**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Micron Technology Inc**                  represented by   **Amanda Tessar**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amy E. Simpson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Graham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David T Krueck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Craig Tyler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Trevor Jonathan Bervik**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**V.**

**Counter Defendant**

**Katana Silicon Technologies LLC**        represented by   **Daniel L. Schmid**
(See above for address)
*LEAD ATTORNEY*

**Appx124**

*ATTORNEY TO BE NOTICED*

**Keely E. Duke**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mallam John Prior**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott W. Breedlove**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bradley David Liddle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**E. Leon Carter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael C. Pomeroy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nathan I. Cox**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth A. Lindner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theresa M. Dawson**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/04/2022 | 1 | COMPLAINT ( Filing fee $ 402 receipt number 0542-15784041). No Summons requested at this time, filed by Katana Silicon Technologies LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Civil Cover Sheet)(Breedlove, Scott) |
| 03/04/2022 | | Case assigned to Judge Lee Yeakel. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (dl) (Entered: 03/07/2022) |

| 03/04/2022 | | If ordered by the court, all referrals and consents in this case will be assigned to Magistrate Judge Lane. (dl) (Entered: 03/07/2022) |
|---|---|---|
| 03/04/2022 | | DEMAND for Trial by Jury by Katana Silicon Technologies LLC. (dl) (Entered: 03/07/2022) |
| 03/07/2022 | 2 | Report on Patent/Trademark sent to U.S. Patent and Trademark Office along with copy of Complaint. (dl) |
| 04/07/2022 | 3 | REQUEST FOR ISSUANCE OF SUMMONS by Katana Silicon Technologies LLC. (Breedlove, Scott) |
| 04/07/2022 | 4 | REQUEST FOR ISSUANCE OF SUMMONS by Katana Silicon Technologies LLC. *Micron Technology Texas, LLC* (Breedlove, Scott) |
| 04/07/2022 | 5 | REQUEST FOR ISSUANCE OF SUMMONS by Katana Silicon Technologies LLC. *Micron Semiconductor Products, Inc.* (Breedlove, Scott) |
| 04/07/2022 | 6 | SUMMONS ISSUED as to Micron Semiconductor Products, Inc., Micron Technology Texas, LLC, and Micron Technology, Inc. (cc3) |
| 04/08/2022 | 7 | RULE 7 DISCLOSURE STATEMENT filed by Katana Silicon Technologies LLC. (Breedlove, Scott) |
| 04/11/2022 | 8 | Summons Reissued as to Micron Technology Texas, LLC. (jv2) |
| 04/22/2022 | 9 | Unopposed MOTION for Extension of Time to File Answer *or Otherwise Respond* by Micron Semiconductor Products, Inc., Micron Technology Texas, LLC, Micron Technology, Inc.. (Attachments: # 1 Proposed Order)(Tyler, M.) |
| 04/22/2022 | 10 | NOTICE of Attorney Appearance by M. Craig Tyler on behalf of Micron Semiconductor Products, Inc., Micron Technology Texas, LLC, Micron Technology, Inc.. Attorney M. Craig Tyler added to party Micron Semiconductor Products, Inc.(pty:dft), Attorney M. Craig Tyler added to party Micron Technology Texas, LLC(pty:dft), Attorney M. Craig Tyler added to party Micron Technology, Inc.(pty:dft) (Tyler, M.) |
| 04/22/2022 | 11 | NOTICE of Attorney Appearance by Amanda Tessar on behalf of Micron Semiconductor Products, Inc., Micron Technology Texas, LLC, Micron Technology, Inc.. Attorney Amanda Tessar added to party Micron Semiconductor Products, Inc.(pty:dft), Attorney Amanda Tessar added to party Micron Technology Texas, LLC(pty:dft), Attorney Amanda Tessar added to party Micron Technology, Inc.(pty:dft) (Tessar, Amanda) |
| 04/25/2022 | 12 | ORDER GRANTING 9 Motion for Extension of Time to Answer; Micron Semiconductor Products, Inc., Micron Technology Texas, LLC, and Micron Technology, Inc. answer due 6/6/2022. Signed by Judge Lee Yeakel. (cc3) |
| 06/06/2022 | 13 | ANSWER to 1 Complaint, with Jury Demand , COUNTERCLAIM against Katana Silicon Technologies LLC by Micron Technology Texas, LLC, Micron Semiconductor Products, Inc., Micron Technology, Inc..(Tessar, Amanda) |
| 06/06/2022 | 14 | Opposed MOTION to Transfer Case *to the District of Idaho Pursuant to 28 U.S.C. § 1404(a)* by Micron Semiconductor Products, Inc., Micron Technology Texas, LLC, Micron Technology, Inc.. (Attachments: # 1 Affidavit Declaration of Kunal Parekh in Support of Motion to Transfer, # 2 Affidavit Declaration of Daniel Graham in Support of Motion to Transfer, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19)(Tessar, Amanda) |

District of Idaho Live CM/ECF

| 06/06/2022 | 15 | RULE 7 DISCLOSURE STATEMENT filed by Micron Semiconductor Products, Inc., Micron Technology Texas, LLC, Micron Technology, Inc. identifying Corporate Parent Micron Technology, Inc. for Micron Semiconductor Products, Inc., Micron Technology Texas, LLC; Corporate Parent None for Micron Technology, Inc.. (Tessar, Amanda) |
|---|---|---|
| 06/16/2022 | 16 | NOTICE of Attorney Appearance by Daniel L. Schmid on behalf of Katana Silicon Technologies LLC. Attorney Daniel L. Schmid added to party Katana Silicon Technologies LLC(pty:pla) (Schmid, Daniel) |
| 06/17/2022 | 17 | Unopposed MOTION for Extension of Time to File Answer re 13 Answer to Complaint, Counterclaim by Katana Silicon Technologies LLC. (Attachments: # 1 Proposed Order Granting Plaintiff's Unopposed Motion for Extension of Time to Answer or Respond to Defendants' Counterclaims)(Breedlove, Scott) |
| 06/17/2022 | 18 | Unopposed MOTION for Extension of Time to File *Motion to Transfer Briefing* by Katana Silicon Technologies LLC. (Attachments: # 1 Proposed Order on Motion for Extension of Time for Motion to Transfer Briefing)(Breedlove, Scott) |
| 06/22/2022 | 19 | ORDER GRANTING 17 Motion for Extension of Time to Answer ; Katana Silicon Technologies LLC answer due 7/11/2022. Signed by Judge Lee Yeakel. (pg) |
| 06/22/2022 | 20 | ORDER GRANTING 18 Motion for Extension of Time to File response to Defendant's motion to transfer. Signed by Judge Lee Yeakel. (pg) |
| 07/06/2022 | 21 | RESPONSE *In Non-Opposition To Micron's Motion To Transfer* to 14 Opposed MOTION to Transfer Case *to the District of Idaho Pursuant to 28 U.S.C. § 1404(a)* by Katana Silicon Technologies LLC. (Breedlove, Scott) |
| 07/08/2022 | 22 | ORDER GRANTING 14 Motion to Transfer Case. IT IS FURTHER ORDERED that this action is TRANSFERRED to the United States District Court for the District of Idaho. Signed by Judge Lee Yeakel. (dm) |
| 07/08/2022 | 23 | Report on Patent/Trademark sent to U.S. Patent and Trademark Office. (dm) |
| 07/08/2022 | 24 | Case transferred in from District of Texas Western; Case Number 1:22-cv-00214. Original file certified copy of transfer order and docket sheet received. |
| 07/08/2022 | 25 | All out of state counsel continuing representation need to obtain local counsel and file an Application for Pro Hac Vice. Please see Local Rule, Civil Rule 83.4 Bar Admission e) Pro Hac Vice/Local Counsel and ECF Procedures 3. Registration, Logins and Passwords. B. Limited Registered Participants.1. (jd) |
| 07/11/2022 | 26 | ANSWER to 13 Answer to Complaint, Counterclaim by Katana Silicon Technologies LLC. (Duke, Keely) |
| 07/11/2022 | 27 | Motion to Dismiss for Failure to State a Claim Keely E. Duke appearing for Counter Defendant Katana Silicon Technologies LLC. Responses due by 8/1/2022 (Attachments: # 1 Memorandum in Support)(Duke, Keely) |
| 07/12/2022 | 28 | DOCKET ENTRY ORDER OF REASSIGNMENT: This case is reassigned to Chief Judge David C. Nye. The parties are directed to use this number on all future filings: 1:22-cv-00282-DCN. Signed by Judge B Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (mls) |
| 07/13/2022 | | DOCKET ENTRY NOTICE of Case Number Change, Case reassigned to Judge David C. Nye for all further proceedings. Judge B Lynn Winmill no longer assigned to case. Please use this case number on all future pleadings, 1:22-cv-00282-DCN (lm) |
| 07/13/2022 | 29 | NOTICE of Availability of Magistrate Judge and Requirement for Consent sent to counsel for Katana Silicon Technologies LLC, Micron Semiconductor Products Inc, Micron |

| | | Technology Inc, Micron Technology Texas, LLC re 26 Answer to Counterclaim, 1 Complaint, Consent/Objection to Magistrate due by 9/12/2022. (lm) |
|---|---|---|
| 07/15/2022 | 30 | MOTION FOR PRO HAC VICE APPEARANCE by Scott W. Breedlove. ( Filing fee $ 250 receipt number AIDDC-2421790.)Keely E. Duke appearing for Plaintiff Katana Silicon Technologies LLC. Responses due by 8/5/2022 (Duke, Keely) |
| 07/15/2022 | 31 | MOTION FOR PRO HAC VICE APPEARANCE by Nathan Cox. ( Filing fee $ 250 receipt number AIDDC-2421794.)Keely E. Duke appearing for Plaintiff Katana Silicon Technologies LLC. Responses due by 8/5/2022 (Duke, Keely) |
| 07/18/2022 | 32 | DOCKET ENTRY ORDER APPROVING 30 Motion for Pro Hac Vice Appearance for Scott W. Breedlove Per Local Rule 83.4(e), out-of-state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk); approving 31 Motion for Pro Hac Vice Appearance for Nathan Cox Per Local Rule 83.4(e), out-of-state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm). |
| 07/18/2022 | 33 | NOTICE by Katana Silicon Technologies LLC *Notice of Constitutional Challenge to a Statute Pursuant to Rule 5.1(a)* (Duke, Keely) |
| 07/21/2022 | 34 | NOTICE of Appearance by Daniel Graham on behalf of Micron Semiconductor Products Inc, Micron Technology Inc, Micron Technology Texas, LLC (Graham, Daniel) |
| 07/21/2022 | 35 | MOTION FOR PRO HAC VICE APPEARANCE by Amanda Tessar. ( Filing fee $ 250 receipt number AIDDC-2424497.)Daniel Graham appearing for Counter Claimants Micron Semiconductor Products Inc, Micron Technology Inc, Micron Technology Texas, LLC, Defendants Micron Semiconductor Products Inc, Micron Technology Inc, Micron Technology Texas, LLC. Responses due by 8/11/2022 (Graham, Daniel) |
| 07/21/2022 | 36 | Corporate Disclosure Statement by Micron Semiconductor Products Inc, Micron Technology Inc, Micron Technology Texas, LLC identifying Corporate Parent Micron Technology, Inc. for Micron Semiconductor Products Inc, Micron Technology Texas, LLC; Corporate Parent None for Micron Technology Inc. (Graham, Daniel) |
| 07/22/2022 | 37 | DOCKET ENTRY ORDER APPROVING 35 Motion for Pro Hac Vice Appearance by Amanda Tessar Per Local Rule 83.4(e), out-of-state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 07/22/2022 | 38 | MOTION FOR PRO HAC VICE APPEARANCE by Trevor J. Bervik. ( Filing fee $ 250 receipt number AIDDC-2425160.)Daniel Graham appearing for Counter Claimants Micron Semiconductor Products Inc, Micron Technology Inc, Micron Technology Texas, LLC, Defendants Micron Semiconductor Products Inc, Micron Technology Inc, Micron Technology Texas, LLC. Responses due by 8/12/2022 (Graham, Daniel) |
| 07/25/2022 | 39 | DOCKET ENTRY ORDER APPROVING (Dkt. 38 ) Motion for Pro Hac Vice Appearance of attorney Trevor Bervik for Micron Semiconductor Products Inc,Trevor Bervik for Micron Semiconductor Products Inc,Trevor Bervik for Micron Technology Inc,Trevor Bervik for Micron Technology Inc,Trevor Bervik for Micron Technology Texas, LLC,Trevor Bervik for Micron Technology Texas, LLC Per Local Rule 83.4(e), out-of-state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 08/01/2022 | 40 | MOTION FOR PRO HAC VICE APPEARANCE by Daniel Schmid. ( Filing fee $ 250 receipt number AIDDC-2429459.)Keely E. Duke appearing for Plaintiff Katana Silicon |

| | | Technologies LLC. Responses due by 8/22/2022 (Duke, Keely) |
|---|---|---|
| 08/01/2022 | 41 | MEMORANDUM in Opposition re 27 Motion to Dismiss for Failure to State a Claim filed by Micron Semiconductor Products Inc, Micron Technology Inc, Micron Technology Texas, LLC. Replies due by 8/15/2022.(Graham, Daniel) |
| 08/02/2022 | 42 | DOCKET ENTRY ORDER APPROVING (DKT. 40 ) Motion for Pro Hac Vice Appearance of attorney Daniel L. Schmid for Katana Silicon Technologies LLC,Daniel L. Schmid for Katana Silicon Technologies LLC Per Local Rule 83.4(e), out-of-state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 08/02/2022 | 43 | MOTION FOR PRO HAC VICE APPEARANCE by Michael Pomeroy. ( Filing fee $ 250 receipt number AIDDC-2429858.)Keely E. Duke appearing for Plaintiff Katana Silicon Technologies LLC. Responses due by 8/23/2022 (Duke, Keely) |
| 08/02/2022 | 44 | DOCKET ENTRY ORDER APPROVING Dkt. 43 Motion for Pro Hac Vice Appearance of attorney Michael C. Pomeroy for Katana Silicon Technologies LLC,Michael C. Pomeroy for Katana Silicon Technologies LLC Per Local Rule 83.4(e), out-of-state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 08/09/2022 | 45 | MOTION FOR PRO HAC VICE APPEARANCE by Amy E. Simpson. ( Filing fee $ 250 receipt number AIDDC-2433486.)Daniel Graham appearing for Defendants Micron Semiconductor Products Inc, Micron Technology Inc, Micron Technology Texas, LLC. Responses due by 8/30/2022 (Graham, Daniel) |
| 08/10/2022 | 46 | DOCKET ENTRY ORDER APPROVING 45 Motion for Pro Hac Vice Appearance of attorney Amy E. Simpson for Micron Semiconductor Products Inc,Amy E. Simpson for Micron Semiconductor Products Inc,Amy E. Simpson for Micron Technology Inc,Amy E. Simpson for Micron Technology Inc,Amy E. Simpson for Micron Technology Texas, LLC,Amy E. Simpson for Micron Technology Texas, LLC Per Local Rule 83.4(e), out-of-state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 08/15/2022 | 47 | REPLY to Response to Motion re 27 Motion to Dismiss for Failure to State a Claim filed by Katana Silicon Technologies LLC.Motion Ripe Deadline set for 8/16/2022. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3) (Duke, Keely) |
| 08/30/2022 | 48 | A REQUEST FOR ASSIGNMENT TO A DISTRICT JUDGE HAS BEEN FILED IN THIS CASE(lm) |
| 09/06/2022 | 49 | MOTION to Intervene *by State of Idaho* Brett T DeLange appearing for Intervenor Defendant State of Idaho. Responses due by 9/27/2022 (Attachments: # 1 Memorandum in Support)(DeLange, Brett) |
| 09/09/2022 | 50 | NOTICE by Micron Semiconductor Products Inc, Micron Technology Inc, Micron Technology Texas, LLC re 49 MOTION to Intervene *by State of Idaho Non-Opposition to State of Idaho's Motion to Intervene* (Graham, Daniel) |
| 09/23/2022 | 51 | NOTICE by Katana Silicon Technologies LLC re 49 MOTION to Intervene *by State of Idaho Notice of Non-Opposition* (Duke, Keely) |
| 09/27/2022 | 52 | DOCKET ENTRY ORDER. Pending before the Court is the State of Idaho's Motion to Intervene. Dkt. 49 . Plaintiffs and Defendant have indicated they do not oppose the Motion. |

| | | |
|---|---|---|
| | | Dkts. 50 , 51 . Accordingly, and pursuant to 28 U.S.C. § 2403(b), the State of Idaho's Motion is GRANTED. It may intervene for the limited purpose identified in its Motion. Signed by Judge David C. Nye. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (bb) |
| 09/28/2022 | 53 | MEMORANDUM in Opposition re 27 Motion to Dismiss for Failure to State a Claim *(Seventh Counterclaim)* filed by State of Idaho. Replies due by 10/12/2022.(DeLange, Brett) |
| 10/12/2022 | 54 | REPLY to Response to Motion re 27 Motion to Dismiss for Failure to State a Claim filed by Katana Silicon Technologies LLC.Motion Ripe Deadline set for 10/13/2022.(Duke, Keely) |
| 10/13/2022 | 55 | NOTICE of Hearing on Motion 27 Motion to Dismiss for Failure to State a Claim : Motion Hearing set for 1/10/2023 at 02:00 PM in Boise - Courtroom 2 before Judge David C. Nye. (pr) |
| 10/31/2022 | 56 | NOTICE by Micron Semiconductor Products Inc, Micron Technology Inc, Micron Technology Texas, LLC re 41 Memorandum in Opposition to Motion *Notice of Supplemental Authority* (Attachments: # 1 Exhibit 1)(Graham, Daniel) |
| 11/22/2022 | 57 | MOTION to Amend/Correct 1 Complaint, *(Unopposed Motion)* Keely E. Duke appearing for Plaintiff Katana Silicon Technologies LLC, Counter Defendant Katana Silicon Technologies LLC. Responses due by 12/13/2022 (Attachments: # 1 Declaration of Counsel, # 2 Exhibit A- Amended Complaint, # 3 Exhibit B- Redlined Version of Amended Complaint)(Duke, Keely) |
| 12/01/2022 | 58 | WITHDRAWAL OF DOCUMENT re: 57 MOTION to Amend/Correct 1 Complaint, *(Unopposed Motion)* filed by Katana Silicon Technologies LLC. (Duke, Keely) |
| 01/10/2023 | 59 | Minute Entry for proceedings held before Judge David C. Nye: Motion Hearing held on 1/10/2023 re 27 Motion to Dismiss for Failure to State a Claim filed by Katana Silicon Technologies LLC. After hearing oral arguments the court took this matter under advisement with a written decision to follow (Court Reporter/ESR Anne Bowline.) (pr) (Entered: 01/11/2023) |
| 02/14/2023 | 60 | Notice of Filing of Official Transcript of Motion Hearing Proceedings held on 1/10/2023 before Judge David C. Nye. Court Reporter Anne Bowline, Email anne_bowline@id.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed until release of transcript restriction. Redaction Request due 3/7/2023. Redacted Transcript Deadline set for 3/17/2023. Release of Transcript Restriction set for 5/15/2023. (amb) |
| 02/15/2023 | 61 | TRANSCRIPT REQUEST by Katana Silicon Technologies LLC for proceedings held on Jan. 10, 2023 (Motion Hearing) before Judge David C. Nye.. Associated Cases: 1:22-cv-00282-DCN, 1:22-cv-00273-DCN(Breedlove, Scott) |
| 03/06/2023 | 62 | DISREGARD by Katana Silicon Technologies *of Withdrawal of Counsel* (Breedlove, Scott) Modified on 3/6/2023 Incorrect defendants listed. (lm). |
| 03/06/2023 | | CORRECTIVE ENTRY - The entry docket number 62 Notice (Other) filed by Katana Silicon Technologies LLC was filed incorrectly in this case. The filing party shall re-submit their correct filing. (lm) |
| 03/06/2023 | 63 | Notice of Withdrawal of Counsel (Breedlove, Scott) Modified on 3/7/2023 to correct docket text (km). |

| | | |
|---|---|---|
| 03/07/2023 | | CORRECTIVE ENTRY - Please disregard docket number 63 Notice filed by Katana Silicon Technologies LLC, as the filing party notified the Court of an error in the document. The filing party will re-submit their corrected filing. (km) |
| 03/07/2023 | | CORRECTIVE ENTRY - Please disregard the Corrective Entry entered on 3/7/23 at 11:46 MST. No corrective action is needed. The Clerk inadvertently entered the corrective entry in the wrong case number. Docket number 63 was correctly filed in this case. (km) |
| 05/03/2023 | 64 | MEMORANDUM DECISION AND ORDER - Longhorns Motion to Dismiss (Case 1:22-cv-00273, (Dkt. 7 ) is DENIED. Katanas Motion to Dismiss (Case 1:22-cv-00282, (Dkt. 27 ) is DENIED. Microns Motion for Bond (Case 1:22-cv-00273, (Dkt. 3 ) is GRANTED. Longhorn or Katana must post a bond of $8 million before the Katana case (1:22-cv-00282) may proceed further. This order will be entered in both cases. Signed by Judge David C. Nye. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) |
| 05/17/2023 | 65 | *Amended* ANSWER to 13 Answer to Complaint, Counterclaim by Katana Silicon Technologies LLC.(Duke, Keely) |
| 05/25/2023 | 66 | NOTICE OF APPEAL 2023-2095 as to 64 Order on Motion to Dismiss for Failure to State a Claim,, by Katana Silicon Technologies LLC. Filing Fee Due. $ 505, receipt number AIDDC-2573546. (Notice sent to Court Reporter & 9th Cir) (Duke, Keely) Modified on 6/30/2023 (lm) to add in the Appeal Case Number. |
| 06/08/2023 | 67 | TRANSCRIPT REQUEST by Katana Silicon Technologies LLC for proceedings held on 01/10/2023 before Judge Judge David Nye, (Notice sent by e-mail to Court Reporter) (Duke, Keely) |
| 06/29/2023 | 68 | USCA for the Federal Circuit Case Number 2023-2095 for 66 Notice of Appeal filed by Katana Silicon Technologies LLC. (lm) |
| 06/30/2023 | 69 | MOTION to Stay Keely E. Duke appearing for Plaintiff Katana Silicon Technologies LLC. Responses due by 7/21/2023 (Attachments: # 1 Memorandum in Support, # 2 Declaration of Scott Breedlove, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4)(Duke, Keely) |
| 07/14/2023 | 70 | MOTION for Extension of Time to File Response/Reply as to 69 MOTION to Stay (*Unopposed*) Daniel Graham appearing for Defendants Micron Semiconductor Products Inc, Micron Technology Inc, Micron Technology Texas, LLC. Responses due by 8/4/2023 (Graham, Daniel) |
| 07/17/2023 | 71 | DOCKET ENTRY ORDER: Good cause appearing, Micron's Unopposed Motion for Extension of Time (Dkt. 70 ) is GRANTED. Micron's response to Longhorn/Katana's Motion to Stay (Dkt. 69 ) is now due on or before August 2, 2023. Longhorn/Katana's reply is now due on or before August 16, 2023. Signed by Judge David C. Nye. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (tjw) |
| 07/17/2023 | | Set/Reset Deadlines as to 69 MOTION to Stay . Micron's Responses are due by 8/2/2023 Longhorn/Katana's Replies are due by 8/16/2023. (lm) |
| 08/02/2023 | 72 | MEMORANDUM in Opposition re 69 MOTION to Stay filed by Micron Technology Inc. Replies due by 8/16/2023. (Attachments: # 1 Affidavit Declaration of Daniel Graham, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D - Part 1, # 6 Exhibit D - Part 2, # 7 Exhibit E - Part 1, # 8 Exhibit E - Part 2, # 9 Exhibit F)(Tessar, Amanda) |
| 08/16/2023 | 73 | REPLY to Response to Motion re 69 MOTION to Stay filed by Katana Silicon Technologies LLC.Motion Ripe Deadline set for 8/17/2023.(Duke, Keely) |

| 11/02/2023 | 74 | MEMORANDUM DECISION AND ORDER - The Movants Motions to Stay (Longhorn Dkt. 56 ; Katana Dkt. 69 ) are GRANTED, and the cases are stayed until: (1) the Federal Circuit Court renders a decision on the Movants appeal, and (2) the PTAB renders a decision regarding the two instituted IPRs. The parties will submit a status report within fourteen (14) days of any dispositive decision from the Federal Circuit or the PTAB. Signed by Judge David C. Nye. Associated Cases: 1:22-cv-00282-DCN, 1:22-cv-00273-DCN(caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (lm) (Entered: 11/03/2023) |
|---|---|---|

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/25/2024 10:00:54 | | |
| **PACER Login:** | breedlove2665 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00282-DCN |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |

Keely E. Duke
ISB #6044; ked@dukevett.com
Mallam Prior
ISB # 10938 mjp@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Longhorn IP LLC*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICRON TECHNOLOGY, INC.;<br>MICRON SEMICONDUCTOR<br>PRODUCTS, INC.; and MICRON<br>TECHNOLOGY TEXAS, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>LONGHORN IP LLC,<br><br>    Defendant. | Case No. CV-22-237<br><br>**NOTICE OF REMOVAL** |

## <u>NOTICE OF REMOVAL</u>

Defendant Longhorn IP LLC, pursuant to 28 U.S.C. § 1441(a) and (b), submits this Notice of Removal to remove the civil action now pending in the District Court of the Fourth District, Ada County, Idaho. In support of this Notice of Removal, Defendant states as follows:

1.    This case relates to allegations that the Micron Plaintiffs infringe three United States patents.

2.    On June 6, 2022, Plaintiffs Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC ("Micron" or "Plaintiffs") filed this action for alleged bad faith assertion of patent infringement against Defendant in the District Court of the Fourth District, Ada County, Idaho, styled *Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC v. Longhorn IP, LLC*, Case No. CV01-22-08130. *Declaration of Keely E. Duke in Support of Defendant's Notice of Removal and Removal Action Under 28 U.S.C. § 1441(a) and (b)* ("Duke Dec."), Ex. B-1. Micron effected service of the Complaint on June 7, 2022. Duke Dec., Ex. B-6.

3.    Accordingly, this Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b)(1).

4.    This Notice of Removal is filed pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, which provide for removal of civil actions concerning controversies between citizens of different states. Removal is proper under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties and the requisite amount-in-controversy exists. Moreover, the sole defendant is not a citizen of Idaho, the state in which the action is brought. *See* 28 U.S.C. § 1441(b)(2).

5.    This Notice of Removal is also filed pursuant to 28 U.S.C. §§ 1331, 1441, 1446, and 1454, which provide for removal of civil actions arising under laws of the United States, including claims for relief arising under any Act of Congress relating to patents. Removal is proper under 28 U.S.C. § 1331 because Micron's claim for relief necessarily requires resolution of a substantial question of federal patent law.

**COMPLETE DIVERSITY EXISTS**

6.     Defendant is a limited liability company organized under the laws of the State of Texas. Because Defendant is a limited liability company, its citizenship is determined by the citizenship of each of its members, not any state of incorporation or its principal place of business. *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) ("[L]ike a partnership, an LLC is a citizen of every state of which its owners/members are citizens.").

7.     Tanit Ventures, Inc. is the only member of Defendant. Duke Dec., Ex. C. The citizenship of Tanit, as a corporation, is "any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1); *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005).

8.     Tanit is incorporated under the laws of the State of Texas and has its principal place of business at 5204 Bluewater Drive, Frisco, Texas, 75034. Duke Dec., Ex. D. Therefore, Defendant is a citizen of Texas only. *See id.*

9.     Micron Technology, Inc. is a citizen of Delaware and Idaho because it is a Delaware corporation with its principal place of business in Idaho. Duke Dec., Ex. B-1 ¶11.

10.     Micron Semiconductor Products, Inc. is a citizen of Idaho because it is an Idaho corporation with its principal place of business in Idaho. *Id.* ¶12.

11.     The complaint states that Micron Technology Texas, LLC is an Idaho limited liability company with its principal place of business in Idaho. *Id.* ¶13. Micron Technology Texas, LLC is a limited liability company, and its only member/owner is

Micron Technology, Inc. Duke Dec., Exs. E–F (Micron Technology Texas, LLC's Articles of Organization and Amended Articles of Organization, respectively); Duke Dec., Ex. G (Micron's Rule 7.1 Corporate Disclosure Statement in the underlying patent action, stating that Micron Technology Texas, LLC is a "wholly-owned" subsidiary of Micron Technology, Inc.). Accordingly, for diversity purposes, Micron Technology Texas, LLC's citizenship is Delaware and Idaho. *Johnson*, 437 F.3d at 899; *see supra* ¶9.

12.    Complete diversity exists between Micron and Defendant, and therefore, diversity jurisdiction exists pursuant to 28 U.S.C. § 1332.

## THE REQUISITE AMOUNT-IN-CONTROVERSY EXISTS

13.    Micron alleges in its complaint that Defendant violated Idaho Code § 48-1703 for "bad faith assertion of patent infringement," Duke Dec., Ex. B-1 ¶86, causing Micron to incur, and entitling Micron to recover, "monetary damages including attorneys' fees." Idaho's bad faith patent assertion statute allows recovery of "(b) Damages; (c) Costs and fees, including reasonable attorney's fees; and (d) Exemplary damages in an amount equal to fifty thousand dollars ($50,000) or three (3) times the total of damages, costs and fees, whichever is greater." Idaho Code § 48-1706.

14.    Micron asserts in its complaint that it costs "millions of dollars" to defend "meritless claims" like those Micron alleges are at issue in this case. Duke Dec., Ex. B-1 ¶2. Indeed, Micron alleges it cost "millions of dollars in attorneys fees" alone in its prior entanglements with Defendant concerning affiliated but distinct

entities. *Id.* ¶¶7, 36; *Gietzen Solar, LLC v. Powerco Solar, Inc.*, No. 1:20-CV-00292-BLW, 2020 WL 6487188, at *2 (D. Idaho Nov. 4, 2020) (holding that "[r]elief which may be included in the amount in controversy includes (1) compensatory damages, (2) punitive damages, (3) value of injunctive relief, and (4) attorney's fees").

15.     Therefore, on the face of Micron's complaint, the amount in controversy exceeds $75,000, and diversity jurisdiction exists under 28 U.S.C. § 1332(a). *Fritsch v. Swift Transp. Co. of Arizona, LLC,* 899 F.3d 785, 788 (9th Cir. 2018) (holding that "notice of removal 'need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold,' and need not contain evidentiary submissions").

16.     This is confirmed by the motion for bond, Duke Dec., Ex. B-3, filed by Micron in this action contemporaneously with its complaint. In the motion, Micron requests that Defendant be required "to post a bond in the amount of $15 million," representing expected damages in this action of four times Micron's estimate of $3.75 million in fees that it expects to incur in the underlying patent lawsuit and related administrative proceedings. Duke Dec., Ex. B-3 ¶4.

### FEDERAL QUESTION JURISDICTION ALSO EXISTS

17.     Micron's complaint challenges an assertion of patent infringement concerning three patents owned by Katana Silicon Technologies LLC, an affiliate of Defendant. Micron's complaint expressly acknowledges that it "primarily focuses on the present infringement claims brought by Katana in Texas," Duke Dec., Ex. B-1 ¶10, referring to the patent infringement case filed against Micron in federal court.

Its complaint further asserts that "Micron would have ideally joined Katana as a defendant in this suit," but "Micron's claim against Katana under [the] Idaho statute is likely a compulsory counterclaim to Katana's pending infringement claims in Texas [federal court]." *Id.* n.2.

18.    Micron's right to relief depends on its insistence that "Katana's infringement claims lack merit." *See id.* ¶8.

19.    Micron's complaint seeks a bond "to cover the costs of defending Katana's . . . infringement claims" and an injunction to stop the assertion of patent infringement against Micron. *Id.* ¶10 & p. 26.

20.    Micron's complaint indicates the action arises under federal law because Micron's purported right to relief originating from the Idaho statute necessarily depends on resolution of a substantial question of patent law, and the action satisfies the test for "arising under jurisdiction" recited in *Gunn v. Minton*, 568 U.S. 251, 257-58 (2013) ("A federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disruption [of] the federal-state balance approved by Congress."). Federal question jurisdiction therefore exists under 28 U.S.C. §§ 1331 & 1454.

### COMPLIANCE WITH REMOVAL PROCEDURES

21.    This Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b)(1) because it is filed within 30 days after the receipt by the Defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which this action is based.

22.    In accordance with 28 U.S.C. § 1441(a), the United States District Court for the District of Idaho is the federal district court for the district embracing the place where the action is pending.

23.    Defendant is serving written notice of the filing of this Notice of Removal upon Micron and will cause a copy of this Notice to be filed with the Court Clerk of the District Court of the Fourth District, Ada County, in accordance with 28 U.S.C. § 1446(d).

24.    All documents to be attached to a notice of removal pursuant to 28 U.S.C. § 1446(a) and Local Rule 81.1 are attached to the *Declaration of Keely E. Duke in Support of Defendant's Notice of Removal and Removal Action Under 28 U.S.C. § 1441(a) and (b)* as Exhibits A & B-1–B-7.

25.    Defendant reserves the right to amend or supplement this Notice of Removal.

**WHEREFORE**, Defendant removes to this Court the above-referenced action now pending in the District Court of the Fourth District, Ada County, Idaho.


Dated:  July 5, 2022                          Respectfully submitted,


                                             DUKE EVETT, PLLC


                                             By _/s/Keely E. Duke_ _____
                                             Keely E. Duke – Of the Firm
                                             Mallam J. Prior – Of the Firm

*Pro Hac Applications forthcoming*
Scott W. Breedlove
Texas Bar No. 00790361
sbreedlove@carterarnett.com
Nathan Cox
Texas Bar No. 24105751
ncox@carterarnett.com

**CARTER ARNETT PLLC**
8150 N. Central Expy, 5th Floor
Dallas, Texas 75206
Telephone No. (214) 550-8188
Facsimile No. (214) 550-8185

**ATTORNEYS FOR DEFENDANT**
LONGHORN IP LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 5th day of July, 2022, I electronically filed the foregoing with the U.S. District Court.  Notice will automatically be electronically mailed or served via email to the following individuals who are registered with the U.S. District Court CM/ECF System:

David Krueck
Daniel Graham
PERKINS COIE LLP
1111 West Jefferson Street, Suite 500
Boise, ID 83702-5391
*Attorneys for Plaintiffs*

☐ U.S. Mail, Postage Prepaid
☐ Overnight
☐ Facsimile
☒ Email dkrueck@perkinscoie.com;
dgraham@perkinscoie.com

Amanda Tessar, Pro Hac
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, CO 80202

☐ U.S. Mail, Postage Prepaid
☐ Overnight
☐ Facsimile
☒ Email atessar@perkinscoie.com

/s/  Keely E. Duke
Keely E. Duke

Electronically Filed
6/6/2022 2:45 PM
Fourth Judicial District, Ada County
Phil McGrane, Clerk of the Court
By: Shantell Eaton, Deputy Clerk

**EXHIBIT**
**B-1**

David Krueck, Bar No. 6246
DKrueck@perkinscoie.com
Daniel Graham, Bar No. 11506
DGraham@perkinscoie.com
PERKINS COIE LLP
1111 West Jefferson Street, Suite 500
Boise, Idaho 83702-5391
Telephone:  208.343.3434
Facsimile:   208.343.3232

Amanda Tessar, *pro hac vice pending*
ATessar@perkinscoie.com
Perkins Coie LLP
1900 Sixteenth Street, Suite 1400
Denver, Colorado 80202
Telephone:  303.291.2300
Facsimile:   303.291.2400

ATTORNEYS FOR PLAINTIFFS, MICRON
TECHNOLOGY, INC., MICRON
SEMICONDUCTOR PRODUCTS, INC., &
MICRON TECHNOLOGY TEXAS, LLC

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT
## OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| MICRON TECHNOLOGY, INC., a Delaware corporation; MICRON SEMICONDUCTOR PRODUCTS, INC., an Idaho corporation; MICRON TECHNOLOGY TEXAS, LLC, an Idaho limited liability company,<br><br>*Plaintiffs,*<br><br>v.<br><br>LONGHORN IP, LLC, a Texas limited liability company,<br><br>*Defendant.* | CV01-22-08130<br>Case No. CaseNumber<br><br>**COMPLAINT FOR VIOLATION OF IDAHO CODE § 48-1703 (BAD FAITH ASSERTION OF PATENT INFRINGEMENT)**<br><br><br>**JURY TRIAL DEMANDED** |

1                    COMPLAINT FOR VIOLATION
                     OF IDAHO CODE § 48-1703

Plaintiffs, Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron

Technology Texas, LLC (collectively, "Micron"), through their counsel, Perkins Coie LLP, bring

this Complaint against Defendant Longhorn IP, LLC ("Longhorn"), alleging as follows:

## I.    INTRODUCTION

1.    Micron is headquartered in Boise, Idaho and is a leading member of Idaho's

corporate community.  With more than 6,000 employees in Idaho alone, Micron is one of Idaho's

largest private employers.  Micron is a world leader in innovative memory solutions that transform

how the world uses information.  For over 40 years, Micron has been instrumental to the world's

most significant technology advancements, delivering optimal memory and storage systems for a

broad range of applications.  Micron devotes more than $2.5 ***billion*** annually to research and

development and, in a tangible measure of Micron's innovations and contributions, Micron is

proud to have one of the world's largest patent portfolios, having obtained well over 50,000 patents

worldwide.  Micron believes that the patent system is critical to our economy and necessary to

spur technical innovation, and it respects the legitimate intellectual property rights of others.

2.    The patent landscape has been marred over the past few decades by a new type of

business model where investors purchase low-value patents and then use them as weapons to

extract unmerited settlement payments and licensing fees from companies like Micron.  Such

entities—often referred to as "non-practicing entities," "patent assertion entities," or, more

derogatively, "patent trolls"—do not make products or perform services.  They view companies

like Micron as having deep pockets, and they know that the costs and risks of fighting meritless

patent litigation make an untenable situation for their targets.  Either those target companies can

spend millions of dollars fighting to defeat meritless claims (and risk judgments entered by juries

who are often unfamiliar with the complex technologies that are at issue), or they can pay

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

settlements that are usually carefully calculated to be less than the cost of fighting. The worst of these non-practicing entities will not drop their suits even in the face of evidence that their patents are invalid or not infringed.

3.      The costs of defending and resolving these types of meritless patent suits must, ultimately, be passed on to consumers in the form of higher prices.

4.      To address this problem of non-practicing entities weaponizing patents to extract unmerited settlement payments and licensing fees, which harms both Idaho companies and consumers, Idaho's legislature has articulated a strong public policy against the assertion of bad faith patent infringement claims. Idaho Code §§ 48-1701(1)(d)-(e) describes such behavior as "harm[ing] Idaho companies":

> Abusive patent litigation, and especially the assertion of bad faith infringement claims, can harm Idaho companies … Not only do bad faith patent infringement claims impose a significant burden on individual Idaho businesses, they also undermine Idaho's efforts to attract and nurture [information technology] and other knowledge-based companies.

5.      Indeed, Idaho's legislature has declared bad faith assertion of patent infringement to be ***unlawful*** and provided companies like Micron with a private cause of action when such bad faith assertions occur. Idaho Code § 48-1706(1) provides for an array of remedies for bad faith patent infringement assertions, including exemplary damages, equitable relief, and attorney's fees.

6.      The defendant in this case, Longhorn, is a non-practicing entity. Longhorn acts on its own behalf and also through various other entities it controls, which Longhorn refers to as "portfolio" entities. Longhorn's pattern and practice is to form a holding company (a "portfolio" entity) and then to have that holding company buy a grouping of patents that the holding company subsequently asserts in its own name. But it is no secret that Longhorn manages and controls the activities of these holding companies. Indeed, Longhorn lists the holding companies' portfolios

on its website (under the "portfolios" tab, *see* www.longhornip.com), and the same person is the

sole manager and member of both Longhorn and each of its holding companies. On information

and belief, Longhorn's portfolio entities are insufficiently capitalized to pay any judgments against

them, and outside counsel for those entities represent them on a contingency basis.

7.    Longhorn's "portfolio" entities include a number that have targeted Micron. First,

Lone Star Silicon Solutions, LLC ("Lone Star") began Longhorn's abusive tactics in 2016 with a

baseless infringement suit filed in the Eastern District of Texas. Faced with Lone Star's baseless

infringement suit, Micron stayed true to its principles and initially refused to pay Lone Star's

extortion racket, instead defending the case, obtaining invalidity rulings from the Patent Trial and

Appeal Board, and decisively claiming victory. But it took years and millions of dollars in attorney

fees to reach that result so, when Lone Star said in 2019 that it would forgo its appeal rights for a

pittance, Micron eventually gave in and paid that amount. Micron did not expect that Longhorn

would have the temerity to bother Micron again, however.

8.    Micron was wrong. Three years later, in March of this year, a different Longhorn

entity, Katana Silicon Technologies, LLC ("Katana"), filed suit against Micron in the Western

District of Texas, claiming that Micron was infringing three patents. *Katana Silicon Techs., LLC

v. Micron Tech., LLC* et al., Case No. 1:22-cv-00214-LY (W.D. Tex.).[1] It did so despite the fact

that the asserted patents in that case are expired, and even though Micron had repeatedly informed

Katana years before the suit was brought that these claims lack merit both because Micron never

infringed the asserted patents and because the patents were not validly issued. Katana's

---

[1]    The Complaint from this Western District of Texas suit is attached as Exhibit 1. That
Complaint includes, as Exhibits A-C, the three patents Longhorn (through Katana) asserts
against Micron. For ease of reference, Micron is separately attaching those three patents as
Exhibits 2-4 here.

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

infringement claims lack merit, and Katana and its controlling entity, Longhorn, know it.

9.    As if that were not bad enough, Longhorn has additionally informed Micron that it will need to buy a license to two of its other companies' portfolios—Hamilcar Barca IP, LLC ("Hamilcar") and Trenchant Blade Technologies, LLC ("Trenchant Blade").

10.    Micron resents being continually subject to this shakedown by Longhorn, and the Idaho legislature has provided suitable recourse to remedy this injustice in the bad faith assertion statute. Micron therefore brings this action, which primarily focuses on the present infringement claims brought by Katana in Texas, as well Longhorn's pattern and practice of behavior, pursuant to Idaho's Bad Faith Assertion of Patent Infringement statute, Idaho Code § 48-1701, *et seq*. Pursuant to Idaho Code § 48-1706(1), Micron is entitled to and seeks (i) equitable relief, (ii) damages, (iii) costs and fees, including reasonable attorney's fees, (iv) a bond from Longhorn to cover the costs of defending Katana's baseless infringement claims, as well as the amounts Micron is reasonably likely to recover in this action, and (v) exemplary damages.[2]

## II.    PARTIES

11.    Micron Technology, Inc. is a Delaware corporation with its principal place of business at 8000 South Federal Way, Boise, Idaho 83716.

12.    Micron Semiconductor Products, Inc. is an Idaho corporation with its principal

---

[2]    Micron would have ideally joined Katana as a defendant in this suit, but it cannot do so for procedural reasons. Specifically, Micron's claim against Katana under Idaho statute is likely a compulsory counterclaim to Katana's pending infringement claims in Texas. Micron therefore asserts its Idaho bad faith state law claim against Katana as a counterclaim in Texas. The Texas court may not be able to impose the bond to which Micron is entitled under Idaho state statute, however. *See Ice Castles, LLC v. LaBelle Lake Ice Palace, LLC*, No. 4:18-cv-00571-DCN, 2021 WL 3085479, at *3 (D. Idaho July 21, 2021) (discussing application of Idaho bad faith assertion statute by federal court). For that reason, Micron separately seeks relief against Longhorn (which is, in any event, the controlling entity of Katana) here.

place of business at 8000 South Federal Way, Boise, Idaho 83716.

13.    Micron Technology Texas, LLC is an Idaho limited liability company with its principal place of business at 8000 South Federal Way, Boise, Idaho 83716.

14.    Longhorn IP, LLC is a Texas limited liability company with its principal place of business at 5204 Bluewater Drive, Frisco, Texas 75034.

### III.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action, pursuant to Idaho Const. Art. V, § 20 and Idaho Code § 1-705.  The amount in controversy in this action exceeds $10,000, exclusive of interest, costs, and attorney's fees.

16.    This Court has jurisdiction over Longhorn for purposes of this action, pursuant to Idaho Code § 48-1704 because, for instance, Longhorn has sent demand letters and emails to Micron at its address in Idaho, visited in person Micron's facility to demand a license, and has filed suit against Micron.  Each of the three Micron plaintiffs here is an "Idaho Person" as defined in Idaho Code § 48-602, and each is a "Target" under Idaho Code §§ 48-1702(3)(a)-(b).  In addition, this Court has jurisdiction over Longhorn for purposes of this action, pursuant to Idaho Code § 5-514 because Longhorn has transacted business in Idaho, as defined in Idaho Code § 5-514(a).

17.    Venue is proper in this Court pursuant to Idaho Code § 5-404 because Longhorn does not reside in Idaho, and Micron designates this Court as the proper county in this Complaint.

### IV.    GENERAL ALLEGATIONS

**A.    Longhorn's Business Model And Practice Of Filing Suits In Texas**

18.    As described above, Longhorn controls several portfolio entities, including Katana, in which Longhorn silos groupings of low-value and sometimes-expired patents that Longhorn has

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

purchased.

19.    Longhorn identifies the following current portfolio entities on its website:

| Entity | Principal | Address |
|--------|-----------|---------|
| Katana Silicon Technologies LLC | Khaled Fekih-Romdhane (via Tanit Ventures, Inc.) | 5204 Bluewater Drive Frisco, TX 75036 |
| Trenchant Blade Technologies LLC | Khaled Fekih-Romdhane | 5204 Bluewater Drive Frisco, TX 75036 |
| Nyckel UI Technologies LLC | Khaled Fekih-Romdhane (via Tanit Ventures, Inc.) | 5204 Bluewater Drive Frisco, TX 75036 |
| Hannibal IP LLC | Khaled Fekih-Romdhane | 5204 Bluewater Drive Frisco, TX 75036 |
| Hamilcar Barca IP LLC | Khaled Fekih-Romdhane | 5204 Bluewater Drive Frisco, TX 75036 |
| Dido Wireless Innovations LLC | Khaled Fekih-Romdhane | 5204 Bluewater Drive Frisco, TX 75036 |
| Lone Star Silicon Innovations LLC | Christian Dubuc (partner or former partner of Mr. Fekih-Romdhane) | 5204 Bluewater Drive Frisco, TX 75036 |
| L2 Mobile Technologies LLC | Khaled Fekih-Romdhane | 8105 Rasor Blvd., Ste 210 Plano, Texas 75024 |
| Nordic Interactive Technologies LLC | Khaled Fekih-Romdhane (via Tanit Ventures, Inc.) | 8105 Rasor Blvd., Ste 210 Plano, Texas 75024 |
| Ox Mobile Technologies LLC | Khaled Fekih-Romdhane | 8105 Rasor Blvd., Ste 210 Plano, Texas 75024 |
| Carthage Silicone Innovations LLC | Khaled Fekih-Romdhane | 8105 Rasor Blvd., Ste 210 Plano, Texas 75024 |

LONGHORN IP PORTFOLIOS, www.longhornip.com/portfolios (last visited May 20, 2022).

20.    As patent assertion entities, Longhorn and its portfolio entities do not earn their profits by providing any product or service. Instead, they assert their patents against companies that do provide products and/or services and in that way try to extract settlement payments or licensing fees from those companies. Longhorn and its portfolio entities coerce companies to pay them by threatening to file, and in some instances actually filing, patent infringement lawsuits.

7                    COMPLAINT FOR VIOLATION
                     OF IDAHO CODE § 48-1703

They even do so in instances where they know that the patents they threaten to assert are weak, including because companies like Micron tell them why their threatened patent infringement claims cannot succeed.

21.     Like many other non-practicing entities, Longhorn and its portfolio entities have been formed under the law of Texas and are Texas limited liability companies.  This is not by accident; it is instead part of a plan to support Longhorn's ability to file its patent infringement suits in the federal courts of Texas.

22.     Non-practicing entities have for many years been drawn to file suits in the Eastern District of Texas and, more recently, in the Western District of Texas.  Most of the judges in these districts have promulgated local rules that patent owners perceive to be favorable to their own interests; times to trial are generally extremely fast, judges are often disinclined to grant either transfer or dispositive motions, and plaintiffs can be assured as to which judge they will be assigned by their selection of the division in which they file.  For instance, if a plaintiff files in the Marshall Division of the Eastern District of Texas, they will be assigned Judge Gilstrap, who for many years had the largest patent docket of any judge in the nation, despite the relatively low population of the Eastern District of Texas and the relatively small number of technology companies with any meaningful presence in that district.  More recently, Judge Albright, the sole Article III judge in the Waco Division of the Western Division of Texas, has become a popular choice for patent plaintiffs, and Judge Albright now has the most patent cases of any judge in the United States.

23.     In 2021 alone, 976 patent cases were filed in the Western District of Texas—almost ¼ of all the patent suits filed in the entire United States.  This contrasts with, for instance, the District of Idaho, which had 2 patent cases filed in 2021.

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

24.     The reluctance of certain judges in these Texas districts to transfer cases has led to a slate of recent Federal Circuit mandamus decisions ordering transfer and has also led to an outcry in the patent community and beyond.  For instance, Republican Senator Thom Tillis of North Carolina and Democratic Senator Patrick Leahy of Vermont joined together in November of last year to send a letter to the United States Supreme Court decrying this situation.  *See* https://fingfx.thomsonreuters.com/gfx/legaldocs/zdpxonybkvx/IP%20ALBRIGHT%20PATENTS%20letter.pdf (asking the Supreme Court to implement reform to address the "extreme concentration of patent litigation in [the Western District of Texas] and the unseemly and inappropriate conduct that has accompanied this phenomenon").

25.     When Longhorn and its portfolio entities file suit, they typically do so in Texas. They do so to exert maximum pressure to force companies into unfavorable settlements even in situations where their asserted patents lack merit.

26.     Katana acts as the agent of Longhorn and Mr. Fekih-Romdhane.

27.     Katana is the alter ego of Longhorn.

**B.     Longhorn's Suit Against Micron By Lone Star Provides The Back-Drop For Longhorn's Present Infringement Claims Through Katana**

28.     Longhorn has been targeting Micron for some time.  The first time that a Longhorn portfolio entity sued Micron was in October of 2016.

29.     On that occasion, Lone Star filed a Complaint for Patent Infringement in the United States District Court for the Eastern District of Texas, Case No. 2:16-cv-01116-JRG-RSP.[3]

---

[3]    Case No. 2:16-cv-01116-JRG-RSP was consolidated into Case No. 2:16-cv-01170-JRG-RSP, along with two other cases involving patent infringement claims by Lone Star, before Micron successfully moved to transfer the case to the Northern District of California.  *Lone Star Silicon Innovations LLC v. Micron Tech., Inc.*, No. 216CV01116JRGRSP, 2017 WL 10221621 (E.D. Tex. Aug. 24, 2017).

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

30.     In its lawsuit in the Eastern District of Texas, Lone Star alleged that Micron Technology, Inc., Micron Semiconductor Products, Inc., and two other Micron affiliates infringed United States Patent Nos. 5,872,038; 5,912,188; 6,023,085; 6,097,061; 6,103,611; 6,326,231; and 6,388,330.  Lone Star demanded millions of dollars from Micron to resolve this suit.

31.     Micron chose to fight that Lone Star suit.  It obtained its first victory when the case for transfer to the Northern District of California was so compelling that Judge Gilstrap granted Micron's motion to transfer.

32.     In California, before Judge Alsup, Micron obtained a full dismissal of the initially-filed case from Judge Alsup, who criticized Lone Star for having incorrectly stated that it was the sole owner of the asserted patents and having engaged in a "litigation gimmick."  Case No. 3:17-cv-5458, Dkt. 96, at 11 (Jan. 20, 2018 Order).

33.     In connection with that Lone Star lawsuit, Micron also filed petitions for *inter partes* review ("IPR") between June 9 and June 16, 2017, challenging the validity of all of the asserted claims in each of the patents that Lone Star asserted.  An IPR is a procedure for challenging a patent's validity before the United States Patent and Trademark Office's Patent and Trademark Appeal Board ("PTAB").  35 U.S.C. §§ 311-19.  Although IPRs are generally a less expensive way to challenge validity than in district court litigation, the costs of IPRs are still substantial (particularly when a large number of them are filed) and it takes approximately 18 months from the filing date of the IPR petitions to reach a decision, which is then subject to appeals.  Moreover, some district courts, including the Eastern District of Texas, do not typically stay the district court litigation pending the resolution of IPRs, so a defendant must still litigate while its IPRs are pending.

34.     Micron achieved overwhelming success in the IPR petitions it filed in connection

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

with the Lone Star lawsuit.  For two of the seven asserted patents, Lone Star conceded before the

PTAB could reach a decision, preemptively cancelling the challenged claims.  For the other five

patents, the PTAB invalidated ***all*** of the challenged claims—a total of 50 claims.  *See Micron*

*Technology, Inc. v. Lone Star Silicon Innovations LLC*, No. IPR2017-01597 (P.T.A.B. Jan. 17,

2018); *Micron Technology, Inc. v. Lone Star Silicon Innovations LLC*, No. IPR2017-01566

(P.T.A.B. Jan. 17, 2018); *Micron Technology, Inc. v. Lone Star Silicon Innovations LLC*, No.

IPR2017-01565 (P.T.A.B. Jan. 17, 2018); *Micron Technology, Inc. v. Lone Star Silicon*

*Innovations LLC*, No. IPR2017-01563 (P.T.A.B. Dec. 18, 2017); *Micron Technology, Inc. v. Lone*

*Star Silicon Innovations LLC*, No. IPR2017-01562 (P.T.A.B. Dec. 18, 2017); *Micron Technology,*

*Inc. v. Lone Star Silicon Innovations LLC*, No. IPR2017-01561 (P.T.A.B. Dec. 15, 2017); *Micron*

*Technology, Inc. v. Lone Star Silicon Innovations LLC*, No. IPR2017-01560 (P.T.A.B. Dec. 15,

2017).   More specifically, the PTAB found the challenged claims in each Lone Star patent to be

unpatentable because the difference between the subject matter of the patent and the prior art were

such that the subject matter as a whole would have been obvious to a person of ordinary skill in

the art at the time of the invention of the patents.  Simply put: Lone Star's (*i.e.*, Longhorn's) patents

were invalid because they contained nothing inventive.

35.    In short, Micron's victory was decisive.  The asserted patents were cancelled or

declared invalid by the PTAB, ***and*** the initial district court litigation was dismissed by the district

court judge on other grounds as well.

36.    But it took more than three years of fighting and cost millions of dollars in fees to

get to this point.

37.    Not only that, but Longhorn and Lone Star filed and threatened appeals that would

have cost even more to defend.  They coupled those appeals with a settlement offer that can only

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

be described as immaterial, tiny, and less-than-nuisance-value.

38.    Faced with this offer, it made no sense to continue to spend money on appeals, and Micron paid Lone Star the demanded settlement amount in 2019 to ***make Longhorn go away***. Micron did so despite the many victories it achieved fighting Longhorn's patents. And it did so believing that Longhorn would never again have the audacity to file another meritless suit against Micron.

39.    Micron's belief proved correct for three years, until March of 2022, when Longhorn entity Katana filed suit.

**C.    Having Lost On Its Lone Star Portfolio, Longhorn Now Targets Micron With Infringement Claims From Its Katana Portfolio**

40.    On August 22, 2018, Longhorn first contacted Micron about Longhorn's Katana portfolio of patents. In that first communication, attached as Exhibit 5, Longhorn asked Micron to take a license to its Katana portfolio and identified two patents that it alleged Micron infringed. In what can only be characterized as a thinly-veiled threat, Longhorn pointed out that its Katana patents had been asserted against other companies. Longhorn did not provide claim charts or other documents explaining its infringement theory for the two identified patents at this time, nor did it offer to do so at this time.

41.    A common tactic used by patent assertion entities is to attempt to shield their conduct behind Federal Rule of Evidence 408 and confidentiality agreements that would prevent bad faith conduct from coming under public scrutiny. Longhorn's communication regarding its Katana portfolio promised nothing different here. Longhorn concluded the communication by indicating that its willingness to discuss the "issues" in its letter was subject to Micron's agreement to treat any "information" shared as being protected under FRE 408. Underlying factual information, of course, is not protected under FRE 408, which is instead designed to shield

settlement offers and admissions made during settlement negotiations from use in litigation to establish the fact or amount of liability.

42.     The two Katana patents identified in Longhorn's initial communication, United States Patent Nos. RE38,806 (the "'806 Patent," Ex. 2) and 6,352,879 (the "'879 Patent," Ex. 3), were on the verge of expiring as of August of 2018.  Indeed, these two patents did expire just months later, in December 2018.  Although United States patent law allows for damages for past infringement for six years before the date that any infringement suit is filed, collection of such past damages is permitted only if the accused infringer was on notice of the patent and only up through the date that the patent expires, among other requirements.  *See* 35 U.S.C. §§ 286, 287.

43.     Notice can be given through a letter, if it is sufficiently detailed, or the public can be put on constructive notice of a patent (*i.e.*, without individualized notice) if the patentee or its licensees mark their products that practice the patent with the patent's number.  *See id.*

44.     Here, Longhorn's letter regarding the Katana patents alleged that "potential licensees" of the Katana portfolio exist, identifying several, but did not state or present any evidence that these licensees or the original owner of Katana's patents (or its licensees) had marked their products with the asserted patent numbers.  Likewise, the Complaint that Longhorn (through Katana) eventually filed against Micron does not allege marking, nor could it accurately do so.

45.     As a result, even setting aside all of the technical weaknesses of the two identified Katana patents (discussed below), the very best-case scenario for Longhorn is that a tiny sliver of damages would be available for the four-month (at most) time period between Longhorn's notice letter to Micron and the patents' expirations.

46.     After the August 2018 communication, Longhorn (through Katana) then sent another letter to Micron on September 18, 2018.  This second letter was similar to the first letter,

but confusingly now identified the '806 patent and a different patent, United States Patent No. 6,731,013 (the "'013 Patent," Ex. 4), as allegedly infringed. The '879 patent is not mentioned in this letter. As with the first letter, no claim charts, proof of alleged infringement, or information relating to marking is included in or attached to this letter either.

47.    Nevertheless, in a demonstration of its good faith, Micron hosted Longhorn personnel and attorneys at its Boise, Idaho campus on November 14, 2018 to discuss Longhorn's infringement allegations relating to the Katana portfolio. In advance of this meeting, in response to repeated requests from Longhorn for an NDA to cover the discussions, Micron made clear that no such NDA would be necessary or appropriate, explaining that Longhorn's theories as to how they read a public patent on Micron's products cannot be confidential. In an email dated October 26, 2018, Micron also informed Longhorn that Micron's preliminary research had already revealed that there were commercially available products before the priority date of the '806 and '879 patents that rendered the independent claims of those Katana patents invalid.

48.    The founder and CEO of Longhorn, Lone Star, and Katana, Khaled Fekih-Romdhane, traveled to Boise to attend the November 2018 meeting, along with outside counsel for "Lone Star" (since the Lone Star lawsuit was still ongoing at the time) and separate outside counsel for "Katana."

49.    During this meeting, Longhorn and Katana presented claim charts, and Micron explained some of the many reasons that Longhorn's patent infringement assertions regarding the Katana patents are meritless, including those discussed below.

50.    Longhorn, by contrast, demanded the payment of license fees or a settlement. Moreover, Longhorn communicated that the amounts demanded would increase as time passed because Longhorn was only just beginning its campaign of seeking licensing fees from companies

based on the Katana portfolio.  In Mr. Fekih-Romdhane's words, they were offering Micron an "early bird special."

51.     On November 20, 2018, Mr. Fekih-Romdhane stated in a follow-up email to Micron that "it might be helpful [for Micron] to also look at some patents from the portfolio" of another Longhorn portfolio entity, Carthage Silicon Innovations, LLC.  Although phrased under the guise of being "helpful," this was really just another way to communicate to Micron that Longhorn would keep targeting Micron over and over.

52.     On February 4, 2019, consistent with the presentation made previously on November 14, 2018 about the Katana patents, Micron detailed for Longhorn the reasons that it should not have to pay for a license to the identified Katana patents.  Ex. 6.

53.     For instance, Micron explained that the claims of the '013, '806, and '879 patents are invalid because the technology claimed in those patents was known, discussed in literature, described in other patents, and used in multiple commercially available products, all prior to the priority dates of the Katana patents.  Micron identified specific prior art references that supported its conclusions on this point, including, but not limited to, chip packages manufactured by Intel, Texas Instruments, GE, and Amkor, and United States Patent Nos. 5,495,398, 5,527,740, 5,322,207, 5,608,262, 5,519,936, 5,639,695, 6,172,419, and 5,541,450.   In other words, the technology described in the '013, '806, and '879 patents was already in use and known prior to the issuance of those patents, and, as a result, the claims in those patents were invalid and Micron could not possibly infringe them, given their invalidity.

54.     Micron also explained that it did not infringe any claims of the '013 patent because at least the Micron product identified in a claim chart Longhorn provided shortly before the November meeting did not have a metal fill pattern or a support pattern corresponding to a

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

wirebond location on a substrate, as required by the '013 claims.

55.    Despite Micron's explanation that it was not infringing the asserted Katana patents, Longhorn nevertheless persisted in its infringement claims.  More particularly, Longhorn provided no plausible rebuttal to Micron's analysis, although it simultaneously continued to press its baseless demands for payments and licensing fees, including through correspondence in 2019 and 2020.

56.    More than three and a half years after Longhorn had first contacted Micron about the Katana portfolio, it filed suit in the Western District of Texas, alleging infringement of three expired (sometimes long-expired) patents.

57.    Longhorn's claims regarding the Katana patents are exceptionally weak.  Micron has not infringed any of the asserted patents, and none of the patents are valid.

58.    Longhorn's assertion of infringement of the Katana patents is in bad faith and is designed for the purpose of extracting a license fee or settlement payment from Micron that is not owed.

**D.    The Asserted Katana Patents Are Expired, Invalid, And Not Infringed**

59.    In its pending lawsuit in the Western District of Texas, Katana asserts that Micron infringes or has infringed the Katana '806, '879, and '013 patents.  As explained below, Katana's (*i.e.*, Longhorn's) claims of infringement are meritless, and Micron has already provided analysis to Longhorn demonstrating that the claims are meritless.  Thus, these claims constitute bad faith assertion of patent infringement and a violation of Idaho Code § 48-1703.

**i.    Micron Cannot Infringe Expired Patents As A Matter Of Law**

60.    In the Western District of Texas Lawsuit, Katana alleges that the Micron defendants "have infringed ***and continue*** to infringe the Asserted Patents."  Ex. 1 (Katana Complaint), at

¶ 13 (emphasis added).

61.     As an initial matter, one cannot infringe an expired patent, as a matter of law.  The asserted '879 and '806 patents expired on December 30, 2018, and the asserted '013 patent expired on July 5, 2021.

62.     As a result, any allegation of continued or ongoing infringement is therefore baseless and legally insupportable.

63.     No damages are available for patent infringement after the date that a patent has expired.  Katana's allegation of ongoing infringement of expired patents is more evidence of its bad faith.

**ii.     The '806 Patent**

64.     The '806 patent purports to claim a supposedly novel method for manufacturing a "semiconductor device that may have a Chip Size Package ('CSP') structure."  Ex. 2; *see also* Ex. 1 (Katana Complaint), at ¶ 26.

65.     Micron has not infringed any asserted claim of the '806 patent.  For instance, Micron's products did not infringe exemplary asserted claim 1 of the '806 patent at least because that claim is directed to a "semiconductor device" comprising a "first semiconductor chip" and a "second semiconductor chip" with "each of said first and second semiconductor chips being wire-bonded to the electrode section with a wire, said first and second semiconductor chips and the wire being ***sealed with a resin***."  Ex. 2 at claim 1 (emphasis added); *see also* Ex. 1 (Katana Complaint), at ¶ 36.

66.     Micron's products did not infringe such claims either directly or indirectly at least because they are not sealed with a resin.  Although Katana in its Complaint points to a figure of uncertain origin that it claims is a Micron product, and although Katana labels something in that

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

figure as "resin" (Complaint ¶ 36), it is not correct that Micron's accused products are sealed using resin. Micron's accused products are instead sealed using thermoplastic encapsulants. Although these encapsulants contain small amounts of resins amongst their many ingredients, they are not themselves resins, and Katana has no basis for its allegation otherwise.

67.    In addition, there can be no indirect infringement because there is no direct infringement here. Micron also has not at any time had the requisite knowledge and/or specific intent necessary for Katana to show indirect infringement.

68.    Further, as Micron has informed Longhorn, the technology that is the subject of the '806 patent was known and used prior to the alleged inventive date of the Katana patent. For example, Intel Corporation developed a semiconductor package with a stacked SRAM and NAND device (part number 28F1602C3) circa 1998. Micron alerted Longhorn to this system prior art in a February 4, 2019 email, which also directed Longhorn to a TechInsights Report relating to same (#PKG-1342, analysis conducted in 1999).

69.    Micron's February 4, 2019 email also alerted Longhorn to the Multi-Chip Module ("MCM") consortium that was working on stacking technology prior to the priority date of the '806 patent. The MCM consortium produced a significant amount of non-patent literature dating back to 1980 regarding various methods of stacking multiple semiconductor chips into one package. Much of that non-patent literature contains disclosure that is very similar to the subject matter of the '806 patent.

70.    Micron's February 4, 2019 email also specifically identified a company called nChip that published an article in 1994 titled "Laminated Memory" and used stacked Micron SRAM, MT2C2568, as a demonstration vehicle. The article contains disclosure that is very similar to the subject matter of the '806 patent.

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

71.     By asserting infringement claims relating to the expired Katana '806 patent, Longhorn has violated Idaho Code § 48-1701, *et seq*.

### iii.     The '879 Patent

72.     The '879 patent also purports to claim a supposedly novel method for manufacturing a "semiconductor device that may have a Chip Size Package ('CSP') structure." Ex. 3; *see also* Ex. 1 (Katana Complaint) at ¶ 57.

73.     Micron has not infringed any asserted claim of the '879 patent.  As one example, the Complaint in the Western District of Texas suit does not (and cannot) show that Micron's products satisfy at least the following limitations of asserted claim 1: "forming a first adhesion layer on a back surface of a first wafer *on which no circuit is formed*" (Ex. 1, Katana Complaint, at ¶ 64, emphasis added) and "forming a second adhesion layer on a back surface of a second wafer *on which no circuit is formed*" (*id.* at ¶ 67, emphasis added).  Further, as another example, the Complaint identifies two *different structures* as "the front surface of the first wafer" of limitations (a) and (d) of claim 1.  *Compare* Ex. 1 (Katana Complaint) at ¶¶ 64-65 *with* ¶¶ 67-69; *see also* Ex. 3 at claim 1 (emphasis added).

74.     In addition, there can be no indirect infringement because there is no direct infringement here.  Micron also has not at any time had the requisite knowledge and/or specific intent necessary for Katana to show indirect infringement.

75.     Further, the technology that is the subject of the '879 patent was known and used prior to the alleged inventive date of the patent.  For example, Intel Corporation developed a semiconductor package with a stacked SRAM and NAND device (part number 28F1602C3) circa 1998.  Micron alerted Longhorn to this system prior art in a February 4, 2019 email, previously mentioned above with reference to the '806 patent, which also directed Longhorn to a TechInsights

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

Report relating to same (#PKG-1342, analysis conducted in 1999).

76.     Micron's February 4, 2019 email also alerted Longhorn to the MCM consortium that was working on stacking technology prior to the priority date of the '806 patent.  The MCM consortium produced a significant amount of non-patent literature dating back to 1980 regarding various methods of stacking multiple semiconductor chips into one package.  Much of that non-patent literature contains disclosure that is very similar to the subject matter of the '879 patent.

77.     Micron's February 4, 2019 email specifically identified a company called nChip that published an article in 1994 titled "Laminated Memory" and used stacked Micron SRAM, MT2C2568, as a demonstration vehicle.  The article contains disclosure that is very similar to the subject matter of the '879 patent.

78.     In addition, at least asserted claim 1 of the '879 patent is invalid as indefinite under 35 U.S.C. § 112, ¶ 2.  Claim 1 is directed to a "method of manufacturing a semiconductor device" comprising steps (a)-(f). Steps (a) and (d) both require "a circuit being formed on a front surface of the first wafer."  In other words, a circuit is formed on the ***same surface*** of the ***same wafer*** at two different steps of the manufacturing process.  In light of this confusing and illogical direction, a person of ordinary skill in the art would have been unable, without undue experimentation, to ascertain the scope of the invention of claim 1 with reasonable certainty.

79.     By asserting its infringement claims relating to the Katana '879 patent, Longhorn has violated Idaho Code § 48-1701, *et seq*.

**iv.     The '013 Patent**

80.     The '013 patent purports to claim a supposedly novel "semiconductor device which provides a wiring substrate, a semiconductor device, and a package stack semiconductor device, all with improved reliability of connection by suppressing the occurrence of inadequate electrical

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

connection." Ex. 4; *see also* Ex. 1 (Katana Complaint) at ¶ 90.

81.     Micron has not infringed any asserted claim of the '013 patent.  For instance, Micron's products did not infringe at least because the alleged "wiring pattern" and the alleged "support pattern" are identified as the same element in Katana's Complaint.  Ex. 1 (Katana Complaint) at ¶ 99-100 (alleged wiring section circled in lime green in ¶ 99 and alleged support pattern circled in dark blue in ¶ 100 correspond to an identical portion of the marked-up figure).  As required by the language of claim 11, the "wiring pattern" makes "electrical connection between the terminal section and the land section" and the "support pattern" is "***not*** electrically connected to one of the terminal section and land section."  The "wiring pattern" and "support pattern," therefore, are mutually exclusive and cannot both refer to the same element.

82.     Further, the technology that is the subject of the '013 patent was known and used before the alleged inventive date of the patent, as Micron has informed Longhorn.  To take a nonlimiting example, United States Patent No. 5,541,450, filed November 2, 1994, and its divisional application United States Patent No. 5,639,695, filed November 3, 1995, disclose a support pattern that is not electrically connected to one of a terminal section and a land section.  Likewise, United States Patent No. 6,172,419, a Micron-owned patent filed February 24, 1998, discloses a support pattern that is not electrically connected to one of a terminal section and a land section.  Micron alerted Longhorn to these patents in a February 4, 2019 email, which also directed Longhorn to numerous other prior art references, including a TechInsights Report (#PKG-1342, analysis conducted in 1999), an Intel product identified by part number 28F1602C3, and United States Patent No. 5,519,936.

83.     Micron's February 4, 2019 email also specifically identified Texas Instruments as using similar wire-bonded packaging technology, such as in their MicroStar BGA, MemoryFlex,

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

GE Chip-on Flex, and Amkor Flex BGA products, that disclose similar support patterns.

84.     By asserting its infringement claims relating to the '013 patent, Longhorn has violated Idaho Code § 48-1701, *et seq.*

## CLAIM FOR RELIEF
### (Violation of Idaho Code §48-1701, *et seq.*)

85.     Micron realleges and incorporates the foregoing allegations in this Complaint.

86.     The claims and demands made by Longhorn acting on its own and through Katana constitute violations of Idaho Code § 48-1703, which makes it "unlawful for a person to make a bad faith assertion of patent infringement in a demand letter, a complaint or any other communication." These violations include the Complaint filed in the Western District of Texas, as well as claims and demands made by Longhorn acting on its own and through Katana prior to the filing of the Complaint.

87.     Longhorn's bad faith conduct is unlawful under Idaho Code § 48-1703, including because:

(a)     The target of Longhorn's claims and demands, Micron (including all three Micron entities named as defendants in the Western District of Texas suit), is an "Idaho person," as defined by Idaho Code § 48-1702(2), which incorporates Idaho Code § 48-602, because each of the Micron defendants is a "business entity."

(b)     Longhorn has failed to conduct more than a superficial analysis comparing the claims in the Katana patents to Micron's accused products.

(c)     The amount of the license fee Longhorn demanded was not reasonably based on the value of a license to the Katana patents.

(d)     Longhorn's assertion of alleged infringement, including in the Complaint in the Western District of Texas, is in subjective bad faith because Longhorn knows or

COMPLAINT FOR VIOLATION
                                                          OF IDAHO CODE § 48-1703

should know that at least some, if not all, of the allegedly infringing Micron products did not infringe the Katana patent claims as drafted or as commonly understood by one with relevant and ordinary skill in the art and that the asserted patents are invalid.

(e)     Longhorn's assertions of alleged infringement, including in the Western District of Texas, are in subjective bad faith because Longhorn's assertions are objectively baseless and lack merit.  Moreover, Longhorn knows that its claims lack merit because Micron, on multiple occasions, provided a detailed analysis that showed why this was so.

(f)     Longhorn, as well as other Longhorn entities, including Lone Star, have previously (and routinely) filed or threatened to file litigation alleging patent infringement based on claims similar to those Longhorn has asserted through Katana in the Western District of Texas and, in IPR proceedings relating to at least some of those actions, the patents have been declared invalid.

(g)     Longhorn, as well as other Longhorn entities, including Lone Star, have previously (and routinely) filed or threatened to file litigation alleging patent infringement based on claims similar to those Longhorn has asserted through Katana in the Western District of Texas, and, in at least some of those actions, settled their claims before their claims could be declared meritless.

88.     Longhorn has violated Idaho Code § 48-1701, *et seq.*, by actions taken and omissions made through its own name, as well as actions taken and omissions made by Longhorn acting through one or more of its portfolio entities, including Katana.

89.     The Complaint in the Western District of Texas suit was filed less than three years

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

ago, on March 4, 2022.

90.     Micron meets the statutory definition of "target" under Idaho Code § 48-1702(3) because it has become the subject of Longhorn's patent infringement allegations, demands, and litigation.

91.     Pursuant to Idaho law, alter ego status is established when the following two requirements are met: "(1) a unity of interest and ownership to a degree that the separate personalities of the [company] and individual no longer exist and (2) if the acts are treated as acts of the [company] an inequitable result would follow." *Wandering Trails, LLC v. Big Bite Excavation, Inc.*, 329 P.3d 368, 376 (2014).

92.     Here, there is a unity of interest and ownership between Longhorn, its portfolio entities, including Katana, and Mr. Fekih-Romdhame, to a degree that their purported separate personalities no longer exist. This unity is evidenced, in part, by the unity of control that Mr. Fekih-Romdhane maintains over Longhorn and its portfolio entities, as further evidenced by the Longhorn website, which holds out the Katana portfolio as being a Longhorn portfolio and describes Longhorn's business as being patent licensing (i.e., through holding companies such as Katana).

93.     An inequitable result would follow if the acts of Longhorn's portfolio entities are treated as separate from the acts of Longhorn.  As an example of such an inequitable result, Longhorn would be able to continue harassing Micron with meritless claims of patent infringement by shifting its claims from portfolio entity to portfolio entity, without ever being held accountable for its bad faith conduct.

94.     Additionally, to determine whether a principal-agent relationship exists pursuant to Idaho law such that the principal can be held liable for the acts of the agent, the "important factor

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

is the control or right of control reserved by the [principal] over the functions and duties of the agent." *Forbush v. Sagecrest Multi Fam. Prop. Owners' Ass'n, Inc.*, 396 P.3d 1199, 1213 (2017).

95.     Here, Longhorn, including via Mr. Fekih-Romdhane, exercises control over the functions and duties of its portfolio entities, including Katana.  This control is evidenced, in part, by Mr. Fekih-Romdhane's formation and oversight over Longhorn and all of the Longhorn portfolio entities, as well as the Longhorn website itself.

96.     Micron is entitled to a finding by this Court that Longhorn's demands and communications, including through the Complaint in the Western District of Texas, constitute bad faith assertion of patent infringement in violation of Idaho Code § 48-1703.

97.     Micron has incurred monetary damages including attorneys' fees as a result of Longhorn's bad faith assertion of patent infringement.

## V.    ATTORNEYS' FEES

98.     Pursuant to Idaho Code § 48-1706(1)(c), Micron seeks recovery of its attorneys' fees in this action.

## VI.    DEMAND FOR JURY TRIAL

99.     Micron demands a trial by jury in accordance with the provisions of Idaho R. Civ. P. 38 and applicable law.

## VII.    PRAYER FOR RELIEF

Micron requests that the Court enter judgment in its favor on its claims, including the following:

     a.    damages described in the above claims, pursuant to Idaho Code § 48-1706(1)(b);

     b.    exemplary damages, pursuant to Idaho Code § 48-1706(1)(d);

     c.    costs, pursuant to Idaho Code § 48-1706(1)(c);

COMPLAINT FOR VIOLATION
OF IDAHO CODE § 48-1703

    d.    attorneys' fees, pursuant to Idaho Code § 48-1706(1)(c);

    e.    injunctive relief against Longhorn's bad faith assertion conduct, pursuant to Idaho

        Code § 48-1706(1)(a);

    f.    a bond posted by Longhorn in an amount equal to a good faith estimate of

        Micron's costs to litigate Katana's infringement claims and the amounts

        reasonably likely to be recovered by Micron under Idaho Code § 48-1701, *et seq*.,

        pursuant to Idaho Code § 48-1707;

    g.    pre-judgment and post-judgment interest; and

    h.    such other relief as is just and proper.

DATED:  June 6, 2022.            **PERKINS COIE LLP**

                      By:*/s/ David Krueck*
                        David Krueck, Bar No. 6246
                        DKrueck@perkinscoie.com
                        Daniel Graham, Bar No. 11506
                        DGraham@perkinscoie.com
                        1111 West Jefferson Street, Suite 500
                        Boise, Idaho 83702-5391

                        Amanda Tessar, *pro hac vice pending*
                        ATessar@perkinscoie.com
                        Perkins Coie LLP
                        1900 Sixteenth Street, Suite 1400
                        Denver, Colorado 80202

                        **ATTORNEYS FOR PLAINTIFFS, MICRON
                        TECHNOLOGY, INC., MICRON
                        SEMICONDUCTOR PRODUCTS, INC., &
                        MICRON TECHNOLOGY TEXAS, LLC**

            COMPLAINT FOR VIOLATION
                      OF IDAHO CODE § 48-1703

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| KATANA SILICON TECHNOLOGIES LLC, | § § § | |
| Plaintiff, | § § § | Case No.  1:22-cv-00214 |
| v. | § § § | JURY TRIAL DEMANDED |
| MICRON TECHNOLOGY, INC.; MICRON SEMICONDUCTOR PRODUCTS, INC.; and MICRON TECHNOLOGY TEXAS, LLC, | § § § § § § | |
| Defendants. | § § | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Katana Silicon Technologies LLC ("Katana"), by and through its attorneys, for its Complaint against Defendants Micron Technology, Inc; Micron Semiconductor Products, Inc.; and Micron Technology Texas, LLC (collectively "Defendants" or "Micron"), and demanding trial by jury, hereby alleges, on information and belief regarding the actions of Micron and on knowledge with regard to its own actions, as follows:

### I.     NATURE OF THE ACTION

1.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 271, *et seq*., to obtain damages resulting from Defendants' unauthorized use, sale, and offer to sell in the United States, of products, methods, processes, services and/or systems that infringed Plaintiff's United States patents, as described herein.

2.     Defendants manufactured, provided, used, sold, offered for sale, imported, and/or distributed infringing products and services, and encouraged others to use their products and services in an infringing manner, as set forth herein.

3.     Plaintiff seeks past damages and prejudgment and post-judgment interest for Defendants' infringement of the Asserted Patents, as defined below.

## II.    PARTIES

4.     Plaintiff Katana Silicon Technologies LLC is a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business located at 5204 Bluewater Drive, Frisco, Texas 75036.

5.     Katana is the owner of the entire right, title, and interest in the Asserted Patents, as defined below, including the right to sue for and collect all damages and to seek and obtain any other relief for infringement.

6.     Defendant Micron Technology, Inc. ("Micron Technology") is a Delaware corporation with a principal place of business at 8000 South Federal Way, Boise, Idaho 83716. Micron Technology also has a place of business at 101 West Louis Henna Boulevard, Suite 210, Austin, Texas 78728. Micron Technology is registered with the Texas Secretary of State to do business in Texas.

7.     Defendant Micron Semiconductor Products, Inc. ("Micron Semiconductor") is an Idaho corporation with a principal place of business at 8000 South Federal Way, Boise, Idaho 83716. Micron Semiconductor also has a place of business at 101 West Louis Henna Boulevard, Suite 210, Austin, Texas 78728. Micron Semiconductor is registered with the Texas Secretary of State to do business in Texas.

Electronically Filed
6/6/2022 2:45 PM
Fourth Judicial District, Ada County
Phil McGrane, Clerk of the Court
By: Shantell Eaton, Deputy Clerk

**EXHIBIT B-3**

David Krueck, Bar No. 6246
DKrueck@perkinscoie.com
Daniel Graham, Bar No. 11506
DGraham@perkinscoie.com
PERKINS COIE LLP
1111 West Jefferson Street, Suite 500
Boise, Idaho 83702-5391
Telephone:  208.343.3434
Facsimile:   208.343.3232

Amanda Tessar, *pro hac vice pending*
ATessar@perkinscoie.com
Perkins Coie LLP
1900 Sixteenth Street, Suite 1400
Denver, Colorado 80202
Telephone:  303.291.2300
Facsimile:    303.291.2400

**ATTORNEYS FOR PLAINTIFFS, MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., & MICRON TECHNOLOGY TEXAS, LLC**

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| MICRON TECHNOLOGY, INC., a Delaware corporation; MICRON SEMICONDUCTOR PRODUCTS, INC., an Idaho corporation; MICRON TECHNOLOGY TEXAS, LLC, an Idaho limited liability company, <br><br> *Plaintiffs,* <br><br> v. <br><br> LONGHORN IP, LLC, a Texas limited liability company, <br><br> *Defendant.* | Case No. <br><br> **MICRON'S MOTION PURSUANT TO IDAHO CODE § 48-1707 REQUESTING THAT LONGHORN BE REQUIRED TO POST A BOND BASED ON LONGHORN'S BAD FAITH ASSERTION OF PATENT INFRINGEMENT** <br><br> **ORAL ARGUMENT REQUESTED** |

1        MICRON'S MOTION PURSUANT
         TO IDAHO CODE § 48-1707

Plaintiffs, Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC (collectively, "Micron"), through their counsel, Perkins Coie LLP, move pursuant to Idaho Code § 48-1707 and request that Longhorn IP, LLC ("Longhorn") be required to post a bond to secure Micron's interest in the damages and attorneys' fees to which Micron asserts that it is entitled due to Longhorn's bad faith assertion of patent infringement.

1.     The Idaho legislature has recognized that bad faith assertion of patent infringement can harm Idaho companies:

> Abusive patent litigation, and especially the assertion of bad faith infringement claims, can harm Idaho companies … Not only do bad faith patent infringement claims impose a significant burden on individual Idaho businesses, they also undermine Idaho's efforts to attract and nurture [information technology] and other knowledge-based companies.

Idaho Code §§ 48-1701(1)(d)-(e).

2.     Idaho Code § 48-1707 expressly permits a District Court to require a person making a claim of patent infringement to "post a bond in an amount equal to a good faith estimate of the target's costs to litigate the claim and amounts reasonably likely to be recovered under this chapter."  For the bond to be required, the party seeking the bond—the target of the patent infringement claim—need only establish a "reasonable likelihood that a person [making the infringement claim] has made a bad faith assertion of patent infringement in violation of this chapter."  Idaho Code § 48-1707; *see also Ice Castles, LLC v LaBelle Lake Ice Palace, LLC*, Case No. 4:18-cv-00571-DCN, 2021 WL 3085479, at *2 (D. Idaho, July 21, 2021).  As will be explained in more detail when Micron's memorandum in support of this motion is filed, Micron can readily meet this standard, including but not limited to for the reasons described in paragraphs 18 to 84 of the Complaint in this case.

3.     Longhorn has made a bad faith assertion of patent infringement against Micron.  As

2                         MICRON'S MOTION PURSUANT
                          TO IDAHO CODE § 48-1707

a result, pursuant to Idaho Code § 48-1707, Micron requests that Longhorn be required to "post a bond in an amount equal to a good faith estimate of [Micron's] costs to litigate the claim and amounts reasonably likely to be recovered under this chapter."

4.    Specifically, Longhorn should be required to post a bond in the amount of $15 million.  This number represents the estimated cost of defending against Longhorn's asserted three patents (including IPRs), calculated at $3,750,000 ($3 million in costs and fees for defending the federal litigation, plus an estimated $250,000 for each IPR), plus treble damages in three times that amount as permitted by Idaho Code § 48-1706(1)(d) ($11,250,000).

5.    Micron is filing this motion contemporaneously with filing its Complaint against Longhorn for violation of Idaho Code §48-1701, *et seq*.  Consequently, pursuant to I.R.C.P. 7(b)(3)(D), Micron states that it is requesting oral argument on this motion and that it asks the Court to set that oral argument promptly after this action is assigned to a District Court Judge.

6.    Pursuant to I.R.C.P. §§ 7(b)(3)(A) and (D), Micron states that it will file a memorandum in support of this motion no later than fourteen (14) days prior to the oral argument on this motion.

WHEREFORE, Micron requests that the Court enter an ORDER requiring Longhorn to post a bond in the amount of $15 million, pursuant to Idaho Code § 48-1707.

MICRON'S MOTION PURSUANT
TO IDAHO CODE § 48-1707

DATED:  June 6, 2022                          **PERKINS COIE LLP**

By:*/s/ David Krueck*
     David Krueck, Bar No. 6246
     DKrueck@perkinscoie.com
     Daniel Graham, Bar No. 11506
     DGraham@perkinscoie.com
     1111 West Jefferson Street, Suite 500
     Boise, Idaho 83702-5391

     Amanda Tessar, *pro hac vice pending*
     ATessar@perkinscoie.com
     Perkins Coie LLP
     1900 Sixteenth Street, Suite 1400
     Denver, Colorado 80202

     **ATTORNEYS FOR PLAINTIFFS, MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., & MICRON TECHNOLOGY TEXAS, LLC**

4                          MICRON'S MOTION PURSUANT
                          TO IDAHO CODE § 48-1707

Keely E. Duke
ISB #6044; ked@dukeevett.com
Mallam J. Prior
ISB#10938; mjp@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Longhorn IP LLC*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICRON TECHNOLOGY, INC.;<br>MICRON SEMICONDUCTOR PRODUCTS,<br>INC.; and MICRON TECHNOLOGY<br>TEXAS, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>LONGHORN IP LLC<br><br>    Defendant. | CASE NO. 1:22-cv-00273-DCN<br><br>**DEFENDANT LONGHORN IP LLC'S<br>MOTION TO DISMISS PLAINTIFFS'<br>COMPLAINT PURSUANT TO FRCP<br>12(B)(6)** |

Defendant Longhorn IP LLC ("Defendant" or "Longhorn"), by and through the

undersigned counsel of record, pursuant to Federal Rule of Civil Procedure 12(b)(6), upon the

accompanying Memorandum in Support, moves this Court to dismiss with prejudice for failure to

state a claim upon which relief can be granted the Complaint (Dkt. 1-4) filed by Micron

Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC

**DEFENDANT LONGHORN IP LLC'S MOTION TO DISMISS
PLAINTIFFS' COMPLAINT PURSUANT TO FRCP 12(B)(6) - 1**

(collectively, "Plaintiffs" or "Micron"), and for other and further relief that the Court deems just and proper.

WHEREFORE, said Defendant respectfully requests that this Motion be granted in its entirety.


DATED this 12th day of July, 2022.

DUKE EVETT, PLLC


By /s/Keely E. Duke_____
Keely E. Duke – Of the Firm
Mallam J. Prior – Of the Firm

*/s/ Scott W. Breedlove*_____
Scott W. Breedlove (*pro hac vice* pending)
sbreedlove@carterarnett.com
Texas Bar No. 00790361
Daniel L. Schmid (*pro hac vice* pending)
Texas State Bar No. 24093118
dschmid@carterarnett.com
Nathan Cox (*pro hac vice* pending)
ncox@carterarnett.com
Texas Bar No. 24105751
**CARTER ARNETT PLLC**
8150 N. Central Expy, 5th Floor
Dallas, Texas 75206
Telephone No. (214) 550-8188
Facsimile No. (214) 550-8185
*Attorneys for Defendant*
*Longhorn IP LLC*


**DEFENDANT LONGHORN IP LLC'S MOTION TO DISMISS**
**PLAINTIFFS' COMPLAINT PURSUANT TO FRCP 12(B)(6) - 2**

## **CERTIFICATE OF SERVICE**

     I hereby certify that on the 12th day of July, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

David Krueck                       dkrueck@perkinscoie.com
Daniel Graham                DGraham@perkinscoie.com
Amanda Tessar                ATessar@perkinscoie.com

                               /s/Keely E. Duke
                               Keely E. Duke

**DEFENDANT LONGHORN IP LLC'S MOTION TO DISMISS**
**PLAINTIFFS' COMPLAINT PURSUANT TO FRCP 12(B)(6) - 3**

Keely E. Duke
ISB #6044; ked@dukevett.com
Mallam J. Prior
ISB#10938; mjp@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Longhorn IP LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICRON TECHNOLOGY, INC.; MICRON SEMICONDUCTOR PRODUCTS, INC.; and MICRON TECHNOLOGY TEXAS, LLC,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>LONGHORN IP LLC<br><br>　　　　Defendant. | CASE NO. 1:22-cv-00273-DCN<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT LONGHORN IP LLC'S MOTION TO DISMISS PURSUANT TO FRCP 12(B)(6)** |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iii

BACKGROUND ON THE LITIGATION ......................................................................... 1

APPLICABLE STANDARD ............................................................................................. 3

RELEVANT COUNTERSUIT ALLEGATIONS ........................................................ 5

ARGUMENT ....................................................................................................................... 6

 I. Micron's Countersuit has been time-barred since 2021 ....................... 6

 II. Idaho's "Bad Faith Assertions of Patent Infringement" statute is preempted ........................................................................................................... 9

  A. *The Idaho statute purports to regulate (a) speech by U.S. patent owners directed to persons anywhere in the world and (b) the filing of federal patent lawsuits* ....................................... 9

  B. *In contravention of federal law, the Idaho statute does not presume an assertion of patent infringement is made in good faith, and it lowers the evidentiary standards for "bad faith"* ................................................................................................... 10

  C. *In contravention of federal law, the Idaho statute purports to apply even in the absence of objective bad faith* ............... 12

  D. *By regulating federal lawsuits and allowing for quadruple damages, an up-front bond, and injunctive relief, the Idaho statute strikes a lopsided balance of the rights of patentees and apparent infringers and poses an obstacle to the "full purposes and objectives" of federal patent laws* ................. 13

 III. Moreover, even taking Micron's false allegations as true, its Countersuit fails to state a plausible claim of "bad faith" .............. 15

  A. *Micron's lengthy allegations about unrelated patents highlight the dearth of factual allegations in support of supposed bad faith* ......................................................................... 15

  B. *Even if believed, the allegations pertaining to the actual patents-in-suit bear no resemblance to the troll behavior that the Idaho statute was intended to address* .............................. 17

       C.      *Micron's supposed evidence of "bad faith" is nothing more than a preview of weak arguments it may raise as possible defenses in the patent litigation* ............................................................17

CONCLUSION ..........................................................................................................20

# TABLE OF AUTHORITIES

**Cases:**

*800 Adept, Inc. v. Murex Secs., Ltd.*,
   539 F.3d 1354, (Fed. Cir. 2008).................................................................................. 18

*Ashcroft v. Iqbal*,
   556 U.S. 662, (2009)......................................................................................... 3, 16

*Barden v. Goodsell*,
   No. 4:21-CV-00089-DCN, WL 5921351, at 7 (D. Idaho Dec. 15, 2021) ............................. 4

*Boggs v. Boggs*,
   520 U.S. 833, (1997)................................................................................................ 15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, (2007)................................................................................................. 3

*Bldg. Innovation Indus., L.L.C. v. Onken*,
   473 F. Supp. 2d 978, (D. Ariz. 2007) ......................................................................... 14

*C.R. Bard, Inc. v. M3 Systems, Inc.*,
   157 F.3d 1340, (Fed. Cir. 1998)........................................................................... 4, 11, 12

*Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*,
   524 F.3d 1254, (Fed. Cir. 2008).................................................................................. 12

*Energy Heating, LLC v. Heat On-The-Fly, LLC*,
   889 F.3d 1291, (Fed. Cir. 2018).................................................................................. 12

*Felder v. Casey*,
   487 U.S. 131, (1988).......................................................................................... 5, 15

*Free v. Bland*,
   369 U.S. 663, (1962).......................................................................................... 5, 14

*Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.*,
   655 F.3d 1291, (Fed. Cir. 2011).................................................................................. 2

*Gen–Probe, Inc. v. Amoco Corp.*,
   926 F. Supp. 948, (S.D. Cal. 1996)............................................................................. 10

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,
   362 F.3d 1367, (Fed. Cir. 2004)............................................................................. 4, 12

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
579 U.S. 93, (2016) ........................................................................................................ 14

*Hines v. Davidowitz*,
312 U.S. 52, (1941) .................................................................................................... 4, 15

*Ice Castles, LLC v. LaBelle Lake Ice Palace, LLC*,
No. 4:18-CV-00571-DCN, WL 3085479, at 4 (D. Idaho July 21, 2021) ................................ 7

*Jones v. Bock*,
549 U.S. 199, (2007) ...................................................................................................... 3

*Jones v. Runft, Leroy, Coffin & Matthews, Chartered*,
873 P.2d 861, (Idaho 1994) ........................................................................................ 8, 9

*Krzyminski v. Spokane Cnty.*,
830 F. App'x 918 (9th Cir. 2020) ................................................................................... 3

*Miesen v. Henderson*,
2017 WL 4270630 at 7 (Sept. 26, 2017 D. Idaho) ............................................................ 8

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
35 F.4th 1367, (Fed. Cir. 2022) ................................................................................... 20

*Thermolife Int'l LLC v. GNC Corp.*,
922 F.3d 1347, (Fed. Cir. 2019) ................................................................................... 11

*Virtue v. Creamery Package Mfg. Co.*,
227 U.S. 8, 37–38 (1913) ......................................................................................... 4, 13

**Statutes:**

28 U.S.C. § 1338(a) ................................................................................... 10

35 U.S.C. § 281 ................................................................................... 11, 13

35 U.S.C. § 282 ................................................................................... 18

35 U.S.C. § 284 ................................................................................... 14

35 U.S.C. § 285 ................................................................................... 14

35 U.S.C. § 286 ................................................................................... 2

42 U.S.C. § 1983 ................................................................................... 15

F. R. Civ. P. 12(b)(6) ................................................................................... 1, 3, 20

Idaho Code § 48-602 ................................................................................... 9

Idaho Code § 48-1701 ................................................................................... 10, 15

Idaho Code § 48-1702 ................................................................................... 10

Idaho Code § 48-1703 ................................................................................... 6, 10, 11, 13, 15, 17

Idaho Code § 48-1706 ................................................................................... 3, 6, 7, 8, 12, 13, 14

Idaho Code § 48-1707 ................................................................................... 6, 12, 13

**Other:**

Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1357 (3d ed.) ................................................. 3

Defendant Longhorn IP LLC ("Defendant" or "Longhorn") moves under Rule 12(b)(6) to dismiss the complaint ("Countersuit" or "CS") (Dkt. 1-4) filed by the three Plaintiffs (collectively, "Micron" or "Plaintiffs"). Plaintiffs filed the Countersuit on the same day they filed a nearly identical counterclaim to the patent infringement complaint filed by an affiliate of Longhorn, Katana Silicon Technologies LLC ("Katana"). *See generally* Case No. 1:22-cv-00282-BLW (D. Idaho) ("*Katana*"). Micron's Countersuit largely tracks its counterclaim in *Katana*. Thus, this memorandum largely tracks the memorandum filed yesterday in that case. *Id.*, Dkt. 27-1.

The Countersuit is time-barred and preempted by federal patent laws, and it otherwise fails to state a plausible state-law claim. Micron attempts to leverage a little-used Idaho statute to bully the patent owner, Katana, out of enforcing federal rights in federal court—rights that, under federal law, are presumed (correctly) to be asserted in good faith. In any event, Micron's allegations may identify its planned defenses in the *Katana* patent infringement case, but even if believed and applied to federal litigation, they fail to state a plausible state-law claim that can meet the high standard for "bad faith" assertion of infringement.

## <u>BACKGROUND ON THE LITIGATION</u>

Micron has shown little respect for the patent rights of others, particularly those of much smaller companies that lack Micron's vast resources. In this case, the unlucky smaller company is Katana, as well as its affiliate Longhorn. From Katana's very first contact with Micron in 2018, Katana disclosed that it "has a licensing service agreement with Longhorn" (Dkt. 1-4, Ex. 5), which has expertise in patent analysis and assisting with licensing. But as Micron knows, it is Katana that has full ownership of the patents at issue. With its Countersuit against the patent owner's affiliate, Micron breaks new ground in tactics calculated to intimidate small patent owners and effectively block their access to federal courts—even demanding a *$15 million* bond, on the theory that

MEMORANDUM IN SUPPORT OF DEFENDANT LONGHORN IP LLC'S
MOTION TO DISMISS PURSUANT TO FRCP 12(B)(6) - 1

Micron will need to spend millions of dollars to defend Katana's supposedly frivolous, low-value patent case and that the Idaho statute allows these millions to be quadrupled to calculate damages.

The patents at issue protected inventions developed by Sharp Corporation in the late 1990s into 2000. At that time, Sharp was on the leading edge of technologies to miniaturize semiconductor devices. Thus, the claims of the three Sharp Patents at issue—the '806 Patent, the '879 Patent, and the '013 Patent (the "Sharp Patents")—captured some of the most foundational work being done at the intersection of techniques for stacking chips and strategies for reducing chip-package size. Katana was able to acquire the patents from Sharp in 2018. Relying on forensic imaging of Micron flash and other memory products, as well as personnel with decades of semiconductor-related engineering experience, Katana successfully identified infringing products of various companies, including certain Micron flash NAND and DRAM devices. Some of the forensic images of Micron products are excerpted in Katana's Complaint. *See, e.g.*, Dkt. 1 ¶¶64-69. This identification occurred before any of the Sharp Patents had expired.[1]

These same Sharp Patents (before Katana owned them) have caused headaches for Micron in the past—blocking Micron's own attempts on multiple occasions in the 2000s to obtain certain patent claims of its own. Specifically, the United States Patent and Trademark Office recognized that inventions Micron was trying to claim as its own were *previously* disclosed by Sharp—disclosures of technology in the same Sharp Patents now owned by Katana and asserted here against Micron's products that incorporate the technology.

---

[1] Patent expiration is one of Micron's many red herrings, as 35 U.S.C. § 286 allows damages going back six years from the filing of the complaint, even if the patent expired before the filing—e.g., during pre-suit negotiations. *See, e.g.*, *Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.*, 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent is not viewed as having 'never existed.' Much to the contrary, a patent does have value beyond its expiration date. For example, an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286.") (internal citations omitted).

As Micron's own allegations state, Katana contacted Micron about Micron's infringement of the three asserted Sharp Patents almost four years ago, on August 23 and September 18, 2018. CS ¶¶40 & 46. The parties subsequently met in person and "Longhorn and Katana presented claim charts" in November 2018. CS ¶¶47-49. Written discussions continued in subsequent years. CS ¶¶51-55. Ultimately, despite its best efforts, Katana determined that it either had to file a complaint for patent infringement or abandon its rights altogether. It chose to file. Now Micron, wielding a practically unused *state* statute, seeks revenge for Katana asserting its *federal* rights. But it is a statute that comes with its own limitations period, which precludes a "private action" brought "more than three (3) years after the cause of action accrues." Idaho Code § 48-1706(3).

## APPLICABLE STANDARD

The Plausibility Standard. "To survive a Rule 12(b)(6) motion to dismiss, [the plaintiff] must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Krzyminski v. Spokane Cnty.,* 830 F. App'x 918 (9th Cir. 2020) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Accordingly, a complaint should be dismissed unless it contains factual allegations that "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. Nor does a "legal conclusion couched as a factual allegation" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.*

Dismissals Based on a Time Bar. Where it is apparent from the face of the complaint that a claim is time-barred, dismissal under Rule 12(b)(6) is appropriate. *Jones v. Bock*, 549 U.S. 199, 215 (2007) ("If the allegations, for example, show that relief is barred by the applicable statute of

limitations, the complaint is subject to dismissal for failure to state a claim . . . ."); *see also* Wright & Miller, 5B FED. PRAC. & PROC. CIV. § 1357 (3d ed.) ("A complaint showing that the governing statute of limitations has run on the plaintiff's claim for relief is ***the most common situation in which the affirmative defense appears on the face of the pleading*** and provides a basis for a motion to dismiss under Rule 12(b)(6), as the many illustrative cases cited in the note below attest.") (see text accompanying note 69) (emphasis added). In these situations, dismissal should be with prejudice. *See Barden v. Goodsell*, No. 4:21-CV-00089-DCN, 2021 WL 5921351, at *7 (D. Idaho Dec. 15, 2021) (Nye, C.J.) ("[T]he claim is time-barred and is appropriately dismissed with prejudice.").

    <u>Preemption.</u> Federal Circuit law applies in deciding whether the patent laws preempt state-law claims. *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004). The Federal Circuit Court of Appeals has held that federal patent law preempts state-law liability "for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation." *Id.* "A plaintiff claiming that a patent holder has engaged in wrongful conduct by asserting claims of patent infringement must establish that the claims of infringement were objectively baseless." *Id.* at 1377. The Federal Circuit has explained that the requirement for ***objective*** baselessness "rests on both federal preemption and the First Amendment." *Id.*

    The Supreme Court of the United States has emphasized that the law "recognizes a presumption that the assertion of a duly granted patent is made in good faith." *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998) (citing *Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8, 37–38 (1913)). Absent affirmative evidence of bad faith, including objective baselessness, "the patentee must have the right of enforcement of a duly granted patent,

unencumbered by punitive consequences should the patent's validity or infringement not survive litigation." 157 F.3d at 1369.

"[A]ny state law . . . which interferes with or is contrary to federal law, must yield." *Free v. Bland*, 369 U.S. 663, 666 (1962). Federal law impliedly preempts state laws that pose an obstacle to the "full purposes and objectives" of Congress. *See Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Felder v. Casey*, 487 U.S. 131, 138 (1988) (recognizing implied preemption when the state statute "conflicts in both its purpose and effects with the remedial objectives of [federal] § 1983").

## RELEVANT COUNTERSUIT ALLEGATIONS

Micron's Countersuit argues that "Longhorn's assertion of alleged infringement . . . is in subjective bad faith." CS ¶87(d). And it confirms this "assertion" did not begin with initiation of the *Katana* case, pointing to "claims and demands made by Longhorn . . . prior to the filing of the Complaint." CS ¶86.

Specifically, the Countersuit identifies an in-person meeting in Boise on November 14, *2018*, where Micron allegedly "explained some of the many reasons that Longhorn's patent infringement assertions regarding the Katana patents are meritless," while Longhorn "demanded the payment of license fees or a settlement." CS ¶¶47-50. The Countersuit further alleges that on February 4, 2019, "consistent with the presentation made previously on November 14, 2018," "Micron explained that the claims of the '013, '806, and '879 patents are invalid." CS ¶¶52-53. Then the Countersuit complains that "Longhorn nevertheless *persisted* in its infringement claims" and "continued to press its baseless demands for payments and licensing fees." CS ¶55 (emphasis added). Yet Micron did not assert any claim under the Idaho statute until June 6, 2022. Dkt. 1-4.

Micron's Countersuit further alleges that, in the *Katana* complaint, "Katana asserts that Micron infringes or has infringed the Katana '806, '879, and '013 patents." CS ¶59. These are the same three patents that had been asserted since 2018. CS ¶¶47-53. Micron ascribes the filing of that federal lawsuit to Longhorn, alleging "Katana's (*i.e.*, Longhorn's) claims of infringement are meritless . . . . Thus, these claims constitute bad faith assertion of patent infringement and a violation of Idaho Code § 48-1703." CS ¶59. But Micron's focus on the filing of Katana's complaint in federal court only highlights the Countersuit's attempt to use a *state* claim to stymie a patent owner from asserting *federal* rights in *federal* court. After insisting that Katana's federal filing is part of the alleged "bad faith assertion," CS ¶¶86 & 96, Micron invokes the state law to seek "injunctive relief against Longhorn's bad faith assertion conduct, pursuant to Idaho Code § 48-1706(1)(a)." CS at 25-26. On top of that, it seeks "a bond posted by Longhorn . . . pursuant to Idaho Code § 48-1707." *Id.* In the motion Micron filed before this case was removed, Micron has argued the bond should be *$15 million*. Dkt. 1-6.

In any event, Micron does not allege that Longhorn itself filed the *Katana* case. Rather, Micron's alleged theory is that "Katana acts as the agent of Longhorn and Mr. Fekih-Romdhane" and that "Katana is the alter ego of Longhorn." CS ¶¶26-27. But the evidence attached to Micron's complaint indicates that Katana simply "has a licensing service agreement with Longhorn," Dkt. 1-4 Ex. 5, which would explain (innocently) Micron's allegation that "the Longhorn website . . . describes Longhorn's business as being patent licensing," CS ¶92.

## ARGUMENT

## I.     Micron's Countersuit has been time-barred since 2021.

Micron's Countersuit is brought under Idaho Code § 48-1706, creating a private cause of action. The last provision of that code section provides as follows:

> No private action may be brought under the provisions of this chapter more than three (3) years after the cause of action accrues. A cause of action shall be deemed to have accrued when the party bringing an action under the provisions of this chapter knows, or in the exercise of reasonable care should have known, about the violation of the provisions of this chapter. Each bad faith assertion of patent infringement constitutes a separate violation under this chapter.

Idaho Code § 48-1706(3). It appears this provision has never been interpreted by any court. Indeed, this entire section of Idaho Code has apparently been addressed by a court in only one prior case since it became law in 2014. *See Ice Castles, LLC v. LaBelle Lake Ice Palace, LLC*, No. 4:18-CV-00571-DCN, 2021 WL 3085479, at *4 (D. Idaho July 21, 2021) (Nye, C.J.) ("[T]he Court reiterates that, as has been noted, Idaho Code section 48-1701 *et seq.* has never been invoked—let alone interpreted—in any state or federal court proceedings.").

The statute's time bar explains why Micron is so anxious to conclude Katana is "the alter ego of Longhorn" and/or "acts as the agent of Longhorn." CS ¶¶25-26. Micron points out in passive voice that the "Complaint in the Western District of Texas [i.e., the *Katana* case now in this District] was filed less than three years ago, on March 4, 2022," and then immediately launches into its argument about alter ego and agency. CS ¶¶89-95. Micron's attempt to overcome the apparent time-bar in this way fails for two reasons: (1) the allegations of alter ego and agency do not suffice to attribute Katana's filing to Longhorn; and (2) even as to Katana, the filing of its complaint does not revive Micron's alleged bad-faith-assertion claim that was already stale, because the federal litigation does not represent a new assertion but the same one that Micron had known about since 2018: the assertion that Micron infringed Katana's Sharp Patents.

For its alter-ego theory, Micron relies on allegations that Mr. Fekih-Romdhane maintains control over Longhorn and Katana. CS ¶92. But companies do not operate themselves; one or more natural persons must act. Micron alleges no meaningful facts that could plausibly establish that there is such a "unity of interest and ownership" that "the separate personalities" of Katana and

Longhorn no longer exist. *See* CS ¶91. This is especially true in light of the first letter, an exhibit to Micron's Countersuit, that Micron received from Katana's counsel. It disclosed the existence of a "licensing service agreement" between Katana and Longhorn. Dkt. 1-4 Ex. 5 (Aug. 22, 2018 letter to Micron's Director of Litigation). Likewise, no factual allegations make a plausible case that Katana "acts as the agent of Longhorn" such that Longhorn, which assists with licensing services, is deemed to have filed Katana's federal complaint asserting Katana-owned patents.

In any event, Micron's alleged bad-faith-assertion claim was stale before the *Katana* case was even filed, as confirmed by Micron's factual allegations. The alleged bad-faith assertion is that Micron infringes Katana's Sharp Patents. Micron acknowledges it was aware of this purported bad faith assertion of patent infringement since 2018. *See* CS ¶¶40-55. Yet Micron did not invoke the Idaho statute until June 6, 2022, well over three years later.

Micron's allegations about Katana's Complaint relate to the same "assertion" that had already been made in 2018. CS ¶96 (alleging "Longhorn's demands and communications, including through the Complaint in the Western District of Texas, constitute bad faith assertion of patent infringement"). Indeed, Micron is careful to explain that the assertion "persisted." CS ¶55. But because there has been no new "assertion," there was no starting of a new limitations clock each time the parties continued their communications without backing down. The clock should not be reset so that Micron can try to intimidate Katana out of seeking redress in federal court.

While Micron may try to seek additional damages related to events in years after 2018, such as Katana's filing of its federal complaint, these events do not impact the accrual of the cause of action in 2018 under the statute. *Cf. Miesen v. Henderson*, 2017 WL 4270630 at \*7 (Sept. 26, 2017 D. Idaho) (holding that the statute of limitations for tort-based claims of aiding and abetting breach of fiduciary duty expired three years after "the first allegedly tortious act occurred"); *Jones*

*v. Runft, Leroy, Coffin & Matthews, Chartered*, 873 P.2d 861, 867 (Idaho 1994) ("To determine whether this statute of limitations bars the [breach-of-assumed-duty] claim, we must determine when the first negligent act occurred."). Again, the "violation" alleged in the Countersuit is the "assertion" that Micron infringed the Sharp Patents. This is exactly the assertion that was made in 2018 and was never withdrawn, including to this day. It has indeed persisted.

The Idaho statute provides that the cause of action is "deemed to have accrued when [Micron] knows, or in the exercise of reasonable care should have known, about the violation of the provisions of this chapter." Idaho Code § 48-1706(3). Based on Micron's own theory, its allegations leave no room to argue that it did not know about the supposed "violation of the provisions" of the Idaho statute back in 2018 and early 2019 (more than three years before this case was filed). *See* CS ¶¶40-55. Thus, the Idaho statute time-bars Micron's cause of action.

## II.    Idaho's "Bad Faith Assertions of Patent Infringement" statute is preempted.

The Idaho statute on its face applies to speech by any patent owner to a person anywhere in the world. It creates the threat of substantial liability, including quadruple damages, for activity that is permitted and even incentivized by federal patent laws. It lowers the burden of proof for "bad faith." And it goes two steps further by making the filing of certain *federal* lawsuits "unlawful" while providing for an injunction. The Idaho statute cannot exist alongside U.S. patent laws in our federal system, particularly not as Micron seeks to apply it.

### A.    *The Idaho statute purports to regulate (a) speech by U.S. patent owners directed to persons anywhere in the world and (b) the filing of federal patent lawsuits.*

Idaho Code § 48-1703(1) makes it "unlawful for a person to make a bad faith assertion of patent infringement in a demand letter, a complaint or any other communication." Section 48-1702(2) notes that "person" is defined in Idaho Code § 48-602, which includes any natural person or business anywhere in the world. Even the personal jurisdiction provision of section 48-1704

lacks meaningful limitations, because "Idaho person" is expressly defined in 48-1702(2) to be any "person," which again includes any natural person or business in the world.

Against this backdrop, particularly remarkable is the prohibition in the Idaho statute that expressly includes assertions made in "a complaint." § 48-1703(1). This broad scope manifests the attempt by the Idaho Legislature to regulate federal court litigation. Even the "legislative findings and intent" provisions target "patent litigation" (§ 48-1701(1)(d)), which of course is conducted exclusively in federal court. 28 U.S.C. § 1338(a). This scheme raises preemption issues in light of the United States Constitution's prohibition on certain laws abridging "the right of the people . . . to petition the Government for a redress of grievances" (First Amendment), *see, e.g.*, *Gen–Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 956 (S.D. Cal. 1996) (agreeing with "the majority of courts who have considered the issue . . . that *Noerr* immunity bars any claim, federal or state, common law or statutory, that has as its gravamen constitutionally-protected petitioning activity"), as well as the Supremacy Clause (Art. IV, para. 2 providing that federal law "shall be the supreme law of the land") and the Patent Clause (Art. I, Sec. 8, Clause 8 enumerating the power of Congress to "promote the Progress of Science" by securing an "exclusive Right" to inventors).  In summary, the Idaho statute at issue is exceptionally broad and ventures far into territory governed exclusively by federal law.

      **B.**      *In contravention of federal law, the Idaho statute does not presume an assertion of patent infringement is made in good faith, and it lowers the evidentiary standard for "bad faith."*

The Idaho statute's findings state that "[p]atent holders have every right to enforce their patents when they are valid and infringed." Idaho Code § 48-1701(1)(b). While undoubtedly true, the phrasing highlights a deficiency in the statutory scheme. A patent holder should not be required to wait for its patent infringement case to be ***successful*** to be assured that it will not be subjected to the harsh remedies of a state statute. Federal law thus "recognizes a presumption that the

assertion of a duly granted patent is made in good faith." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998). The Idaho statute, however, includes no such presumption. Rather, in Section 48-1703(2), it lists numerous factors that the court may consider "as evidence that a person has made a bad faith assertion of patent infringement," and these include activity that is acceptable under federal law. *See, e.g.*, Idaho Code § 48-1703(2)(b), (c) & (i).

Instead of a presumption of good faith, the Idaho statute lists three particular factors that a court "may consider" as "evidence that a person has not made a bad faith assertion of patent infringement." § 48-1703(3). In this way, the statutory scheme effectively suggests a presumption of bad faith. And of the three "not bad faith" factors, not one of them is required by federal law. Moreover, the second factor blatantly discriminates against individual inventors and other persons who do not necessarily "use" the invention or make or sell "a product or item covered by the patent." § 48-1703(3)(b). Federal law does not permit such discrimination. The Patent Act states: "A patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. And the term "patentee" comprises "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d); *see also Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1363 (Fed. Cir. 2019) ("the patent statute does not restrict enforceable patent rights to those who practice the patent"). It would be bad public policy—and impair the patent marketplace and the incentives to inventors to promote the progress of science—to allow Idaho to subject patent owners to much greater risk simply because they do not make covered products.

The Federal Circuit has emphasized that "a principal purpose of the patent system is to provide innovators with a property right upon which investment and other commercial commitments can be made." *C.R. Bard*, 157 F.3d at 1369. Thus, absent the criteria for truly sham litigation, "the patentee must have the right of enforcement of a duly granted patent, unencumbered

by punitive consequences should the patent's validity or infringement not survive litigation"; and "sham litigation requires more than a failed legal theory." *Id*.

There is a presumption of good faith associated with a patent assertion, and "this presumption is overcome only by affirmative evidence of bad faith." *Id.* Yet Idaho's statutory scheme is at odds with this presumption. This is magnified by Idaho's failure to require proof of both the objective and subjective aspects of bad faith by clear and convincing evidence. *See Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH,* 524 F.3d 1254, 1260 (Fed. Cir. 2008). Indeed, Idaho Code § 48-1707's bond provision requires only a "reasonable likelihood" showing.

> C.    *In contravention of federal law, the Idaho statute purports to apply even in the absence of objective bad faith.*

Even if the Idaho statute did not conflict with federal law and policy on its face, it would still be "preempted by federal patent laws, unless the claimant can show that the patent holder acted in bad faith." *Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1304 (Fed. Cir. 2018). Long before the Idaho Legislature enacted the statute at issue, the Federal Circuit made clear that "bad faith" requires a showing that the claims of infringement are both (1) "objectively baseless" and (2) asserted with subjective bad faith. *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1375-77 (Fed. Cir. 2004). Yet the Idaho statute allows a finding of bad faith without the presence of both objective and subjective bad faith. Instead, one of the factors listed in the statute that the court "may consider" as evidence that a person has made a bad faith assertion is that the person "acts in subjective bad faith, *or* a reasonable actor in the person's position would know or reasonably should know that such assertion is meritless." Idaho Code 48-1703(2)(f) (emphasis added). The "or" is a significant fault because it does not require both objective baselessness *and* subjective bad faith, and this factor is just one of many factors that a court "may consider."

D.     *By regulating federal lawsuits and allowing for quadruple damages, an up-front bond, and injunctive relief, the Idaho statute strikes a lopsided balance of the rights of patentees and apparent infringers and poses an obstacle to the "full purposes and objectives" of federal patent laws.*

As the Supreme Court recognized a century ago, "Patents would be of little value if infringers of them could not be notified of the consequences of infringement or proceeded against in the courts." *Virtue v. Creamery Package Mfg. Co.*, 227 U.S 8, 37-38 (1913); *see also* 35 U.S.C. § 281 ("A patentee shall have remedy by civil action for infringement of his patent."). While the Idaho statute does not expressly preclude federal court suits for patent infringement, as a practical matter its excessively punitive scheme risks doing just that for patentees with limited resources.

Micron's attempt to leverage the statute highlights this point. The Countersuit alleges, "Micron is entitled to a finding by this Court that Longhorn's demands and communications, *including through [the Katana Complaint]*, constitute bad faith assertion of patent infringement in violation of Idaho Code § 48-1703." CS ¶96 (emphasis added). In its prayer for relief, Micron seeks damages, costs, and fees pursuant to Idaho Code § 48-1706(1)(b) and (c), as well as "exemplary damages, pursuant to Idaho Code § 48-1706(1)(d)," which provides for "[e]xemplary damages in an amount equal to . . . three (3) times the total of damages, costs and fees"—setting up **quadruple** damages. Then, the Countersuit cites Section 48-1707 and requests "a bond posted by Longhorn in an amount equal to a good faith estimate of Micron's costs to litigate Katana's infringement claims and the amounts reasonably likely to be recovered by Micron" under the statute. CS at 26. How much is that? Micron claims the bond should be ***$15 million***. Dkt. 1-6. In its coup de grâce, Micron also seeks injunctive relief, apparently to use the state statute to stop Katana's patent infringement action from even proceeding. After insisting that Katana's federal Complaint is part of the alleged "bad faith assertion," Micron requests "injunctive relief against Katana's bad faith assertion conduct, pursuant to Idaho Code § 48-1706(1)(a)." CS at 26.

The Idaho statute goes too far in giving accused infringers mechanisms to effectively block patent owners, especially smaller ones, from seeking redress in federal court. When it comes to patent litigation, federal law already protects against bad-faith assertions, carefully balancing the rights of patentees and accused infringers. *See, e.g.*, 35 U.S.C. § 285 (providing that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party" in patent cases); Fed. R. Civ. P. 11(b), (c) (providing courts the ability to sanction parties who bring federal claims "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation"). The more substantial problem historically has been willful patent infringers, which, as here, often have vastly more resources than the patentee. Thus, federal law allows for the possibility of enhanced damages up to treble damages, 35 U.S.C. § 284, generally reserved for "egregious cases typified by willful misconduct." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 109-10 (2016). But the Idaho statute would badly distort the balance of rights in patent litigation, displacing Congress's "chosen calculus of litigation incentives and disincentives." *Bldg. Innovation Indus., L.L.C. v. Onken*, 473 F. Supp. 2d 978, 986-88 (D. Ariz. 2007) (holding that 35 U.S.C. § 285 impliedly preempted the application of a state fee-shifting statute, and explaining that besides ousting the federal statute, enforcing various state laws on fees in patent-related cases "would also undermine Congress's goal of nationwide uniformity in patent law"). The state statutory scheme does nothing to protect patentees from bad-faith infringement but practically presumes bad-faith assertion and creates the threat of quadruple damages and an injunction in favor of accused infringers. This threat risks chilling speech and blocking the federal courthouse doors, particularly for smaller patent owners.

The Idaho statute thereby interferes with federal law, and "any state law . . . which interferes with or is contrary to federal law, must yield." *Free v. Bland*, 369 U.S. 663, 666 (1962).

Federal law impliedly preempts state laws that pose an obstacle to the "full purposes and objectives" of Congress. *See Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Boggs v. Boggs*, 520 U.S. 833, 844 (1997) (explaining that "[s]tates are not free to change ERISA's structure and balance" and holding that application of state law was preempted where it would "undermine the purpose" of ERISA's mandated survivor's annuity); *Felder v. Casey*, 487 U.S. 131, 138 (1988) (recognizing implied preemption when the state statute "conflicts in both its purpose and effects with the remedial objectives of [42 U.S.C.] § 1983").

Thus, the Countersuit's allegations demonstrate that the statute at Idaho Code § 48-1701 *et seq.* would impede the vindication of a federal right and is impliedly preempted as written and as applied. The Countersuit should be dismissed with prejudice for this independent reason.

### III.  Moreover, even taking Micron's false allegations as true, its Countersuit fails to state a plausible claim of "bad faith."

Micron's Countersuit offers six purported reasons why Longhorn's alleged assertion that Micron infringes Katana's Sharp Patents is "unlawful under Idaho Code § 48-1703." CS ¶87(b)-(g). All six reasons lack plausible factual support for the requisite bad faith. Katana will address subparts (f) and (g) first.

#### A.  *Micron's lengthy allegations about unrelated patents highlight the dearth of factual allegations in support of supposed bad faith.*

Micron recounts interim victories it achieved years ago in unrelated patent litigation against a company called Lone Star. CS ¶¶7-8, 31-35. The Countersuit lists the patents involved in that Lone Star litigation (CS ¶30) but fails to note just how unrelated those patents are to this case. Not only were those patents never owned by Katana, they were originally issued to Advanced Micro Devices Inc. ("AMD"), a fact of which the Court can take judicial notice from the face of the listed Lone Star patents. Thus, the source of those patents had nothing to do with the work being done

by Sharp Corporation that led to the Sharp Patents now asserted against Micron by Katana. Even so, Micron relies heavily on the unrelated AMD/Lone Star patents. CS ¶87(f) & (g).

Specifically, Countersuit paragraph 87(f) and (g) begin identically, "Longhorn, as well as other Longhorn entities, including Lone Star, have previously (and routinely) filed or threatened to file litigation alleging patent infringement *based on claims similar to those Longhorn has asserted through Katana* in the Western District of Texas" (emphasis added). CS ¶87. Then subpart (f) goes on to say, "and, in IPR proceedings relating to at least some of those actions, the patents have been declared invalid," while subpart (g) says, "and, in at least some of those actions, settled their claims before their claims could be declared meritless." *Id.* But the Countersuit fails to offer factual allegations in support, much less to render Micron's bad faith claim plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (cleaned up).

What are these "claims similar to those Longhorn has asserted through Katana"? Apparently claims in the AMD/Lone Star patents (CS ¶¶7-8, 31-35). But Micron offers no factual allegations in support of its conclusion of similarity. Micron's argument here appears to invoke the "bad faith" factor at Idaho Code § 48-1703(h), which specifies "the same or similar claim" and requires "the person attempted to enforce the claim of patent infringement in litigation and a court found the claim to be meritless." Yet Micron has failed to make any factual allegation to support any asserted claim in Lone Star's AMD patents being "the same or similar" to any asserted claim in Katana's Sharp Patents—i.e., so "similar" that a court finding about the similar claim would be relevant to a claim at issue. Micron's conclusory accusation on this factor should therefore be discarded entirely.

B.    *Even if believed, the allegations pertaining to the actual patents-in-suit bear no resemblance to the troll behavior that the Idaho statute was intended to address.*

Katana owns numerous patents acquired from Sharp Corporation but has asserted only three of them against Micron. Micron does not allege that Katana or Longhorn has gone after Micron's customers; approached unsophisticated entities inexperienced with patent analysis; asserted the patents against a large volume of businesses to achieve hurried settlements; or failed to explain the basis for its infringement read. Instead, Micron's allegations confirm Katana has been exceedingly patient and willing to discuss the merits. *E.g.*, CS ¶49 ("During this [November 14, 2018] meeting, Longhorn and Katana presented claim charts . . . ."); ¶54 (alluding to "a claim chart Longhorn provided shortly before the November meeting"). Yet Micron dismisses Katana's infringement read as "superficial analysis." CS ¶87(b). In effect, Micron insists that Katana should just agree with Micron's analysis and walk away. CS ¶87(e). But whether Micron agrees with them or not, the infringement allegations in Katana's complaint reflect explanation, analysis, and evidence. *See, e.g.*, Dkt. 1-4 Ex. 1 ("Katana Compl."), ¶¶30-36, 61-69, & 96-104.

In short, the circumstances of this case do not match the behavior of patent trolls that the Idaho statute seeks to address, such as sending demand letters without conducting an analysis, obfuscating patent ownership and accused products, attempting to rush unsophisticated end-users of products into a quick payment, or trying to enforce patents already held invalid. *See* Idaho Code § 48-1703(2)(a), (b), (c), (d), (g), and (h).

C.    *Micron's supposed evidence of "bad faith" is nothing more than a preview of weak arguments it may raise as possible defenses in the patent litigation.*

To state a claim, Micron must articulate a plausible claim of "bad faith." In its Countersuit at paragraph 87, Micron refers to "subjective bad faith" in both subparts (d) and (e). But the requisite "objective" bad faith requires factual allegations making a plausible case that "no

reasonable litigant could realistically expect success on the merits." *See 800 Adept, Inc. v. Murex Secs., Ltd.*, 539 F.3d 1354, 1370 (Fed. Cir. 2008) (citation omitted).

Micron's allegations addressing invalidity and non-infringement arguments, however, would not meet even a low standard for bad faith. Regarding invalidity, discussing each patent sequentially, the Countersuit identifies prior art that it suggests is "very similar" or "similar" to the claimed subject matter in the Sharp Patents. *See, e.g.*, CS ¶¶69, 70, 76, 77, 83. Perhaps Micron can use some of this art to attempt an invalidity defense, but plausible allegations of actual "bad faith" cannot simply ignore the presumption of validity that the Sharp Patents enjoy. *See* 35 U.S.C. § 282 ("A patent shall be presumed valid.").

As for Micron's non-infringement arguments, to which it seems to believe Katana had a duty to defer, the Countersuit's allegations fall far short. Micron's allegations about non-infringement begin in petty fashion, identifying an obvious drafting error in a single paragraph of the Complaint's *venue* allegations and misrepresenting it to suggest Katana has made a baseless claim. Micron cites Katana Compl. ¶13 and represents: "Katana alleges that the Micron defendants 'have infringed ***and continue to*** infringe the Asserted Patents'" (emphasis by Micron). CS ¶60. Given that the three patents are now expired, the "and continue to" language is clearly a drafting error and is not repeated anywhere else in Katana's 124-paragraph Complaint. Indeed, the prayer for relief at the end of the Complaint seeks a determination that each patent "has been infringed" (not "is being infringed"). Moreover, even the drafting error did not say that *Defendants* "continue to infringe." Rather, Katana Compl. ¶13 begins, "Defendants *have committed* acts of infringement in this District . . ." (emphasis added). The allegation is in the "jurisdiction and venue" section of the Complaint, and the mistaken "continue to" language is referring to the products, not the Defendants' acts of infringement. In any event, this is not evidence of bad faith.

Next, Micron moves to the '806 patent and identifies one point of purported non-infringement, although Micron does not allege whether or how it presented this argument to Longhorn. CS ¶¶65-66. Micron emphasizes that the literal scope of the claim requires sealing "with a resin," admits that its products are sealed with thermoplastic encapsulants that contain purportedly "small amounts of resins," but then insists "they are not themselves resins." *Id.* Perhaps Micron will prevail on this defense or perhaps not, but again, such thin allegations cannot suffice to state a plausible case of bad faith on Longhorn's part, particularly when Micron fails to allege that it provided Longhorn any supporting *evidence*.

Micron then turns to the '879 patent and criticizes the Complaint's analysis in two sentences. CS ¶73. In the first sentence, Micron offers a naked conclusion that the Complaint "does not (and cannot) show that Micron's products satisfy" limitations requiring that no circuit be formed on the "back surface" of a first and second wafer. Yet Micron's conclusion is unexplained and inexplicable. The Katana Complaint clearly points to the back surface related to both wafers—structure B in the figure at paragraph 64, and structure H in the figure at paragraph 67. Micron's allegations provide no plausible support for the notion that Katana's infringement read is wrong, much less in bad faith. In the second sentence of Micron's criticism of the Complaint's analysis, Micron's argument reaches a new low, criticizing Katana for supposedly identifying one structure for the "front surface of the first wafer" in claim element 1(a) and a different structure for the same claim language in element 1(d). But Micron surely knows, as any person of ordinary skill in the art would, that in claim element 1(d) of the '879 patent, the reference to the "front surface of the first wafer" was supposed to refer to the "second wafer"; indeed, claim element 1(d) is all about

the second wafer.[2] If Micron insists on sticking with the patent's minor typographical error, then the infringement read for claim element 1(d) could simply point to the same "back surface of the first wafer" that it pointed to in analyzing claim element 1(a). *See* Katana Compl. ¶64. Micron's argument for supposed "bad faith" here is beyond implausible.

Finally, Micron turns to the '013 patent. CS ¶81. It argues that Katana's Complaint identifies "the same element" for both the claimed "wiring pattern" and the claimed "support pattern." In the first place, the claim term is "wiring patterns," plural. And while the wiring patterns and support pattern are made at the same time in the fabrication process, Katana's Complaint does not contend that they are the same structure. And the fact that Katana's illustrations may need to distinguish the support pattern from the wiring patterns more precisely does not support a plausible case to satisfy the high bar for a "bad faith" assertion.

And again, in addition to all of this, Micron has failed to allege sufficient facts to plausibly attribute Katana's filing of its Complaint to Longhorn in the first place.

## **CONCLUSION**

For all of these reasons, Micron's Countersuit should be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

DATED this 12th day of July, 2022.

---

[2] *See Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 35 F.4th 1367, 1374 (Fed. Cir. 2022) (stating "we agree with the district court that claims 1 and 24 of the '544 patent contain an obvious minor clerical error" and explaining, "even if Kingston were right that the correction changes the structure described in the corrected claim, nothing in our case law precludes district courts from correcting obvious minor errors that alter the claimed structure").

David Krueck, Bar No. 6246
DKrueck@perkinscoie.com
Daniel Graham, Bar No. 11506
DGraham@perkinscoie.com
PERKINS COIE LLP
1111 West Jefferson Street, Suite 500
Boise, Idaho 83702-5391
Telephone: 208.343.3434
Facsimile: 208.343.3232

Amanda Tessar, *pro hac vice pending*
ATessar@perkinscoie.com
Perkins Coie LLP
1900 Sixteenth Street, Suite 1400
Denver, Colorado 80202
Telephone: 303.291.2300
Facsimile: 303.291.2400

**ATTORNEYS FOR PLAINTIFFS, MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., & MICRON TECHNOLOGY TEXAS, LLC**

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., and MICRON TECHNOLOGY TEXAS, LLC., | No. 1:22-cv-00273-DCN |
| *Plaintiffs*, | PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR BOND PURSUANT TO IDAHO CODE §48-1707 |
| v. | ORAL ARGUMENT REQUESTED |
| LONGHORN IP, LLC, | |
| *Defendant*. | |

TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................ 2

   A.   Micron ......................................................................................................... 2

   B.   Longhorn, Its "Portfolio" Companies, And Their Practice Of Filing Suits In
       Texas .......................................................................................................... 3

   C.   Longhorn's History Of Litigation Against Micron ....................................... 5

   D.   Having Lost On Its Lone Star Portfolio, Longhorn Again Targets Micron, Now
       With Infringement Claims From Its Katana Portfolio .................................. 6

   E.   The Asserted Katana Patents Are Expired, Invalid, And Not Infringed ...................... 9

       1.   Micron Cannot Infringe Expired Patents As A Matter Of Law .................... 10

       2.   The '806 Patent ................................................................................. -10

       3.   The '879 Patent ................................................................................. 11

       4.   The '013 Patent ................................................................................. 12

LEGAL STANDARDS .................................................................................................. 13

   A.   Bad Faith Assertions Of Patent Infringement (Idaho Code §48-1701 et seq.)............ 13

   B.   Alter Ego Law ........................................................................................... 15

   C.   Principal-Agent Relationships ................................................................... 15

ARGUMENT .............................................................................................................. 15

   A.   Longhorn Is Liable For Katana's Acts ...................................................... 15

   B.   This Court Must Assess Whether Micron Has Shown A Reasonable Likelihood
       Of Success On Its Claim That Longhorn Has Acted In Bad Faith............................ 16

   C.   This Court Is Empowered To Grant A Bond .............................................. 17

   D.   Longhorn's Patent Infringement Claims Against Micron Are Made In Bad Faith
       And Violate Idaho Code §48-1703 .......................................................... 18

   E.   A Bond Of $15 Million Is Appropriate And Necessary.............................. 20

TABLE OF AUTHORITIES

*CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.,*
    224 F.3d 1308 (Fed. Cir. 2000)................................................................13

*Forbush v. Sagecrest Multi Fam. Prop. Owners' Ass'n, Inc.,*
    396 P.3d 1199 (Idaho 2017)...................................................................15

*Hanna v. Plumer,*
    380 U.S. 460 (1965)..............................................................................17

*Kimble v. Marvel Entm't, LLC,*
    576 U.S. 446 (2015)................................................................................9

*SK hynix, Inc. v. Longhorn IP LLC,*
    No. 22-cv-3915 (N.D. Cal., filed July 5, 2022) .......................................9

*Vanderford Co., Inc. v. Knudson,*
    165 P.3d 261 (Idaho 2007)....................................................................15

*Wandering Trails, LLC v. Big Bite Excavation, Inc.,*
    329 P.3d 368 (Idaho 2014)....................................................................15

STATUTES

Idaho Code §48-1701 et *seq.* .......................................................... *passim*

35 U.S.C. §154(a)(2)...................................................................................7

35 U.S.C. §255.........................................................................................11

35 U.S.C. §§285-287 ...............................................................................2, 7

35 U.S.C. §§311-19 ...................................................................................5

OTHER AUTHORITIES

37 C.F.R. §1.323 .......................................................................................11

INTRODUCTION

This case focuses on Defendant Longhorn IP, LLC's ("Longhorn's") most recent attempt, in a series of similar attempts, to shake down and extort money from Micron.[1]  In March, Katana Silicon Technologies, LLC ("Katana"), a Longhorn entity, sued Micron in the Western District of Texas, claiming that Micron is infringing three patents.  No. 1:22-cv-214 (W.D. Tex.).  Katana did so even though these three asserted patents are expired and the damages available for any alleged infringement are extremely limited even in a best-case scenario for Longhorn.  And Katana did so even though Micron had repeatedly informed Longhorn years before that Katana's claims are baseless as a technical matter.

Idaho's Legislature has codified a strong public policy against the assertion of bad faith patent infringement claims.  Idaho Code §§48-1701(1)(d)-(e) recognize that "abusive patent litigation" can "harm Idaho companies" and undermine the State's ability to attract technology companies.  In enacting this statute, the Idaho Legislature could have had no more egregious a business model in mind than that of Longhorn's.

Longhorn operates through a series of shell entities that share the same owner/manager as Longhorn itself, Mr. Khaled Fekih-Romdhane.  Mr. Fekih-Romdhane buys low-value patents and holds these patents in the name of the shells, which become nominal plaintiffs in Longhorn's suits.  Longhorn typically sues in the pro-plaintiff Eastern and Western Districts of Texas (*i.e.*, Marshall and Waco), rather than the home districts where its targeted companies reside.  Longhorn directs its suits at large, successful companies—like Micron—that are viewed as having deep pockets.  Longhorn seeks settlements much smaller than defense costs because Mr. Fekih-Romdhane knows that the targets of his suits are reluctant to both spend millions of dollars to defend and to assume all of the risks associated with fighting.  Longhorn puts it targets between a rock and a hard place: they can cave to Longhorn's demands for amounts often as low as five or six figures, or they can spend millions proving that the allegations are wrong—in which case Longhorn will just try again

---

[1]  Plaintiffs Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC are collectively referred to here as "Micron."

with a new suit through a new shell entity. This is ***exactly*** what has happened to Micron: Micron decisively defeated claims by another Longhorn shell, "Lone Star," only to now be faced with a suit by the Katana shell and threats of additional suits by multiple other Longhorn shells.

Regardless of the weakness or sloppiness of its assertions, Longhorn experiences no downside for any of this; if it loses one case by one shell entity, it moves on to the next. Though prevailing parties in patent cases can eventually recover attorney fees in exceptional cases (*see* 35 U.S.C. §285), the promise of those fees at the end of a suit is empty when, as is often the case, the entities that serve as the plaintiff, as here, admittedly have no resources to pay. Dkt. 7-1, at 1.

Idaho's bad faith patent assertion statute corrects the balance by requiring a bond at the outset of a case as surety against baseless suits, upon a movant's showing of a reasonable likelihood of bad faith. Idaho Code §48-1707. The bond must be high enough to cover the movant's defense costs ***and*** amounts reasonably likely to be recovered under the statute. *Id.* Micron, as an Idaho citizen, seeks the Court's aid here to ensure that, once Micron has fought Longhorn's claims to victory, the bond will be available to ensure that Micron's victory is not hollow—exactly as Idaho's Legislature intended. Micron can readily establish a reasonable likelihood that Katana's (*i.e.*, Longhorn's) infringement claims are made in bad faith, meaning both subjective bad faith on Longhorn's part and objective baselessness because no reasonable litigant in Longhorn's shoes could realistically expect success on the merits.

Micron respectfully asks the Court to protect Micron from Longhorn's abusive claims by requiring Longhorn to post a bond of $15 million pursuant to Idaho Code §48-1707. The basis for the calculation of this bond is explained below.

FACTUAL BACKGROUND

## A.    Micron

Micron is Idaho's most successful technology company. Micron was founded in 1978 as a four-person company in the basement of a Boise dental office. Decl. of David Westergard ("West. Dec."), ¶5. By 1980, Micron had broken ground on its first fabrication plant. *Id.* In 1994, Micron earned a spot in the Fortune 500 and steadily grew into a world leader for computer

memory.  *Id.*  Micron's products are used in everything from cars to appliances to servers to computers.  *Id.*

Micron is an innovator.  45,000+ Micron employees across 17 countries (including >6,000 in Idaho) contribute to Micron's success.  *Id.*, ¶6.  Micron devotes >$2.5 billion per year to research and development.  *Id.* & Ex. 3.[2]  As a result, Micron has obtained over 50,000 patents worldwide and holds one of the world's largest portfolios.  West Dec. ¶6 & Ex. 4.  Micron understands that a strong patent system that protects innovators is a critical feature of strong economies, and Micron respects legitimate intellectual property rights.  West Dec. ¶6.

The suggestion that Micron's success as a company is any way attributable to Longhorn or its patents, or that these entities should share in Micron's success, is not tenable.

**B.     Longhorn, Its "Portfolio" Companies, And Their Practice Of Filing Suits In Texas**

Longhorn is a non-practicing entity ("NPE"), sometimes called a "patent assertion entity" or "patent troll."  Longhorn produces no products and provides no services.  Ex. 5 (describing itself as a "privately owned IP management and patent portfolio licensing company").

Longhorn's pattern and practice is to form a holding company (a "portfolio" entity), controlled by Mr. Fekih-Romdhane, and then to have that holding company buy a grouping of patents that the holding company asserts in its own name.  Longhorn lists the following portfolio entities on its website, and public records provide the principals' names and addresses for each:

| Entity | Principal | Address |
|---|---|---|
| Katana Silicon Technologies LLC | Khaled Fekih-Romdhane (via Tanit Ventures, Inc.) | 5204 Bluewater Drive Frisco, TX 75036 |
| Trenchant Blade Technologies LLC | Khaled Fekih-Romdhane | 5204 Bluewater Drive Frisco, TX 75036 |
| Nyckel UI Technologies LLC | Khaled Fekih-Romdhane (via Tanit Ventures, Inc.) | 5204 Bluewater Drive Frisco, TX 75036 |
| Hannibal IP LLC | Khaled Fekih-Romdhane | 5204 Bluewater Drive Frisco, TX 75036 |

---

[2]     All exhibits are attached to the Declaration of Dan Graham.

| Entity | Principal | Address |
|--------|-----------|---------|
| Hamilcar Barca IP LLC | Khaled Fekih-Romdhane | 5204 Bluewater Drive Frisco, TX 75036 |
| Dido Wireless Innovations LLC | Khaled Fekih-Romdhane | 5204 Bluewater Drive Frisco, TX 75036 |
| Lone Star Silicon Innovations LLC | Christian Dubuc (partner or former partner of Mr. Fekih-Romdhane) | 5204 Bluewater Drive Frisco, TX 75036 |
| L2 Mobile Technologies LLC | Khaled Fekih-Romdhane | 8105 Rasor Blvd., #210 Plano, Texas 75024 |
| Nordic Interactive Technologies LLC | Khaled Fekih-Romdhane (via Tanit Ventures, Inc.) | 8105 Rasor Blvd., #210 Plano, Texas 75024 |
| Ox Mobile Technologies LLC | Khaled Fekih-Romdhane | 8105 Rasor Blvd., #210 Plano, Texas 75024 |
| Carthage Silicone Innovations LLC | Khaled Fekih-Romdhane | 8105 Rasor Blvd., #210 Plano, Texas 75024 |

Exs. 6-7.

As is clear from this table and from Longhorn's website (which proudly touts these entities as part of Longhorn), Mr. Fekih-Romdhane controls all of these entities, which share just two addresses (one of which is Mr. Fekih-Romdhane's home address in Frisco). *Id.* He does so either directly himself or through Tanit Ventures, Inc. ("Tanit"). Ex. 7. Mr. Fekih-Romdhane is Tanit's Director, Organizer, & President, and Tanit is the sole member of Longhorn. *Id.* at 9, 12-14.

Like many other NPEs, Longhorn and its entities are formed as Texas LLCs. Ex. 7. This is not by accident; it is instead part of a calculated plan that, superficially, creates the impression that Longhorn has sufficient connections with Texas to justify jurisdiction for its suits there.

NPEs have been drawn to file suits in the Eastern and, more recently, Western Districts of Texas because, for instance: the judges there have adopted local rules that patent owners perceive as favorable; times to trial are extremely fast; judges are often disinclined to grant transfer or dispositive motions; and plaintiffs can often know which judge they will be assigned by the selection of the division in which they file. *E.g.*, Exs. 8-10. In 2021 alone, 977 patent cases were filed in Western Texas—almost ¼ of all patent suits filed in the entire USA. Ex. 11. This contrasts

with, for instance, the District of Idaho, which had only two patent cases filed in 2021.[3]  *Id.*

Longhorn has taken full advantage of this trend.  In total, Longhorn has filed 16 patent suits in the

Eastern and Western Districts of Texas through its assertion entities, including all five Katana,

both Trenchant Blade, six Lone Star, half of L2 Mobile, and both Nordic Interactive cases.[4]

Ultimately, Longhorn's approach creates pressures that force companies to settle even in

situations where the asserted patents lack merit.

**C.    Longhorn's History Of Litigation Against Micron**

Longhorn's shells include Lone Star, through which Longhorn first targeted Micron in

2016 with a baseless suit filed in the Eastern District of Texas.  No. 2:16-cv-1116.  There,

Longhorn (through Lone Star) accused Micron of infringing seven patents.  Ex. 13.  Micron earned

an early victory by securing a transfer to Northern California.  Ex. 14.  The case was then dismissed

with prejudice by Judge Alsup, who criticized Lone Star for having incorrectly stated that it was

the sole owner of the asserted patents and having engaged in a "litigation gimmick."  Ex.15, at 11.

Micron also filed *inter partes* review ("IPR") petitions challenging the validity of all of

Lone Star's asserted claims.  An IPR is a procedure to challenge patent validity before the U.S.

Patent & Trademark Office's Patent & Trademark Appeal Board ("PTAB").  35 U.S.C. §§311-19.

Although IPRs are generally cheaper than district court litigation, the costs are still sizeable

(particularly when a large number must be filed), and it takes about 18 months to reach a decision,

which is then subject to appeal.  35 U.S.C. §316(a)(11).  Moreover, some district courts, including

---

[3]    The reluctance of certain judges in these Texas districts to transfer cases has recently led to numerous Federal Circuit mandamus decisions ordering transfer, as well as outcry in the patent community and beyond.  Ex. 12 (Republican and Democratic senators jointly asking for Supreme Court reform to address the "extreme concentration of patent litigation in [Western Texas] and the unseemly and inappropriate conduct that has accompanied this phenomenon").

[4]    Katana cases: Nos. 6:21-cv-074 (Western Digital); 6:19-cv-344 (Samsung); 6:19-cv-695 (TSMC); 6:22-cv-191 (GlobalFoundries); & 1:22-cv-214 (Micron) (all W.D. Tex.).  Trenchant Blade cases: Nos. 6:21-cv-67 (Samsung); & 6:21-cv-490 (Intel) (both W.D. Tex.).  Lone Star cases:  Nos. 2:16-cv-1116 (Micron); 2:16-cv-1117 (Nanya); 2:16-cv-1170 (Toshiba); 2:16-cv-1216 (UMC); 2:16-cv-1276 (SMIC); & No. 2:16-cv-1438 (Renesas) (all E.D. Tex.).  L2 case: No. 6:21-cv-358 (Google) (W.D. Tex.).  Nordic cases: Nos. 6:20-cv-64 (Samsung); & 6:21-cv-438 (LG) (both W.D. Tex.).

those in Eastern and Western Texas, do not typically stay litigation pending resolution of IPRs, so a defendant must still litigate while its IPRs are pending. *E.g.*, Ex. 8.

Micron achieved overwhelming success on its IPRs. For two of the seven asserted patents, Lone Star conceded before the PTAB could reach a decision, preemptively cancelling challenged claims. Exs. 16-17. For the other five patents, the PTAB invalidated 50+ challenged claims. *See* Exs. 18-23. This means that the PTAB found the challenged claims contained nothing inventive.

But it took more than three years of fighting and millions of dollars to get to that point. Not only that, but Longhorn and Lone Star threatened a series of appeals that would have cost even more to defend—and even filed a first one. No. 18-1578 (Fed. Cir.). Longhorn coupled these threats with a tiny settlement offer that made it nonsensical to keep fighting. West. Dec., ¶7.

Faced with this offer, Micron paid Lone Star a small settlement amount in 2019. *Id.* (amount shown in Ex. 36, filed under seal). This amount was far less than Lone Star's original demand and was intended to simply make Longhorn go away. West. Dec., ¶7. Micron made this payment believing that Longhorn would never again have the audacity to file another meritless suit against Micron. Micron's belief proved correct for just three years, until March of 2022.

**D. Having Lost On Its Lone Star Portfolio, Longhorn Again Targets Micron, Now With Infringement Claims From Its Katana Portfolio**

On August 22, 2018, Longhorn first contacted Micron about Katana. Ex. 24; West. Dec., ¶8. The demand letter that "Katana" sent to Micron explained that Katana "has a licensing service agreement with Longhorn" (Ex. 24 at 1; West. Dec., ¶8), confirming that Katana is one of Longhorn's many portfolio entities. In that first letter, Katana asked Micron to take a license to its portfolio and identified two patents that Micron allegedly infringed. *Id.* In what can only be characterized as a thinly-veiled threat, Longhorn pointed out that its Katana patents had been asserted against other companies. *Id.* ("[Katana's] patents have been asserted against major semiconductor companies in the world. Among the potential licensees are: Toshiba, TSMC, SK Hynix and NXP."). Longhorn did not provide claim charts or other documents explaining its infringement theory for the two identified patents at this time, nor did it offer to do so. West. Dec.,

¶9.  In the patent world, such claim charts are the standard way that parties explain their infringement theories and allow companies to assess the strength of a patentee's infringement claim.  *Id*.

Longhorn accused Micron of infringing U.S. Patent Nos. RE38,806 ("the '806 patent") and 6,352,879 ("the '879 patent").  Specifically, Longhorn pointed to claims 1, 12, 23, and 30 of the '806 patent and claims 1, 2, and 15 of the '879 patent as allegedly infringed.  Ex. 24, at 2.

At the time of this letter, the '806 and '879 patents were on the verge of expiring, although Longhorn's letter makes no mention of this fact.  Ex. 24.  And, in fact, these two patents did expire in December 2018.[5]  Although U.S. patent law allows for damages for infringement six years pre-suit, collection of such past damages is permitted only if, among other requirements, the accused infringer was on notice of the patent.  *See* 35 U.S.C. §§286, 287.  Notice can be given by letter, if it is sufficiently detailed, or the public can be put on constructive notice of a patent if the patentee and its licensees mark their practicing products with the patent's number.  *See id.*  Here, Longhorn's letter stated that "potential licensees" of the Katana portfolio exist, identifying several, but did not state or present evidence that any of its licensees or the original patent owner (or its licensees) had marked their products.  Ex. 24, at 1.  Likewise, the Complaint that Longhorn (through Katana) eventually filed against Micron alleges notice, but not marking by licensees or the original patent owner.  Ex. 1, ¶122.  As a result, even setting aside the technical weaknesses of the identified Katana patents (discussed below), the very best-case scenario for Longhorn is that a tiny sliver of damages may be available for the four-month period between Longhorn's letter to Micron in August 2018 and expiration of Katana's patents in December 2018.

After the August 2018 demand letter, Longhorn (through Katana) sent another letter to Micron on September 18, 2018.  Ex. 27.  This second letter was similar to the first, but now confusingly identified the '806 patent and a different patent, U.S. Patent No. 6,731,013 ("the '013 Patent," specifically, claims 1-5 of that patent) as allegedly infringed.  *Id.*, at 2; Ex. 28.  The second

---

[5]   A patent expires 20 years from its earliest U.S. filing date.  35 U.S.C. §154(a)(2).  The earliest such date for the '806 and '879 patents is Dec. 30, 1998.  Exs. 25, at 1; 26, at 1.

letter makes no mention of the '879 patent. *Id.* As with the first letter, no claim charts, proof of infringement, or evidence of marking were included. West. Dec., ¶10.

On October 4, 2018, Longhorn requested a meeting "to discuss the Longhorn portfolios." Ex. 29. As before, Longhorn provided Micron with no claim charts, proof of infringement, or evidence of marking for any of the '013, '806, or '879 patents. West. Dec., ¶11. Nevertheless, in a demonstration of good faith, Micron hosted Longhorn and its attorneys at Micron's Boise campus in November 2018 to discuss Longhorn's allegations. *Id.*, ¶12. Mr. Fekih-Romdhane and his outside counsel traveled to Idaho to attend this meeting. *Id.*

Shortly before the meeting, Longhorn finally sent Micron claim charts for the three asserted patents, and Longhorn and Katana presented these charts at the meeting. *Id.*, ¶13. For its part, Micron explained some of the many reasons that Longhorn's assertions of the Katana patents are meritless, including some of those detailed below. *Id.*, ¶14. Undeterred, Longhorn demanded payment of license fees or a settlement. *Id.* Longhorn explained that the amount sought would increase over time because, in Mr. Fekih-Romdhane's words, they were offering Micron an "early bird special" on the Katana portfolio. *Id.*, ¶14; Ex. 30.[6]

Over the course of these negotiations, Micron repeatedly explained to Longhorn that the three asserted Katana patents were invalid and/or not infringed. Such communications took place on at least November 14, 2018 and February 4, 2019. West. Dec., ¶14; Exs. 29-30. For instance, on February 4, 2019, Micron sent Longhorn an email detailing some of the reasons that Micron should not have to pay for a license to the '806, '879, and '013 patents. Ex. 30. Micron explained that the claimed technology was known, discussed in literature and other patents, and used in multiple commercial products, all before the priority dates of the '806, '879, and '013 patents, rendering those claims invalid. *Id.* Micron identified specific prior art references supporting its

---

[6]  Another threat was made soon after when, on Nov. 20, 2018, Mr. Fekih-Romdhane sent an email saying that it might be "helpful" for Micron to review patents from another Longhorn entity's portfolio, Carthage. Ex. 31. Although phrased under the guise of being "helpful," Micron understood this as a threat of additional meritless litigation. West. Dec., ¶16.

conclusions, including products manufactured by Intel, TI, GE, and Amkor, and multiple specific United States patents.  *Id.*  Micron also explained that it did not infringe the '013 patent because the accused Micron product lacks a metal fill or support pattern corresponding to a wirebond location on a substrate, as required by the '013 claims.  *Id.*

Longhorn provided no plausible rebuttal to Micron's points, but it continued to press its baseless demands for payment, including in correspondence in 2019 and 2020.  West Dec., ¶15.

Moreover, Longhorn also threatened that—if Micron refused to pay—Longhorn had other portfolios that might be "of interest" to Micron, such as its Hamilcar and Trenchant Blade portfolios.[7]  West. Dec., ¶17.  This, too, was simply a threat that Longhorn would keep coming back until Micron paid more, regardless of the merits of any claims.

On July 5, 2021, the '013 patent expired.[8]

For 18 months, from October 2020 to March 2022, Longhorn was silent.  West Dec., ¶15.  Then, on March 4, 2022, Katana filed suit against Micron in the Western District of Texas, alleging infringement of the expired '806, '879, and '013 patents.  Ex. 1.  Micron moved to transfer the suit to Idaho.  Longhorn, unable to muster any facts in support of the Texas venue, ultimately did not oppose, Ex. 32, although it conceded this only *after* Micron had incurred the expense of the motion.

**E.     The Asserted Katana Patents Are Expired, Invalid, And Not Infringed**

**1.     Micron Cannot Infringe Expired Patents As A Matter Of Law**

Katana alleges that the Micron defendants "have infringed ***and continue to infringe*** the Asserted Patents."  Ex. 1, at ¶13 (emphasis added).  But, as a matter of law, one ***cannot*** infringe an expired patent.  *See, e.g., Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 451 (2015) ("[W]hen the patent expires, the patentee's prerogatives expire too, and the right to make or use the article, free from all restriction, passes to the public.").  The asserted '879 and '806 patents expired on

---

[7]     Further corroborating these threats, Longhorn appears to have also told third parties that it had threatened to Micron with these portfolios.  *See* Dkt. 1, ¶23, *SK hynix, Inc. v. Longhorn IP LLC*, No. 22-cv-3915 (N.D. Cal., filed July 5, 2022) (alleging that Longhorn and Trenchant Blade had informed SK hynix of their attempts to license many companies, including Micron).

[8]     *See* n.5, *supra*; Ex. 28, at 1 (expiration date adjusted 30 days, as noted on face of patent).

December 30, 2018, and the asserted '013 patent expired on July 5, 2021.  As a result, Longhorn's allegations of ongoing infringement are baseless and legally insupportable.[9]

### 2.    The '806 Patent

The '806 patent claims a supposedly novel method for manufacturing a "semiconductor device that may have a Chip Size Package ('CSP') structure." Ex. 1, ¶26; *see also* Ex. 25.  Katana alleges that Micron infringes claim 1 of this patent (Ex. 1, ¶32), no longer mentioning the other three '806 claims on which it had supposedly based its demand in August 2018.[10]  Ex. 24, at 2.

Katana cannot in good faith allege that Micron infringed claim 1 of the '806 patent even before it expired in 2018.[11]  For instance, Micron's products did not infringe asserted claim 1 of the '806 patent at least because that claim is directed to a "semiconductor device" with a "first semiconductor chip" and a "second semiconductor chip" with "each of said first and second semiconductor chips being wire-bonded to the electrode section with a wire, said first and second semiconductor chips and the wire ***being sealed with a resin***."  Ex. 25, claim 1 (emphasis added); *see also* Ex. 1, ¶36.  But Micron's products are ***not*** now and were not then sealed with a resin. Stephenson Decl., ¶6.  Although Katana points to a figure of uncertain origin that it claims is a Micron product and labels something in that figure as "resin" (Ex. 1, ¶36), there is no basis for this allegation.  Micron's accused products are, in fact, sealed using thermoplastic encapsulants, as Longhorn would have known if it had tested the products before filing suit.  Stephenson Decl., ¶6.

---

[9]    Confronted with this point, Longhorn now says that its allegation of continuing infringement is "clearly a drafting error" (Dkt. 7-1 at 18), but Longhorn has not amended to fix this "error."

[10]    To prove infringement, the patentholder must show that the accused infringer practices every element of any asserted claim.  Ex. 33 at 4-5 (excerpt of Chisum treatise).

[11]    Given the page limits here, Micron presents only exemplary noninfringement arguments, and it features ones that require little technical analysis and no Micron confidential technical information.  Micron's understanding is that this Court is ***not*** adjudicating whether Micron infringes the patents to resolve this motion, but instead is deciding whether there is a reasonable likelihood that Longhorn ***acted in bad faith*** in making its claims.  Idaho Code §48-1703(1). Micron does not waive technical arguments not presented here.

3.     **The '879 Patent**

Like the '806 patent, the '879 patent claims a supposedly novel method for making a "semiconductor device that may have a … 'CSP' structure." Ex. 1, ¶57; *see also* Ex. 26. Katana now alleges that Micron infringes claim 1 of the '879 patent (Ex. 1, ¶63), no longer mentioning the other two claims that it had originally asserted in its August 2018 letter. Ex. 24, at 2.

Katana cannot in good faith allege that Micron infringed claim 1 of the '879 patent even before it expired in 2018. Claim 1 is directed to a "method of manufacturing a semiconductor device" with six steps, (a) through (f). Ex. 26 (claim 1). Step (a) requires "forming a first adhesion layer on a back surface of a first wafer on which no circuit is formed, *a circuit being formed on a front surface of the first wafer*." Step (d) requires "forming a second adhesion layer on a back surface of a second wafer on which no circuit is formed, *a circuit being formed on a front surface of the first wafer*." *Id.* Read together, steps (a) and (d) make no sense, but the one thing that is apparent is that two circuits must be formed on *one* ("front") surface. Any good faith effort to assert limits (a) and (d) must refer to that same surface (*i.e.*, "a front surface of the first wafer").

Longhorn tries to sidestep this issue by identifying the "front surface of the first wafer" in green and red, respectively, in two separate figures. Ex. 1, ¶¶64, 67. But, in doing so, Longhorn then is forced to identify two entirely *different* surfaces as the *same* "front surface of the first wafer." It is hornbook law that a claim term must be construed consistently in all places that it is used in a patent claim. Ex. 33 at 6-7 (excerpt of Chisum treatise) ("[I]t is presumed that the same terms appearing in different portions of the claims should be given the same meaning."). A reasonable actor in Longhorn's shoes would not realistically expect success on Longhorn's '879 infringement theory because that theory ignores the asserted claim's requirements.

Confronted with this reality, Longhorn again resorts to the excuse of "minor typographical error." Dkt. 7-1, at 20. But this cannot be correct. Such minor errors must be corrected through a certificate of correction, 35 U.S.C. §255, not ignored. And the "typo" here does not qualify for correction because the proposed change would "materially affect the scope or meaning of the patent." 37 C.F.R. §1.323. That standard is not met here, where even Longhorn acknowledges

that it would need a different infringement theory without the correction.[12]  Dkt. 7-1, at 20.

### 4.    The '013 Patent

The '013 patent claims a supposedly novel "semiconductor device … with improved reliability of connection by suppressing the occurrence of inadequate electrical connection."  Ex. 1, ¶90; *see also* Ex. 28.  Katana alleges that Micron infringes claim 11 of the '013 patent.  Ex. 1, ¶96.  Notably, this claim was not even mentioned in Katana's September 2018 letter, which identified five completely different '013 patent claims as the basis for Katana's claim.  Ex. 27.

Katana cannot in good faith allege that Micron infringed claim 11 of the '013 patent before its expiration in 2021.  As just one example, Micron's products did not infringe claim 11 because the alleged "wiring pattern" and the alleged "support pattern" ***are identified as the same element*** in Katana's Complaint, despite the mutual exclusivity of these claimed features.  Ex. 1, ¶¶99-100



---

[12]  Longhorn says that, even if the "typo" is not ignored and Longhorn therefore must prove that two circuits are formed on the front side of the first wafer, it could pivot to allege that Micron's products meet this requirement.  Dkt. 7-1, at 18.  But Longhorn provides absolutely no basis for suggesting that it has done any testing or has any other reason to suggest that such a revised allegation would be plausible.  Indeed, if Longhorn had any basis for making such an infringement allegation, it presumably would have done so from the outset.

(alleged wiring section circled by Katana in lime green in Fig. 4 of ¶99 and alleged support pattern circled in dark blue by Katana in Fig. 5 of ¶100 correspond to the same portion of the marked-up figures) (below, dark/thick red circles, line, and italic annotation added; rest in original).

Asserted claim 11 makes it clear that the wiring and support patterns are mutually exclusive by virtue of their electrical relationship. Claim 11 requires, among other elements:

> *wiring patterns* … *for making electrical connection* between the terminal section and the land section; [and]
>
> a *support pattern* … wherein the support pattern *is not electrically connected* to one of the terminal section and land section ….

In short, the claim requires that the "wiring pattern" make an "electrical connection between the terminal section and the land section," *and* that the "support pattern" is "*not* electrically connected to one of the terminal section and land section." Ex. 28 (claim 11). Thus, the "wiring pattern" and "support pattern" *cannot* both refer to the same element, as alleged, because they cannot be electrically connected. *E.g.*, *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("[T]he use of … different terms in the claims connotes different meanings."). Longhorn's only response here, that "Katana's Complaint does not contend that they [the wiring pattern and the support pattern] are the same structure" (Dkt. 7-1, at 18), cannot be reconciled with paragraph 64 and 67 of the Katana Complaint's figures.

## LEGAL STANDARDS

### A.    Bad Faith Assertions Of Patent Infringement (Idaho Code §48-1701 et seq.)

In 2014, the Idaho Legislature passed §48-1701 *et seq.*, titled, "Bad Faith Assertions of Patent Infringement," in an attempt to "protect Idaho businesses from abusive and bad faith assertions of patent infringement and build Idaho's economy, while at the same time carefully not interfering with legitimate patent enforcement actions." §48-1701(2).

The statute provides multiple factors in §§48-1703(2)(a)-(i) that courts may consider when deciding whether a patentee has asserted its patent in bad faith. Factors (2)(a) to (2)(d) relate specifically to the contents of any demand letter sent to the alleged infringer. More relevantly

here, however, given that Micron's Idaho claim is based on the Katana Complaint filed on March 4, 2022, Factors 2(e) to 2(i) are relevant to any type of bad faith assertion, including those made in complaints.  §48-1703(1) ("It is unlawful for a person to make a bad faith assertion of patent infringement in a demand letter, *a complaint* or any other communication.") (emphasis added).

Factor 2(f) calls for consideration of both subjective factors bearing on bad faith, including for instance, whether "[t]he person asserting a claim or allegation of patent infringement acts in subjective bad faith," and objective factors, including whether "a reasonable actor in the person's position would know or reasonably should know that such assertion is meritless."  §48-1703(2)(f).  In *Ice Castles v. LaBelle Lake*, this Court found this Factor (2)(f) "particularly relevant" and said that it "will give more weight to this factor as it strikes at the heart of the statute's purpose."  No. 4:18-cv-00571-DCN, 2021 WL 3085479, at *6 n.3 (D. Idaho July 21, 2021).

Factor 2(e) asks whether the demanded license amount is reasonably related to the patent's value, and Factor 2(g) focuses on whether patent infringement claim is "deceptive."  There is also a catch-all that gives this Court discretion to consider "[a]ny other factor the court finds relevant."  §48-1703(i).[13]  These other factors might include, for instance, whether the patentholder conducted a pre-suit investigation and analysis that suggested that the claims have merit.

Idaho Code §48-1707 provides for the patentholder to "post a bond in an amount equal to a good faith estimate of the target's costs to litigate the claim and amounts reasonably likely to be recovered under this chapter."  The party seeking the bond—the target of the bad faith assertion—need only establish a "reasonable likelihood that a person has made a bad faith assertion of patent infringement in violation of this chapter."  *Id.*

Although the Idaho bad faith patent assertion statute is now eight years old, it is largely untested, with *Ice Castles* as the only relevant authority.  In other words, the issues presented by this motion are largely issues of first impression for this Court to decide.

---

[13]  §48-1703(2)(h) considers whether a court has already found a claim to be meritless.  It is not (yet) relevant here with respect to the asserted Katana patents.

**B.    Alter Ego Law**

Idaho law allows litigants to pierce the corporate veil of an LLC.  *See, e.g.*, *Vanderford Co., Inc. v. Knudson*, 165 P.3d 261, 270-71 (Idaho 2007).  Alter ego status is established when there is: "(1) a unity of interest and ownership to a degree that the separate personalities of the [companies] no longer exist and (2) if the acts are treated as acts of [separate companies] an inequitable result would follow."  *Wandering Trails, LLC v. Big Bite Excavation, Inc.*, 329 P.3d 368, 376 (Idaho 2014).  "The question … [is] whether there is sufficient evidence 'such that there was no distinction between the [company and its members].'"  *Id.* at 377 (citation omitted).

**C.    Principal-Agent Relationships**

To determine whether a principal-agent relationship exists pursuant to Idaho law such that the principal can be held liable for the acts of the agent, the "important factor is the control or right of control reserved by the [principal] over the functions and duties of the agent."  *Forbush v. Sagecrest Multi Fam. Prop. Owners' Ass'n, Inc.*, 396 P.3d 1199, 1213 (Idaho 2017).

ARGUMENT

**A.    Longhorn Is Liable For Katana's Acts**

Mr. Fekih-Romdhane follows a pattern and practice of strategically using his Longhorn entities to assert different patent portfolios while shielding liability from Longhorn itself.  A complete unity of interest and ownership exists between and among Longhorn, its portfolio entities (including Katana), and Mr. Fekih-Romdhane to a degree inconsistent with purported separateness.  During talks between Micron and Longhorn in 2018-2019, Mr. Fekih-Romdhane and his agents continually blurred the lines between Longhorn, Katana, Lone Star, and himself.

For example, the August and September 2018 letters that "Katana" sent to Micron explained that Katana "has a licensing service agreement with Longhorn."  Exs. 24, at 1; 27, at 1. Likewise, on October 4, 2018, Jason Wejnert of SpencePC ("Katana's" counsel) emailed Micron to schedule a meeting for the stated purpose of "discuss[ing] ***the Longhorn portfolios*.**"  Ex. 29 (emphasis added).  On November 14, 2018, Mr. Fekih-Romdhane participated on behalf of all of Longhorn, Katana, and Lone Star at a meeting at Micron's Boise offices.  West. Dec., ¶12.  Shortly

MICRON MEMORANDUM
ISO MOTION FOR BOND

after that meeting, Mr. Fekih-Romdhane told Micron that it might be "helpful" for Micron to review the portfolio of another Longhorn entity, Carthage.  Ex. 31.  This threat was later followed with threats for the Hamilcar and Trenchant Blade portfolios.  West. Dec., ¶17.  Longhorn has demonstrated that there was and is no distinction between Longhorn and its portfolio entities.

This unity of interest and control is further evidenced by Longhorn's website, which lists the "Portfolios under [Longhorn]'s Management."  Each portfolio entity listed then links to its own page, also part of the longhornip.com domain.  Ex. 6.

If Longhorn's acts are not treated as acts of Katana, and vice versa, an inequitable result will follow.  NPEs like Longhorn structure themselves to disperse patents across a web of holding companies to avoid liability, such as the liability for bad faith assertions.  An alleged infringer that prevails and is awarded damages is often faced with a judgment-proof adversary.  Treating Longhorn as the alter ego of Katana is merited here to avoid such an inequitable result.

Likewise, Longhorn is liable for the acts of Katana under principal-agent theories.  For the reasons discussed above, and as acknowledged through the admitted existence of a licensing services agreement, Longhorn exercises control over the functions and duties of its portfolio entities (including Katana) such that a principal-agent relationship exists.  This control is evidenced, in part, by Mr. Fekih-Romdhane's formation and oversight over Longhorn and all of the Longhorn entities (directly and/or through Tanit) and his disregard of separateness between the various entities during negotiations with Micron, as well as on the Longhorn website itself.

## B.   This Court Must Assess Whether Micron Has Shown A Reasonable Likelihood Of Success On Its Claim That Longhorn Has Acted In Bad Faith

Idaho's bad faith assertion statute does not require or suggest that this Court must dive into the technical details of a full patent case to resolve Micron's bond motion.  Requiring claim construction, expert testimony, etc. would be inconsistent with the Idaho statute's provision for a bond procedure in the first place.  Instead of the technical issues, Idaho law requires this Court's focus for a bond motion be on the patentholder's objective and subjective bad faith.  Idaho Code §48-1707 (bond required if movant establishes a reasonable likelihood of success that there has

been "a bad faith assertion … in violation of this chapter."). The manifest weakness of asserted patent claims certainly may bear on the question of the patentholder's intent (and is particularly relevant for establishing the objective component of bad faith—i.e., no reasonable litigant in Longhorn's shoes could have realistically expected success on the merits of its claims), and although such evidence is discussed here, nothing prohibits Micron from also relying on other types of evidence. Indeed, the Idaho statute contemplates exactly that in §§48-1703(2)(a)-(i).

**C.     This Court Is Empowered To Grant A Bond**

In *Ice Castles*, the Court concluded that a federal court exercising diversity jurisdiction has jurisdiction over a claim brought under §48-1701, *et seq*. 2021 WL 3085479, at *3. The Court also addressed the merits of the claimant's bond motion because the court "strives to also address the merits of any question before it." *Id.* But, because the motion was denied, the Court did not ultimately decide whether it had the authority to impose a bond.

Unquestionably, it must, and this case proves it. Micron filed its Idaho claim in state court under §48-1706 precisely so that it ***could obtain a bond***. Micron Complaint, at 5, n.2. Longhorn then removed the claim to this Court in part based on the assertion that federal question jurisdiction exists.[14] Dkt. 1, ¶¶17-20. Longhorn should not be able to single-handedly nullify §48-1707.

Every time that §48-1703 is asserted, the claimant will be an Idaho citizen and, almost every time, the other party will not. Diversity jurisdiction will almost always exist. If the patentholder can force the case to federal court, and that court finds itself powerless to grant a bond, the Idaho Legislature's intent will be thwarted and the statute emasculated. *See* §48-1706 (providing private cause of action); §48-1707 (requiring bond). This would also be inconsistent with the *Erie* rule and improperly encourage forum-shopping. *Hanna v. Plumer*, 380 U.S. 460, 467-68 (1965) ("The *Erie* rule is rooted in part in a realization that it would be unfair for … the result of a litigation materially to differ because the suit had been brought in a federal court.").

---

[14]   Micron disagrees, but the point is moot here because diversity jurisdiction exists.

**D.     Longhorn's Patent Infringement Claims Against Micron Are Made In Bad Faith And Violate Idaho Code §48-1703**

As the above chronology shows, Micron is reasonably likely—for multiple reasons—to prove that Longhorn and Katana have brought bad faith infringement claims against Micron.

***First***, the Idaho Legislature enacted §48-1701 *et seq.* to protect Idaho companies (like Micron) from NPEs exactly like Longhorn.  *See* §48-1701(2).  Longhorn, through its portfolio entities, preys on "deep pockets" with its parade of demands and threats, nuisance-value settlements, weak infringement theories, sloppy claims, and assertion of expired patents.  In short, "abusive and bad faith assertions of patent infringement" that violate, for instance, §§48-1703(2)(e), (f) (subjective portion), (g), and (i) are Longhorn's bread and butter.

Micron has been in Longhorn's crosshairs since 2016.  Micron has already spent millions of dollars defending itself from Longhorn's low-rent patents—and with great success in the process.  But fighting Longhorn is like fighting the rising tide.  Longhorn has openly threatened to bring additional claims against Micron through other Longhorn entities like Hamilcar, Carthage, and Trenchant Blade.  It is time that Longhorn be required to be responsible for the ramifications of its assertions through the posting of the requested bond here.

***Second***, Longhorn's infringement claims here fail on their face because Longhorn purports to assert claims of ongoing, ***current*** infringement for expired patents. Ex. 1, ¶13.  This is a legal impossibility.  Belatedly claiming that this illegal assertion was just a "drafting error," *see supra*, n.9, does not cure the problem.  Assertion of patents in these circumstances cannot satisfy, *e.g.*, §48-1703(2)(f) (subjective and objective portions).

***Third***, even if Longhorn's claims are somehow read to only focus on past conduct between August (or September) of 2018 and the date that Katana filed its Complaint—*i.e.*, the time for which Katana is permitted to seek damages—Longhorn's claims here are exceptionally weak as a technical matter.   Longhorn's infringement allegations are facially insufficient to show infringement of any of the '806, '879, and '013 patents.  Longhorn knows, or should know (had it conducted an appropriate pre-suit investigation), that its infringement theories are meritless.  No

reasonable litigant in Longhorn's shoes could realistically expect success on the merits of these claims, which are both objectively and subjectively in bad faith under §48-1703(2)(f).

For instance, as discussed above, Katana cannot in good faith suggest that Micron ever infringed asserted claim 1 of the '806 patent because Micron's products are not now and were not at the relevant time sealed with a resin, as required by the asserted claim.  Ex. 25 (claim 1); Steph. Decl., ¶6.  Katana/Longhorn have not, and presumably cannot, show that they tested before suing to confirm the composition of the accused products consistent with at least §48-1703(2)(i).

Likewise, Katana also cannot in good faith suggest that Micron ever infringed claim 1 of the '879 patent because step (d) of the asserted claim does not make sense and is not infringed by Micron.  As discussed above, step (d)—like step (a)—requires that two separate circuits be formed on "a front surface of the first wafer."  Ex. 26 (claim 1).  But Katana maps steps (a) and (d) to the two totally different structures, rather than alleging (much less showing) that there are two circuits formed on a first wafer in Micron's accused products.  Assertion of this claim is inconsistent with the requirements of at least §48-1703(2)(f) (subjective and objective portions), and the meaning of the asserted claim should not simply be written off as another "typo."

Longhorn's allegations for the '013 patent are similarly meritless, including because the alleged electrically **connected** "wiring pattern" and electrically **unconnected** "support pattern" are said to be the same thing, even though this theory directly contradicts the relevant claim language. Ex. 28 (claim 11, relevant portion quoted above).  Just as a single car cannot be both driving and parked at the same time, a single accused "pattern" cannot be both electrically connected and electrically unconnected at the same time.  These are mutually exclusive—yet Katana ignores this distinction in contravention of both the objective and subjective portions of at least §48-1703(2)(f).

**Fourth**, Micron repeatedly **told** Longhorn of the weakness of its patents and allegations on multiple occasions.  Exs. 29-30; West. Dec., ¶¶13-14.  Micron also met with Longhorn representatives in a good-faith effort to discuss Longhorn's allegations.  *Id.*  Nevertheless, on March 4, 2022, more than three years after these communications and meetings, and after the '806, '879, and '013 patents had long since expired, Longhorn (through Katana) sued in Texas.  Ex. 1.

Longhorn simply ignored Micron's explanations.  A reasonable actor would have investigated and dropped claims when presented with clear evidence of weakness.  Longhorn instead charged ahead, in contravention of at least §§48-1703(2)(f) (objective and subjective portions) and (i).

For at least these reasons, Longhorn's claims are not made in good faith.  A reasonable actor in Longhorn's shoes would or should know that Longhorn's claims are baseless.

**E.      A Bond Of $15 Million Is Appropriate And Necessary**

There is a reasonable likelihood that Micron will succeed on its claim that Longhorn has acted in bad faith in violation of Idaho Code §48-1703.  Longhorn therefore must "post a bond in an amount equal to a good faith estimate of [Micron's] costs to litigate the claim and ***amounts reasonably likely to be recovered under this chapter***."  *Id.*, §48-1707 (emphasis added).  §48-1706 defines the damages available for violation of the Idaho statute, including:  "[c]osts and fees, including reasonable attorney's fees;" ***and*** "[e]xemplary damages in an amount equal to … three (3) times the total of damages, costs and fees."

The American Intellectual Property Law Association publishes a highly-regarded, data-driven report every year regarding the cost to defend patent suits.  This report includes data for patent suits filed by NPEs.  Ex. 34, at 13-17, 22-33.  It estimates average litigation costs pre- to post-trial and including appeal (if applicable) at $4,558,000 for a ***one-patent*** case where $25 million is at stake.  *Id*. at 17; *see also id*. at 7 ("Respondents were further instructed to estimate [costs] based on a ***single IP asset, such as one patent at issue***.") (emphasis added).  Costs are slightly less when less damages are sought (*e.g.*, $2.2 million for a one-patent case where $1 million to $10 million is sought, *id.* at 17); *see also id.* at 20 (estimating IPR costs); Ex. 35 (similar).

This case involves ***three*** patents ***and*** IPRs (to be filed).  Longhorn's damages demand (one factor relevant total defense costs) is not yet known, but Longhorn's historically low settlement asks do not correlate with its historically high damages demands.  Against this backdrop, $3.75 million is a conservative estimate of Micron's defense costs through trial.  West. Dec., ¶18.

Micron respectfully requests that the bond be set at $15 million—*i.e.*, an approximation of anticipated defense costs, plus treble damages ($3.75M x 3 = $11.25M), pursuant to §48-1707.

DATED:  July 21, 2022     **PERKINS COIE LLP**

By:*/s/: Daniel Graham*_____
  David Krueck, Bar No. 6246
  DKrueck@perkinscoie.com
  Daniel Graham, Bar No. 11506
  DGraham@perkinscoie.com
  1111 West Jefferson Street, Suite 500
  Boise, Idaho 83702-5391

  Amanda Tessar, *pro hac vice pending*
  ATessar@perkinscoie.com
  Perkins Coie LLP
  1900 Sixteenth Street, Suite 1400
  Denver, Colorado 80202

  **ATTORNEYS FOR PLAINTIFFS, MICRON
  TECHNOLOGY, INC., MICRON
  SEMICONDUCTOR PRODUCTS, INC., &
  MICRON TECHNOLOGY TEXAS, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 21st day of July, 2022, I electronically filed the foregoing with the U.S. District Court. Notice will automatically be electronically mailed or served via email to the following individuals who are registered with the U.S. District Court CM/ECF System, and sealed materials will be served by counsel directly via email on the following counsel of record:

Keely E. Duke - ked@dukevett.com

Mallam J. Prior - mjp@dukeevett.com

Scott W. Breedlove - sbreedlove@carterarnett.com

Nathan Cox - ncox@carterarnett.com

*/s/: Daniel Graham* _____

MICRON MEMORANDUM
ISO MOTION FOR BOND

**Appx408**

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

MICRON TECHNOLOGY, INC., MICRON
SEMICONDUCTOR PRODUCTS, INC., and
MICRON TECHNOLOGY TEXAS, LLC.,

        *Plaintiffs*,

vs.

LONGHORN IP, LLC

        *Defendant*.

No. 1:22-cv-00273-DCN

DECLARATION OF DAVID
WESTERGARD IN SUPPORT OF
MICRON'S MOTION FOR BOND
PURSUANT TO IDAHO CODE
§ 48-1707

I, David Westergard, declare as follows:

1.      I am over 18 years of age and am competent to make this declaration. If called to testify as a witness, I could and would testify truthfully under oath to each of the statements in this declaration. I make each statement below based either on my personal knowledge or, after investigation, based on information and belief.

2.      I am a current employee of Micron Technology, Inc. I collectively refer to Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC here as "Micron," unless the context dictates otherwise or there is a reason here to distinguish between the entities.

3.      I joined Micron approximately twenty-seven years ago, in March 1995. Since then, I have served in many roles, including Chief Counsel, Patent Litigation & Licensing, as well as Director, Patent Licensing & European Litigation. I am currently Senior Director,

Licensing & Litigation.  Among other responsibilities, I oversee Micron's patent litigation matters, including oftentimes litigations and assertions by non-practicing entities.

4.      I hold a Bachelor's Degree in Civil Engineering and a Juris Doctor from Brigham Young University.

5.      Micron is, in my opinion and by many objective measures, Idaho's most successful technology company.  Micron was founded in 1978 as a four-person company in the basement of a Boise dental office.  By 1980, Micron had broken ground on its first fabrication plant and then, just a few years later, Micron introduced the world's smallest 256K DRAM memory product.  In 1994, Micron earned a spot in the Fortune 500 and steadily grew into a world leader for computer memory products.  Micron's products are used in everything from cars to appliances to servers to computers.

6.      More than 45,000 Micron employees across seventeen countries (including more than 6,000 employees in Idaho) contribute to Micron's success.  Micron devotes more than $2.5 billion per year to research and development.  Micron has obtained one of the world's largest patent portfolios over several decades: over 50,000 patents worldwide (approximately 20,000 of which are currently active).  Micron understands that a strong patent system that protects innovators is a critical feature of strong economies, and Micron respects legitimate intellectual property rights.  Indeed, part of my job is to ensure that Micron does so.

7.      Longhorn IP, LLC ("Longhorn"), through Lone Star Silicon Solutions, LLC ("Lone Star"), filed an infringement suit against Micron in the Eastern District of Texas in 2016.  Micron achieved success in the Lone Star litigation, particularly in *inter partes* review ("IPR") proceedings.  Longhorn threatened to file appeals, however, and even did file one.  Longhorn

WESTERGARD DECLARATION IN
SUPPORT OF MOTION FOR BOND

coupled its threats with a less-than-nuisance-value settlement offer.  Faced with this offer,
Micron paid Lone Star a small settlement amount in 2019 to make Longhorn go away.

8.      In August 2018, Katana Silicon Technologies, LLC ("Katana") sent Micron a
letter asserting that Micron infringes two of Katana's patents.  Although the letter facially came
from Katana, I understood then and understand now that Katana is controlled by Longhorn
and/or the principal behind Longhorn.

9.      In its August 2018 demand letter, Longhorn did not provide claim charts or other
documents explaining its infringement theory for the two asserted patents, nor did it offer to do
so.  In the patent world, such claim charts are the standard way that parties explain their
infringement theories and allow companies to assess the strength of a patentee's infringement
claim.

10.     After the August 2018 demand letter, Longhorn (through Katana) then sent
another letter to Micron on September 18, 2018.  As with its first letter, Longhorn did not
provide claim charts or proof of infringement with this letter.

11.     On October 4, 2018, Longhorn (or Katana) requested a meeting with Micron "to
discuss the Longhorn portfolios."  As before, Longhorn still did not provide Micron with claim
charts or proof of infringement for any of the '013, '806, or '879 patents.

12.     Micron hosted Longhorn and its attorneys at Micron's Boise campus on
November 14, 2018 to discuss Longhorn's allegations relating to the Katana portfolio.  The
founder and CEO of Longhorn, Mr. Fekih-Romdhane, traveled to Idaho to attend this November
2018 meeting on behalf of Longhorn, Lone Star, and Katana, along with outside counsel for
Lone Star and Katana.

13.     Shortly before that meeting, Longhorn finally sent Micron claim charts for the

WESTERGARD DECLARATION IN
                                              SUPPORT OF MOTION FOR BOND

**Appx411**

three asserted patents, and Longhorn and Katana presented these claim charts at the meeting.

14.     At the meeting, Micron explained some of the many reasons that Longhorn's assertions of the Katana patents are meritless.  Longhorn, for its part, demanded the payment of license fees or a settlement.  Moreover, Longhorn explained that the amount sought would increase as time passed because Longhorn/Katana was only just beginning its enforcement campaign.  Longhorn referred to this approach as offering Micron an "early bird" special.

15.     Longhorn continued to press for payment on the Katana patents during 2019 and 2020.  But Micron heard nothing from Longhorn about the Katana patents between October of 2020 and March of 2022.

16.     In addition to its threats regarding its Katana portfolio, Longhorn has made threats regarding other portfolios it has owned and/or continues to own.  On November 20, 2018, after the in-person meeting in Boise, Longhorn sent a follow-up email from Mr. Fekih-Romdhane, where he stated that it might be "helpful" for Micron to also look at patents from the portfolio of another Longhorn portfolio entity, Carthage Silicon Innovations, LLC.  Although phrased under the guise of being "helpful," I understood this as a further threat.

17.     Further, Longhorn has now made similar threats regarding two of its other portfolios—the Hamilcar and Trenchant Blade portfolios—which it has said may be "of interest" to Micron, in the context of demanding payments from Micron for the Katana portfolio.

18.     Based on my experience in supervising large, complex patent litigations, as well as associated IPRs and related follow-on litigations like this Idaho suit, I believe that $3.75 million is a very conservative approximation of the likely costs of litigating issues relating to "Katana's" (i.e., Longhorn's) three asserted patents through trial, and to a final written decision from the PTAB in connection with the three IPR proceedings.

WESTERGARD DECLARATION IN
                                                SUPPORT OF MOTION FOR BOND

I declare under penalty of perjury that the foregoing is true and correct.


Executed on July 20, 2022.

W. David Westergard

Westergard Declaration in
                                        Support of Motion for Bond

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., and MICRON TECHNOLOGY TEXAS, LLC., | No. 1:22-cv-00273 DCN |
| *Plaintiffs*, | |
| vs. | DECLARATION OF WILLIAM RODNEY STEPHENSON IN SUPPORT OF MICRON'S MOTION FOR BOND PURSUANT TO IDAHO CODE § 48-1707 |
| LONGHORN IP, LLC | |
| *Defendant*. | |

I, William Rodney Stephenson, declare as follows:

1.      I am over 18 years of age and competent to make this declaration.  If called to testify as a witness, I could and would testify truthfully under oath to each of the statements in this declaration.  I make each statement below based on my personal knowledge or after investigation of the relevant information.

2.      I am a current employee of Micron Technology, Inc.  I collectively refer to Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC here as "Micron," unless the context dictates otherwise or there is a reason here to distinguish between the entities.

3.      I joined Micron approximately 26 years ago.  Since then, I have served in many roles, among others as Package Product Engineer and Package Design Manager. I am currently Senior Manager of Package Design at Micron.  Among other responsibilities, I oversee package road mapping, package design, and package design quality.

DECLARATION ISO MICRON'S
MOTION FOR BOND

4.      I am the co-inventor listed on 14 issued US patents, most of them directed at packaging encapsulants.

5.      I understand that Longhorn IP, LLC (through Katana Silicon Technologies, LLC) has accused the following Micron products of infringement: LPDDR4 SDRAM MT53D768M64D4SQ-046 WT A 2019, MT53E512M32D2NP, RLDRAM 3 MT44K32M36RCT-125, DRAM LPDDR4 12G 384MX32 FBGA XT DDP, MT53E384M32D2DS-053, FLASH - NAND Memory IC 128Gb (16G x 8) MMC 100-TBGA MTFC16GAKAENA-4M_IT TR, LPDDR4X, MT53D512M64D4NZ-046 WT E, 32L 3D NAND Flash memory, MT29F768G08EEHBBJ4, LPDDR4 SDRAM MT53E256M64D4NZ-053 WT B DRAM Memory Device, MT29VZZZCDAFQKWL-046 W.G0L Multichip Memory Device, LPDDR5 MT62F1536M64D8CH-031 WT A DRAM Memory Device, LPDDR4 SDRAM MT53D512M64D4DG-046 XT F DRAM Memory Device, MT29F2T08GELBEJ4 B NAND Flash Memory Device, LPDDR4X MT53E1G32D4NQ-046 WT E SDRAM Memory Device, MT29VZZZAD8DQKSL-046_W.9K8 mixed NAND and LPDDR4 DRAM Memory Device, and MT29F768G08EEHBBJ4 32L 3D NAND Flash memory.

6.      These accused products are not now and were not during the past six years sealed with a resin. Instead, they are sealed using thermoplastic encapsulants. It is possible to reverse engineer and test any of the accused Micron products to confirm that they are sealed with thermoplastic encapsulants.

DECLARATION ISO MICRON'S
MOTION FOR BOND

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 19, 2022.

William Rodney Stephenson

DECLARATION ISO MICRON'S
MOTION FOR BOND

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., and MICRON TECHNOLOGY TEXAS, LLC.,<br><br>*Plaintiffs*,<br><br>vs.<br><br><br><br>LONGHORN IP, LLC<br><br>*Defendant*. | No. 1:22-cv-00273-DCN<br><br><br>DECLARATION OF DANIEL GRAHAM IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR BOND PURSUANT TO IDAHO CODE §48-1707 |

1

I, Daniel Graham, declare as follows:

1.      I am over 18 years of age and competent to make this declaration.  If called to testify as a witness, I could and would testify truthfully under oath to each of the statements in this declaration.  I make each statement below based on my personal knowledge or after investigation of the relevant information.

2.      I am an attorney at Perkins Coie LLP, counsel of record for Plaintiffs Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC ("Defendants" or "Micron").  I am licensed to practice law in the States of Idaho and Colorado.

3.      I make this Declaration in support of Micron's Memorandum in Support of Their Motion for Bond Pursuant to Idaho Code §48-1707.

4.      Attached hereto as Exhibit 1 is a true and correct copy of Katana Silicon Technologies LLC's ("Katana") Complaint for Patent Infringement filed in the Western District of Texas, Austin Division, dated March 4, 2022.

5.      Attached hereto as Exhibit 2 is a true and correct copy of a timeline titled "A Long-Term Innovation Path" from Micron's website, from https://www.micron.com/about/our-company/timeline (last visited July 16, 2022).

6.      Attached hereto as Exhibit 3 is a true and correct copy of an excerpt from Micron's Form 10-K for the fiscal year ended September 2, 2021.  For the Court's convenience, Micron's counsel has highlighted the $2.663 billion figure that Micron reports having spent on R&D in 2021.

7.      Attached hereto as Exhibit 4 is a true and correct copy of a press release titled "Micron Marks 50,000 Patents Milestone," dated May 11, 2022.

GRAHAM DECLARATION
IN SUPPORT OF MOTION FOR BOND

8.      Attached hereto as Exhibit 5 is a true and correct copy of the home page of

Longhorn IP's website at https://www.longhornip.com/ (last visited July 5, 2022).

9.      Attached hereto as Exhibit 6 is a true and correct copy of the "Portfolios" page of

Longhorn IP's website at https://www.longhornip.com/portfolios (last visited July 5, 2022).

10.     Attached hereto as Exhibit 7 are true and correct copies of the following entity

documents:

- Katana's Certificate of Formation, as filed with the Texas Secretary of State, dated May 14, 2018;

- Katana's Certificate of Amendment, as filed with the Texas Secretary of State, dated March 11, 2019;

- Katana's Certificate of Amendment, as filed with the Texas Secretary of State, dated December 9, 2019;

- Longhorn IP, LLC's ("Longhorn") Certificate of Formation, as filed with the Texas Secretary of State identifying Khaled Fekih-Romdhane as the Registered Agent and Managing Member of Longhorn, dated April 10, 2016;

- Longhorn's Texas Franchise Tax Public Information Report, dated May 3, 2021;

- Tanit Ventures Inc.'s ("Tanit") Certificate of Formation, identifying Khaled Fekih-Romdhane as Tanit's Registered Agent, Director, and Organizer, dated May 9, 2016;

- Tanit's Certificate of Amendment, dated March 18, 2019;

- Carthage Silicon Innovations LLC's ("Carthage") Certificate of Formation, dated May 21, 2018;

- Carthage's Certificate of Amendment, dated March 11, 2019;

- Carthage's Certificate of Amendment, dated December 9, 2019;

- Dido Wireless Innovations LLC's ("Dido") Certificate of Formation, dated March 1, 2022;

- Hamilcar Barca IP LLC's ("Hamilcar") Certificate of Formation, dated November 24, 2021;

- Hannibal IP LLC's ("Hannibal") Certificate of Formation, dated April 20, 2021;

- L2 Mobile Technologies LLC's ("L2") Certificate of Formation, dated December 7, 2016;

GRAHAM DECLARATION
IN SUPPORT OF MOTION FOR BOND

- L2's Statement of Change of Registered Agent, dated August 3, 2021;

- L2's Acceptance of Appointment and Consent to Serve as Registered Agent, dated July 29, 2021;

- Lone Star Silicon Innovations LLC's ("Lone Star") Certificate of Formation, dated July 7, 2016;

- Nordic Interactive Technologies LLC's ("Nordic") Certificate of Formation, dated April 19, 2018;

- Nordic's Certificate of Amendment, dated March 11, 2019;

- Nordic's Certificate of Amendment, dated December 9, 2019;

- Nyckel UI Technologies LLC's ("Nyckel") Certificate of Formation, dated January 4, 2019;

- Nyckel's Certificate of Amendment, dated March 11, 2019;

- Nyckel's Certificate of Amendment, dated December 9, 2019;

- Nyckel's Statement of Change of Address of Registered Agent, dated August 3, 2021;

- Nyckels' Acceptance of Appointment and Consent to Serve as Registered Agent, dated July 29, 2021;

- Ox Mobile Technologies LLC's ("Ox Mobile") Certificate of Formation, dated December 15, 2016;

- Ox Mobile's Texas Franchise Tax Public Information Report, dated May 10, 2021;

- Taijitu Ventures Inc.'s ("Taijitu") Certificate of Formation, dated May 9, 2016;

- Taijitu's Certificate of Amendment, dated November 22, 2019;

- Taijitu's Statement of Change of Address of Registered Agent, dated July 8, 2019;

- Taijitu's Statement of Change of Address of Registered Agent, dated February 20, 2019;

- Trenchant Blade Technologies LLC's ("Tenchant") Certificate of Formation, dated January 8, 2020;

- Trenchant's Texas Franchise Tax Public Information Report, dated May 1, 2021;

- Denton County, Texas CAD sheet showing that 5204 Bluewater Driver, Frisco, Texas 75036 is a residence owned by Khaled Fekih-Romdhane.

GRAHAM DECLARATION
IN SUPPORT OF MOTION FOR BOND

For the Court's convenience, Micron's counsel has highlighted some of the pertinent information in these documents.

11.      Attached hereto as Exhibit 8 is a true and correct copy of an article titled "Move Over Marshall, There's a New Sherriff in Town—The Rise of Waco and the Western District of Texas" by Ronald S. Lemieux and Steven M. Auvil, National Law Review, Volume XI, Number 87, from https://www.natlawreview.com/article/move-over-marshall-there-s-new-sheriff-town-rise-waco-and-western-district-texas (last visited July 16, 2022.

12.      Attached hereto as Exhibit 9 is a true and correct copy of an article titled "Guest Post: How it Started…How It's Going: Venue Transfers in the Western District of Texas," by Jason Rantanen, PATENTLYO, dated October 28, 2021, from https://patentlyo.com/patent/2021/10/startedhow-transfers-district.html (last visited June 30, 2022).

13.      Attached hereto as Exhibit 10 is a true and correct copy of an article titled "Judge Gilstrap Keeps Eastern District's Tight Ship Afloat," by Jess Krochtengel, Law 360, dated March 6, 2015, from https://www.law360.com/articles/628732/print?section=ip (last visited June 30, 2022).

14.      Attached hereto as Exhibit 11 is a true and correct copy of a report from LexMachina titled All Court Case Filings by Year, Patent Cases Filed by Year" for the past ten years, from https://law.lexmachina.com/court/table?case_type=27. For the Court's convenience, Micron's counsel has highlighted some of the pertinent information in this document.

15.      Attached hereto as Exhibit 12 is a true and correct copy of a letter from United States Senators Thom Tillis and Patrick Leahy to The Honorable Chief Justice John Roberts of

GRAHAM DECLARATION
IN SUPPORT OF MOTION FOR BOND

the United States Supreme Court regarding issues with forum shopping in patent litigation, dated November 2, 2021.

16.    Attached hereto as Exhibit 13 is a true and correct copy of Lone Star Silicon Innovations LLC's ("Lone Star") Complaint for Patent Infringement filed against Micron in the Eastern District of Texas, Marshall Division, on October 7, 2016.

17.    Attached hereto as Exhibit 14 is a true and correct copy of United States Magistrate Judge Roy S. Payne's Order Granting Micron's Motion to Transfer from the Eastern District of Texas to the Northern District of California in Case No. 2:16-cv-01116-JRG-RSP, dated August 24, 2017.

18.    Attached hereto as Exhibit 15 is a true and correct copy of District Judge William Alsup's Order Granting Motions to Dismiss Lone Star's patent infringement action for lack of standing in the Northern District of California, in Case No. 17-05458 WHA, dated January 20, 2018.

19.    Attached hereto as Exhibit 16 is a true and correct copy of the Patent Trial and Appeal Board's Decision Granting Motion for Adverse Judgment pursuant to 37 C.F.R. § 42.73 in Case No. IPR2017-01565, regarding United States Patent No. 6,326,231, dated June 25, 2018 (Paper No. 15).

20.    Attached hereto as Exhibit 17 is a true and correct copy of the Patent Trial and Appeal Board's Decision Granting Motion for Adverse Judgment pursuant to 37 C.F.R. § 42.73 in Case No. IPR2017-01630, regarding United States Patent No. 5,872,038, dated June 25, 2018 (Paper No. 13).

21.    Attached hereto as Exhibit 18 is a true and correct copy of the Patent Trial and Appeal Board's Final Written Decision pursuant to 35 U.S.C. § 318 and 37 C.F.R. § 42.73 in

GRAHAM DECLARATION
IN SUPPORT OF MOTION FOR BOND

Case No. IPR2017-01561, regarding United States Patent No. 5,912,188, dated December 12, 2018 (Paper No. 34).

22.    Attached hereto as Exhibit 19 is a true and correct copy of the Patent Trial and Appeal Board's Final Written Decision pursuant to 35 U.S.C. § 318 and 37 C.F.R. § 42.73 in Case No. IPR2017-01560, regarding United States Patent No. 5,912,188, dated December 12, 2018 (Paper No. 41).

23.    Attached hereto as Exhibit 20 is a true and correct copy of the Patent Trial and Appeal Board's Final Written Decision Determining that Claims 1, 3-6, 11 and 13-16 Are Proven Unpatentable pursuant to 35 U.S.C. § 318(a) in Case No. IPR2017-01562, regarding United States Patent No. 6,097,061, dated December 13, 2018 (Paper No. 30).

24.    Attached hereto as Exhibit 21 is a true and correct copy of the Patent Trial and Appeal Board's Final Written Decision Finding Claims 1-5, 8-12, and 15 Unpatentable pursuant to 35 U.S.C. § 318(a) in Case No. IPR2017-01563, regarding United States Patent No. 6,103,611, dated December 17, 2018 (Paper No. 29).

25.    Attached hereto as Exhibit 22 is a true and correct copy of the Patent Trial and Appeal Board's Final Written Decision pursuant to 35 U.S.C. § 318 and 37 C.F.R. § 42.73 in Case No. IPR2017-01566, regarding United States Patent No. 6,388,330, dated January 14, 2019 (Paper No. 24).

26.    Attached hereto as Exhibit 23 is a true and correct copy of the Patent Trial and Appeal Board's Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 in Case No. IPR2017-01597, regarding United States Patent No. 6,023,085, dated January 16, 2019 (Paper No. 26).

GRAHAM DECLARATION
IN SUPPORT OF MOTION FOR BOND

27.     Attached hereto as Exhibit 24 is a true and correct copy of a letter from Jason Wejnert of SpencePC to Micron's former General Counsel, Joel L. Poppen, dated August 22, 2018.

28.     Attached hereto as Exhibit 25 is a true and correct copy of United States Patent No. RE38,806, issued to Fukui, et al. on October 4, 2005.  For the Court's convenience, Micron's counsel has highlighted the application date on the cover page of this document.

29.     Attached hereto as Exhibit 26 is a true and correct copy of United States Patent No. 6,352,879, issued to Fukui, et al. on March 5, 2002.  For the Court's convenience, Micron's counsel has highlighted in the application date on the cover page of this document.

30.     Attached hereto as Exhibit 27 is a true and correct copy of a letter from Jason Wejnert of SpencePC to Micron's former General Counsel, Joel L. Poppen, dated September 18, 2018.

31.     Attached hereto as Exhibit 28 is a true and correct copy of United States Patent No. 6,731,013, issued to Juso, et al. on May 4, 2004.  For the Court's convenience, Micron's counsel has highlighted in the application date on the cover page of this document.

32.     Attached hereto as Exhibit 29 is a true and correct copy of an email thread with the topmost email from Jason Wejnert to David Westergard, sent October 19, 2018.  For the Court's convenience, Micron's counsel has highlighted some of the pertinent information in the document.  Micron has also omitted the attachment to this exhibit.

33.     Attached hereto as Exhibit 30 is a true and correct copy of an email thread with the topmost email from David Westegard to William Cory Spence of SpencePC, sent February 4, 2019.

34.     Attached hereto as Exhibit 31 is a true and correct copy of an email thread with the topmost email from Khaled Fekih-Romdhane to David Westegard, sent November 20, 2018.

35.     Attached hereto as Exhibit 32 is a true and correct copy of Katana's Response in Non-Opposition to Micron's Motion to Transfer, filed in Case No. 1:22-cv-00214-LY, in the Western District of Texas, Austin Division, dated July 6, 2022.

36.     Attached hereto as Exhibit 33 are true and correct copies of excerpts from 5A Chisum on Patents § 18.03.  For the Court's convenience, Micron's counsel has highlighted the portions of this document referenced in its Memorandum.

37.     Attached hereto as Exhibit 34 are true and correct copies of excerpts from the American Intellectual Property Law Association's 2021 Report of the Economic Survey.

38.     Attached hereto as Exhibit 35 is a true and correct copy of an article titled "IPRs: Balancing Effectiveness vs. Cost," RPX Rational Patent, dated June 17, 2016, from https://www.rpxcorp.com/intelligence/blog/iprs-balancing-effectiveness-vs-cost/ (last visited July 20, 2022).

39.     Attached hereto as Exhibit 36 is a true and correct copy of Settlement and Patent License Agreement between Lone Star and Micron, dated March 4, 2019.  This exhibit is being filed under seal.  For the Court's convenience, Micron's counsel has highlighted the monetary amount found in section 4.1 of this document.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 20, 2022 in Honolulu, Hawaii.

Daniel Graham

GRAHAM DECLARATION
IN SUPPORT OF MOTION FOR BOND

# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

KATANA SILICON TECHNOLOGIES
LLC,

   Plaintiff,

v.

MICRON TECHNOLOGY, INC.;
MICRON SEMICONDUCTOR
PRODUCTS, INC.; and
MICRON TECHNOLOGY TEXAS,
LLC,

   Defendants.

Case No. 1:22-cv-00214

JURY TRIAL DEMANDED

COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Katana Silicon Technologies LLC ("Katana"), by and through its attorneys, for its Complaint against Defendants Micron Technology, Inc; Micron Semiconductor Products, Inc.; and Micron Technology Texas, LLC (collectively "Defendants" or "Micron"), and demanding trial by jury, hereby alleges, on information and belief regarding the actions of Micron and on knowledge with regard to its own actions, as follows:

## I.  NATURE OF THE ACTION

1.  This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 271, *et seq.*, to obtain damages resulting from Defendants' unauthorized use, sale, and offer to sell in the United States, of products, methods, processes, services and/or systems that infringed Plaintiff's United States patents, as described herein.

# EXHIBIT 2



About    Our Company    Timeline

# Timeline

## A Long-Term Innovation Path

Micron began in 1978 as a four-person semiconductor design company in the basement of a Boise, Idaho, dental office. By 1980 we had broken ground on our first fabrication plant, and then just a few years later we introduced the world's smallest 256K DRAM. In 1994, we earned a spot on the Fortune 500 and steadily grew into an industry leader through our technology innovations, key partnerships, and strategic acquisitions around the world. Check out the milestones that have made us who we are today.

### 2021

- Micron Delivers Industry's First 1α DRAM Technology
- Micron Launches Low-Power Memory Qualified for Automotive Safety Applications

### 2020

- Micron Allocates $50 Million to Support Community Development for Underrepresented Groups

- Micron Dedicates $35 Million to Support Global Communities and Provide Financial Relief for Those Affected by the COVID-19 Pandemic



2019

- Forbes places Micron on its list of Best Employers for Diversity

- Micron acquires FWDNXT

- Micron establishes its Center of Excellence for Advanced Technology DRAM Center in Hiroshima, Japan

2018

- Micron receives its first Great Place to Work® certification

- Micron celebrates 40th anniversary: 40 Years Strong, Getting Stronger

- Micron announces $1M grant to advance curiosity in Artificial Intelligence

- Micron establishes its Center of Excellence for Long-Lifecycle Products in Manassas, Virginia

2017

- Micron establishes its Center of Excellence for High-Volume DRAM in Taiwan.

- Micron establishes Technology Innovation Center of Excellence in Boise

- Micron named a Top 100 Innovator in Diversity & Inclusion by Mogul



- Micron acquires Inotera Memories

- Micron named one of the most popular Fortune 500 companies to work for based on employee input

- Micron establishes its Center of Excellence for NAND in Singapore

2015

- Micron ranked #1 in Top 50 Employers by Electronic Design magazine

- Micron acquires Tidal Systems

- Micron acquires Convey Computer

- Micron acquires Pico Computing

2013

- Micron acquires Elpida Memory Inc. and Rexchip Electronics Corporation

2010

- Micron acquires NOR manufacturer Numonyx B.V. from Intel, STMicroelectronics, N.V. and Francisco Partners

2008



2006

- Micron acquires Lexar Media

2005

- Micron and Intel form a NAND joint venture IM Flash Technologies

2004

- Micron ships first 2-gigabit NAND flash product

2002

- Micron demonstrates world's first 1-gigabit DDR DRAM product

- Micron acquires Toshiba's commodity DRAM operations at Dominion Semiconductor, LLC, a subsidiary of Toshiba Corporation of Japan, located in Manassas, Virginia

1999

- The Micron Foundation is established to advance STEM education and support communities.

1998



memory operations

1996

- Crucial Technology is created to market and sell memory upgrades to end-users

1994

- Micron is named a Fortune 500 company for first time at #402

1987

- Micron introduces 1-megabit DRAM product

1984

- Micron introduces world's smallest 256K DRAM product

- Micron becomes a publicly traded company on NASDAQ

1981

- First 64K DRAM product is shipped

1980

- Micron breaks ground on first fabrication site in Boise, Idaho



- Micron Technology Inc., is founded on Oct. 5, 1978

Products

Solutions

Support

Insight

About

Sales          Support

Contact

Legal

Privacy

Suppliers

Careers

Do Not Sell or Share My Personal Information

Exercise My Rights

# EXHIBIT 3

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.  20549

# FORM 10-K

(Mark One)

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended September 2, 2021**

OR

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**
**Commission file number 1-10658**

# Micron Technology, Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **75-1618004** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| **8000 S. Federal Way, Boise, Idaho** | **83716-9632** |
| (Address of principal executive offices) | (Zip Code) |
| Registrant's telephone number, including area code | (208) 368-4000 |

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.10 per share | MU | Nasdaq Global Select Market |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.     Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.     Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).     Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large Accelerated Filer | Accelerated Filer | Non-Accelerated Filer | Smaller Reporting Company | Emerging Growth Company |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.     ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.     ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).     Yes ☐   No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates was $79.9 billion based on the closing price reported on the Nasdaq Global Select Market on March 4, 2021. Shares of common stock held by each executive officer and director and by each person who owns 5% or more of the outstanding common stock were excluded as they may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

The number of outstanding shares of the registrant's common stock as of October 1, 2021 was 1,118,623,738.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Proxy Statement for the registrant's Fiscal 2021 Annual Meeting of Shareholders to be held on January 13, 2022 are incorporated by reference into Part II and Part III of this Annual Report on Form 10-K.

The performance graph above assumes $100 was invested on August 31, 2016 in common stock of Micron Technology, Inc., the S&P 500 Composite Index, and the Philadelphia Semiconductor Index (SOX). Any dividends paid during the period presented were assumed to be reinvested. The performance was plotted using the following data:

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| Micron Technology, Inc. | $ 100 | $ 194 | $ 318 | $ 275 | $ 276 | $ 447 |
| S&P 500 Composite Index | 100 | 116 | 139 | 143 | 174 | 229 |
| Philadelphia Semiconductor Index (SOX) | 100 | 141 | 181 | 198 | 303 | 464 |

## ITEM 6. [RESERVED]

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*This discussion should be read in conjunction with the consolidated financial statements and accompanying notes for the year ended September 2, 2021. All period references are to our fiscal periods unless otherwise indicated. Our fiscal year is the 52 or 53-week period ending on the Thursday closest to August 31. Fiscal 2021 contained 52 weeks, fiscal 2020 contained 53 weeks, and fiscal 2019 contained 52 weeks. Our fourth quarter of fiscal 2020 contained 14 weeks and all other fiscal quarters in the years presented contained 13 weeks. All tabular dollar amounts are in millions, except per share amounts.*

For an overview of our business and certain related trends, see "Part I – Item 1. Business – Overview."

# Results of Operations

## Consolidated Results

| For the year ended | 2021 | | 2020 | | 2019 | |
|---|---|---|---|---|---|---|
| Revenue | $ 27,705 | 100 % | $ 21,435 | 100 % | $ 23,406 | 100 % |
| Cost of goods sold | 17,282 | 62 % | 14,883 | 69 % | 12,704 | 54 % |
| Gross margin | 10,423 | 38 % | 6,552 | 31 % | 10,702 | 46 % |
| | | | | | | |
| Research and development | 2,663 | 10 % | 2,600 | 12 % | 2,441 | 10 % |
| Selling, general, and administrative | 894 | 3 % | 881 | 4 % | 836 | 4 % |
| Restructure and asset impairments | 488 | 2 % | 60 | — % | (29) | — % |
| Other operating (income) expense, net | 95 | — % | 8 | — % | 78 | — % |
| Operating income | 6,283 | 23 % | 3,003 | 14 % | 7,376 | 32 % |
| | | | | | | |
| Interest income (expense), net | (146) | (1)% | (80) | — % | 77 | — % |
| Other non-operating income (expense), net | 81 | — % | 60 | — % | (405) | (2)% |
| Income tax (provision) benefit | (394) | (1)% | (280) | (1)% | (693) | (3)% |
| Equity in net income (loss) of equity method investees | 37 | — % | 7 | — % | 3 | — % |
| Net income attributable to noncontrolling interests | — | — % | (23) | — % | (45) | — % |
| Net income attributable to Micron | $ 5,861 | 21 % | $ 2,687 | 13 % | $ 6,313 | 27 % |

***Total Revenue***: Total revenue for 2021 increased 29% as compared to 2020 primarily due to increases in DRAM and NAND sales. Sales of DRAM products for 2021 increased 38% as compared to 2020 primarily due to growth in

# EXHIBIT 4



## Micron Marks 50,000 Patents Milestone

May 11, 2022

**Technology innovation and leadership remain the cornerstone of Micron's continued success after more than four decades**

BOISE, Idaho, May 11, 2022 (GLOBE NEWSWIRE) -- Micron Technology, Inc. (Nasdaq: MU), today announced it has surpassed 50,000 lifetime patents, reinforcing the company's leadership in innovation. Patents play a key role in Micron's technology leadership strategy, from creating the world's smallest 256K DRAM chip in 1984, to delivering the first 1-alpha DRAM shipment in 2021—with thousands of inventions in between. More than 4,000 team members across 16 countries have contributed to this notable accomplishment over the course of Micron's 43-year history.

"Very few companies in any industry have reached this achievement. I want to acknowledge the contributions of all Micron team members, past and present, as this milestone would not have been possible without their innovative ideas that ensure we stay on the cutting edge of technology," said Micron President and CEO Sanjay Mehrotra. "Thanks to their hard work and tenacity, Micron is the world leader in memory and storage solutions."

Micron was founded with the belief that innovation and persistence would drive long term success. This unwavering focus on innovation led Micron to overcome performance barriers and bring better products to market faster than the competition, all while garnering patents on these revolutionary inventions. Micron's 50,000 th patent caps what is widely recognized to be the most valuable memory and storage patent portfolio in the industry.

"With global demand for memory and storage growing rapidly, Micron's customers are counting on us to keep advancing the pace of innovation," said Scott DeBoer, Micron's executive vice president of technology and products. "That pioneering spirit is still very much alive and well at Micron, especially as we pursue the next 50,000 patents that will serve as a foundation for future technological breakthroughs."

As innovation continues to accelerate, so does Micron's patent portfolio. In 2021, nearly 1,500 Micron team members contributed to almost 2,600 Micron patent grants – the most patents issued to Micron in a single year throughout the history of the company. This outstanding performance is due in part to Micron's increasing focus on team member and inventor diversity. For example, the annual number of women who were inventors on Micron's original patent applications was four times greater in 2021 than 2017, furthering the diversity of ideas being represented across Micron's industry-leading advancements.

**Resources:**

- Micron's Patent Legacy

**About Micron Technology, Inc.**

We are an industry leader in innovative memory and storage solutions transforming how the world uses information to enrich life *for all*. With a relentless focus on our customers, technology leadership, and manufacturing and operational excellence, Micron delivers a rich portfolio of high-performance DRAM, NAND and NOR memory and storage products through our Micron® and Crucial® brands. Every day, the innovations that our people create fuel the data economy, enabling advances in artificial intelligence and 5G applications that unleash opportunities — from the data center to the intelligent edge and across the client and mobile user experience. To learn more about Micron Technology, Inc. (Nasdaq: MU), visit micron.com.

*© 2022 Micron Technology, Inc. All rights reserved. Information, products, and/or specifications are subject to change without notice. Micron, the Micron logo, and all other Micron trademarks are the property of Micron Technology, Inc. All other trademarks are the property of their respective owners.*

Micron Media Relations Contact Kelly Sasso Micron Technology, Inc. +1 (208) 340-2410 ksasso@micron.com Micron Investor Relations Contact Farhan Ahmad Micron Technology, Inc. +1 (408) 834-1927 farhanahmad@micron.com

# EXHIBIT 5



Home    Portfolios    News    News Archive    People    Investors    Careers    Contact Us

## Longhorn IP

Longhorn IP is a privately owned IP management and patent portfolio licensing company. Drawing upon the deep experience of its team, Longhorn IP is dedicated to providing best-in-class intellectual property analysis, management, and licensing services to its clients. Longhorn IP provides technology solutions to several world's leading HighTech companies.





Contact

info@longhornip.com

+1-469-268-2567

Follow

 

©2017 BY LONGHORN IP LLC



Appx485

EXHIBIT 6



Home    Portfolios    News    News Archive    People    Investors    Careers    Contact Us



| Portfolios under Management | Technology Areas |
|---|---|
| Katana Silicon Technologies (http://www.longhornip.com/katana-silicon-technologies-llc) | Semiconductor devices manufacturing technology |
| L2 Mobile Technologies (http://www.longhornip.com/l2-mobile-technologies-llc) | 3G/LTE cellular technology |
| Lone Star Silicon Innovations (http://www.longhornip.com/lone-star-silicon-innovations-llc) | Semiconductor devices manufacturing technology |
| Nordic Interactive Technologies (http://www.longhornip.com/nordic-interactive-technologies-llc) | Mobile and video codec technologies |
| Ox Mobile Technologies (http://www.longhornip.com/ox-mobile-technologies-llc) | LTE cellular technology |
| Carthage Silicon Innovations (http://www.longhornip.com/carthage-silicon-innovations-llc) | Memory Technology, CMOS Image Sensor and Semiconductor devices manufacturing Technology |
| Trenchant Blade Technologies (http://www.longhornip.com/trenchant-blade-technologie-llc) | Semiconductor Technology |
| Nyckel UI Technologies (https://www.longhornip.com/nyckel-ui-technologies-llc) | IoT, 5G NR and MTC technologies |

Contact

info@longhornip.com

+1-469-268-2567

Follow

 

**Appx487**

# EXHIBIT 7

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 803015972 05/14/2018
Document #: 813163620002
Image Generated Electronically
for Web Filing**

**Article 1 - Entity Name and Type**

The filing entity being formed is a limited liability company. The name of the entity is:

## Katana Silicon Technologies LLC

**Article 2 – Registered Agent and Registered Office**

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**CHRISTIAN    DUBUC**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**8105 RASOR BLVD STE 210   PLANO  TX  75024**

**Consent of Registered Agent**

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

**Article 3 - Governing Authority**

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: **CHRISTIAN    DUBUC**                                    Title: **Manager**

Address: **300 SOUTH WATTERS RD UNIT 318   ALLEN  TX, USA  75013**

Manager 2: **KHALED    FEKIH-ROMDHANE**                          Title: **Manager**

Address: **5204 BLUEWATER DR   FRISCO  TX, USA  75034**

**Article 4 - Purpose**

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

### Organizer

The name and address of the organizer are set forth below.

**CHRISTIAN DUBUC**      **8105 RASOR BLVD STE 210 PLANO, TX 75024**

### Effectiveness of Filing

☐ A. This document becomes effective when the document is filed by the secretary of state.

### OR

☑ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: **May 15, 2018**

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**CHRISTIAN DUBUC**

Signature of Organizer

**FILING OFFICE COPY**

**Form 424**
**(Revised 01/06)**

Return in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512/463-5709
**Filing Fee: See instructions**

**Certificate of Amendment**

This space reserved for office use.

**F I L E D**
In the Office of the
Secretary of State of Texas

**MAR 1 1 2019**

**Corporations Section**

---

## Entity Information

The name of the filing entity is:

KATANA SILICON TECHNOLOGIES LLC

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation      ☐ Professional Corporation

☐ Nonprofit Corporation      ☐ Professional Limited Liability Company

☐ Cooperative Association      ☐ Professional Association

☒ Limited Liability Company      ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is:  TX/803015972

The date of formation of the entity is:  05/14/2018

---

## Amendments

### 1. Amended Name
(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

---

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

Form 424             6

Registered Agent
(Complete either A or B, but not both. Also complete C.)

☐ A.  The registered agent is an organization (cannot be entity named above) by the name of:

OR

☒ B.  The registered agent is an individual resident of the state whose name is:

CHRISTIAN                              DUBUC
First Name                M.I.       Last Name                              Suffix

C.  The business address of the registered agent and the registered office address is:

5204 BLUEWATER DRIVE                   FRISCO              TX    75034
Street Address (No P.O. Box)           City                State  Zip Code

### 3.  Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below.  If the space provided is insufficient, incorporate the additional text by providing an attachment to this form.  Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☐ **Add** each of the following provisions to the certificate of formation.  The identification or reference of the added provision and the full text are as follows:

☒ **Alter** each of the following provisions of the certificate of formation.  The identification or reference of the altered provision and the full text of the provision as amended are as follows:

The amendment changes the article that states the number of Member and their names and addresses. The Article in the Certificate of Formation is amended to read as follows:

Article VII
TAIJITU VENTURES INC (MEMBER)              TANIT VENTURES INC (MEMBER)
700 CENTRAL EXPRESSWAY S SUITE 400         5204 BLUEWATER DR
ALLEN TX 75013                             FRISCO TX 75034

☒ **Delete** each of the provisions identified below from the certificate of formation.
KHALED FEKIH-ROMDHANE  (Member)           CHRISTIAN DUBUC (Member)
5204 BLUEWATER DR                         506 RIVERSIDE CT
FRISCO TX 75034                           ALLEN TX 75013

### Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the

Form 424                                   7

**Appx493**

Texas Business Organizations Code and by the governing documents of the entity.

| Effectiveness of Filing (Select either A, B, or C.) |
|---|

A. ☒ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

_____

_____

| Execution |
|---|

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date: ___03/08/2019___

Taijitu Ventures inc., Member

Christian Dubuc, President

Signature and title of authorized person(s) (see instructions)

Form 424                                    8

| | |
|---|---|
| **Form 424**<br>**(Revised 05/11)**<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512/463-5709<br>**Filing Fee: See instructions** | This space reserved for office use.<br><br>F I L E D<br>In the Office of the<br>Secretary of State of Texas<br><br>DEC 0 9 2019<br><br>**Corporations Section** |



**Certificate of Amendment**

## Entity Information

The name of the filing entity is:

KATANA SILICON TECHNOLOGIES LLC

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation                    ☐ Professional Corporation

☐ Nonprofit Corporation                    ☐ Professional Limited Liability Company

☐ Cooperative Association                  ☐ Professional Association

☑ Limited Liability Company              ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is: TX/803015972

The date of formation of the entity is: 5/14/2018

## Amendments

### 1. Amended Name

(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

2/09/19 11:17AM Chris Dubuc, Longhorn IP    5124635709 Page 8/16

**Registered Agent**
(Complete either A or B, but not both. Also complete C.)

☐  A.  The registered agent is an organization (cannot be entity named above) by the name of:

_____

OR
☐  B.  The registered agent is an individual resident of the state whose name is:

_____
*First Name*                              *M.I.*              *Last Name*                                  *Suffix*

The person executing this instrument affirms that the person designated as the new registered agent has consented to serve as registered agent.

C.  The business address of the registered agent and the registered office address is:

                                                                                      TX
_____
*Street Address (No P.O. Box)*                          *City*                          *State*    *Zip Code*

### 3.  Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below.  If the space provided is insufficient, incorporate the additional text by providing an attachment to this form.  Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☐ **Add** each of the following provisions to the certificate of formation.  The identification or reference of the added provision and the full text are as follows:

☑ **Alter** each of the following provisions of the certificate of formation.  The identification or reference of the altered provision and the full text of the provision as amended are as follows:
The amendment changes the article that states the number of Member and their names and addresses. The Article in the Certificate of Formation is amended as follows:

Article VII
TANIT VENTURES INC (MEMBER)
5204 BLUEWATER DR
FRISCO TX 75034

☐ **Delete** each of the provisions identified below from the certificate of formation.

## Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

Form 424                                          7

## Effectiveness of Filing (Select either A, B, or C.)

A. ☐ This document becomes effective when the document is filed by the secretary of state.

B. ☑ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: __January 1, 2020__

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

```
[                                                                ]
```

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: __12/04/2019__

By: ==Tanit Ventures inc., Member== _____

*Khaled Fekih Romdhane*
Signature of authorized person

==Khaled Fekih-Romdhane, President==
Printed or typed name of authorized person (see instructions)

Form 424                                8

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 802432859 04/10/2016
Document #: 665127170002
Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

**Longhorn IP LLC**

### Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**Khaled     Fekih Romdhane**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**5204 Bluewater Drive     Frisco  TX  75034**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☐ A. The limited liability company is to be managed by managers.

**OR**

☑ B. The limited liability company will not have managers. Management of the company is reserved to the members. The names and addresses of the governing persons are set forth below:

Managing Member 1: **Khaled     Fekih Romdhane**     Title: **Managing Member**

Address: **5204 Bluewater Drive     Frisco  TX, USA  75034**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

| **Organizer** |
| --- |
| The name and address of the organizer are set forth below. |
| **Khaled Fekih Romdhane**          **5204 Bluewater Drive, Frisco, TX 75034** |

| **Effectiveness of Filing** |
| --- |
| ☑A. This document becomes effective when the document is filed by the secretary of state. |

**OR**

| ☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: |
| --- |

| **Execution** |
| --- |
| The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument. |
| **Khaled Fekih Romdhane** |
| Signature of Organizer |

FILING OFFICE COPY

# Texas Franchise Tax Public Information Report

*To be filed by Corporations , Limited Liability Companies (LLC) and Financial Institutions*
**This report MUST be signed and filed to satisfy franchise tax requirements**

05-102 (Rev.9-11/30) FORM
Comptroller of Public Accounts

**Tcode** 13196 Franchise

■ Taxpayer number

| 3 | 2 | 0 | 6 | 0 | 1 | 4 | 2 | 1 | 9 | 0 |

■ Report year

| 2 | 0 | 2 | 1 |

*You have certain rights* under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at (800) 252-1381or (512) 463-4600.

Taxpayer name
**LONGHORN IP LLC**

Mailing address
**8105 RASOR BLVD STE 210**

| City | State | ZIP Code | Plus 4 |
| **PLANO** | **TX** | **75024** | |

Secretary of State (SOS) file number or Comptroller file number
**0802432859**

● Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office
5204 BLUEWATER DR FRISCO, TX 75036 9313

Principal place of business
5204 BLUEWATER DR FRISCO, TX 75036 9313

*Please sign below!*

Officer, director and manager information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or managers change throughout the year.

3206014219021

**SECTION A**  Name, title and mailing address of each officer, director or manager.

| Name | Title | Director | | m m d d y y |
| TANIT VENTURES INC | MEMBER | ○ YES | Term expiration | |
| Mailing address | City | | State | ZIP Code |
| 5204 BLUEWATER DRIVE | FRISCO | | TX | 75034 |
| Name | Title | Director | | m m d d y y |
| | | ○ YES | Term expiration | |
| Mailing address | City | | State | ZIP Code |
| | | | | |
| Name | Title | Director | | m m d d y y |
| | | ○ YES | Term expiration | |
| Mailing address | City | | State | ZIP Code |
| | | | | |

**SECTION B**  Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of 10 percent  or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |

**SECTION C**  Enter the information required for each corporation or LLC, if any, that owns an interest of 10  percent  or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |

Registered agent and registered office currently on file. *(see instructions if you need to make changes)*
Agent: **KHALED FEKIH ROMDHANE**

○ Blacken circle if you need forms to change the registered agent or registered office information.

| Office: 5204 BLUEWATER DRIVE | City FRISCO | State TX | ZIP Code 75034 |

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▶ MARWAN  KASSIM | Title Electronic | Date 05-03-2021 | Area code and phone number ( 281 )  248 - 1683 |

**Texas Comptroller Official Use Only**

| VE/DE ○ | PIR IND ○ |

| Form 201 | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $300 | <br>**Certificate of Formation<br>For-Profit Corporation** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 802453941 05/09/2016<br>Document #: 669901600002<br>Image Generated Electronically<br>for Web Filing** |

### Article 1 - Entity Name and Type

The filing entity being formed is a for-profit corporation. The name of the entity is:

## TANIT VENTURES INC

The name must contain the word "corporation," "company," "incorporated," "limited," or an abbreviation of one of these terms. The name must not be the same as, deceptively similar to or similar to that of an existing corporate, limited liability company, or limited partnership name on file with the secretary of state. A preliminary check for "name availability" is recommended.

### Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be corporation named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**

**KHALED   FEKIH-ROMDHANE**

C. The business address of the registered agent and the registered office address is:

**Street Address:**

**5204 BLUEWATER DR   FRISCO  TX  75034**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Directors

The number of directors constituting the initial board of directors and the names and addresses of the person or persons who are to serve as directors until the first annual meeting of shareholders or until their successors are elected and qualified are set forth below:

Director 1: **KHALED   FEKIH-ROMDHANE**

Address: **5204 BLUEWATER DR   FRISCO  TX, USA  75034**

### Article 4 - Authorized Shares

The total number of shares the corporation is authorized to issue and the par value of each of such shares, or a statement that such shares are without par value, is set forth below.

| Number of Shares | Par Value (must choose and complete either A or B) | Class | Series |
|---|---|---|---|
| **1000** | ☑ A. has a par value of $**1**<br>☐ B. without par value. | | |

If the shares are to be divided into classes, you must set forth the designation of each class, the number of shares of each class, and the par value (or statement of no par value), of each class. If shares of a class are to be issued in series, you must provide the designation of each series. The preferences, limitations, and relative rights of each class or series must be stated in space provided for supplemental information.

### Article 5 - Purpose

The purpose for which the corporation is organized is for the transaction of any and all lawful business for which corporations may be organized under the Texas Business Organizations Code.

### Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

| **Effectiveness of Filing** |
| --- |

☐ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☑ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: **May 10, 2016**

| **Organizer** |
| --- |

The name and address of the organizer is set forth below.

**KHALED FEKIH-ROMDHANE        5204 BLUEWATER DR FRISCO TX 75034**

| **Execution** |
| --- |

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**KHALED FEKIH-ROMDHANE**

Signature of organizer

FILING OFFICE COPY

| **Form 424**<br>**(Revised 05/11)**<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512/463-5709<br>**Filing Fee: See instructions** | <br>**Certificate of Amendment** | This space reserved for office use.<br><br>F I L E D<br>In the Office of the<br>Secretary of State of Texas<br>**MAR 1 8 2019**<br>Corporations Section |

## Entity Information

The name of the filing entity is:

TANIT VENTURES INC

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☑ For-profit Corporation          ☐ Professional Corporation
☐ Nonprofit Corporation          ☐ Professional Limited Liability Company
☐ Cooperative Association        ☐ Professional Association
☐ Limited Liability Company      ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is: 802453941

The date of formation of the entity is:  May 9, 2016

## Amendments

### 1. Amended Name

(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

Form 424                                    6

Registered Agent
(Complete either A or B, but not both. Also complete C.)

☐ A. The registered agent is an organization (cannot be entity named above) by the name of:

_____

**OR**

☐ B. The registered agent is an individual resident of the state whose name is:

_____
*First Name*              *M.I.*         *Last Name*                    *Suffix*

The person executing this instrument affirms that the person designated as the new registered agent has consented to serve as registered agent.

C. The business address of the registered agent and the registered office address is:

                                                              TX
_____
*Street Address (No P.O. Box)*              *City*              *State*   *Zip Code*

### 3. Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below. If the space provided is insufficient, incorporate the additional text by providing an attachment to this form. Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☐ **Add** each of the following provisions to the certificate of formation. The identification or reference of the added provision and the full text are as follows:

☑ **Alter** each of the following provisions of the certificate of formation. The identification or reference of the altered provision and the full text of the provision as amended are as follows:

Article 4

Number of Shares: 50,000

☐ **Delete** each of the provisions identified below from the certificate of formation.

## Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

Form 424                                    7

## Effectiveness of Filing (Select either A, B, or C.)

A. [✓] This document becomes effective when the document is filed by the secretary of state.

B. [ ] This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. [ ] This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

_____

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date:    03/12/2019

By:    _Khaled Fekih Romdhane_

_____
Signature of authorized person

KHALED FEKIH-ROMDHANE, PRESIDENT
_____
Printed or typed name of authorized person (see instructions)

Form 424

8

**Appx505**

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 803021868 05/21/2018
Document #: 814396350002
Image Generated Electronically
for Web Filing**

---

**Article 1 - Entity Name and Type**

The filing entity being formed is a limited liability company. The name of the entity is:

**<u>Carthage Silicon Innovations llc</u>**

**Article 2 – Registered Agent and Registered Office**

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**KHALED   FEKIH-ROMDHANE**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**8105 RASOR BLVD STE 210   PLANO  TX  75024**

**Consent of Registered Agent**

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

**Article 3 - Governing Authority**

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: **CHRISTIAN    DUBUC**                    Title: **Manager**

Address: **300 SOUTH WATTERS RD UNIT 318   ALLEN  TX, USA  75013**

Manager 2: **KHALED    FEKIH-ROMDHANE**              Title: **Manager**

Address: **5204 BLUEWATER DR   FRISCO  TX, USA  75034**

**Article 4 - Purpose**

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

### Organizer

The name and address of the organizer are set forth below.

**KHALED FEKIH-ROMDHANE**     **8105 RASOR BLVD STE 210 PLANO, TX 75024**

### Effectiveness of Filing

☐ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☑ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: **May 22, 2018**

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**KHALED FEKIH-ROMDHANE**

Signature of Organizer

**FILING OFFICE COPY**

**Form 424**
**(Revised 01/06)**

Return in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512/463-5709
**Filing Fee: See instructions**



**Certificate of Amendment**

This space reserved for office use.

**F I L E D**
In the Office of the
Secretary of State of Texas

**MAR 1 1 2019**

**Corporations Section**

---

## Entity Information

The name of the filing entity is:

CARTHAGE SILICON INNOVATIONS LLC

State the name of the entity as currently shown in the records of the secretary of state.  If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation                     ☐ Professional Corporation
☐ Nonprofit Corporation                      ☐ Professional Limited Liability Company
☐ Cooperative Association                     ☐ Professional Association
☒ Limited Liability Company                   ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is:   TX/803021868
The date of formation of the entity is:   05/21/2018

## Amendments

### 1. Amended Name

(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement.)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity.  The article or provision is amended to read as follows:

Form 424                                          6

### Registered Agent
(Complete either A or B, but not both. Also complete C.)

☐ A. The registered agent is an organization (cannot be entity named above) by the name of:

OR

☒ B. The registered agent is an individual resident of the state whose name is:

| CHRISTIAN | | DUBUC | |
|---|---|---|---|
| First Name | M.I. | Last Name | Suffix |

C. The business address of the registered agent and the registered office address is:

| 5204 BLUEWATER DRIVE | FRISCO | TX | 75034 |
|---|---|---|---|
| Street Address (No P.O. Box) | City | State | Zip Code |

### 3. Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below. If the space provided is insufficient, incorporate the additional text by providing an attachment to this form. Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☐ **Add** each of the following provisions to the certificate of formation. The identification or reference of the added provision and the full text are as follows:

☒ **Alter** each of the following provisions of the certificate of formation. The identification or reference of the altered provision and the full text of the provision as amended are as follows:

The amendment changes the article that states the number of Member and their names and addresses. The Article in the Certificate of Formation is amended to read as follows:

Article VII
TAIJITU VENTURES INC (MEMBER)          TANIT VENTURES INC (MEMBER)
700 CENTRAL EXPRESSWAY S SUITE 400     5204 BLUEWATER DR
ALLEN TX 75013                          FRISCO TX 75034

☒ **Delete** each of the provisions identified below from the certificate of formation.
KHALED FEKIH-ROMDHANE (Member)          CHRISTIAN DUBUC (Member)
5204 BLUEWATER DR                        506 RIVERSIDE CT
FRISCO TX 75034                          ALLEN TX 75013

### Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the

Form 424                                        7

Texas Business Organizations Code and by the governing documents of the entity.

| Effectiveness of Filing (Select either A, B, or C.) |
| --- |

A. ☒ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

_____

_____

| Execution |
| --- |

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date:  ___03/08/2019_____

Taijitu Ventures inc., Member

Christian Dubuc, President

Signature and title of authorized person(s) (see instructions)

Form 424                                          8

| **Form 424**<br>**(Revised 05/11)**<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512/463-5709<br>**Filing Fee: See instructions** | <br>**Certificate of Amendment** | This space reserved for office use.<br><br>**F I L E D**<br>In the Office of the<br>Secretary of State of Texas<br><br>**DEC 0 9 2019**<br><br>**Corporations Section** |
| --- | --- | --- |

## Entity Information

The name of the filing entity is:

CARTHAGE SILICON INNOVATIONS LLC

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation      ☐ Professional Corporation

☐ Nonprofit Corporation      ☐ Professional Limited Liability Company

☐ Cooperative Association      ☐ Professional Association

☑ Limited Liability Company      ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is: TX/803021868

The date of formation of the entity is: 05/21/2018

## Amendments

### 1. Amended Name

(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

Form 424             6

Registered Agent
(Complete either A or B, but not both. Also complete C.)

☐ A.  The registered agent is an organization (cannot be entity named above) by the name of:

_____

**OR**

☐ B.  The registered agent is an individual resident of the state whose name is:

_____
*First Name*                        *M.I.*          *Last Name*                          *Suffix*

The person executing this instrument affirms that the person designated as the new registered agent has consented to serve as registered agent.

C.  The business address of the registered agent and the registered office address is:

                                                                    TX
_____
*Street Address (No P.O. Box)*                 *City*                 *State*   *Zip Code*

### 3. Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below.  If the space provided is insufficient, incorporate the additional text by providing an attachment to this form.  Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☐ **Add** each of the following provisions to the certificate of formation.  The identification or reference of the added provision and the full text are as follows:

☑ **Alter** each of the following provisions of the certificate of formation.  The identification or reference of the altered provision and the full text of the provision as amended are as follows:
The amendment changes the article that states the number of Member and their names and addresses.
The Article in the Certificate of Formation is amended as follows:

Article VII
TANIT VENTURES INC (MEMBER)
5204 BLUEWATER DR
FRISCO TX 75034

☐ **Delete** each of the provisions identified below from the certificate of formation.

## Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

Form 424                                    7

## Effectiveness of Filing (Select either A, B, or C.)

A. ☐ This document becomes effective when the document is filed by the secretary of state.

B. ☑ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: __January 1, 2020__

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date:     __12/04/2019__

By:    Tanit Ventures inc., Member

     _Khaled Fekih Romdhane_
     Signature of authorized person

     Khaled Fekih-Romdhane, President
     Printed or typed name of authorized person (see instructions)

Form 424                8

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 804455023 03/01/2022
Document #: 1125076710002
Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## Dido Wireless Innovations LLC

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

**TANIT VENTURES INC**

**OR**

☐B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**

**5204 Bluewater Drive     Frisco  TX  75036**

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

**OR**

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑A. The limited liability company is to be managed by managers.

**OR**

☐B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name) **TANIT VENTURES INC**

Address: **5204 Bluewater Drive     Frisco  TX, USA  75036**

Manager 2: **Khaled      Fekih-Romdhane**               Title: **Manager**

Address: **5204 Bluewater Drive     Frisco  TX, USA  75036**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

**Initial Mailing Address**

Address to be used by the Comptroller of Public Accounts for purposes of sending tax information.

The initial mailing address of the filing entity is:

**5204 Bluewater Drive**
**Frisco, TX 75036**
**USA**

**Organizer**

The name and address of the organizer are set forth below.

**Khaled Fekih-Romdhane          5204 Bluewater Drive, Frisco, TX 75036**

**Effectiveness of Filing**

☑ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

**Execution**

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Khaled Fekih-Romdhane**

Signature of Organizer

FILING OFFICE COPY

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 804325539 11/24/2021
Document #: 1096766090002
Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

### HAMILCAR BARCA IP LLC

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

### TANIT VENTURES INC

### OR

☐B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**

**5204 Bluewater Drive    Frisco  TX  75036**

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

### OR

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑A. The limited liability company is to be managed by managers.

### OR

☐B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name) **TANIT VENTURES INC**

Address: **5204 Bluewater Drive    Frisco  TX, USA  75036**

Manager 2: **Khaled    Fekih-Romdhane**                    Title: **Manager**

Address: **5204 Bluewater Drive    Frisco  TX, USA  75036**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

### Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

**Organizer**

The name and address of the organizer are set forth below.

**Khaled Fekih-Romdhane**          **5204 Bluewater Drive, Frisco, TX 75036**

**Effectiveness of Filing**

☑A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

**Execution**

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Khaled Fekih-Romdhane**

Signature of Organizer

**FILING OFFICE COPY**

| | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $300 | <br>**Certificate of Formation**<br>**Limited Liability Company** | **Filed in the Office of the**<br>**Secretary of State of Texas**<br>**Filing #: 804029901 04/20/2021**<br>**Document #: 1044629470002**<br>**Image Generated Electronically**<br>**for Web Filing** |

**Article 1 - Entity Name and Type**

The filing entity being formed is a limited liability company. The name of the entity is:

<u>**HANNIBAL IP LLC**</u>

**Article 2 – Registered Agent and Registered Office**

☑ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**TANIT VENTURES INC**

**OR**

☐ B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**

**5204 Bluewater Drive    Frisco  TX  75036**

**Consent of Registered Agent**

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

**Article 3 - Governing Authority**

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name) **TANIT VENTURES INC**

Address: **5204 Bluewater Drive    Frisco  TX, USA  75036**

**Article 4 - Purpose**

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

|  |
|---|
| **Organizer** |
| The name and address of the organizer are set forth below. |
| **Khaled Fekih-Romdhane**        **5204 Bluewater Drive, Frisco, TX 75036** |
| **Effectiveness of Filing** |
| ☑A. This document becomes effective when the document is filed by the secretary of state. |
| **OR** |
| ☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: |
| **Execution** |
| The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument. |
| **Khaled Fekih-Romdhane** |
| Signature of Organizer |

FILING OFFICE COPY

| | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $300 | <br>**Certificate of Formation<br>Limited Liability Company** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 802598293 12/07/2016<br>Document #: 703309720002<br>Image Generated Electronically<br>for Web Filing** |

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## L2 Mobile Technologies LLC

### Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

### OR

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**

**Chris    Dubuc**

C. The business address of the registered agent and the registered office address is:

**Street Address:**

**8105 Rasor blvd.**

**Suite 210  Plano  TX  75024-75024**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

### OR

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑ A. The limited liability company is to be managed by managers.

### OR

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name)  **Longhorn IP LLC**

Address:  **8105 Rasor blvd.   Suite 210  Plano  TX, USA  75024-75024**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

### Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

| **Organizer** |
|---|

The name and address of the organizer are set forth below.

**Longhorn IP LLC**          **8105 Rasor blvd. suite 210, Plano TX 75024**

| **Effectiveness of Filing** |
|---|

☐ A. This document becomes effective when the document is filed by the secretary of state.

| **OR** |
|---|

☑ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: **December 8, 2016**

| **Execution** |
|---|

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Chris Dubuc**

Signature of Organizer

**FILING OFFICE COPY**

| Form 401 | | |
| --- | --- | --- |
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>**Filing Fee: See Instructions** | <br><br>**Statement of Change of<br>Registered Office/Agent** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 802598293 08/03/2021<br>Document #: 1069652810002<br>Image Generated Electronically<br>for Web Filing** |

**Entity Information**

The name of the entity is :

**L2 Mobile Technologies LLC**

The file number issued to the entity by the secretary of state is: **802598293**

The registered agent and registered office of the entity as currently shown on the records of the secretary of state are:

**Chris Dubuc**

**8105 Rasor blvd., Suite 210, Plano, TX, USA 75024-75024**

**Change to Registered Agent/Registered Office**

The following changes are made to the registered agent and/or office information of the named entity:

Registered Agent Change

☐ A. The new registered agent is an organization by the name of:

OR

☑ B. The new registered agent is an individual resident of the state whose name is:

**Khaled Fekih-Romdhane**

Registered Office Change

☑ C. The business address of the registered agent and the registered office address is changed to:

**5204 Bluewater, Frisco, TX, USA 75036-75024**

The street address of the registered office as stated in this instrument is the same as the registered agent's business address.

Consent of Registered Agent

☑ A. A copy of the consent of registered agent is attached. **L2 Form 401-A Consent of Agent Form_rev6 (1).pdf**

☐ B. The consent of the registered agent is maintained by the entity.

**Statement of Approval**

The change specified in this statement has been authorized by the entity in the manner required by the BOC or in the manner required by the law governing the filing entity, as applicable.

**Effectiveness of Filing**

☑ A. This document becomes effective when the document is filed by the secretary of state.

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its filing by the secretary of state. The delayed effective date is:

**Execution**

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date: **August 3, 2021**   **Khaled Fekih-Romdhane, Manager of L2 Mobile Technologies LLC**

| Signature of authorized person(s) |
| --- |

**FILING OFFICE COPY**

Form 401-A—General Information
Acceptance of Appointment and Consent to Serve as Registered Agent

> The attached form is promulgated by the secretary of state and may be used to evidence the acceptance and consent of a person appointed as the registered agent of an entity. *This form and the information provided are not substitutes for the advice and services of an attorney.*

### Commentary

A domestic filing entity and a foreign filing entity registered to do business in Texas are required to continuously maintain a registered agent and a registered office address in Texas. A registered agent must be: 1) an individual resident of Texas; or 2) an organization, other than the organization to be represented, that is registered or authorized to do business in Texas. The registered office address must be located at a street address where service of process may be personally served on the entity's registered agent during normal business hours. Although the registered office is not required to be the entity's principal place of business, the registered office address may not be solely the address of a company that provides mailbox services or telephone answering service (BOC § 5.201).

> House Bill 1787, effective January 1, 2010, amended subchapter E of chapter 5 of the Texas Business Organizations Code (BOC) to establish the requirement that a person appointed or named as an entity's registered agent must have consented, in a written or electronic form, to serve in that capacity.

**Consent**: The appointment of a person as registered agent by an organizer or managerial official of an entity is an affirmation by the organizer or managerial official that the person has consented to serve in the capacity of registered agent. In addition, before the sale, acquisition, or transfer of a majority-in-interest or majority interest of the outstanding ownership or membership interests of a represented entity, the governing authority of the entity must verify whether the person named as the registered agent of the entity prior to the sale, acquisition, or transfer has consented to continue to serve the represented entity in that capacity.

**Form**: Section 5.201(b) requires that a person who is to be named as the registered agent of a represented entity in a registered agent filing must consent, in a written or electronic form, to serve in that capacity. A registered agent filing is defined by section 5.200(1) and includes any filing instrument that designates or appoints a registered agent or that effects a change or correction to the registered agent such as a certificate of formation, certificate of amendment, or statement of change of registered agent.

Section 5.201(b) also requires the secretary of state to develop the form of the consent. The consent of a registered agent need not be on a prescribed form or contain all the statements found on the attached promulgated form; however, a written or electronic consent to serve as registered agent should contain:

    a. the name of the represented entity;
    b. an express statement that the person designated consents to serve as the entity's registered agent;
    c. the name of the person designated as registered agent;
    d. the signature of the registered agent; and
    e. the date of execution.

**Execution of Consent**: If the person named as registered agent is an individual, the individual designated must sign the consent. If the person named as registered agent is not an individual, the consent would be signed by an individual authorized to accept the appointment as registered agent on behalf of the organization named as registered agent.

Form 401-A                                                                 1

**Filing Not Required**:  The signed consent of the registered agent should be sent to and retained by the represented entity.

Unless otherwise required by the provisions of the BOC or other law applicable to the represented entity, the consent of the registered agent is not required to be submitted or included as part of a registered agent filing.  However, a registered agent filing that includes the written consent of the person designated will be retained in the records of the secretary of state as part of the document.

**Permissive Filing**:  A consent of registered agent that is submitted separately for purposes of filing with the secretary of state will be indexed in the filing history of the represented entity if the consent is accompanied by the fee imposed under chapter 4 of the BOC for the filing of an instrument for which a fee is not expressly provided.  The fee is **$15**, unless the consent is submitted on behalf of a nonprofit corporation or cooperative association.  The fee for a nonprofit corporation or cooperative association is **$5**.  The consent may be mailed to P.O. Box 13697, Austin, Texas 78711-3697; faxed to (512) 463-5709; or delivered to the James Earl Rudder Office Building, 1019 Brazos, Austin, Texas 78701.

**Rejection of Appointment**:  A person who has been named as the registered agent of an entity without the person's consent is not required to perform the duties of a registered agent (BOC § 5.206).  In addition, a person who has been designated as a registered agent without the person's consent may file a rejection of the appointment with the secretary of state.  On filing, the rejection of appointment will terminate the appointment of the registered agent and registered office.  Failure to appoint or maintain a registered agent and registered office may result in the involuntary termination of a domestic filing entity or the revocation of a foreign filing entity's registration to transact business in Texas.

**Changes by a Registered Agent**:  A registered agent that changes its name or that changes its address as the address of the entity's registered office should notify the represented entity of the change and file a statement of change with the secretary of state.  (Form 408)

A person may resign as the registered agent of an entity by providing notice to the represented entity and the secretary of state.  Notice to the secretary of state must be given before the 11th day after the date notice is given to the entity.  On compliance with the notice requirements, the appointment of the registered agent and registered office terminate.  However, this termination is not effective until the 31st day after the date the secretary of state receives notice (BOC § 5.204(d)).

**Changes by a Represented Entity**:  The failure of a domestic or foreign filing entity to maintain a registered agent and registered office address in Texas may result in the involuntary termination of the domestic filing entity or in the revocation of the foreign entity's registration.  Therefore, it is important that an entity file a statement of change of registered agent and/or registered office (Form 401) with the secretary of state to appoint a new registered agent when the person named as registered agent will no longer serve in that capacity or when the registered office address of the entity changes.

**False or Fraudulent Filings**:  Please note that the liabilities and penalties imposed by sections 4.007 and 4.008 of the BOC apply with respect to a false statement in a filing instrument that designates and appoints a person as the registered agent of an entity without that person's consent (BOC § 5.207).

---

A person commits an offense under section 4.008 of the BOC if the person signs or directs the filing of a filing instrument the person knows is materially false with the intent that the instrument be delivered to the secretary of state for filing.  The offense is a Class A misdemeanor unless the person's intent is to harm or defraud another, in which case the offense is a state jail felony.

---

Revised 12/09

Form 401-A                                        2

Case 1:22-cv-00273-DCN   Document 15-10   Filed 07/21/22   Page 38 of 77

**Form 401-A**
**(Revised 12/09)**



## Acceptance of Appointment
## and
## Consent to Serve as Registered Agent
### §5.201(b) Business Organizations Code

The following form may be used when the person designated as registered agent in a registered agent filing is an individual.

| Acceptance of Appointment and Consent to Serve as Registered Agent |
|---|
| I acknowledge, accept and consent to my designation or appointment as registered agent in Texas for |
| L2 Mobile Technologies LLC |
| *Name of represented entity* |
| I am a resident of the state and understand that it will be my responsibility to receive any process, notice, or demand that is served on me as the registered agent of the represented entity; to forward such to the represented entity; and to immediately notify the represented entity and submit a statement of resignation to the Secretary of State if I resign. |

x: *Khaled Fekih-Romdhane*        Khaled Fekih-Romdhane        07/29/2021
   *Signature of registered agent*        *Printed name of registered agent*        *Date (mm/dd/yyyy)*

The following form may be used when the person designated as registered agent in a registered agent filing is an organization.

| Acceptance of Appointment and Consent to Serve as Registered Agent |
|---|
| I am authorized to act on behalf of |
| *Name of organization designated as registered agent* |
| The organization is registered or otherwise authorized to do business in Texas. The organization acknowledges, accepts and consents to its appointment or designation as registered agent in Texas for: |
| *Name of represented entity* |
| The organization takes responsibility to receive any process, notice, or demand that is served on the organization as the registered agent of the represented entity; to forward such to the represented entity; and to immediately notify the represented entity and submit a statement of resignation to the Secretary of State if the organization resigns. |

x:
   *Signature of person authorized to act on behalf of organization*        *Printed name of authorized person*        *Date (mm/dd/yyyy)*

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 802494841 07/07/2016
Document #: 679097060002
Image Generated Electronically
for Web Filing**

---

**Article 1 - Entity Name and Type**

The filing entity being formed is a limited liability company. The name of the entity is:

**<u>Lone Star Silicon Innovations LLC</u>**

**Article 2 – Registered Agent and Registered Office**

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

**Longhorn IP LLC**

**OR**

☐ B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**5204 Bluewater Dr    Frisco  TX  75034**

**Consent of Registered Agent**

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑B. The consent of the registered agent is maintained by the entity.

**Article 3 - Governing Authority**

☑A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name) **Longhorn IP LLC**

Address: **5204 Bluewater Dr    Frisco  TX, USA  75034**

**Article 4 - Purpose**

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

**Organizer**

The name and address of the organizer are set forth below.

**Christian Dubuc**          **506 Riverside Ct, Allen TX 75013**

**Effectiveness of Filing**

☐ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☑ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: **July 8, 2016**

**Execution**

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Christian Dubuc**

Signature of Organizer

**FILING OFFICE COPY**

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 802993770 04/19/2018
Document #: 808616490003
Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

**Nordic Interactive Technologies LLC**

### Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**CHRISTIAN    DUBUC**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**8105 Rasor boulevard, suite 210    Plano  TX  75024**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: **KHALED    FEKIH-ROMDHANE**    Title: **Manager**
Address: **5204 BLUEWATER DR    FRISCO  TX, USA  75034**

Manager 2: **CHRISTIAN    DUBUC**    Title: **Manager**
Address: **300 SOUTH WATTERS RD UNIT 318    ALLEN  TX, USA  75013**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

### Organizer

The name and address of the organizer are set forth below.

**CHRISTIAN DUBUC**        **8105 Rasor boulevard, suite 210 Plano TX 75024**

### Effectiveness of Filing

☐ A. This document becomes effective when the document is filed by the secretary of state.

### OR

☑ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: **April 20, 2018**

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**CHRISTIAN DUBUC**

Signature of Organizer

**FILING OFFICE COPY**

**Form 424**
**(Revised 01/06)**

Return in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512/463-5709
**Filing Fee: See instructions**



**Certificate of Amendment**

This space reserved for office use.

~~FILED~~
In the Office of the
Secretary of State of Texas

MAR 1 1 2019

Corporations Section

---

## Entity Information

The name of the filing entity is:

NORDIC INTERACTIVE TECHNOLOGIES LLC

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation                   ☐ Professional Corporation
☐ Nonprofit Corporation                    ☐ Professional Limited Liability Company
☐ Cooperative Association                  ☐ Professional Association
☒ Limited Liability Company                ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is:  TX/802993770

The date of formation of the entity is:   04/19/2018

---

## Amendments

### 1. Amended Name
(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

---

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

Form 424                                6

Registered Agent
(Complete either A or B, but not both. Also complete C.)

☐ A.  The registered agent is an organization (cannot be entity named above) by the name of:

_____

OR

☒ B.  The registered agent is an individual resident of the state whose name is:

| CHRISTIAN | | DUBUC | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

C.  The business address of the registered agent and the registered office address is:

| 5204 BLUEWATER DRIVE | FRISCO | TX | 75034 |
|---|---|---|---|
| *Street Address (No P.O. Box)* | *City* | *State* | *Zip Code* |

### 3.  Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below.  If the space provided is insufficient, incorporate the additional text by providing an attachment to this form.  Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☐ **Add** each of the following provisions to the certificate of formation.  The identification or reference of the added provision and the full text are as follows:

☒ **Alter** each of the following provisions of the certificate of formation.  The identification or reference of the altered provision and the full text of the provision as amended are as follows:

The amendment changes the article that states the number of Member and their names and addresses.  The Article in the Certificate of Formation is amended to read as follows:

Article VII
TAIJITU VENTURES INC (MEMBER)      TANIT VENTURES INC (MEMBER)
700 CENTRAL EXPRESSWAY S SUITE 400    5204 BLUEWATER DR
ALLEN TX 75013                      FRISCO TX 75034

☒ **Delete** each of the provisions identified below from the certificate of formation.

KHALED FEKIH-ROMDHANE  (Member)      CHRISTIAN DUBUC (Member)
5204 BLUEWATER DR                    506 RIVERSIDE CT
FRISCO TX 75034                      ALLEN TX 75013

### Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the

Form 424                                    7

Texas Business Organizations Code and by the governing documents of the entity.

| Effectiveness of Filing (Select either A, B, or C.) |
|---|

A. ☒ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

_____

_____

_____

| Execution |
|---|

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date:    03/08/2019 _____

Taijitu Ventures inc., Member

Christian Dubuc, President

Signature and title of authorized person(s) (see instructions)

| **Form 424**<br>**(Revised 05/11)**<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512/463-5709<br>**Filing Fee: See instructions** | <br><br>**Certificate of Amendment** | This space reserved for office use.<br><br>F I L E D<br>In the Office of the<br>Secretary of State of Texas<br><br>**DEC 0 9 2019**<br><br>**Corporations Section** |

## Entity Information

The name of the filing entity is:

NORDIC INTERACTIVE TECHNOLOGIES LLC

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation                    ☐ Professional Corporation

☐ Nonprofit Corporation                     ☐ Professional Limited Liability Company

☐ Cooperative Association                    ☐ Professional Association

☑ Limited Liability Company                  ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is: TX/802993770

The date of formation of the entity is: 04/19/2018

## Amendments

### 1. Amended Name

(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

Form 424                                    6

Case: 23-2007     Document: 70-1     Page: 313     Filed: 07/05/2024

2/09/19 11:17AM Chris Dubuc Longhorn IP   5124635709 Page12/16
Case 1:22-cv-00275-DCN   Document 15-10   Filed 07/21/22   Page 47 of 77

Registered Agent
(Complete either A or B, but not both. Also complete C.)

☐  A.  The registered agent is an organization (cannot be entity named above) by the name of:

_____

**OR**

☐  B.  The registered agent is an individual resident of the state whose name is:

_____

*First Name*                    *M.I.*              *Last Name*                        *Suffix*

The person executing this instrument affirms that the person designated as the new registered agent has consented to serve as registered agent.

C.  The business address of the registered agent and the registered office address is:

                                                              TX

*Street Address (No P.O. Box)*                              *City*                         *State*    *Zip Code*

### 3. Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below.  If the space provided is insufficient, incorporate the additional text by providing an attachment to this form.  Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☐ **Add** each of the following provisions to the certificate of formation.  The identification or reference of the added provision and the full text are as follows:

☑ **Alter** each of the following provisions of the certificate of formation.  The identification or reference of the altered provision and the full text of the provision as amended are as follows:
The amendment changes the article that states the number of Member and their names and addresses. The Article in the Certificate of Formation is amended as follows:

Article VII
TANIT VENTURES INC (MEMBER)
5204 BLUEWATER DR
FRISCO TX 75034

☐ **Delete** each of the provisions identified below from the certificate of formation.

## Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

Form 424                                7

Case: 23-2007     Document: 70-1     Page: 314     Filed: 07/05/2024

2/09/19 11:17AM Chris Dubug 273 Longhorn ID 5424935709 Page12/16
Case 1:22-cv-00273-DGN Document 15-10 Filed 07/21/22 Page 48 of 77

## Effectiveness of Filing (Select either A, B, or C.)

A. ☐ This document becomes effective when the document is filed by the secretary of state.

B. ☑ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: January 1, 2020

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is:

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: 12/04/2019

By: Tanit Ventures inc., Member

Khaled Fekih Romdham

Signature of authorized person

Khaled Fekih-Romdhane, President

Printed or typed name of authorized person (see instructions)

Form 424

8

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 803202104 01/04/2019
Document #: 859274150002
Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

**Nyckel UI Technologies LLC**

### Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**CHRISTIAN    DUBUC**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**8105 RASOR BLVD STE 210    PLANO  TX  75024**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: **KHALED    FEKIH-ROMDHANE**                    Title: **Manager**

Address: **5204 BLUEWATER DR    FRISCO  TX, USA  75034**

Manager 2: **CHRISTIAN    DUBUC**                    Title: **Manager**

Address: **8105 RASOR BLVD STE 210    PLANO  TX, USA  75024**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

### Organizer

The name and address of the organizer are set forth below.

**CHRISTIAN DUBUC**        **8105 RASOR BLVD STE 210 PLANO, TX 75024**

### Effectiveness of Filing

☐A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☑B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: **January 5, 2019**

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**CHRISTIAN DUBUC**

Signature of Organizer

**FILING OFFICE COPY**

MAR-11-2019 09:36 From: Case 1:22-cv-00273-DCN    Document 15-10    Filed 07/21/22    Page 51 of 77  7643124635  Page:2/7



| **Form 424**<br>**(Revised 01/06)** | | This space reserved for office use. |
| --- | --- | --- |
| Return in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512/463-5709<br>**Filing Fee: See instructions** | **Certificate of Amendment** | **F I L E D**<br>In the Office of the<br>Secretary of State of Texas<br>**MAR 1 1 2019**<br>**Corporations Section** |

---

## Entity Information

The name of the filing entity is:

### NYCKEL UI TECHNOLOGIES LLC

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation                    ☐ Professional Corporation

☐ Nonprofit Corporation                     ☐ Professional Limited Liability Company

☐ Cooperative Association                   ☐ Professional Association

☒ Limited Liability Company                 ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is:    TX/803202104

The date of formation of the entity is:    01/04/2019

---

## Amendments

### 1. Amended Name
(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

---

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:



Form 424                                     6

**Registered Agent**
(Complete either A or B, but not both. Also complete C.)

☐ A. The registered agent is an organization (cannot be entity named above) by the name of:

_____

**OR**

☒ B. The registered agent is an individual resident of the state whose name is:

| CHRISTIAN | | DUBUC | |
|---|---|---|---|
| First Name | M.I. | Last Name | Suffix |

C. The business address of the registered agent and the registered office address is:

| 5204 BLUEWATER DRIVE | FRISCO | TX | 75034 |
|---|---|---|---|
| Street Address (No P.O. Box) | City | State | Zip Code |

**3. Other Added, Altered, or Deleted Provisions**

Other changes or additions to the certificate of formation may be made in the space provided below. If the space provided is insufficient, incorporate the additional text by providing an attachment to this form. Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

---

☐ Add each of the following provisions to the certificate of formation. The identification or reference of the added provision and the full text are as follows:

---

☒ Alter each of the following provisions of the certificate of formation. The identification or reference of the altered provision and the full text of the provision as amended are as follows:

The amendment changes the article that states the number of Member and their names and addresses. The Article in the Certificate of Formation is amended to read as follows:

Article VII
TAIJITU VENTURES INC (MEMBER)                 TANIT VENTURES INC (MEMBER)
700 CENTRAL EXPRESSWAY S SUITE 400            5204 BLUEWATER DR
ALLEN TX 75013                                FRISCO TX 75034

---

☒ Delete each of the provisions identified below from the certificate of formation.
KHALED FEKIH-ROMDHANE (Member)               CHRISTIAN DUBUC (Member)
5204 BLUEWATER DR                            506 RIVERSIDE CT
FRISCO TX 75034                              ALLEN TX 75013

---

**Statement of Approval**

The amendments to the certificate of formation have been approved in the manner required by the

Form 424                                      7

**Appx540**

Texas Business Organizations Code and by the governing documents of the entity.

---

| **Effectiveness of Filing** (Select either A, B, or C.) |
|---|

A. ☒ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

_____

_____

---

| **Execution** |
|---|

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date:   03/08/2019

Taijitu Ventures inc., Member

Christian Dubuc, President

Signature and title of authorized person(s) (see instructions)

| Form 424 (Revised 05/11) | | This space reserved for office use. |
|---|---|---|
| Submit in duplicate to: Secretary of State P.O. Box 13697 Austin, TX 78711-3697 512 463-5555 FAX: 512/463-5709 **Filing Fee: See instructions** |  **Certificate of Amendment** | **F I L E D** In the Office of the Secretary of State of Texas **DEC 0 9 2019** **Corporations Section** |

## Entity Information

The name of the filing entity is:

NYCKEL UI TECHNOLOGIES LLC

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

- ☐ For-profit Corporation
- ☐ Nonprofit Corporation
- ☐ Cooperative Association
- ☑ Limited Liability Company
- ☐ Professional Corporation
- ☐ Professional Limited Liability Company
- ☐ Professional Association
- ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is: TX/803202104

The date of formation of the entity is: 01/04/2019

## Amendments

### 1. Amended Name

(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

Form 424                                6

Registered Agent
(Complete either A or B, but not both. Also complete C.)

☐ A. The registered agent is an organization (cannot be entity named above) by the name of:

_____

OR

☐ B. The registered agent is an individual resident of the state whose name is:

_____

| *First Name* | *M.I.* | *Last Name* | *Suffix* |

The person executing this instrument affirms that the person designated as the new registered agent has consented to serve as registered agent.

C. The business address of the registered agent and the registered office address is:

TX

_____

| *Street Address (No P.O. Box)* | *City* | *State* | *Zip Code* |

### 3. Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below.  If the space provided is insufficient, incorporate the additional text by providing an attachment to this form.  Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☐ **Add** each of the following provisions to the certificate of formation.  The identification or reference of the added provision and the full text are as follows:

☑ **Alter** each of the following provisions of the certificate of formation.  The identification or reference of the altered provision and the full text of the provision as amended are as follows:
The amendment changes the article that states the number of Member and their names and addresses. The Article in the Certificate of Formation is amended as follows:

Article VII
TANIT VENTURES INC (MEMBER)
5204 BLUEWATER DR
FRISCO TX 75034

☐ **Delete** each of the provisions identified below from the certificate of formation.

## Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

Form 424                                                    7

## Effectiveness of Filing (Select either A, B, or C.)

A. ☐ This document becomes effective when the document is filed by the secretary of state.

B. ☑ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing.  The delayed effective date is:  January 1, 2020 _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time.  The 90ᵗʰ day after the date of signing is:  _____

The following event or fact will cause the document to take effect in the manner described below:

[blank box]

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date:  _____12/04/2019_____

By:  Tanit Ventures inc., Member _____

_Khaled Fekih Romdhane_
Signature of authorized person

Khaled Fekih-Romdhane, President
Printed or typed name of authorized person (see instructions)

Form 424                                    8

| **Form 401** | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>**Filing Fee: See Instructions** | <br>**Statement of Change of<br>Registered Office/Agent** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 803202104 08/03/2021<br>Document #: 1069652810003<br>Image Generated Electronically<br>for Web Filing** |

**Entity Information**

The name of the entity is :

**Nyckel UI Technologies LLC**

The file number issued to the entity by the secretary of state is: **803202104**

The registered agent and registered office of the entity as currently shown on the records of the secretary of state are:

**CHRISTIAN DUBUC**

**5204 BLUEWATER DRIVE, Frisco, TX, USA 75034**

**Change to Registered Agent/Registered Office**

The following changes are made to the registered agent and/or office information of the named entity:

Registered Agent Change

☐ A. The new registered agent is an organization by the name of:

OR

☑ B. The new registered agent is an individual resident of the state whose name is:

**Khaled Fekih-Romdhane**

Registered Office Change

☑ C. The business address of the registered agent and the registered office address is changed to:

**5204 Bluewater, Frisco, TX, USA 75036**

The street address of the registered office as stated in this instrument is the same as the registered agent's business address.

Consent of Registered Agent

☑ A. A copy of the consent of registered agent is attached. **Nyckel - Form 401-A Consent of Agent Form_rev6 (1).pdf**

☐ B. The consent of the registered agent is maintained by the entity.

**Statement of Approval**

The change specified in this statement has been authorized by the entity in the manner required by the BOC or in the manner required by the law governing the filing entity, as applicable.

**Effectiveness of Filing**

☑ A. This document becomes effective when the document is filed by the secretary of state.

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its filing by the secretary of state. The delayed effective date is:

**Execution**

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date: **August 3, 2021**    **Khaled Fekih-Romdhane, Manager of Nyckel UI Technologies LLC**

| Signature of authorized person(s) |
| --- |

**FILING OFFICE COPY**

**Form 401-A—General Information**
**Acceptance of Appointment and Consent to Serve as Registered Agent**

> The attached form is promulgated by the secretary of state and may be used to evidence the acceptance and consent of a person appointed as the registered agent of an entity. *This form and the information provided are not substitutes for the advice and services of an attorney.*

### Commentary

A domestic filing entity and a foreign filing entity registered to do business in Texas are required to continuously maintain a registered agent and a registered office address in Texas. A registered agent must be: 1) an individual resident of Texas; or 2) an organization, other than the organization to be represented, that is registered or authorized to do business in Texas. The registered office address must be located at a street address where service of process may be personally served on the entity's registered agent during normal business hours. Although the registered office is not required to be the entity's principal place of business, the registered office address may not be solely the address of a company that provides mailbox services or telephone answering service (BOC § 5.201).

> House Bill 1787, effective January 1, 2010, amended subchapter E of chapter 5 of the Texas Business Organizations Code (BOC) to establish the requirement that a person appointed or named as an entity's registered agent must have consented, in a written or electronic form, to serve in that capacity.

**Consent**: The appointment of a person as registered agent by an organizer or managerial official of an entity is an affirmation by the organizer or managerial official that the person has consented to serve in the capacity of registered agent. In addition, before the sale, acquisition, or transfer of a majority-in-interest or majority interest of the outstanding ownership or membership interests of a represented entity, the governing authority of the entity must verify whether the person named as the registered agent of the entity prior to the sale, acquisition, or transfer has consented to continue to serve the represented entity in that capacity.

**Form**: Section 5.201(b) requires that a person who is to be named as the registered agent of a represented entity in a registered agent filing must consent, in a written or electronic form, to serve in that capacity. A registered agent filing is defined by section 5.200(1) and includes any filing instrument that designates or appoints a registered agent or that effects a change or correction to the registered agent such as a certificate of formation, certificate of amendment, or statement of change of registered agent.

Section 5.201(b) also requires the secretary of state to develop the form of the consent. The consent of a registered agent need not be on a prescribed form or contain all the statements found on the attached promulgated form; however, a written or electronic consent to serve as registered agent should contain:

    a. the name of the represented entity;
    b. an express statement that the person designated consents to serve as the entity's registered agent;
    c. the name of the person designated as registered agent;
    d. the signature of the registered agent; and
    e. the date of execution.

**Execution of Consent**: If the person named as registered agent is an individual, the individual designated must sign the consent. If the person named as registered agent is not an individual, the consent would be signed by an individual authorized to accept the appointment as registered agent on behalf of the organization named as registered agent.

**Filing Not Required**:  The signed consent of the registered agent should be sent to and retained by the represented entity.

Unless otherwise required by the provisions of the BOC or other law applicable to the represented entity, the consent of the registered agent is not required to be submitted or included as part of a registered agent filing.  However, a registered agent filing that includes the written consent of the person designated will be retained in the records of the secretary of state as part of the document.

**Permissive Filing**:  A consent of registered agent that is submitted separately for purposes of filing with the secretary of state will be indexed in the filing history of the represented entity if the consent is accompanied by the fee imposed under chapter 4 of the BOC for the filing of an instrument for which a fee is not expressly provided.  The fee is **$15**, unless the consent is submitted on behalf of a nonprofit corporation or cooperative association.  The fee for a nonprofit corporation or cooperative association is **$5**.  The consent may be mailed to P.O. Box 13697, Austin, Texas 78711-3697; faxed to (512) 463-5709; or delivered to the James Earl Rudder Office Building, 1019 Brazos, Austin, Texas 78701.

**Rejection of Appointment**:  A person who has been named as the registered agent of an entity without the person's consent is not required to perform the duties of a registered agent (BOC § 5.206).  In addition, a person who has been designated as a registered agent without the person's consent may file a rejection of the appointment with the secretary of state.  On filing, the rejection of appointment will terminate the appointment of the registered agent and registered office.  Failure to appoint or maintain a registered agent and registered office may result in the involuntary termination of a domestic filing entity or the revocation of a foreign filing entity's registration to transact business in Texas.

**Changes by a Registered Agent**:  A registered agent that changes its name or that changes its address as the address of the entity's registered office should notify the represented entity of the change and file a statement of change with the secretary of state.  (Form 408)

A person may resign as the registered agent of an entity by providing notice to the represented entity and the secretary of state.  Notice to the secretary of state must be given before the 11th day after the date notice is given to the entity.  On compliance with the notice requirements, the appointment of the registered agent and registered office terminate.  However, this termination is not effective until the 31st day after the date the secretary of state receives notice (BOC § 5.204(d)).

**Changes by a Represented Entity**:  The failure of a domestic or foreign filing entity to maintain a registered agent and registered office address in Texas may result in the involuntary termination of the domestic filing entity or in the revocation of the foreign entity's registration.  Therefore, it is important that an entity file a statement of change of registered agent and/or registered office (Form 401) with the secretary of state to appoint a new registered agent when the person named as registered agent will no longer serve in that capacity or when the registered office address of the entity changes.

**False or Fraudulent Filings**:  Please note that the liabilities and penalties imposed by sections 4.007 and 4.008 of the BOC apply with respect to a false statement in a filing instrument that designates and appoints a person as the registered agent of an entity without that person's consent (BOC § 5.207).

---

A person commits an offense under section 4.008 of the BOC if the person signs or directs the filing of a filing instrument the person knows is materially false with the intent that the instrument be delivered to the secretary of state for filing.  The offense is a Class A misdemeanor unless the person's intent is to harm or defraud another, in which case the offense is a state jail felony.

---

Revised 12/09

Form 401-A                                                2

**Form 401-A**
**(Revised 12/09)**



### Acceptance of Appointment
### and
### Consent to Serve as Registered Agent
### §5.201(b) Business Organizations Code

The following form may be used when the person designated as registered agent in a registered agent filing is an individual.

| Acceptance of Appointment and Consent to Serve as Registered Agent |
|---|
| I acknowledge, accept and consent to my designation or appointment as registered agent in Texas for Nyckel UI Technologies LLC |
| *Name of represented entity* |
| I am a resident of the state and understand that it will be my responsibility to receive any process, notice, or demand that is served on me as the registered agent of the represented entity; to forward such to the represented entity; and to immediately notify the represented entity and submit a statement of resignation to the Secretary of State if I resign. |

| x: *Khaled Fekih-Romdhane* | Khaled Fekih-Romdhane | 07/29/2021 |
|---|---|---|
| *Signature of registered agent* | *Printed name of registered agent* | *Date (mm/dd/yyyy)* |

The following form may be used when the person designated as registered agent in a registered agent filing is an organization.

| Acceptance of Appointment and Consent to Serve as Registered Agent |
|---|
| I am authorized to act on behalf of |
| *Name of organization designated as registered agent* |
| The organization is registered or otherwise authorized to do business in Texas. The organization acknowledges, accepts and consents to its appointment or designation as registered agent in Texas for: |
| *Name of represented entity* |
| The organization takes responsibility to receive any process, notice, or demand that is served on the organization as the registered agent of the represented entity; to forward such to the represented entity; and to immediately notify the represented entity and submit a statement of resignation to the Secretary of State if the organization resigns. |

| x: | | |
|---|---|---|
| *Signature of person authorized to act on behalf of organization* | *Printed name of authorized person* | *Date (mm/dd/yyyy)* |

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 802604956 12/15/2016
Document #: 704716130002
Image Generated Electronically
for Web Filing**

---

**Article 1 - Entity Name and Type**

The filing entity being formed is a limited liability company. The name of the entity is:

### Ox Mobile Technologies LLC

**Article 2 – Registered Agent and Registered Office**

☑ A. The initial registered agent is an organization (cannot be company named above) by the name of:

### Longhorn IP LLC

**OR**

☐ B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**8105 Rasor Blvd, Suite 210   Plano  TX  75024-75024**

**Consent of Registered Agent**

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

**Article 3 - Governing Authority**

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name)  **Longhorn IP LLC**

Address:  **8105 Rasor blvd.   Suite 210  Plano  TX, USA  75024**

**Article 4 - Purpose**

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

| Organizer |
| --- |

The name and address of the organizer are set forth below.

**Longhorn IP LLC**          **8105 Rasor blvd. suite 210, Plano TX 75024**

**Effectiveness of Filing**

☐ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☑ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: **December 16, 2016**

**Execution**

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Christian Dubuc**

Signature of Organizer

**FILING OFFICE COPY**

# Texas Franchise Tax Public Information Report

05-102
(Rev.9-11/30)
Comptroller of Public Accounts FORM

**Tcode** 13196 Franchise

*To be filed by Corporations , Limited Liability Companies (LLC) and Financial Institutions*
**This report MUST be signed and filed to satisfy franchise tax requirements**

■ Taxpayer number

| 3 | 2 | 0 | 6 | 2 | 3 | 1 | 8 | 4 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|---|

■ Report year

| 2 | 0 | 2 | 1 |
|---|---|---|---|

*You have certain rights* under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at (800) 252-1381or (512) 463-4600.

Taxpayer name
**OX MOBILE TECHNOLOGIES LLC**

Mailing address
**8105 RASOR BLVD STE 210**

| City **PLANO** | State **TX** | ZIP Code **75024** | Plus 4 | Secretary of State (SOS) file number or Comptroller file number **0802604956** |

● Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office
**8105 RASOR BLVD STE 210 PLANO, TX 75024 0340**

Principal place of business
**8105 RASOR BLVD STE 210 PLANO, TX 75024 0340**

*Please sign below!*

Officer, director and manager information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or managers change throughout the year.

**SECTION A**  Name, title and mailing address of each officer, director or manager.

| Name **CHRISTIAN DUBUC** | Title **MANAGER** | Director ○ YES | Term expiration | m m d d y y |
| Mailing address **506 RIVERSIDE CT** | City **ALLEN** | State **TX** | ZIP Code **75013** | |
| Name **KHALED FEKIH-ROMDHANE** | Title **MANAGER** | Director ○ YES | Term expiration | m m d d y y |
| Mailing address **5204 BLUEWATER DR** | City **FRISCO** | State **TX** | ZIP Code **75034** | |
| Name | Title | Director ○ YES | Term expiration | m m d d y y |
| Mailing address | City | State | ZIP Code | |

**SECTION B**  Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of 10 percent  or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |

**SECTION C**  Enter the information required for each corporation or LLC, if any, that owns an interest of 10  percent or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |

Registered agent and registered office currently on file. *(see instructions if you need to make changes)*
Agent: **LONGHORN IP LLC**

○ Blacken circle if you need forms to change the registered agent or registered office information.

| Office: **8105 RASOR BLVD, SUITE 210** | City **PLANO** | State **TX** | ZIP Code **75024** |

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▶ **MARWAN  KASSIM** | Title **Electronic** | Date **05-10-2021** | Area code and phone number **( 281 )  248 - 1683** |

**Texas Comptroller Official Use Only**

| VE/DE ○ | PIR IND ○ |

| **Form 201** | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $300 | <br><br>**Certificate of Formation<br>For-Profit Corporation** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 802453965 05/09/2016<br>Document #: 669907210002<br>Image Generated Electronically<br>for Web Filing** |

| Article 1 - Entity Name and Type |
|---|

The filing entity being formed is a for-profit corporation. The name of the entity is:

**TAIJITU VENTURES INC**

The name must contain the word "corporation," "company," "incorporated," "limited," or an abbreviation of one of these terms. The name must not be the same as, deceptively similar to or similar to that of an existing corporate, limited liability company, or limited partnership name on file with the secretary of state. A preliminary check for "name availability" is recommended.

| Article 2 – Registered Agent and Registered Office |
|---|

☐ A. The initial registered agent is an organization (cannot be corporation named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**

**Christian     Dubuc**

C. The business address of the registered agent and the registered office address is:

**Street Address:**

**506 Riverside Ct    Allen  TX  75013**

| Consent of Registered Agent |
|---|

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

| Article 3 - Directors |
|---|

The number of directors constituting the initial board of directors and the names and addresses of the person or persons who are to serve as directors until the first annual meeting of shareholders or until their successors are elected and qualified are set forth below:

Director 1: **Christian     Dubuc**

Address: **506 Riverside Ct    Allen  TX, USA  75013**

| Article 4 - Authorized Shares |
|---|

The total number of shares the corporation is authorized to issue and the par value of each of such shares, or a statement that such shares are without par value, is set forth below.

| Number of Shares | Par Value (must choose and complete either A or B) | Class | Series |
|---|---|---|---|
| **1000** | ☑ A. has a par value of $**1**<br>☐ B. without par value. | | |

If the shares are to be divided into classes, you must set forth the designation of each class, the number of shares of each class, and the par value (or statement of no par value), of each class. If shares of a class are to be issued in series, you must provide the designation of each series. The preferences, limitations, and relative rights of each class or series must be stated in space provided for supplemental information.

| Article 5 - Purpose |
|---|

The purpose for which the corporation is organized is for the transaction of any and all lawful business for which corporations may be organized under the Texas Business Organizations Code.

| Supplemental Provisions / Information |
|---|

[The attached addendum, if any, is incorporated herein by reference.]

| Effectiveness of Filing |
|---|
| ☐ A. This document becomes effective when the document is filed by the secretary of state. |
| **OR** |
| ☑ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: **May 10, 2016** |

| Organizer |
|---|
| The name and address of the organizer is set forth below. |
| **Christian Dubuc          506 Riverside Ct Allen TX 75013** |

| Execution |
|---|
| The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument. |
| **Christian Dubuc** |
| Signature of organizer |

**FILING OFFICE COPY**

| Form 424 | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>**Filing Fee: See instructions** | <br>**Certificate<br>of Amendment** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 802453965 11/22/2019<br>Document #: 928756010003<br>Image Generated Electronically<br>for Web Filing** |

### Entity Information

The filing entity is a: **Domestic For-Profit Corporation**

The name of the filing entity is: **TAIJITU VENTURES INC**

The file number issued to the filing entity by the secretary of state is: **802453965**

### Amendment to Name

The amendment changes the formation document of the filing entity to change the article or provision that names the entity. The article or provision is amended to read as follows:

The name of the filing entity is:

**Harfang IP Investment Corp**

A letter of consent, if applicable, is attached.

### Statement of Approval

The amendment has been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

### Effectiveness of Filing

☐ A. This document becomes effective when the document is filed by the secretary of state.

☑ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its filing by the secretary of state. The delayed effective date is: **November 23, 2019**

### Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and declares under penalty of perjury that the undersigned is authorized under the Texas Business Organizations Code to execute the filing instrument.

Date: **November 22, 2019**

**Christian Dubuc**

Signature of authorized person

FILING OFFICE COPY



**Office of the Secretary of State**
**Corporations Section**
**P.O. Box 13697**
**Austin, Texas 78711-3697**
**(Form 408)**

**Filed in the Office of the**
**Secretary of State of Texas**
**Filing #: 802453965  07/08/2019**
**Document #: 900950985118**
**Image Generated Electronically**

---

## STATEMENT OF CHANGE OF
## ADDRESS OF REGISTERED AGENT

1.  The name of the entity represented is
    TAIJITU VENTURES INC

    The entity's filing number is    802453965

2.  The address at which the registered agent has maintained the registered office address for such entity is: (Please provide street address, city, state and zip code presently shown in the records of the Secretary of State.)

    700 Lavaca Suite 1401, Austin, TX 78701

3.  The address at which the registered agent will hereafter maintain the registered office address for such entity is: (Please provide street address, city, state and zip code.  The address must be in Texas.)

    5900 Balcones Drive, Suite 100, Austin, TX 78731

4.  Notice of the change of address has been given to said entity in writing at least 10 business days prior to the submission of this filing.


Date:    07/08/2019


Registered Agents Inc.

**Name of Registered Agent**


Bill Havre

**Signature of Registered Agent**


**FILING OFFICE COPY**

| Form 401 |  | Filed in the Office of the |
| --- | --- | --- |

**Form 401**

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

**Filing Fee: See Instructions**



**Statement of Change of
Registered Office/Agent**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 802453965 02/20/2019
Document #: 869546290007
Image Generated Electronically
for Web Filing**

### Entity Information

The name of the entity is :

**TAIJITU VENTURES INC**

The file number issued to the entity by the secretary of state is: **802453965**

The registered agent and registered office of the entity as currently shown on the records of the secretary of state are:

**Christian Dubuc**

**506 Riverside Ct, Allen, TX, USA 75013**

### Change to Registered Agent/Registered Office

The following changes are made to the registered agent and/or office information of the named entity:

Registered Agent Change

☑A. The new registered agent is an organization by the name of:

**Registered Agents Inc.**

OR

☐B. The new registered agent is an individual resident of the state whose name is:

Registered Office Change

☑C. The business address of the registered agent and the registered office address is changed to:

**700 Lavaca St STE 1401, Austin, TX, USA 78701**

The street address of the registered office as stated in this instrument is the same as the registered agent's business address.

Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

☑B. The consent of the registered agent is maintained by the entity.

### Statement of Approval

The change specified in this statement has been authorized by the entity in the manner required by the BOC or in the manner required by the law governing the filing entity, as applicable.

### Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its filing by the secretary of state. The delayed effective date is:

### Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date: **February 20, 2019**       **Riley Park**

| |
|---|
| Signature of authorized person(s) |

**FILING OFFICE COPY**



Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 803512485 01/08/2020
Document #: 935896400002
Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## Trenchant Blade Technologies LLC

### Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**Peyton   Healey**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**1700 Pacific Avenue, Suite 4650   Dallas  TX  75201**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name)  **Tanit Ventures Inc.**

Address:  **5204 Bluewater Drive    Frisco  TX, USA  75034**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

### Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

### Organizer

The name and address of the organizer are set forth below.

**Peyton Healey          1700 Pacific Avenue, Ste. 4650, Dallas, TX 75201**

### Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Peyton Healey**

Signature of Organizer

**FILING OFFICE COPY**

# Texas Franchise Tax Public Information Report

Comptroller 05-102
of Public (Rev.9-11/30)
Accounts FORM
■ **Tcode** 13196 Franchise

*To be filed by Corporations , Limited Liability Companies (LLC) and Financial Institutions*
**This report MUST be signed and filed to satisfy franchise tax requirements**

■ Taxpayer number

| 3 | 2 | 0 | 7 | 3 | 0 | 1 | 9 | 8 | 0 | 7 |
|---|---|---|---|---|---|---|---|---|---|---|

■ Report year

| 2 | 0 | 2 | 1 |
|---|---|---|---|

*You have certain rights under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at (800) 252-1381or (512) 463-4600.*

Taxpayer Name
**TRENCHANT BLADE TECHNOLOGIES LLC**

Mailing address
**1700 PACIFIC AVE STE 4650**

| City | State | ZIP Code | Plus 4 | Secretary of State (SOS) file number or Comptroller file number |
|------|-------|----------|--------|---------------------------------|
| **DALLAS** | **TX** | **75201** | | **0803512485** |

○ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office
**1700 PACIFIC AVE STE 4650 DALLAS, TX 75201 4684**

Principal place of business
**1700 PACIFIC AVE STE 4650 DALLAS, TX 75201 4684**

*Please sign below!*

Officer, director and manager information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or managers change throughout the year.

**SECTION A** Name, title and mailing address of each officer, director or manager.

| Name | Title | Director | | Term expiration | m m d d y y |
|------|-------|----------|---|-----------------|-------------|
| **Khaled Fekih-Romdhane** | **Member** | ● YES | | | |
| Mailing address **5204 BLUEWATER DRIVE** | City **FRISCO** | State **TX** | | ZIP Code **75034** | |
| Name | Title | ○ YES | | Term expiration | m m d d y y |
| Mailing address | City | State | | ZIP Code | |
| Name | Title | ○ YES | | Term expiration | m m d d y y |
| Mailing address | City | State | | ZIP Code | |

**SECTION B** Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |

**SECTION C** Enter the information required for each corporation or LLC, if any, that owns an interest of 10 percent or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|

Registered agent and registered office currently on file. *(see instructions if you need to make changes)*
○ Blacken circle if you need to change the registered agent or registered office information.

Agent: **PEYTON HEALEY**

| Office: **1700 PACIFIC AVENUE, SUITE 4650** | City **DALLAS** | State **TX** | ZIP Code **75201** |
|---|---|---|---|

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▶ **MARWAN KASSIM** | Title **Electronic** | Date **05-01-2021** | Area code and phone number ( **281** ) **248 - 1683** |
|---|---|---|---|

**Texas Comptroller Official Use Only**

| VE/DE ○ | PIR IND ○ |
|---|---|

# Denton CAD

## Property Search > 497910 FEKIH-ROMDHANE, KHALED for Year 2022

Tax Year: 2022

## Property

### Account

| | | | |
|---|---|---|---|
| Property ID: | 497910 | Legal Description: | THE SHORES AT HIDDEN COVE PHASE FIVE BLK H LOT 7 |
| Geographic ID: | SN2117A-000000H-0000-0007-0000 | Zoning: | Residential |
| Type: | Real | Agent Code: | |
| Property Use Code: | | | |
| Property Use Description: | | | |

### Location

| | | | |
|---|---|---|---|
| Address: | 5204 BLUEWATER DR FRISCO, TX 75036 | Mapsco: | |
| Neighborhood: | The Shores at Hidden Cove Ph 4 & 5 | Map ID: | LE05 |
| Neighborhood CD: | DS10604 | | |

### Owner

| | | | |
|---|---|---|---|
| Name: | FEKIH-ROMDHANE, KHALED | Owner ID: | 832127 |
| Mailing Address: | 5204 BLUEWATER DR FRISCO, TX 75036-9313 | % Ownership: | 100.0000000000% |
| | | Exemptions: | HS |

## Values

| | | | |
|---|---|---|---|
| (+) Improvement Homesite Value: | + | $245,208 | |
| (+) Improvement Non-Homesite Value: | + | $0 | |
| (+) Land Homesite Value: | + | $93,775 | |
| (+) Land Non-Homesite Value: | + | $0 | Ag / Timber Use Value |
| (+) Agricultural Market Valuation: | + | $0 | $0 |
| (+) Timber Market Valuation: | + | $0 | $0 |
| | | ------------------------ | |

| (=) Market Value: | = | $338,983 |
| (–) Ag or Timber Use Value Reduction: | – | $0 |
| | | ------------------------- |
| (=) Appraised Value: | = | $338,983 |
| (–) HS Cap: | – | $35,100 |
| | | ------------------------- |
| (=) Assessed Value: | = | $303,883 |

## Taxing Jurisdiction

Owner:                  FEKIH-ROMDHANE, KHALED
% Ownership:   100.0000000000%
Total Value:    $338,983

| Entity | Description | Tax Rate | Appraised Value | Taxable Value | Estimated Tax | |
|--------|-------------|----------|-----------------|---------------|---------------|---|
| CAD | DENTON CENTRAL APPRAISAL DISTRICT | 0.000000 | $338,983 | $303,883 | $0.00 | |
| G01 | DENTON COUNTY | 0.233086 | $338,983 | $298,883 | $708.31 | |
| PID6 | HACKBERRY HIDDEN COVE PUBLIC IMPROVEMENT DISTRICT NO.2 | 0.000000 | $338,983 | $303,883 | $0.00 | |
| S10 | LITTLE ELM ISD | 1.430300 | $338,983 | $263,883 | $4,346.44 | |
| W26 | DENTON CO FWSD 4-A | 0.238240 | $338,983 | $303,883 | $723.97 | |
| | Total Tax Rate: | 1.901626 | | | | |
| | | | | Taxes w/Current Exemptions: | $5,778.72 | |
| | | | | Taxes w/o Exemptions: | $6,446.19 | |

## Improvement / Building

| Improvement #1: Residential    State Code: A1    Living Area: 1615.0 sqft    Value: $245,208 |

| Type | Description | Class CD | Exterior Wall | Year Built | SQFT |
|------|-------------|----------|---------------|------------|------|
| MA | MAIN AREA | 8 | Brick Veneer | 2012 | 1615.0 |
| AG | ATTACHED GARAGE | 8 | | 2012 | 412.0 |
| OP | OPEN PORCH | 8 | | 2012 | 48.0 |

## Land

| # | Type | Description | Acres | Sqft | Eff Front | Eff Depth | Market Value | Prod. Value | |
|---|------|-------------|-------|------|-----------|-----------|--------------|-------------|---|

**Appx563**

| 1 | 8 | | RESIDENT LOT | 0.1389 | 6050.00 | 0.00 | | 0.00 | | $93,775 | | $0 |

## Roll Value History

| Year | Improvements | Land Market | Ag Valuation | Appraised | HS Cap | Assessed |
|------|-------------|-------------|--------------|-----------|--------|----------|
| 2022 | $245,208 | $93,775 | 0 | 338,983 | $35,100 | $303,883 |
| 2021 | $191,557 | $84,700 | 0 | 276,257 | $0 | $276,257 |
| 2020 | $175,975 | $84,700 | 0 | 260,675 | $0 | $260,675 |
| 2019 | $176,440 | $84,700 | 0 | 261,140 | $0 | $261,140 |
| 2018 | $170,404 | $84,700 | 0 | 255,104 | $0 | $255,104 |
| 2017 | $167,746 | $67,760 | 0 | 235,506 | $0 | $235,506 |
| 2016 | $153,219 | $67,760 | 0 | 220,979 | $6,450 | $214,529 |
| 2015 | $148,804 | $46,222 | 0 | 195,026 | $0 | $195,026 |
| 2014 | $133,058 | $46,222 | 0 | 179,280 | $0 | $179,280 |
| 2013 | $118,049 | $46,222 | 0 | 164,271 | $0 | $164,271 |
| 2012 | $0 | $46,222 | 0 | 46,222 | $0 | $46,222 |

## Deed History - (Last 3 Deed Transactions)

| # | Deed Date | Type | Description | Grantor | Grantee | Volume | Page | Deed Number |
|---|-----------|------|-------------|---------|---------|--------|------|-------------|
| 1 | 1/30/2013 | SW | SPECIAL WD | LENNAR HOMES OF TEXAS LAND & CONSTRUCTION LTD | LENNAR HOMES OF TEXAS SALES & MARKETING LTD dba | | | 2013-13032 |
| 2 | 1/30/2013 | SWD | SPECIAL WD WITH VENDOR'S LIEN | LENNAR HOMES OF TEXAS SALES & MARKETING LTD dba | FEKIH-ROMDHANE, KHALED | | | 2013-13033 |
| 3 | 5/10/2012 | SW | SPECIAL WD | ONE HACKBERRY LTD | LENNAR HOMES OF TEXAS LAND & CONSTRUCTION LTD | | | 2012-54946 |

**Questions Please Call (940) 349-3800**

Website version: 1.2.2.33

Database last updated on: 7/18/2022 10:49 PM

© N. Harris Computer Corporation

# EXHIBIT 13

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| LONE STAR SILICON INNOVATIONS LLC, | Civil Action No. 2:16-cv-1116 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., MICRON CONSUMER PRODUCTS GROUP, INC., and MICRON MEMORY JAPAN, INC. | |
| Defendants. | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff, Lone Star Silicon Innovations LLC ("Lone Star"), complains against Defendants Micron Technology, Inc., Micron Semiconductor Products, Inc., Micron Consumer Products Group, Inc., and Micron Memory Japan, Inc. (individually or collectively "Defendants" or "Micron") as follows:

**NATURE OF ACTION**

1. This is an action for patent infringement of United States Patent Nos. 5,872,038; 5,912,188; 6,023,085; 6,097,061; 6,103,611; 6,326,231 and 6,388,330 (collectively, the "Patents in Suit") under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*

**THE PARTIES**

2. Plaintiff Lone Star is a corporation organized and existing under the laws of the State of Texas with its principal place of business at 8105 Rasor Blvd., Suite 210, Plano, TX

EXHIBIT 14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| LONE STAR SILICON | § | |
| INNOVATIONS LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 2:16-CV-01116-JRG-RSP |
| | § | |
| MICRON TECHNOLOGY, INC. ET AL., | § | |
| | § | |
| Defendants. | § | |

## TRANSFER ORDER

### I.    BACKGROUND

This patent case was once consolidated with three other cases concerning the same patents. *See* Nos. 2:16-CV-01117, 2:16-CV-01170, and 2:16-CV-01216. While the overlap was not identical, each patent asserted in this case was also asserted in at least one of the other consolidated cases. In addition, two other related (but not consolidated) cases, Nos. 2:16-CV-01276 and 2:16-CV-01438, concerned some of the same patents.

The defendants in the other cases moved to transfer venue to the Northern District of California. The Micron defendants moved to transfer to the District of Idaho, where Micron Technology, Inc. is headquartered, but also asked the Court to transfer this case to the Northern District of California if it granted the other defendants' transfer motions. Micron's Motion [Dkt. # 34] at 1.

Ultimately, the Court transferred all five of the other cases. Therefore, the Court

factors weigh in favor of transfer and others are neutral, then the speed of the transferee

district court should not alone outweigh all of those other factors").

Based on this balancing, the Court concludes the Northern District of California is

clearly more convenient than this District. The Court therefore **GRANTS** Micron's Motion

and **ORDERS** the District Clerk to transfer this case to the Northern District of California.

The claim construction hearing scheduled for September 20, 2017, is cancelled, and all

claim construction deadlines are **STAYED**.

**SIGNED this 24th day of August, 2017.**


ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

EXHIBIT 15

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE LONE STAR SILICON INNOVATIONS LLC | No. C 17-03980 WHA<br>No. C 17-03981 WHA<br>No. C 17-04032 WHA<br>No. C 17-04033 WHA<br>No. C 17-04034 WHA<br>No. C 17-05458 WHA |

**ORDER GRANTING
MOTIONS TO DISMISS**

_____/

**INTRODUCTION**

Defendants in six related patent infringement actions move to dismiss on the basis that plaintiff in all six lacks standing. To the extent stated below, the motions are **GRANTED**.

**STATEMENT**

The essence of this problem is that the patent owner tried to find a way to shield itself from counterclaims while retaining a way to reap the monetary benefits of suing competitors and others for infringement of its patents. Its mechanism for that neat trick was a "patent transfer agreement" that seemed to include the magic wording required to authorize a non-practicing entity to sue. But other wording in the same agreement subtracted from those provisions and thus rendered the agreement insufficient to sustain standing for the non-practicing entity under Federal Circuit law.

\*          \*          \*

In the six above-captioned actions, plaintiff Lone Star Silicon Innovations LLC, a non-practicing entity with its principal place of business in Plano, Texas, asserts claims for patent infringement against Semiconductor Manufacturing International Corporation, Semiconductor Manufacturing International (Shanghai) Corporation, Semiconductor Manufacturing International (Beijing) Corporation, and SMIC, Americas (collectively, "SMIC"); Renesas Electronics Corporation and Renesas Electronics America Inc. (collectively, "Renesas"); Nanya Technology Corporation, Nanya Technology Corporation, U.S.A., and Nanya Technology Corporation Delaware (collectively, "Nanya"); United Microelectronics Corporation and UMC Group (USA) (collectively, "UMC"); Toshiba Corporation, Toshiba America, Inc., and Toshiba America Electronic Components, Inc. (collectively, "Toshiba"); and Micron Technology, Inc., Micron Semiconductor Products, Inc., Micron Consumer Products Group, Inc., and Micron Memory Japan, Inc. (collectively, "Micron"). These actions originated in the Eastern District of Texas and transferred to our district in mid-2017.

Lone Star currently asserts the following patents against each group of defendants:

- SMIC — 5,973,372 ("the '372 patent") and 6,388,330 ("the '330 patent")

- Renesas — 6,153,933 and the '330 patent

- Nanya — 6,097,061 ("the '061 patent") and the '330 patent

- UMC — the '372 patent and the '330 patent

- Toshiba — 5,912,188 ("the '188 patent"), 6,023,085 ("the '085 patent"), the '330 patent, and RE39,518

- Micron — the '188 patent, the '085 patent, the '061 patent, and the '330 patent

Each of the patents-in-suit originally issued to Advanced Micro Devices, Inc., a multinational semiconductor company based in Sunnyvale, California. On August 4, 2016, AMD and Lone Star entered into a patent transfer agreement that encompassed various patents, including the patents-in-suit, and executed an assignment for those patents. The complaint in each of the six above-captioned actions alleges that Lone Star is the "assignee" and "sole owner" of the patents-in-suit. Lone Star, however, did not produce the patent transfer agreement until October 2017 — months after the actions commenced.

United States District Court
For the Northern District of California

2

Case: 23-2007    Document: 70-1    Page: 352    Filed: 07/05/2024

Case 3:17-cv-00738-WHA Document 1548 Filed 07/26/18 Page 4 of 12
Case 3:17-cv-00738-WHA Document 1548 Filed 07/26/18 Page 4 of 12

United States District Court
For the Northern District of California

1    Section 2.1 of the patent transfer agreement gave Lone Star "all right, title and interest

2    in, to and under the Assigned Patents . . . including any and all inventions and discoveries

3    claimed therein, any and all legal rights entitled by the original owner of the Assigned Patents

4    and all rights of AMD to sue for past, present and future infringement of any and all of the

5    Assigned Patents."  In exchange, Section 5.1 gave AMD 35 to 50 percent of the proceeds from

6    Lone Star's "monetization efforts."  No provision in the patent transfer agreement addressed

7    Lone Star's right (or lack thereof) to practice the patents-in-suit.

8    Despite the broad language of Section 2.1, other provisions in the same agreement

9    substantially curtailed Lone Star's rights.  For example, Section 4.1 gave AMD "a fully paid up,

10   irrevocable, worldwide, transferable, non-exclusive, license under the Assigned Patents to use,

11   develop, copy, modify, import, make and have made, offer for sale, sell, lease, import, export,

12   distribute, demonstrate, display, transfer and/or otherwise exploit or dispose of [its] Licensed

13   Products," which includes "all of its software, hardware, products, designs, services, and

14   activities."  Section 2.3 further required Lone Star to comply with "Existing Encumbrances"

15   and "to make any and every future sale, transfer, assignment, lien, mortgage or other

16   encumbrance of the Assigned Patents subject to the Existing Encumbrances and the license and

17   other rights granted under Section 4," with "Existing Encumbrances" broadly defined as:

18           (a) pre-existing patent licenses, covenants not to assert, promises
             or agreements to license, and/or similar patent immunities; (b)
19           rights to renew or extend pre-existing patent licenses exercised
             unilaterally by third parties (such as legally binding options); (c)
20           releases for past infringement; and/or (d) pre-existing
             commitments related to AMD's or its Affiliates' standardization
21           activities or patent pool activities, and other pre-existing
             specification-related or standards-related licenses, covenants and
22           promises of AMD or any of its Affiliates, which, in each of (a),
             (b), (c) and (d), shall transfer in connection with the transfer of the
23           Assigned Patent(s) and/or which AMD or any of its Affiliates has
             committed to maintain in connection with the transfer of such
24           Assigned Patent(s).

25   Section 2.6 further restricted Lone Star's ability to transfer the patents-in-suit:

26           Any assignment of an Assigned Patent in violation of this Section
             2.6 shall be void ab initio.  Lone Star will not transfer ownership
27           of any of the Assigned Patents unless:  (a) all Assigned Patents
             are transferred collectively; (b) the proposed successor-in-interest
28           agrees to be bound by this Agreement (with the successor-in-
             interest taking the place of Lone Star for all purposes of this

3

Case: 23-2007    Document: 70-1    Page: 353    Filed: 07/05/2024

Case 3:17-cv-06473-WHA Document 548 Filed 07/31/22 Page 4 of 12
Case 3:17-cv-06473-WHA Document 548 Filed 07/31/22 Page 5 of 12

Agreement) including, but not limited to, obtaining ownership of any of the Assigned Patents subject to any and all Existing Encumbrances, in writing enforceable by AMD and with a copy provided to AMD; and (c) AMD provides its written consent to the transfer, which shall not be unreasonably withheld.

Finally, Section 6.2(f) explicitly limited Lone Star's enforcement rights to specific "Unlicensed Third Party Entities" listed in Exhibit E to the patent transfer agreement:

Lone Star acknowledges that the Assigned Patents are subject to Existing Encumbrances to other Persons and that Lone Star represents and warrants that it shall not commence, direct or control any legal action seeking to enforce and/or licensing activity asserting any of the Assigned Patents against a Person that is (1) not an Unlicensed Third Party Entity or Affiliate thereof, or (2) is a distributor, reseller, or direct or indirect customer with respect to materials, devices, software or firmware, services or products that are used, made or supplied directly or indirectly by or for a Person that is not an Unlicensed Third Party Entity.

Section 3.3(c) added that "[t]he Parties shall cooperate in good faith in attempting to identify additional third-parties that the Parties may agree, *at each's sole discretion*, to add to the Exhibit E list of Unlicensed Third Party Entities" (emphasis added).

After receiving the patent transfer agreement, all defendants moved to dismiss on the basis that Lone Star had no standing to sue thereunder. This order follows full briefing in each of the above-captioned actions (*i.e.*, eighteen briefs in total) and oral argument.[1]

## ANALYSIS

The question of standing is jurisdictional. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995). The party bringing the action bears the burden of establishing it has standing. *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975–96 (Fed. Cir. 2005) (citation omitted). The Federal Circuit has recognized three general categories of plaintiffs in analyzing the standing issue in patent infringement actions. *First*, a patentee or assignee of "all rights or all substantial rights" under the patent can sue in its own name alone. *Second*, an exclusive licensee or other party with exclusionary rights — but not "all substantial rights" — can sue, but must usually join the patentee to avoid "the potential for multiple litigations and multiple liabilities and recoveries against the same alleged infringer." Joinder also "protects the

---

[1] In Case No. 17-5458, Micron styled its motion as one for judgment on the pleadings. That motion, however, seeks the same relief as the other defendants' motions to dismiss and thus receives no separate treatment herein.

4

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    patentee from losing substantial rights if its patent claims are invalidated or the patent rendered

2    unenforceable in an action in which it did not participate." *Luminara Worldwide, LLC v. Liown*

3    *Elecs. Co. Ltd.*, 814 F.3d 1343, 1350 (Fed. Cir. 2016). *Third*, a party that holds "less than all

4    substantial rights to the patent" and lacks exclusionary rights thereunder cannot sue or even

5    participate alongside the patent owner as a party to an infringement action. *Morrow v.*

6    *Microsoft Corp.*, 499 F.3d 1332, 1339–41 (Fed. Cir. 2007) (citations omitted).

7         The instant motions concern only the first category since Lone Star claims to be an

8    "assignee" and "sole owner" of the patents-in-suit under its patent transfer agreement with

9    AMD.  To create an assignment, a contract must transfer (1) the entire exclusive patent right,

10   including "all substantial rights in the patent"; (2) an undivided interest in the patent right; or

11   (3) the entire exclusive patent right within any geographical region of the United States.  An

12   agreement that does not transfer one of these three interests is merely a license. *Diamond*

13   *Coating Techs., LLC v. Hyundai Motor Am.*, 823 F.3d 615, 618 (Fed. Cir. 2016).  Whether an

14   agreement constitutes an assignment or license depends not on the "labels" or "bare formalities"

15   of title transfer but on the "substance of what was granted." *Ibid.*

16        The Federal Circuit has observed that the exclusive right to make, use, and sell products

17   or services under the patent is "vitally important" to assignment, and that the nature and scope

18   of the right to sue accused infringers and license the patent is the "most important factor" to

19   consider. *Id.* at 619 (quoting *Alfred E. Mann Found. for Scientific Research v. Cochlear Corp.*,

20   604 F.3d 1354, 1360–61 (Fed. Cir. 2010)).

21        Other rights that should be examined include the scope of the licensee's right to

22   sublicense, the licensor's reversionary rights following breach or termination of the license

23   agreement, the licensor's right to proceeds from litigation or licensing activities, the duration of

24   the licensee's rights, the licensor's ability to supervise and control the licensee's activities, the

25   licensor's obligation to continue paying patent maintenance fees, and the nature of any limits on

26   the licensee's right to assign its interests in the patent. *See Mann*, 604 F.3d at 1360–61.

27        Both sides cite selective snippets of various favorable-sounding authorities in their

28   briefs.  Considering the *Mann* factors as a whole, however, the controlling decision with

1   underlying facts closest to ours is *Diamond Coating*.  There, as here, the plaintiff claimed

2   standing to sue on the basis that it had received "all substantial rights" in the patents-in-suit

3   through a patent assignment and transfer agreement.  *See* 823 F.3d at 618.  The district court

4   disagreed, holding that the actual terms of the agreement weighed against finding a transfer of

5   substantial rights because (1) the plaintiff could not assign the agreement to another party

6   without the transferor's consent; (2) the transferor retained an economic interest in future

7   proceeds, including from infringement litigation; (3) the transferor retained a license to practice

8   the patents-in-suit; and (4) the transferor retained significant control over enforcement decisions

9   because the agreement conditioned enforcement on consideration of both the transferor and the

10  plaintiff's "best interests."  On appeal, the plaintiff argued, as Lone Star does here, that it had

11  the sole right to exclude others, had the sole right to sue, could assign or sell the patents-in-suit,

12  and could enforce the patents-in-suit free from the transferor's control.  *Id.* at 619.

13         The Federal Circuit affirmed based on two aspects of the agreement.  *First*, a "licensor's

14  retention of a limited right to develop and market the patented invention indicates that the

15  licensee failed to acquire all substantial rights," and the agreement allowed the transferor to

16  keep "'a world-wide, royalty-free, non-exclusive, non-sublicensable, non-transferable right and

17  license to practice the methods and to make, have made, use, distribute, lease, sell, offer for

18  sale, import, export, develop and otherwise dispose of and exploit any' products covered by the

19  patents-in-suit."  Indeed, the agreement did not even grant the plaintiff practicing rights but

20  limited it to the "prosecution, maintenance, licensing, litigation, enforcement and exploitation"

21  of the patents-in-suit and explained that it would "engage in no other business or activity."  The

22  Federal Circuit specifically rejected the argument that the plaintiff's right to "exploitation"

23  implied the right to make, use, and sell the patented invention.  The Federal Circuit noted that

24  the agreement explicitly provided such rights to the transferor, so if the parties to the agreement

25  had intended to also provide such rights to the plaintiff, "they knew how to say so."  Thus, with

26  respect to the "vitally important" exclusive right to make, use, and sell products or services

27  under the patent, the plaintiff "unquestionably failed to acquire all substantial rights in the

28  patents-in-suit."  *Id.* at 619–20 (citation and internal modifications omitted).

6

Case: 23-2007    Document: 70-1    Page: 356    Filed: 07/05/2024

Case 3:17-cv-08233-WHA Document 198 Filed 01/26/18 Page 7 of 12
Case 3:17-cv-08233-DGN Document 154-8 Filed 07/31/23 Page 8 of 12

*Second*, the transferor in *Diamond Coating* "retained significant control over [the plaintiff's] enforcement and litigation activities" because the agreement (1) conditioned such activities on consideration of the transferor's "best interests," (2) prohibited the plaintiff from licensing the patents-in-suit jointly with patents owned by other parties absent the transferor's written consent, and (3) included a list of companies that the plaintiff reserved the right to *not* assert the patents-in-suit against, and another list of companies that the transferor reasonably believed represented "licensing opportunities," thereby indicating that the plaintiff did not enjoy "unfettered discretion on enforcement." *Id.* at 620–21. Although *Diamond Coating* styled its analysis of these terms as bearing on "the nature and scope of the patentee's retained right to sue accused infringers and license the patent," *see id.* at 619, it seemed to also implicate other *Mann* factors, including the scope of the plaintiff's right to sublicense, the transferor's ability to supervise and control the plaintiff's activities, and limits on the plaintiff's right to assign its interests in the patents-in-suit. *See Mann*, 604 F.3d at 1360–61.

After analyzing the two foregoing issues, *Diamond Coating* concluded the agreement therein "did not convey all of the substantial rights in the patents-in-suit" to the plaintiff. The same result obtains here given our similar facts.

*First*, as stated, the patent transfer agreement did not grant Lone Star any practicing rights. Lone Star insists it had such rights by implication through Section 2.1, which provided it with "all right, title and interest in, to and under the Assigned Patents . . . including any and all inventions and discoveries claimed therein, any and all legal rights entitled by the original owner of the Assigned Patents and all rights of AMD to sue for past, present and future infringement of any and all of the Assigned Patents." *Lone Star's reliance on this provision is misplaced given that other provisions in the same agreement plainly curtailed Lone Star's rights thereunder notwithstanding the superficially-broad language of Section 2.1.*[2]

---

[2] Defendants also point out that the purported "assignment" in *Diamond Coating* also contained superficially-broad language granting the plaintiff "all right, title, and interest" in the patents-in-suit, but that language did not suffice to establish standing by assignment. This argument enjoys some force but is not relied upon in this order because the *Diamond Coating* decision did not specifically examine the language cited by defendants in its analysis.

United States District Court
For the Northern District of California

7

Case: 23-2007     Document: 70-1     Page: 357     Filed: 07/05/2024

Case 3:17-cv-06378-DCN Document 1548 Filed 07/01/22 Page 9 of 12
Case 3:17-cv-06418-WHA Document 563 Filed 01/26/18 Page 8 of 11

1    Lone Star also argues that, as a practical matter, it "obviously" acquired the unfettered

2    right to practice the patents-in-suit because only it can enforce them.  This argument is just

3    another attempt to conjure up practicing rights by implication and remains unpersuasive for the

4    reasons already stated.  The suggestion that, as a practical matter, no one can stop Lone Star

5    from practicing the patents-in-suit also rings particularly hollow given that Lone Star is a non-

6    practicing entity.  Moreover, the plaintiff in *Diamond Coating* similarly attempted to rely on its

7    "sole right to sue" to no effect.  The same argument fails to distinguish *Diamond Coating* here.

8    Even assuming for the sake of argument that Lone Star indeed has some right to practice

9    the patents-in-suit, any such right is certainly not exclusive.  As stated, Section 4.1 preserved

10   AMD's practicing rights and Section 2.3 preserved the "Existing Encumbrances," including

11   practicing rights, of other entities.  Lone Star cites *Azure Networks, LLC v. CSR PLC*, 771 F.3d

12   1336 (Fed. Cir. 2014), *vacated on other grounds*, 135 S. Ct. 1846 (2015), and *Luminara*, 814

13   F.3d 1343, for the proposition that AMD's retention of a non-exclusive license to practice the

14   patented inventions does not prevent assignment of the patents-in-suit.  Both decisions are

15   readily distinguishable.

16   In *Azure Networks*, the principle relied upon in *Diamond Coating* — that a "licensor's

17   retention of a limited right to develop and market the patented invention indicates that the

18   licensee failed to acquire all substantial rights" — enjoyed "little force" because the licensor did

19   not make or sell any products, nor would it make or sell any products in the future.  *See* 771

20   F.3d at 1344.  Here, in contrast, AMD actually practices the patents-in-suit and has expressly

21   preserved the "Existing Encumbrances" of other entities ostensibly practicing the patents-in-

22   suit.  Under our circumstances, *Diamond Coating* remains the better authority.

23   *Luminara* considered a limited set of rights retained by the licensor — the right to

24   practice the patents at issue, the title to those patents, the responsibility to pay maintenance fees,

25   a financial interest in litigation and licensing, and a right to notice of litigation and licensing

26   activities — and concluded they were not substantial enough to preclude assignment.  *See* 814

27   F.3d at 1351.  *Luminara* did not have occasion to weigh other factors present in our case,

28

**United States District Court**
For the Northern District of California

8

Case: 23-2007     Document: 70-1     Page: 358     Filed: 07/05/2024

Case: 3:17-cv-00373-WHA   Document 159-8   Filed 07/20/18   Page 10 of 12
Case: 3:17-cv-00454-WHA   Document 159-8   Filed 07/20/18   Page 9 of 12

1    including the patent transfer agreement's preservation of "Existing Encumbrances" and other

2    constraints on Lone Star's litigation and licensing activities, discussed further below.

3         *Second*, like the transferor in *Diamond Coating*, AMD retained significant control over

4    Lone Star's activities.  In addition to the "Existing Encumbrances" preserved by Section 2.3 of

5    the patent transfer agreement, Section 2.6 conditioned any transfer of the "Assigned Patents" on

6    bundling of said patents, the successor-in-interest's agreement to be bound by the patent

7    transfer agreement, and AMD's written consent.  Section 2.6 did specify that AMD could not

8    "unreasonably" withhold its consent but did not further explain what "unreasonable" meant.

9    Sections 6.2(f) and 3.3(c) also limited all of Lone Star's enforcement capabilities to specific

10   targets listed in Exhibit E and conditioned any expansion of that list on AMD's agreement, with

11   AMD could grant or deny in its "sole discretion."  These terms are not identical to but, taken as

12   a whole, are at least as restrictive as those examined in *Diamond Coating*.

13        Lone Star cites three decisions for the proposition that Section 2.6 does not defeat the

14   purported "assignment" here.  None of those decisions, however, examined restrictions like

15   those set by Section 2.6, let alone a whole body of terms comparable to the patent transfer

16   agreement here.  *See Rude v. Westcott*, 130 U.S. 152, 163 (1889) ("absolute transfer of title"

17   reserved "no control over the patents or their use or disposal, or any power to interfere with the

18   management of the business growing out of their ownership"); *Speedplay, Inc. v. Bebop, Inc.*,

19   211 F.3d 1245, 1251–52 (Fed. Cir. 2000) (consent requirement to transfer did not significantly

20   curtail rights of licensee free from existing encumbrances, prior practice rights, and restrictions

21   on enforcement); *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870,

22   874–75 (Fed. Cir. 1991) (grant of exclusive practice and enforcement rights constituted

23   assignment despite retention of a veto right on sublicensing, the right to obtain foreign patents

24   on the invention, termination provisions "consistent with an assignment," and a right to receive

25   infringement damages).  Again, *Diamond Coating* remains the better authority on our facts.[3]

26

27   _____

28   [3]  The issues examined in *Diamond Coating* suffice to decide the standing issue here, but it merits mention that AMD's right to 35–50 percent of Lone Star's "monetization efforts" — a factor not discussed in *Diamond Coating* — further belies the notion that Lone Star received "all substantial rights" in the patents.  *See Mann*, 604 F.3d at 1360–61.

United States District Court
For the Northern District of California

9

United States District Court
For the Northern District of California

1    Lone Star further contends Section 6.2(f) is immaterial here because, even if Lone Star

2  lacks standing to sue on the patents-in-suit *in general*, it still has standing to sue the *specific*

3  defendants herein since they are all listed as targets on Exhibit E to the patent transfer

4  agreement.  This argument ignores that, *even as to the specific targets listed on Exhibit E*, Lone

5  Star's enforcement and licensing capabilities remain subject to the "Existing Encumbrances"

6  and restrictions on alienation set forth in Sections 2.3 and 2.6, respectively.  Even assuming for

7  the sake of argument that, as Lone Star urges, standing should be determined on a defendant-by-

8  defendant basis, that general proposition would not suffice to create standing for Lone Star here.

9    In support of its position, Lone Star also cites *WiAV Solutions LLC v. Motorola, Inc.*,

10  631 F.3d 1257, 1266–67 (Fed. Cir. 2010), for the proposition that, "[d]epending on the scope of

11  its exclusionary rights, an exclusive licensee may have standing to sue some parties and not

12  others. . . .  [I]f an exclusive licensee has the right to exclude others from practicing a patent,

13  and a party accused of infringement does not possess, and is incapable of obtaining, a license of

14  those rights from any other party, the exclusive licensee's exclusionary right is violated."  But

15  *WiAV* examined the standing of *exclusive licensees* to sue based on their *exclusionary rights*,

16  not the standing of *assignees* to sue based on receipt of *all substantial rights* in the patents-in-

17  suit.  The question here is not merely whether or not Lone Star received *exclusionary rights* but

18  whether or not Lone Star received *all substantial rights* in the patents-in-suit.  To repeat, Lone

19  Star's complaints alleged only that it is an "assignee" and "sole owner" of the patents-in-suit.  It

20  cannot simply retreat to the position of an "exclusive licensee" to evade arguments that it did

21  not actually receive "all substantial rights" in the patents-in-suit.

22    In a similar vein, Lone Star requests in the alternative that, if it is not an "assignee" and

23  "sole owner" of the patents-in-suit, it be granted leave to join AMD as a party.  Defendants

24  counter-propose that these actions be dismissed without prejudice so that Lone Star can re-file if

25  it can allege sufficient facts to state a claim as an exclusive licensee and secure AMD as a co-

26  plaintiff.  Defendants point out that Lone Star's delay in producing the crucial patent transfer

27  agreement already prejudiced defendants' ability to litigate effectively because, without AMD,

28  defendants had to move to transfer these actions to our district from the Eastern District of

1    Texas.  Additionally, defendants have not been able to leverage their own patent portfolios to

2    resolve this dispute because Lone Star, unlike AMD, is a non-practicing entity immune from the

3    threat of counterclaims.  Moreover, if AMD simply joins at this stage, Lone Star and AMD

4    would enjoy earlier filing dates for their claims than defendants would for any counterclaims for

5    purposes of recovering damages.  *See* 35 U.S.C. § 286 ("Except as otherwise provided by law,

6    no recovery shall be had for any infringement committed more than six years prior to the filing

7    of the complaint or counterclaim for infringement in the action.").  This would be a manifestly

8    unfair outcome given that Lone Star itself prevented defendants from asserting counterclaims

9    earlier by failing to timely produce the patent transfer agreement.

10        This order agrees with defendants that allowing Lone Star to simply add AMD in at this

11   stage would reward Lone Star for its litigation gimmick and unfairly prejudice defendants.

12   Accordingly, these actions are hereby dismissed.  Lone Star will have the option to re-file its

13   claims as an "exclusive licensee" with AMD as a co-plaintiff, though this order in no way

14   decides the separate question of whether or not Lone Star could sustain such claims under the

15   applicable law.  To be clear, if Lone Star re-files, it will not be allowed to take advantage of the

16   earlier filing dates in the instant actions for purposes of recovering damages.

**CONCLUSION**

18        To the foregoing extent, defendants' motions to dismiss are **GRANTED**.  The above-

19   captioned actions are **DISMISSED**.  The Clerk shall please **CLOSE THE FILES**.

21        **IT IS SO ORDERED.**

23   Dated:  January 20, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

11

# EXHIBIT 16

Trials@uspto.gov                                      Paper No. 15
571-272-7822                                       Filed: June 25, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

MICRON TECHNOLOGY, INC.,
Petitioner,

v.

LONE STAR SILICON INNOVATIONS, LLC,
Patent Owner.

_____

Case IPR2017-01565
Patent 6,326,231 B1

_____

Before JENNIFER MEYER CHAGNON, JOHN F. HORVATH, and
ELIZABETH M. ROESEL, *Administrative Patent Judges*.

ROESEL, *Administrative Patent Judge*.

DECISION
*Granting* Motion for Adverse Judgment
*37 C.F.R. § 42.73*

I.    INTRODUCTION

Micron Technology, Inc. ("Petitioner") filed a Petition (Paper 1) to
institute *inter partes* review of claims 1–9, 13, and 15–17 (the "challenged
claims") of U.S. Patent No. 6,326,231 B1 ("the '231 patent").  Lone Star

IPR2017-01565
Patent 6,326,231 B1

"requests that the [Patent Trial and Appeal Board] enter an adverse judgment against Patent Owner and terminate this proceeding pursuant to 37 C.F.R. § 42.73(b)(2)." *Id.* As noted above, Petitioner did not oppose Patent Owner's motion.

Adverse judgment against a party is appropriate when the party requests "[c]ancellation or disclaimer of a claim such that the party has no remaining claim in the trial." 37 C.F.R. § 42.73(b)(2). Here, upon cancellation of claims 4, 5, and 17, *i.e.*, all instituted claims of the '231 patent, no claims will remain pending in the trial. Accordingly, under these circumstances, adverse judgment against Patent Owner is appropriate. We, therefore, grant Patent Owner's motion, enter adverse judgment against Patent Owner, cancel claims 4, 5, and 17 of the '231 patent, and terminate the trial. *See* 37 C.F.R. §§ 42.72, 42.73(b)(2).

### III.    ORDER

It is:

ORDERED that Paper 12 is *expunged*;

FURTHER ORDERED that Patent Owner's request for adverse judgment is *granted*;

FURTHER ORDERED that adverse judgment is entered against Patent Owner;

FURTHER ORDERED that claims 4, 5, and 17 of the '231 patent are cancelled; and

FURTHER ORDERED that this proceeding is *terminated*.

# EXHIBIT 17

Trials@uspto.gov                                         Paper No. 13
571-272-7822                                        Filed: June 25, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

MICRON TECHNOLOGY, INC.,
Petitioner,

v.

LONE STAR SILICON INNOVATIONS, LLC,
Patent Owner.

————————

Case IPR2017-01630
Patent 5,872,038

————————

Before JENNIFER MEYER CHAGNON, JOHN F. HORVATH, and
ELIZABETH M. ROESEL, *Administrative Patent Judges*.

HORVATH, *Administrative Patent Judge*.

DECISION
*Granting* Motion for Adverse Judgment
*37 C.F.R. §§ 42.73*

IPR2017-01630
Patent 5,872,038

Adverse judgment against a party is appropriate when the party requests "[c]ancellation or disclaimer of a claim such that the party has no remaining claim in the trial." 37 C.F.R. § 42.73(b)(2). Here, upon cancellation of claims 1, 2, 8–11, 14, and 15, *i.e.*, all challenged claims of the '038 patent, no claims will remain pending in the trial. Accordingly, under these circumstances, adverse judgment against Patent Owner is appropriate. We, therefore, grant Patent Owner's motion, enter adverse judgment against Patent Owner, cancel claims 1, 2, 8–11, 14, and 15 of the '038 patent, and terminate the trial. *See* 37 C.F.R. §§ 42.72, 42.73(b)(2).

III.ORDER

It is:

ORDERED that Patent Owner's request for adverse judgment is *granted*;

FURTHER ORDERED that adverse judgment is entered against Patent Owner;

FURTHER ORDERED that claims 1, 2, 8–11, 14 and 15 of the '038 patent are cancelled; and

FURTHER ORDERED that this proceeding is *terminated*.

EXHIBIT 18

Trials@uspto.gov                                              Paper No. 34
Tel: 571-272-7822                               Entered:  December 12, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

MICRON TECHNOLOGY, INC.,
Petitioner,

v.

LONE STAR SILICON INNOVATIONS, LLC,
Patent Owner.

————————

Case IPR2017-01561
Patent 5,912,188

————————

Before GRACE KARAFFA OBERMANN, KRISTINA M. KALAN, and
ELIZABETH M. ROESEL, *Administrative Patent Judges*.

ROESEL, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318 and 37 C.F.R. § 42.73*

IPR2017-01561
Patent 5,912,188

view of Kawai and Sung. *Id.* at 66–69. Regarding a motivation to combine Kawai and Sung, Petitioner directs us to substantial evidence that a POSA would have known that the formation of higher-level interconnects, as taught by Sung, was necessary to complete a DRAM device, as disclosed by Kawai. Pet. 68–69.

Patent Owner does not contest that evidence. Patent Owner presents no argument regarding dependent claim 20 separate from its arguments regarding independent claim 11. *See* PO Resp. 63–64. Patent Owner presents no argument regarding dependent claims 28 and 29 separate from its arguments regarding independent claim 21. *See id.* at 64.

Accordingly, after considering the parties' arguments and evidence and the record as a whole, we are persuaded Petitioner has established by a preponderance of the evidence that claim 20 of the '188 patent is unpatentable as obvious in view of Kawai or alternatively in view of Kawai and Sung and that claims 28 and 29 are unpatentable in view of Kawai and Sung.

### III.    CONCLUSION

Petitioner has shown by a preponderance of the evidence that claims 3, 11–13, 15–23, and 25–29 of the '188 patent are unpatentable.

### IV.    ORDER

Accordingly, in consideration of the foregoing, it is hereby:

ORDERED that, based on a preponderance of the evidence, claims 3, 11–13, 15–23, and 25–29 of the '188 patent are unpatentable;

FURTHER ORDERED that Patent Owner's unopposed motion to excuse the late filing of the Patent Owner Response and accompanying exhibits is *granted*; and

EXHIBIT 19

Trials@uspto.gov                                                  Paper No. 41
Tel: 571-272-7822                                Entered: December 12, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

MICRON TECHNOLOGY, INC.,
Petitioner,

v.

LONE STAR SILICON INNOVATIONS, LLC,
Patent Owner.

————————

Case IPR2017-01560
Patent 5,912,188

————————

Before GRACE KARAFFA OBERMANN, KRISTINA M. KALAN, and
ELIZABETH M. ROESEL, *Administrative Patent Judges*.

ROESEL, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318 and 37 C.F.R. § 42.73*

IPR2017-01560
Patent 5,912,188

Patent Owner also concedes that, in contrast to Ogawa, "Hashimoto fails to use the word 'isotropic' in describing its etching steps." *Id.* at 43. Patent Owner distinguishes Hashimoto by arguing that its etching steps would not necessarily be understood as anisotropic. *Id.* at 36. That argument is substantially different from the argument presented during prosecution, where Applicants distinguished Ogawa by arguing that at least one of its etching steps was required to be isotropic. *Id.* at 15; Ex. 1002, 61.

Accordingly, we decline to exercise our discretion to deny review under section 325(d).

### III. CONCLUSION

Petitioner has shown by a preponderance of the evidence that claims 3, 11–13, 15, and 18–20 of the '188 patent are unpatentable. Petitioner has not shown by a preponderance of the evidence that claims 16, 17, 21–23, and 25–29 of the '188 patent are unpatentable.

### IV. ORDER

Accordingly, in consideration of the foregoing, it is hereby:

ORDERED that, based on a preponderance of the evidence, claims 3, 11–13, 15, and 18–20 of the '188 patent are unpatentable;

FURTHER ORDERED that, based on a preponderance of the evidence, claims 16, 17, 21–23, and 25–29 of the '188 patent are not shown to be unpatentable; and

FURTHER ORDERED that Patent Owner's unopposed motion to excuse the late filing of Exhibits 2012 and 2013 is *granted*; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

EXHIBIT 20

Trials@uspto.gov                                         Paper No. 30
571-272-7822                              Entered:  December 13, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

MICRON TECHNOLOGY, INC.,
Petitioner,

v.

LONE STAR SILICON INNOVATIONS LLC,
Patent Owner.
_____

Case IPR2017-01562
Patent 6,097,061
_____

Before GRACE KARAFFA OBERMANN, KRISTINA M. KALAN, and
ELIZABETH M. ROESEL, *Administrative Patent Judges*.

OBERMANN, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
Determining That Claims 1, 3–6, 11,
And 13–16 Are Proven Unpatentable
*35 U.S.C. § 318(a)*

IPR2017-01562
Patent 6,097,061

### *Claims 3, 4, 11, 13, and 14*

Petitioner directs us to substantial evidence that claims 3, 4, 11, 13, and 14 are obvious over Anderson.  Pet. 81–90.  Patent Owner does not meaningfully contest that evidence, except to argue that Anderson lacks a doped channel region that falls within the scope of the claims.  Resp. 53–60. Here again, Patent Owner's counterarguments are unpersuasive because they are keyed to an incorrect claim construction.  *See supra* section II.A. Accordingly, we determine that Petitioner has demonstrated by a preponderance of the evidence that Anderson renders obvious claims 3, 4, 11, 13, and 14.  Pet. 81–90.

## II.    CONCLUSION

Petitioner has established by a preponderance of the evidence that: (1) claims 1, 3–5, 11, and 13–15 are unpatentable as obvious over Tanaka; (2) claims 6 and 16 are unpatentable as obvious over Tanaka and Ooka; and (3) claims 1, 3, 4, 11, 13, and 14 are unpatentable over Anderson.

## III.    ORDER

It is

ORDERED that each of claims 1, 3–6, 11, and 13–16 of the '061 patent is unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

# EXHIBIT 21

Trials@uspto.gov
571-272-7822

Paper No. 29
Entered:  December 17, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

MICRON TECHNOLOGY, INC.,
Petitioner,

v.

LONE STAR SILICON INNOVATIONS, LLC,
Patent Owner.

————————

Case IPR2017-01563
Patent 6,103,611

————————

Before GRACE KARAFFA OBERMANN, KRISTINA M. KALAN, and
ELIZABETH M. ROESEL, *Administrative Patent Judges*.

KALAN, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
Finding Claims 1–5, 8–12, and 15 Unpatentable
*35 U.S.C. § 318(a)*

IPR2017-01563
Patent 6,103,611

independent claims, which we have discussed above, Patent Owner does not

present additional arguments as to these claims.  *See* PO Resp. 29.  Based on

the record now before us, we are persuaded that Petitioner has shown by a

preponderance of the evidence that the combination of Yonemaru, Ohshima,

and Narita renders obvious claims 2–5 and 9–12.

## III.    CONCLUSION

After considering the parties' arguments and evidence, we are

persuaded that Petitioner has shown by a preponderance of the evidence that

a person having ordinary skill in the art would have combined the teachings

of Yonemaru, Ohshima, and Narita in the manner proposed by Petitioner.

We conclude that Petitioner has satisfied its burden of demonstrating, by a

preponderance of the evidence, that the subject matter of claims 1–5, 8–12,

and 15 of the '611 patent is unpatentable under 35 U.S.C. § 103(a) as

obvious in view of Yonemaru, Ohshima, and Narita.

## IV.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner establishes, by a preponderance of the

evidence, that claims 1–5, 8–12, and 15 of U.S. Patent No. 6,103,611 are

unpatentable; and

FURTHER ORDERED that this is a Final Written Decision;

therefore, parties to the proceeding seeking judicial review of the decision

must comply with the notice and service requirements of 37 C.F.R. § 90.2.

34

# Exhibit 22

Trials@uspto.gov

Tel: 571-272-7822

Paper No. 24

Entered: January 14, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

MICRON TECHNOLOGY, INC.,
Petitioner,

v.

LONE STAR SILICON INNOVATIONS, LLC,
Patent Owner.

————————

Case IPR2017-01566
Patent 6,388,330 B1

————————

Before JON B. TORNQUIST, JOHN F. HORVATH, and
ELIZABETH M. ROESEL, *Administrative Patent Judges*.

ROESEL, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318 and 37 C.F.R. § 42.73*

IPR2017-01566
Patent 6,388,330 B1

Accordingly, after considering the parties' arguments and evidence and the record as a whole, we are persuaded Petitioner has established by a preponderance of the evidence that claims 5 and 10 of the '330 patent are unpatentable as obvious in view of Watatani and Tanaka I.

### III.    CONCLUSION

Petitioner has shown by a preponderance of the evidence that claims 1, 2, 5–7, and 10 of the '330 patent are unpatentable.

### IV.    ORDER

Accordingly, in consideration of the foregoing, it is hereby:

ORDERED that, based on a preponderance of the evidence, claims 1, 2, 5–7, and 10 of the '330 patent are unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

# Exhibit 23

Trials@uspto.gov                                                    Paper No. 26
571-272-7822                                              Entered: January 16, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

MICRON TECHNOLOGY, INC.,
Petitioner,

v.

LONE STAR SILICON INNOVATIONS, LLC,
Patent Owner.

————————

Case IPR2017-01597
Patent 6,023,085

————————

Before KRISTINA M. KALAN, JOHN F. HORVATH, and
ELIZABETH M. ROESEL, *Administrative Patent Judges*.

HORVATH, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2017-01597
Patent 6,023,085

For the reasons discussed in § II.E, *supra*, Petitioner has demonstrated by a preponderance of evidence that claims 1, 3, 6, and 7 are unpatentable as obvious over Hemink.  For the reasons discussed in §II.F, *supra*, Petitioner has demonstrated by a preponderance of evidence that claim 4 is unpatentable as obvious over Hemink and Shudo.

## IV.    ORDER

It is hereby:

ORDERED that claims 1, 3, 4, 6, and 7 of the '085 patent are unpatentable;

FURTHER ORDERED that because this Decision is final a party to this proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

EXHIBIT 24



Case: 23-2007    Document: 70-1    Page: 386    Filed: 07/05/2024

Jason Wejnert
312-637-3394
jason.wejnert@spencepc.com

August 22, 2018

**VIA COURIER AND EMAIL**

Joel L. Poppen
Director of Litigation

Micron Technology, Inc.
P.O. Box 6
Boise, ID 83707-0006

    Re:   **KATANA SILICON TECHNOLOGIES PATENT LICENSING**

Dear Mr. Poppen:

    I write with respect to the Semiconductor Patent Licensing Program of our client, Katana Silicon Technologies LLC ("KST"). KST has a licensing service agreement with Longhorn IP LLC.

    KST owns a portfolio of patents related to semiconductor designs and manufacturing technologies. KST's semiconductor patents have been asserted against major semiconductor companies in the world. Among the potential licensees are: Toshiba, TSMC, SK Hynix and NXP. We believe that products of MICRON TECHNOLOGY, INC. and its subsidiaries/affiliates ("Micron") infringe our client's patented semiconductor technologies and are made using infringing fabrication methods, and thus require a license. In particular, we believe that Micron sells and offers to sell in the United States, and imports into the United States, integrated circuit devices that infringe one or more of the KST patents, including integrated circuit devices incorporated into products such as mobile broadband data devices, modems, smartphones, tablets, smartwatches, cameras, laptops, and automotive applications as well as several other consumer electronics products. We also believe that Micron induces other companies, such as distributors, resellers and end-users, to perform one or more of these acts in the United States. Infringing Micron products that are imported into, and sold and offered for sale in the United States, include but are not limited to integrated circuit devices packaged in a Chip Size Package structure and a manufacturing method that produces the same.

---

Case: 23-2007    Document: 70-1    Page: 387    Filed: 07/05/2024

Page 2 of 3
Joel Poppen
August 22, 2018

Specifically, the following *exemplary* Micron products and fabrication technologies infringe at least the KST patents identified below.

Claims 1, 12, 23 and 30 of U.S. Patent No. RE38,806:

- All integrated circuit devices processed and packaged as shown, for example, in Micron MT29F768G08EEHBBJ4 32L 3D and other devices with a semiconductor device including a stacked package structure and a chip size package structure, with first and second semiconductor chips mounted in a stacked configuration through adhesion layers and wire-bonded to an electrode section of the package, and all sealed within a resin.

Claims 1, 2 and 15 of U.S. Patent No. 6,352,879 B1:

- All integrated circuit devices processed and packaged as shown, for example, in Micron MT29F768G08EEHBBJ4 32L 3D and other devices with a semiconductor device including a stacked package structure and a chip size package structure, with first and second semiconductor chips mounted in a stacked configuration through adhesion layers and wire-bonded to an electrode section of the package, and all sealed within a resin.

Also, subject to receiving confirmation that the information will be treated as privileged settlement information under Fed.R.Evid. 408, we are willing to discuss these issues with Micron. We would be pleased to discuss with you the terms under which your company might obtain a license to the Semiconductor Patent Licensing Program and to answer any questions that you may have. We look forward to your prompt reply, so we can arrange a meeting with you or your representatives as soon as possible.

Thank you in advance for your attention to this matter.

Very truly yours,

SPENCE PC
JASON WEJNERT

Enclosures:
U.S. Patent Nos. RE38,806; 6,352,879 B1:

*Fed. Rule Evid. 408 Settlement Communication*

Page 3 of 3
Joel Poppen
August 22, 2018

cc: William Cory Spence, Khaled Fekih-Romdhane, Chris Dubuc

*Fed. Rule Evid. 408 Settlement Communication*

EXHIBIT 27



Jason Wejnert
312-637-3394
jason.wejnert@spencepc.com

September 18, 2018

**VIA COURIER AND EMAIL**

Joel L. Poppen
Senior Vice President of Legal Affairs, General Counsel and Corporate Secretary

Micron Technology, Inc.
8000 S. Federal Way
MS 1-557
Boise, ID 83716

Re:    **KATANA SILICON TECHNOLOGIES PATENT LICENSING**

Dear Mr. Poppen:

I follow up to write you again with respect to the Semiconductor Patent Licensing Program of our client, Katana Silicon Technologies LLC ("KST"). KST has a licensing service agreement with Longhorn IP LLC. Previously, KST sent you a notice letter on August 22, 2018 (enclosed).

KST owns a portfolio of patents related to semiconductor designs and manufacturing technologies. KST's semiconductor patents have been asserted against major semiconductor companies in the world. Among the potential licensees are: Toshiba, TSMC, SK Hynix and NXP. We believe that products of MICRON TECHNOLOGY, INC. and its subsidiaries/affiliates ("Micron") infringe our client's patented semiconductor technologies and are made using infringing fabrication methods, and thus require a license. In particular, we believe that Micron sells and offers to sell in the United States, and imports into the United States, integrated circuit devices that infringe one or more of the KST patents, including integrated circuit devices incorporated into products such as mobile broadband data devices, modems, smartphones, tablets, cameras, laptops, and automotive applications as well as several other consumer electronics products. We also believe that Micron induces other companies, such as distributors, resellers and end-users, to perform one or more of these acts in the United States. Infringing Micron products that are imported into, and sold and offered for sale in the United States, include but are not limited

Page 2 of 3
Joel Poppen
September 18, 2018

to integrated circuit devices packaged in a Chip Size Package structure and a manufacturing method that produces the same.

Specifically, the following *exemplary* Micron products and fabrication technologies infringe at least the KST patents identified below.

Claims 1 and 12 of U.S. Patent No. RE38,806:

- All integrated circuit devices processed and packaged as shown, for example, in Micron's MT53D512M64D4NZ-053   WT_D   1x   nm   LPDDR4   SDRAM   Memory, MT66R7072A10AB5ZZW 45 nm Phase Change Memory ACMOS and other devices with a semiconductor device including a stacked package structure and a chip size package structure, with first and second semiconductor chips mounted in a stacked configuration through adhesion layers and wire-bonded to an electrode section of the package, and all sealed within a resin.

Claims 1, 2, 3, 4 and 5 of U.S. Patent No. 6,731,013 B2:

- All integrated circuit devices processed and packaged as shown, for example, in Micron MT29F768G08EEHBBJ4 32L 3D NAND Flash Memory and other devices with a semiconductor device including a stacked package structure and a chip size package structure, with first and second semiconductor chips mounted in a stacked configuration through adhesion layers and wire-bonded to an electrode section of the package, and all sealed within a resin.

Also, subject to receiving confirmation that the information will be treated as privileged settlement information under Fed.R.Evid. 408, we are willing to discuss these issues with Micron. We would be pleased to discuss with you the terms under which your company might obtain a license to the Semiconductor Patent Licensing Program and to answer any questions that you may have. We look forward to your prompt reply, so we can arrange a meeting with you or your representatives as soon as possible.

Thank you in advance for your attention to this matter.

Very truly yours,

SPENCE PC
JASON WEJNERT

*Fed. Rule Evid. 408 Settlement Communication*

Page 3 of 3
Joel Poppen
September 18, 2018


Enclosures:
U.S. Patent Nos. RE38,806; 6,731,013 B2; Notice Letter to Micron Technology dated August 22, 2018:



cc: William Cory Spence, Khaled Fekih-Romdhane, Chris Dubuc

*Fed. Rule Evid. 408 Settlement Communication*

# EXHIBIT 29

| | |
|---|---|
| **From:** | Jason Wejnert |
| **To:** | David Ashmore (dashmore) [ CONT-Type2-APS CONSULTING LLC ]; Dave Westergard (dwestergard) |
| **Cc:** | Khaled Fekih-Romdhane; William Cory Spence; Chris Dubuc |
| **Subject:** | FW: [EXT] Katana Silicon Technologies Semiconductor Patent Licensing Program- Sept. 18, 2018 |
| **Date:** | Friday, October 19, 2018 2:53:51 PM |
| **Attachments:** | Katana - Micron Confidentiality Agreement - 09.28.2018.pdf |

David,

I'm following up on my previous email below to see what your availability is in the last week of October or early November to discuss the Longhorn portfolios. I look forward to hearing from you.

Regards,

Jason Wejnert│ SpencePC
Partner
515 N. State, Suite 1801, Chicago, IL 60654
Phone:  312-637-3394 Fax:  312-635-2299
Email:  jason.wejnert@spencepc.com

*PLEASE NOTE OUR CHANGE IN MAILING ADDRESS, EFFECTIVE APRIL 2, 2018*

The information contained in this communication is confidential, may be attorney-client privileged, and is intended only for the use of the addressee. If you believe that you may have received this message in error, please delete the message and notify SpencePC at info@spencepc.com.

---

**From:** Jason Wejnert
**Sent:** Thursday, October 4, 2018 7:49 AM
**To:** 'David Ashmore (dashmore)' <dashmore@micron.com>; Dave Westergard (dwestergard) <dwestergard@micron.com>
**Cc:** Khaled Fekih-Romdhane <khaled@longhornip.com>; Chris Dubuc <chris@longhornip.com>; William Cory Spence <william.spence@spencepc.com>
**Subject:** RE: [EXT] Katana Silicon Technologies Semiconductor Patent Licensing Program- Sept. 18, 2018

David,

Thanks for reaching out and including Dave Westergard on the email chain. Dave W., nice to meet you electronically.

Do you think we can have a meeting the back half of October or early November to discuss the Longhorn portfolios? I sent you an NDA previously, which if you sign, allows us to send you claim charts to discuss. If you have questions or issues about the NDA (attached again), please feel free to contact me.

Regards,

Jason Wejnert│ SpencePC
Partner

515 N. State, Suite 1801, Chicago, IL 60654
Phone: 312-637-3394 Fax: 312-635-2299
Email: jason.wejnert@spencepc.com

*PLEASE NOTE OUR CHANGE IN MAILING ADDRESS, EFFECTIVE APRIL 2, 2018*

The information contained in this communication is confidential, may be attorney-client privileged, and is intended only for the use of the addressee. If you believe that you may have received this message in error, please delete the message and notify SpencePC at info@spencepc.com.

---

**From:** David Ashmore (dashmore) <dashmore@micron.com>
**Sent:** Monday, October 1, 2018 12:59 PM
**To:** Jason Wejnert <Jason.Wejnert@spencepc.com>; Dave Westergard (dwestergard) <dwestergard@micron.com>
**Cc:** Khaled Fekih-Romdhane <khaled@longhornip.com>; Chris Dubuc <chris@longhornip.com>; William Cory Spence <william.spence@spencepc.com>
**Subject:** RE: [EXT] Katana Silicon Technologies Semiconductor Patent Licensing Program- Sept. 18, 2018

Jason,

I'm adding my colleague Dave Westergard, who is handling other Longhorn matters for Micron.

Regards,
David

---

**From:** Jason Wejnert [mailto:Jason.Wejnert@spencepc.com]
**Sent:** Friday, September 28, 2018 8:38 AM
**To:** Joel Poppen (jlpoppen) <jlpoppen@micron.com>
**Cc:** Khaled Fekih-Romdhane <khaled@longhornip.com>; Chris Dubuc <chris@longhornip.com>; William Cory Spence <william.spence@spencepc.com>; David Ashmore (dashmore) <dashmore@micron.com>
**Subject:** RE: [EXT] Katana Silicon Technologies Semiconductor Patent Licensing Program- Sept. 18, 2018

Joel, David,
Please find attached  Confidentiality Agreement between Micron Technology and KST, to allow exchange of information under FRE 408. Please let us know if this is agreeable, and we can send you example claim charts and plan to meet to discuss.

Regards,

Jason Wejnert| SpencePC
Partner
515 N. State, Suite 1801, Chicago, IL 60654

Phone:  312-637-3394 Fax:  312-635-2299
Email:  jason.wejnert@spencepc.com

*PLEASE NOTE OUR CHANGE IN MAILING ADDRESS, EFFECTIVE APRIL 2, 2018*

The information contained in this communication is confidential, may be attorney-client privileged, and is intended only for the use of the addressee. If you believe that you may have received this message in error, please delete the message and notify SpencePC at info@spencepc.com

---

**From:** Joel Poppen (jlpoppen) <jlpoppen@micron.com>
**Sent:** Tuesday, September 18, 2018 2:19 PM
**To:** Jason Wejnert <Jason.Wejnert@spencepc.com>
**Cc:** Khaled Fekih-Romdhane <khaled@longhornip.com>; Chris Dubuc <chris@longhornip.com>; William Cory Spence <william.spence@spencepc.com>; David Ashmore (dashmore) <dashmore@micron.com>
**Subject:** RE: [EXT] Katana Silicon Technologies Semiconductor Patent Licensing Program- Sept. 18, 2018

Mr. Wejnert,

I've copied David Ashmore, Senior Director, Litigation and IP Transactions. He will follow up with you as appropriate. Thanks.  Joel

---

**From:** Jason Wejnert [mailto:Jason.Wejnert@spencepc.com]
**Sent:** Tuesday, September 18, 2018 8:33 AM
**To:** Joel Poppen (jlpoppen) <jlpoppen@micron.com>
**Cc:** Khaled Fekih-Romdhane <khaled@longhornip.com>; Chris Dubuc <chris@longhornip.com>; William Cory Spence <william.spence@spencepc.com>
**Subject:** [EXT] Katana Silicon Technologies Semiconductor Patent Licensing Program- Sept. 18, 2018

Mr. Poppen,
Please see the attached correspondence regarding Katana's Semiconductor Patent Licensing Program.

Regards,

Jason Wejnert│ SpencePC
Partner
515 N. State, Suite 1801, Chicago, IL 60654
Phone:  312-637-3394 Fax:  312-635-2299
Email:  jason.wejnert@spencepc.com

*PLEASE NOTE OUR CHANGE IN MAILING ADDRESS, EFFECTIVE APRIL 2, 2018*

The information contained in this communication is confidential, may be attorney-client privileged, and is intended only for the use of the addressee. If you believe that you may have received this message in error, please delete the message and notify SpencePC at info@spencepc.com

# Exhibit 30

| | |
|---|---|
| **From:** | Dave Westergard (dwestergard) <dwestergard@micron.com> |
| **Sent:** | Monday, February 4, 2019 1:49 PM |
| **To:** | William Cory Spence |
| **Cc:** | Jan Bissey (jbissey); Jason Wejnert; Chris Dubuc; Khaled  Fekih-Romdhane |
| **Subject:** | RE: [EXT] Re: Katana Silicon Technologies Semiconductor Patent Licensing Program- Sept. 18, 2018 |

Hi, Cory.  In truth, I was losing hope of ever hearing from you again, given the pounding your patents (at least in Lone Star) have been taking of late.  😊  But glad to hear you're rid of crutches.  You should take advantage of your newly rekindled mobility to come see some of Idaho's backcountry.  It has no peer.

Moving on to the business at hand, thanks for your email of January 15, 2019, and for your offer of an "early bird special."  After serious internal inquiry and assessment, we can't see the business justification for entering into a license agreement with Katana/Longhorn IP at this time.  Given the PTAB invalidity rulings for each of the Lone Star patents-in-suit, we see the Lone Star "component" at zero.  While we expect Lone Star to appeal, we see little likelihood the Federal Circuit will reverse given the strong analytical underpinnings of PTAB's rulings on each patent.

On the Katana patents, we come to the same conclusion; specifically that the patents presented in our November meeting (US 6,731,013, US RE38,806, and US 6,352,879) and the patents identified in Khaled's follow-up email (US 7,087,524 and US 7,910,437) are either invalid or not infringed.

In our November meeting, you asserted (seconded by Khaled), that Katana is not interested in asserting "weak" patents against anyone.  You invited Micron to provide evidence of weakness.  Below is a brief glimpse of the patents, the prior art, and non-infringement information.  In light of all of this, we don't see benefit in continuing license negotiations.  Let me know if you disagree.
Cheers.
dave.


**US 6,731,013**
1. Priority date of June 28, 2000.
2. Patent claims a semiconductor device wirebonded to a substrate that has a "support pattern" located underneath the wirebonding location on the substrate. The claims require that the support pattern "corresponds" to the wire bonding location.
3. The claim chart that Katana presented shows a metal fill pattern located on the substrate of a FBGA packaged device that does not "correspond" to the location of the wirebond location as interpreted in light of the specification.
4. The exemplary Micron product that Katana presented does not have a "support pattern" that corresponds to the wirebond location on the substrate.
5. This technology (as construed by Katana's claim construction/claim charts) was known and used prior to the priority date of the patent.  An example is an Intel product with an SRAM and NAND device part number 28F1602C3.  See TechInsights, Report #PKG-1342 (analysis conducted in 1999).  Other companies used similar technology, notably Texas Instruments MicroStar$^{tm}$ BGA and Memory Flex$^{tm}$, GE Chip-on Flex$^{tm}$ and Amkor Flex BGA$^{tm}$.  Each of the foregoing used stacked wirebonded packaging technology prior to the priority date of the patent.
6. Numerous US patents and non-patent literature describe similar use of "support patterns" located beneath the wire bond location on the substrate.  See, for example, U.S. Patent Nos. 5,519,936; 5,639,695; 6,172,419; and 5,541,450.

**US RE38,806 and US 6,352,879**

1. These patents are related back to US 6,100,594 and have a priority date of December 30, 1998.
2. These patents claim a stacked multi-chip package primarily using wirebonds to connect to the mounting substrate.
   a. Notable difference in the claims
      i. US 6,100,594: all independent claims are method claims. Various face up and face down embodiments are claimed. Claims 1 and 11 requires the stacked semiconductor chips come from different wafers.
      ii. US RE38,806: 6 device claims + 2 method claims. The device claims vary the methods and orientation of the die used to form the stack. Method claims are similar to the '594 patent.
3. This technology was known and used prior to the inventive date of the patent. An example is an Intel package with a stacked SRAM and NAND device part number 28F1602C3, ca 1998. A report is available from TechInsights, Report #PKG-1342, analysis conducted in 1999.
4. The Multi-Chip Module ("MCM") consortium was working on stacking technology prior to the priority date of these patents. The MCM consortium produced a significant amount of non-patent literature dating back to 1980 regarding various methods of stacking multiple semiconductor chips into one package. Wirebond was the common method of attachment between the semiconductor devices and the substrate. Notably, a company called nChip published an article in 1994 describing "Laminated Memory" and used stacked Micron SRAM, MT2C2568, as a demonstration vehicle.
5. Several US patents disclose and claim the same subject matter as (and pre-date) the Katana patents, notably US 5,495,398; US 5,527,740; US 5,322,207; and US 5,608,262.

**US 7,087,524**

1. Priority date July 09, 2003.
2. This patent has one independent method claim regarding a damascene copper layer that is that has a "metal element doping layer" on the surface of the copper layer.
3. Micron products do not use a method of forming a "metal element doping layer" on top of our copper layers.

**US 7,910,437**

1. Priority date Nov 19, 2009.
2. This patent has one independent method claim regarding the formation of a recessed gate transistor using two trenches.
3. Micron processes do not use a method of forming a recessed gate transistor using two stacked trenches.

---

**From:** William Cory Spence [mailto:william.spence@spencepc.com]
**Sent:** Tuesday, January 15, 2019 9:35 AM
**To:** Dave Westergard (dwestergard) <dwestergard@micron.com>
**Cc:** Jan Bissey (jbissey) <jbissey@micron.com>; Jason Wejnert <Jason.Wejnert@spencepc.com>; Chris Dubuc <chris@longhornip.com>; Khaled Fekih-Romdhane <khaled@longhornip.com>
**Subject:** Re: [EXT] Re: Katana Silicon Technologies Semiconductor Patent Licensing Program- Sept. 18, 2018

Dave,

Happy New Year. I hope that 2019 is off to a great start for you. I am happy to report that I have finally been "relieved" of my crutches. It is a very welcome development to be walking again.

I am also writing to express my thanks to you for hosting our meeting in November. It was humbling to learn that Micron does not often host such meetings with potential licensors. We appreciate the apparent serious consideration given to the Katana patent porfolio.

Further, as Khaled mentioned, I left our meeting with an appreciation that Micron may be willing to negotiate a comprehensive agreement to address the the entirety of the licensing opportunities that both law firms presented. I believe that the negotiated financial terms with Fitch are well defined at this point. Please let me know if you are available this week to further define potential financial terms for the Katana component of such a possible comprehensive agreement.

I am confident we can jointly succeed here. And I look forward to hearing from you soon so that we can explore the necessary and mutually rewarding terms that will provide ample justification for Micron to become one—of what we anticipate will soon be many—valuable licensees. Of course, early adopters, such as your self, are far for more likely to receive more favorable terms. The timing may be a big benefit to you.

In the meantime, please let me know if your travels will bring you to Chicago (or whether we might cross paths in Korea or Japan where I will once again be traveling from the 21st to the 27th).

Cory

William C. Spence | SpencePC
515 N. State, Suite 1801
Chicago, IL, 60654
P 312.404.8882 | C 312.882.4468
E william.spence@spencepc.com

The information contained in this communication is confidential, may be attorney-client privileged, and is intended only for the use of the addressee. If you believe that you may have received this message in error, please delete the message and notify SpencePC at info@spencepc.com.

On Tue, Nov 20, 2018 at 2:17 AM -0600, "Khaled Fekih-Romdhane" <khaled@longhornip.com> wrote:

Hi Dave,

Thanks a lot for meeting with us last week. It was a productive and fruitful conversation and we were delighted to meet you and Jan face-to-face. We look forward to your feedback this week as we discussed. In the meantime and since you mentioned that you turned the "machine" on and that there is eventually some interest in a global deal with LIP, it might be helpful to also look at some patents from the Carthage portfolio that are not licensed to Micron such as US7087524 and US7910437 among others. As I mentioned during the meeting, we are willing to be flexible and to work with you on a fair deal for both of us.

Please let me know if you have any questions or concerns. Cory and Nick are also happy to help if there are any outstanding questions on your end. I look forward to any feedback from David Kaplan as well.

Best Regards,
Khaled

On Wed, Nov 14, 2018 at 9:42 AM Dave Westergard (dwestergard) <dwestergard@micron.com> wrote:

Copy that. Check into Building 17C (most cabbies know location on north side of campus with small, blue tent/looking things over the entryway). Security will advise us, and someone will come get you. We don't have access to more than one conference room so if you don't intend for your entire party to be in the room at the same time, some will need to wait downstairs.

On Nov 14, 2018, at 8:37 AM, Khaled Fekih-Romdhane <khaled@longhornip.com> wrote:

> Hi Dave,
>
> Due to some issues, we might be few minutes late. Please bare with us.
>
> Best,
> Khaled
>
> On Nov 1, 2018, at 7:07 PM, Dave Westergard (dwestergard) <dwestergard@micron.com> wrote:
>
>> Micron Technology, Inc.
>>
>> 8000 S. Federal Way
>>
>> Boise, ID  83716
>>
>>
>> Bldg 17C
>>
>> <mime-attachment.ics>

--
Khaled Fekih-Romdhane
Founder and Managing Member
Longhorn IP LLC
www.longhornip.com
https://www.linkedin.com/in/khaledfekih
Mobile | 469.268.2567

EXHIBIT 31

**From:** Khaled Fekih-Romdhane [mailto:Khaled@longhornip.com]
**Sent:** Tuesday, November 20, 2018 12:17 AM
**To:** Dave Westergard (dwestergard) <dwestergard@micron.com>
**Cc:** Ian Bisney (jbisney <jbisney@micron.com>; Jason Weinert <Jason.Weinert@axiospc.com>; William Cory Spence <william.spence@spencepc.com>; Chris Dubuc <chris@longhornip.com>
**Subject:** Re: [EXT] Re: Katana Silicon Technologies-Semiconductor Patent Licensing Program- Sept. 18, 2018

Hi Dave,

Thanks a lot for meeting with us last week. It was a productive and fruitful conversation and we were delighted to meet you and Ian face-to-face. We look forward to your feedback this week as we discussed. In the meantime and since you mentioned that you turned the "machine" on and that there is eventually some interest in a global deal with LIP, it might be helpful to also look at some patents from the Carthage portfolio that are not licensed to Micron such as US7087524 and US7910437 among others. As I mentioned during the meeting, we are willing to be flexible and to work with you on a fair deal for both of us.

Please let me know if you have any questions or concerns. Cory and Nick are also happy to help if there are any outstanding questions on your end. I look forward to any feedback from David Kaplan as well.

Best Regards,
Khaled

On Wed, Nov 14, 2018 at 9:42 AM Dave Westergard (dwestergard) <dwestergard@micron.com> wrote:

Copy that. Check into Building 17C (most cabbies know location on north side of campus with small, blue tent/looking things over the entryway). Security will advise us, and someone will come will come get you. We don't have access to more than one conference room so if you don't intend for your entire party to be in the room at the same time, some will need to wait downstairs.

On Nov 14, 2018, at 8:37 AM, Khaled Fekih-Romdhane <Khaled@longhornip.com> wrote:

Hi Dave,

Due to some issues, we might be few minutes late. Please bare with us.

Best,
Khaled

On Nov 1, 2018, at 7:07 PM, Dave Westergard (dwestergard) <dwestergard@micron.com> wrote:

Micron Technology, Inc.

8000 S. Federal Way

Boise, ID 83716

Bldg 17C

<mime-attachment.ics>

---

Khaled Fekih-Romdhane
Founder and Managing Member
Longhorn IP LLC
www.longhornip.com
https://www.linkedin.com/in/khaledfekih
Mobile 1.469.268.2567

**Appx1048**

# EXHIBIT 32

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| KATANA SILICON TECHNOLOGIES LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § § | Case No. 1:22-cv-00214-LY |
| MICRON TECHNOLOGY, INC.; MICRON SEMICONDUCTOR PRODUCTS, INC.; and MICRON TECHNOLOGY TEXAS, LLC, | § § § § § § § | **JURY TRIAL DEMANDED** |
| Defendants. | § § | |

## KATANA'S RESPONSE IN NON-OPPOSITION
## TO MICRON'S MOTION TO TRANSFER

Plaintiff Katana Silicon Technologies LLC ("Katana") responds to the motion (Dkt. 14) of all three Defendants ("Micron") under 28 U.S.C. § 1404(a) to transfer to the District of Idaho.

In recent patent lawsuits involving unrelated plaintiffs, Micron has requested transfer ***to*** the Austin Division of the Western District of Texas, where it has a substantial presence. *E.g.*, Case No. 1:22-cv-00136-LY, Dkt. 43 (Micron stipulating "to the entry of an Order transferring the above-captioned action to the United States District Court for the Western District of Texas, Austin Division, for the convenience of the parties and witnesses and in the interest of justice"); Case No. 6:20-cv-00500-ADA, Dkt. 34 (Micron moving for intra-district transfer to the Austin Division). Yet in this case, where Plaintiff Katana is in Texas, Micron moves to transfer ***out*** of the Austin Division to the District of Idaho.

Even so, to conserve party and judicial resources, and based on Micron's representations in its motion and accompanying evidence (which Katana reserves the right to challenge as appropriate in other contexts), Katana has determined it is not opposed to the Micron motion's

1

requested relief in this particular case. Katana's non-opposition to Micron's requested relief should

not be interpreted as any form of agreement to Micron's allegations, including those concerning

Katana or affiliated companies.


Dated: July 6, 2022                                    Respectfully submitted,

                                                       */s/ Scott W. Breedlove*
                                                       E. Leon Carter
                                                       lcarter@carterarnett.com
                                                       Texas Bar No. 03914300
                                                       Scott W. Breedlove
                                                       sbreedlove@carterarnett.com
                                                       Texas Bar No. 00790361
                                                       Bradley D. Liddle
                                                       bliddle@carterarnett.com
                                                       Texas Bar No. 24074599
                                                       Seth A. Lindner
                                                       slinder@carterarnett.com
                                                       Texas Bar No. 24078862
                                                       Theresa M. Dawson
                                                       tdawson@carterarnett.com
                                                       Texas Bar No. 24065128
                                                       Daniel L. Schmid
                                                       Texas State Bar No. 24093118
                                                       dschmid@carterarnett.com
                                                       Nathan Cox
                                                       ncox@carterarnett.com
                                                       Texas Bar No. 24105751
                                                       **CARTER ARNETT PLLC**
                                                       8150 N. Central Expy, 5th Floor
                                                       Dallas, Texas 75206
                                                       Telephone No. (214) 550-8188
                                                       Facsimile No. (214) 550-8185

                                                       **ATTORNEYS FOR PLAINTIFF
                                                       KATANA SILICON TECHNOLOGIES
                                                       LLC**

# EXHIBIT 34

Case 1:22-cv-00273-DCN    Document 15-37    Filed 07/21/22    Page 2 of 33



# AIPLA
## 2021
### Report of the Economic Survey

Prepared Under Direction of the
American Intellectual Property Law Association
Law Practice Management Committee

**American Intellectual
Property Law Association**
1400 Crystal Drive, Suite 600
Arlington, VA 22202

www.aipla.org

EXHIBIT 35

# IPRs: Balancing Effectiveness vs. Cost

June 17, 2016

Our continued study of *inter partes* review (IPR) as a potentially cost-effective alternative or adjunct to district court litigation shows that IPRs are relatively cheap *per petition*—but single-petition IPR strategies are not always sufficient. Multi-petition strategies, on the other hand, can cost millions. Whether IPR is a cost-effective strategy to deal with a patent assertion or an expensive detour depends on the chosen strategy and the circumstances of the campaign.

**The cost baseline**

Data confirm that an IPR generally costs in the six figures. Most range from about $100,000 to $700,000, depending on the litigation stage reached. As illustrated by the percentiles, costs vary widely even at the same stage; indeed, some petitions cost more just to file than others cost to reach final decision. This variation likely reflects case-specific circumstances that drive costs. For example, some petitioners use a "copycat" strategy, filing a petition that lifts the arguments from an existing IPR that the new petitioner then seeks to join. Such a petition requires far less counsel time, which is the most significant component of cost.

**Figure 1: Median and Range of Costs per IPR Petition (Cumulative, by Stage)**



To be sure, a six-figure price tag is much cheaper than the total cost of defense for most district court litigations, which can reach into the seven figures by the time validity is usually determined—that is, at summary judgment or trial. This math makes IPR an attractive alternate strategy to litigation alone, especially considering the much faster, far more certain 18-month timeline to resolution. Still, the particular circumstances matter.

# EXHIBIT 36
# FILED UNDER SEAL

SETTLEMENT AND PATENT LICENSE AGREEMENT

between

LONE STAR SILICON INNOVATIONS LLC

and

MICRON TECHNOLOGY, INC.

1

Keely E. Duke
ISB #6044; ked@dukevett.com
Mallam J. Prior
ISB#10938; mjp@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Longhorn IP LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICRON TECHNOLOGY, INC.; MICRON SEMICONDUCTOR PRODUCTS, INC.; and MICRON TECHNOLOGY TEXAS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> LONGHORN IP LLC <br><br> Defendant. | CASE NO. 1:22-cv-00273-DCN <br><br> **DEFENDANT LONGHORN IP LLC'S MOTION TO STAY BOND PROCEEDINGS OR, IN THE ALTERNATIVE, FOR ENTRY OF A BRIEFING SCHEDULE** |

Defendant Longhorn IP LLC ("Defendant" or "Longhorn"), by and through the undersigned counsel of record, upon the accompanying Memorandum in Support, moves to stay proceedings related to the motion (Dkt. 3) and memorandum (Dkt. 15) of the three Plaintiffs ("Micron") to require Longhorn to pay a $15 million bond ("Bond Motion"), pending resolution of Longhorn's Motion to Dismiss (Dkt. 7); or, in the alternative, to enter a briefing schedule allowing a brief discovery period before Longhorn is required to file its response brief, and for other and further relief that the Court deems just and proper.

**DEFENDANT LONGHORN IP LLC'S MOTION TO STAY BOND PROCEEDINGS OR, IN THE ALTERNATIVE, FOR ENTRY OF A BRIEFING SCHEDULE - 1**

WHEREFORE, said Defendant respectfully requests that this Motion be granted in its entirety.

DATED this 28th day of July, 2022.

DUKE EVETT, PLLC


By /s/Keely E. Duke_ _____
Keely E. Duke – Of the Firm
Mallam J. Prior – Of the Firm


/s/ Nathan Cox
Nathan Cox (*pro hac vice*)
ncox@carterarnett.com
Texas Bar No. 24105751
**CARTER ARNETT PLLC**
8150 N. Central Expy, 5th Floor
Dallas, Texas 75206
Telephone No. (214) 550-8188
Facsimile No. (214) 550-8185
*Attorneys for Defendant*
*Longhorn IP LLC*

## **CERTIFICATE OF CONFERENCE**

I hereby certify that on the 28th day of July, 2022, counsel for Plaintiffs indicated Plaintiffs were opposed to the motion to stay.

Daniel Graham                    DGraham@perkinscoie.com
Amanda Tessar                   ATessar@perkinscoie.com


/s/Keely E. Duke
Keely E. Duke

**DEFENDANT LONGHORN IP LLC'S MOTION TO STAY BOND PROCEEDINGS OR, IN THE ALTERNATIVE, FOR ENTRY OF A BRIEFING SCHEDULE - 3**

**Appx1117**

David Krueck, Bar No. 6246
DKrueck@perkinscoie.com
Daniel Graham, Bar No. 11506
DGraham@perkinscoie.com
PERKINS COIE LLP
1111 West Jefferson Street, Suite 500
Boise, Idaho 83702-5391
Telephone: 208.343.3434
Facsimile: 208.343.3232

Amanda Tessar, admitted *pro hac vice*
ATessar@perkinscoie.com
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, Colorado 80202
Telephone: 303.291.2357
Facsimile: 303.291.2457

**ATTORNEYS FOR PLAINTIFFS,
MICRON TECHNOLOGY, INC.,
MICRON SEMICONDUCTOR PRODUCTS, INC., AND
MICRON TECHNOLOGY TEXAS, LLC**

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., and MICRON TECHNOLOGY TEXAS, LLC., <br><br> *Plaintiffs,* <br><br> v. <br><br> LONGHORN IP, LLC, <br><br> *Defendant.* | Case No. 1:22-cv-00273-DCN <br><br> **MICRON'S OPPOSITION TO LONGHORN'S MOTION TO DISMISS MICRON'S COMPLAINT PURSUANT TO F.R.C.P. 12(B)(6)** |

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

II.     LEGAL STANDARDS FOR A MOTION TO DISMISS ................................................. 3

III.    MICRON'S CLAIM IS NOT TIME-BARRED ......................................................... 3

        A.      The Statute Of Limitations For Idaho's Bad Faith Patent Assertion ................. 3

        B.      Micron's Claim Is Not Time-Barred Both Because Longhorn Has
                Committed A Continuing Tort And Because It Is Based On The Katana
                Complaint, With Each Bad Faith Assertion Being A Separate Violation Of
                The Idaho Statute ............................................................................... 3

        C.      Longhorn Is A Proper Target For Micron's Bad Faith Assertion Claim ........... 5

IV.     THE IDAHO STATUTE IS NOT PREEMPTED OR OTHERWISE UNCONSTITUTIONAL ............ 6

        A.      Idaho's Statute Is Not Preempted ....................................................... 6

        B.      Longhorn's Kitchen Sink Of Other Constitutional Complaints Fares No
                Better ................................................................................................ 11

        C.      A Rule 12(b)(6) Motion Is Not The Right Platform To Strike Down A
                State Statute ...................................................................................... 13

V.      MICRON'S CLAIMS ARE MORE THAN SUFFICIENT TO STATE A PLAUSIBLE CLAIM
        THAT LONGHORN HAS ACTED WITH OBJECTIVE AND SUBJECTIVE BAD FAITH ............ 14

        A.      Micron's Allegations Are Detailed And Thorough ......................................... 14

        B.      None Of Longhorn's Attempts To Undercut Micron's Detailed Showing
                Of Bad Faith Move The Needle ............................................................ 17

        C.      If The Court Believes That Micron Has Not Adequately Pleaded Good
                Faith, Leave To Amend Should Be Granted .......................................... 20

TABLE OF AUTHORITIES

CASES

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................3

*B&G Foods N. Am., Inc. v. Embry,*
    29 F.4th 527 (9th Cir. 2022) ...................................................................12

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................3

*Building Innovation Indus., L.L.C. v. Onken,*
    473 F. Supp. 2d 978 (D. Ariz. 2007) .....................................................10

*Bumgarner v. Bumgarner,*
    862 P.2d 321 (Idaho Ct. App. 1993) ........................................................5

*Courthouse News Serv. v. Omundson,*
    No. 1:21-cv-305, 2022 WL 1125357 (D. Idaho Apr. 14, 2022) ............13

*Curtis v. Firth,*
    850 P.2d 749 (Idaho 1993) ..................................................................4, 5

*English v. Gen. Elec. Co.,*
    496 U.S. 72 (1990) ...................................................................................7

*Frisby v. Schultz,*
    487 U.S. 474 (1988) .................................................................................7

*Globetrotter Software, Inc. v. Elan Comput. Grp., Inc.,*
    362 F.3d 1367 (Fed. Cir. 2004) ...............................................................7

*Hartman v. Canyon Cnty.,*
    No. 1:20-cv-26, 2021 WL 4847426 (D. Idaho Oct. 18, 2021) .........2, 18

*Jones v. Runft, Leroy, Coffin & Matthews, Chartered,*
    873 P.2d 861 (Idaho 1994) .......................................................................4

*Keene v. Smith,*
    569 F. Supp. 1513 (E.D. Cal. 1983) ................................................. 13-14

*Kimble v. Marvel Ent., LLC,*
    576 U.S. 446 (2015) ...............................................................................19

*Lafky Properties, LLC v. Glob. Credit Union,*
    No. 1:19-cv-413, 2020 WL 4736296 (D. Idaho Aug. 14, 2020) ...........17

MICRON'S OPPOSITION TO
LONGHORN'S MOTION TO DISMISS

*Landmark Tech., LLC v. Azure Farms, Inc.*,
     No. 3:18-cv-1568, 2020 WL 1430088 (D. Or. Mar. 24, 2020) ......................2, 9, 20

*Medtronic, Inc. v. Lohr*,
     518 U.S. 470 (1996)............................................................................................7

*Miesen v. Henderson*,
     No. 1:10-cv-404, 2017 WL 4270630 (D. Idaho Sept. 26, 2017) ..............................4

*MPJH Tech. Invs., LLC v. Sorrell*,
     108 F. Supp. 3d 231 (D. Vt. 2015).......................................................................10

*Nakota Trucking, LLC v. HUB Int'l Mountain States Ltd.*,
     No. 1:22-cv-41, 2022 WL 2702535 (D. Idaho July 12, 2022)................................20

*NAPCO, Inc. v. Landmark Tech. A, LLC*,
     555 F.Supp. 3d 189 (M.D.N.C 2021) .............................................................. *passim*

*Nw. Band of Shoshone Nation v. Idaho*,
     No. 4:21-cv-252, 2022 WL 170034 (D. Idaho Jan. 19, 2022)..................................3

*Pavo Sols. LLC v. Kingston Tech. Co.*,
     35 F.4th 1367 (Fed. Cir. 2022) ...........................................................................20

*Pippen v. NBCUniversal Media*,
     734 F.3D 610 (7th Cir. 2013) ...............................................................................3

*Pub. Citizen v. U.S. Dep't of Just.*,
     491 U.S. 440 (1989)........................................................................................7, 12

*Puritan Med. Prods. Co. v. Copan Italia S.P.A.*,
     188 A.3d 853 (Me. Super. Ct. 2018)................................................................2, 10

*Sahara Case, LLC v. BelAir Elecs., Inc.*,
     No. 1:22-cv-96 ...................................................................................................13

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
     709 F.3d 1281 (9th Cir. 2013) .............................................................................11

*Summer Infant (USA), Inc. v. Tomy Int'l, Inc.*,
     No. 17-549, 2019 WL 5540224 (D.R.I. Oct. 25, 2019).........................................10

*Triple7Vaping.com, LLC v. Shipping & Transit LLC*,
     No. 16-cv-80855, 2017 WL 5329874 (S.D. Fla. Feb. 6, 2017) ......................... 2, 9-10

*Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*,
     411 F.3d 1369 (Fed. Cir. 2005)..............................................................................7

MICRON'S OPPOSITION TO
LONGHORN'S MOTION TO DISMISS

*United States v. Koziol*,
    993 F.3d 1160 (9th Cir. 2021) ............................................................12

STATUTES

35 U.S.C. § 255 .................................................................................................19

Idaho Code § 48-1701 *et seq.* .................................................................. *passim*

OTHER AUTHORITIES

37 C.F.R. § 1.323 .............................................................................................19

Fed. R. Civ. Proc. 5.1(c) ..................................................................................13

Fed. R. Civ. Proc. 12(b)(6) ...................................................................... *passim*

MPEP § 1481 (9th ed. Rev. 10, June 2020)......................................................19

MICRON'S OPPOSITION TO
LONGHORN'S MOTION TO DISMISS

## I.    INTRODUCTION

Finally faced with the prospect of being held accountable for its questionable business practices and unwarranted patent assertions against Micron, Longhorn moves to dismiss.  In doing so, Longhorn casts itself as the victim—an "unlucky smaller" company subject to "bully[ing]" and "intimidat[ion]" by Micron.  Dkt. 7-1 ("MTD") at 1.  Size alone, however, does not make a bully.  Micron neither sought nor picked this fight.  Instead, Longhorn itself, over the course of years, continually lobbed baseless assertions of patent infringement at Micron, accompanied by demands for hush-money payments to which Longhorn is not entitled.  Longhorn is the one that has tried to avoid Idaho and the protections that its statutes afford its citizens, including through the present motion.  Longhorn cannot claim surprise now that Micron is standing up for itself.

Longhorn makes three arguments in support of dismissal, none with any merit.  First, it argues that Micron's claim is barred by Idaho's statute of limitations because Longhorn waited three *and a half* years after sending its bad faith demand letters before actually suing, supposedly putting its bad faith conduct outside the three-year statute of limitations.  But this approach ignores: (a) settled Idaho law regarding the continuing tort doctrine; (b) the fact that Micron's Complaint also expressly includes allegations of bad faith assertions by Longhorn within the past three years; and (c) the language of Idaho's bad faith statute itself, which states that "[e]ach bad faith assertion of patent infringement constitutes a *separate violation* under this chapter."  Idaho Code § 48-1706(3) (2022) (emphasis added).  In short, Micron makes its claim well within the statute of limitations.  Properly considered, Longhorn's 2018 letters each constitute independent violations of Idaho's statute, since Idaho law tolls the statute of limitations for continuing torts, and/or they provide context for and evidence of Longhorn's intent when it more recently violated the Idaho statute through the filing of its Complaint—in a way that is now causing material damages.

Second, Longhorn argues that federal law preempts Idaho's statute, citing old cases that pre-date the bad faith patent assertion statutes that have now—in the past decade—been adopted by more than thirty states.  Curiously and tellingly, Longhorn's motion fails to cite the recent cases that have considered preemption and other constitutional challenges to these specific types of

statutes. Notably, such decisions **reject** arguments that state law bad faith patent assertion statutes are preempted or are otherwise unconstitutional, so long as the courts applying these statutes require a showing of both objective and subjective bad faith—just as Idaho's statute also permits.[1]

Third, Longhorn makes the more traditional Rule 12(b)(6) argument that Micron has not alleged facts sufficient to state a claim that is plausible on its face, including because it has not alleged facts supporting both objective and subjective bad faith. This is simply wrong. Micron's Complaint provides more than twenty-five pages of detailed allegations that support Micron's claim of bad faith, including allegations of subjective and objective bad faith, as detailed below. This Court should reject Longhorn's weak attempts to rebut Micron's allegations on the merits (e.g., by claiming that its materially incorrect allegations are "typos" and "drafting errors"), particularly in the context of a Rule 12(b)(6) motion.[2]

In short, Micron has fully satisfied the applicable pleading standards, and Longhorn's motion should be denied in full.

---

[1] *See, e.g.*, *NAPCO, Inc. v. Landmark Tech. A, LLC*, 555 F. Supp. 3d 189 (M.D.N.C. 2021) (upholding North Carolina's statute against preemption and other constitutional challenges); *Landmark Tech., LLC v. Azure Farms, Inc.*, No. 3:18-cv-1568, 2020 WL 1430088 (D. Or. Mar. 24, 2020) (rejecting preemption arguments for Oregon's bad faith patent assertion statute, although dismissing complaint with leave to amend due to inadequate pleading of bad faith); *Triple7Vaping.com, LLC v. Shipping & Transit LLC*, No. 16-cv-80855, 2017 WL 5329874, at *6-7 (S.D. Fla. Feb. 6, 2017) (denying motion to dismiss based on preemption arguments for Maryland statute); *Puritan Med. Prods. Co. v. Copan Italia S.P.A.*, 188 A.3d 853 (Me. Super. Ct. 2018) (upholding Maine's bad faith assertion statute as not preempted, although granting summary judgment for patentholder due to insufficient evidence of bad faith).

[2] Under the auspices of describing the "background on the litigation," Longhorn spends two pages disparaging Micron and introducing—without citation—new factual allegations. MTD at 1-2. For instance, Longhorn claims that Sharp (the original owner of the asserted patents) was an industry leader for the technologies of the asserted patents and that those patents are "foundational" (despite, apparently, Sharp's decision to sell them). Longhorn likewise alleges that the patents have "block[ed] Micron's own attempts on multiple occasions in the 2000s to obtain certain patent claims." *Id*. at 2. These allegations are false and reflect Longhorn's fundamental misunderstanding of patent prosecution practice, and none of the Sharp patents at issue here ultimately "blocked" a single Micron patent claim. More importantly for now, these allegations cannot be considered in the context of a motion to dismiss. *Hartman v. Canyon Cnty.*, No. 1:20-cv-26, 2021 WL 4847426, at *3 (D. Idaho Oct. 18, 2021) ("In ruling on a Rule 12(b)(6) motion, the Court may not consider any material beyond the pleadings.").

MICRON'S OPPOSITION TO
LONGHORN'S MOTION TO DISMISS

## II. Legal Standards For A Motion To Dismiss

To survive a Rule 12(b)(6) motion such as this one, Micron need only allege enough facts to state a claim that is "plausible" on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). No more is required. When evaluating the sufficiency of a pleading, the pleading's factual allegations must be accepted as true. *See, e.g.*, *Nw. Band of Shoshone Nation v. Idaho*, No. 4:21-cv-252, 2022 WL 170034, at *3 (D. Idaho Jan. 19, 2022). Moreover, when allegations relate to a defendant's state of mind, such as whether the defendant acted in bad faith, courts have found that such allegations may be pleaded generally so long as a plaintiff points to details sufficient to render a claim plausible. *See, e.g.*, *Pippen v. NBCUniversal Media*, 734 F.3D 610, 614 (7th Cir. 2013); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 570.

## III. Micron's Claim Is Not Time-Barred

### A.    The Statute Of Limitations For Idaho's Bad Faith Patent Assertion

A claim of bad faith patent infringement under Idaho's statute can, unequivocally, be based on the filing of a complaint. Section 48-1703(1) explicitly so provides: "It is unlawful for a person to make a bad faith assertion of patent infringement in a demand letter, ***a complaint*** or any other communication" (emphasis added).

The statute of limitations for claims of bad faith patent assertion is set forth in Section 48-1706(3). After providing for three years to file suit, that provision states: "Each bad faith assertion of patent infringement constitutes a ***separate*** violation under this chapter" (emphasis added). In other words, the statute is plain on its face that, each and every bad faith assertion in "a demand letter, a complaint or any other communication," qualifies as a separate violation of the statute.

### B.    Micron's Claim Is Not Time-Barred Both Because Longhorn Has Committed A Continuing Tort And Because It Is Based On The Katana Complaint, With Each Bad Faith Assertion Being A Separate Violation Of The Idaho Statute

Katana (i.e., Longhorn) filed its Western District of Texas Complaint against Micron on March 4, 2022. Ex. 1 to Dkt. 1-4 ("Katana Complaint," No. 1:22-cv-214). Barely three months later, on June 6, 2022, Micron filed its Complaint here against Longhorn. Dkt. 1-4 ("Micron Complaint," No. 1:22-cv-273). This filing was well within the statute of limitations.

Micron's Complaint is clear that its claims are centered on the Katana Complaint, which makes sense since that is the event that has caused the most damage to Micron. In its Complaint, Micron therefore expressly points to "the Complaint filed in the Western District of Texas" in describing the basis for Micron's claim. *Id*. ¶ 86. Likewise, Micron specifically pointed out that the Katana Complaint "was filed less than three years ago." *Id*. ¶ 89. Micron also alleges violation of the Idaho statute based on pre-suit conduct (e.g., ¶ 86 also points to "claims and demands made by Longhorn acting on its own and through Katana prior to the filing of the Complaint") and additionally explains that some pre-suit communications occurred in 2019 and 2020. *Id*. ¶ 55.

Longhorn is wrong that its 2018 letters fall outside the statute of limitations for Micron's bad faith claim. Because Longhorn continued its misconduct "over a period of time," this behavior constitutes a "continuing tort," tolling the statute of limitations:

> "Continuing tort" has been defined as "one inflicted over a period of time; it involves a wrongful conduct that is repeated until desisted, and each day creates a separate cause of action. A continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation."

*Curtis v. Firth*, 850 P.2d 749, 754 (Idaho 1993) (quoting 54 C.J.S. *Limitations of Actions* § 177, at 231 (1987)) (internal punctuation and citations removed).[3] Longhorn relies heavily in its motion on Micron's use of the term "persisted" in a single paragraph (¶ 55) of Micron's Complaint, but Longhorn's behavior allows for no better characterization than that. Longhorn made bad faith allegations of infringement in 2018, and it persisted in making them again in 2019 and 2020, and then again in 2022 when it filed a patent infringement complaint against Micron in Texas. This is the essence of a continuing tort: repeated misconduct that occurs over a period of time.

But even if the Court concludes that each instance of Longhorn's wrongful conduct is

---

[3] The cases cited by Longhorn, *Miesen v. Henderson*, No. 1:10-cv-404, 2017 WL 4270630, at *7 (D. Idaho Sept. 26, 2017), and *Jones v. Runft, Leroy, Coffin & Matthews, Chartered*, 873 P.2d 861, 867 (Idaho 1994), involved the distinct and different question of how to determine when a cause of action accrues when the parties dispute when the plaintiff knew or should have known of the tort in question. No such issue exists here, where the bad faith assertions were known to each party, and each separate assertion constitutes its own tort under the statute.

separate, despite the rule described above, then "the statute of limitations begins to run from the time of the commission of each wrongful act." *Curtis*, 850 P.2d at 754. There is no support in Idaho law for the idea that repeat offenders get a free pass every time that they commit a tort because their victim did not initially move fast enough. *Id*. Indeed, this point is embedded in the language of Idaho's bad faith assertion statute itself so that there can be no ambiguity: "Each bad faith assertion of patent infringement constitutes a separate violation under this chapter." § 48-1706(3). Micron has alleged misconduct occurring within the past three years, including the filing of the Complaint in the Western District of Texas in March of this year.[4] *See* Micron Complaint at ¶¶ 55, 87(d), 89. There is therefore no basis to dismiss Micron's claim as time-barred.

## C.      Longhorn Is A Proper Target For Micron's Bad Faith Assertion Claim

In the context of its statute of limitations argument, Longhorn also sprinkles in the argument that Longhorn is not the right defendant for Micron's bad faith infringement claim because it is not the alter ego of, and does not have a principal/agent relationship with, Katana. Although difficult to understand, it appears that Longhorn attempts to avoid the inescapable conclusion about the relationship between Longhorn and Katana by positing that Micron's Complaint attributed only the demand letters to Longhorn, and only the filing of the Complaint to Katana, thus leading Longhorn to suggest that Micron must be taking this supposed approach to avoid the statute of limitations. MTD at 7.

This strawman argument, to the extent it can be understood, cannot be reconciled with the actual allegations Micron makes. For instance, when discussing the Katana Complaint, Micron repeatedly attributes responsibility for the filing of Katana's 2022 Complaint to Longhorn.[5]

---

[4]    To the extent that the Court finds that any conduct before June of 2019 is not actionable, that misconduct remains relevant to adjudicating Longhorn's intent. *See, e.g.*, *Bumgarner v. Bumgarner*, 862 P.2d 321, 333 (Idaho Ct. App. 1993) (finding conduct occurring outside of statute of limitations relevant to state of mind).

[5]    *See, e.g.*, Micron Complaint at ¶ 8 n.1 (indicating that the 2022 Complaint "includes, as Exhibits A-C, the three patents that ***Longhorn (through Katana) asserts*** against Micron"); ¶ 44 ("[T]he Complaint that ***Longhorn (through Katana) eventually filed*** against Micron does not allege marking …."); ¶ 86 ("The claims and demands made by ***Longhorn acting on its***

Micron also repeatedly alleges that Longhorn controls Katana.[6]  Micron Complaint at ¶¶ 6, 8, 10 n.2, 18, 92, 94, 95.  Additionally, Micron's Complaint explains why Micron targets Longhorn instead of Katana, pointing to the reality that Longhorn's portfolio entities are likely "insufficiently capitalized to pay any judgments against them" with outside counsel for those entities potentially "represent[ing] them on a contingency basis."[7]  *Id.* at ¶ 6.  Micron's allegations unambiguously demonstrate that Longhorn is responsible for the Katana Complaint, and those allegations are more than sufficient to withstand Rule 12(b)(6) scrutiny, whether Longhorn's arguments are tethered to the statute of limitations or not.

### IV.  THE IDAHO STATUTE IS NOT PREEMPTED OR OTHERWISE UNCONSTITUTIONAL

#### A.     Idaho's Statute Is Not Preempted

States are not powerless to remedy abuses of the federal patent system just because federal statutes regulate patent law.  A majority of states have now passed statutes similar to Idaho's to protect local businesses from patent trolls that extort settlements to which they are not entitled by asserting weak patents in bad faith.  *See, e.g.*, § 48-1701 (expressing the need for the statute's protection and remedies); *Guide to State Patent Legislation*, PATENT PROGRESS (May 1, 2019), https://www.patentprogress.org/patent-progress-legislation-guides/patent-progresss-guide-state-patent-legislation/ (identifying thirty-three states with bad faith patent assertions statutes).  To date,

---

*own and through Katana* constitute violations of Idaho Code § 48-1703… These violations include the Complaint filed in the Western District of Texas, as well as claims and demands made by Longhorn acting on its own and through Katana prior to the filing of the Complaint."); ¶ 87(d) ("***Longhorn's assertion of alleged infringement, including in the Complaint*** in the Western District of Texas, is in subjective bad faith …."); ¶ 96 ("Micron is entitled to a finding by this Court that ***Longhorn's demands and communications, including through the Complaint*** in the Western District of Texas, constitute bad faith assertion of patent infringement in violation of Idaho Code § 48-1703.") (all emphases added).

6    Supporting detail regarding the relationship between Longhorn and Katana (and Longhorn's other portfolio entities) is found throughout Micron's entire Complaint.  *See, e.g.*, Micron Complaint at ¶¶ 6-9, 18-28, 40-58, 92-95.  This detail rebuts any suggestion that the Complaint does not allege sufficient facts to support that Longhorn is Katana's alter ego and/or principal.

7    Alternatively, it is possible that an investor or litigation funder is paying Longhorn's attorney fees.  If so, the money is equally likely to dry up before any award of attorneys' fees to Micron at the conclusion of the case.

no state statute has been struck down as unconstitutional, although patent owners have tried mightily, attempting a range of arguments (e.g., First Amendment, Takings Clause, and Dormant Commerce Clause). Moreover, numerous state statutes have survived preemption challenges based on the Supremacy Clause like the one that Longhorn attempts to make here, exactly as Idaho's statute should now survive.

There are three types of federal preemption of state law: express, field, and conflict. *E.g.*, *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990). The Federal Circuit, which adjudicates patent law appeals, has determined that federal patent law neither fully occupies the field nor expressly preempts state patent law. *See, e.g.*, *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1377 (Fed. Cir. 2005). Therefore, federal patent law preempts state law ***only*** when the state law directly conflicts with federal law. *Id.* Moreover, this Court must apply a presumption ***against*** preemption. *E.g.*, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

Importantly, federal patent law protects only a ***good faith*** assertion of patent infringement. *See Globetrotter Software, Inc. v. Elan Comput. Grp., Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004). The concept of bad faith under federal preemption law includes both subjective and objective components (*id.*), both of which have been alleged and will be proven here, as discussed below. But state law claims that are based on bad faith patent assertions are simply not preempted.

Indeed, a state law claim for bad faith assertion will not be preempted so long as bad faith is alleged and ultimately proven, "***even if bad faith is not otherwise an element of the [state law] claim***." *Id.* (emphasis added). This is because it is a "well-established principle that statutes will be interpreted to avoid constitutional difficulties." *Frisby v. Schultz*, 487 U.S. 474, 483 (1988). "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 466 (1989) (internal quotation marks omitted).

When Idaho's Legislature passed Idaho's bad faith statute, it was so aware of the need to protect good faith patent assertions that it explicitly addressed this point in § 48-1701(1)-(2):

MICRON'S OPPOSITION TO
LONGHORN'S MOTION TO DISMISS

> Patent holders have every right to enforce their patents when they are
> valid and infringed, to solicit interest from prospective licensees and to
> initiate patent enforcement litigation as necessary to protect intellectual
> property.… The legislature does not wish to interfere with the good
> faith enforcement of patents or good faith patent litigation. The
> legislature also recognizes that Idaho is preempted from passing any
> law that conflicts with federal patent law…. Through this narrowly
> focused chapter, the legislature seeks to facilitate the efficient and
> prompt resolution of patent infringement claims, protect Idaho
> businesses from abusive and bad faith assertions of patent infringement
> and build Idaho's economy, while at the same time carefully not
> interfering with legitimate patent enforcement actions.

Idaho's statute, in other words, is drafted to focus precisely on the abusive practices that states are permitted to regulate.[8] Idaho makes no attempt to prevent, interfere with, or—in Longhorn's words—"create[] the threat of substantial liability" for activity that is permitted and even "incentivized" by the federal patent laws. MTD at 9. Indeed, it is a perversion of the federal patent laws to suggest that these laws encourage the kind of meritless infringement assertions that Longhorn has made against Micron and others.

Idaho's statute provides a non-exhaustive list of factors that a court **may** consider in evaluating whether a patent assertion is made in bad faith (*see* § 48-1703(2)), as well as a non-exhaustive list of factors that a court may consider as evidence of good faith (*see* § 48-1703(3)). One of the factors listed in subsection 2—Factor 2(f)—allows for and contemplates consideration of whether "[t]he person asserting a claim or allegation of patent infringement acts in subjective bad faith, or a reasonable actor in the person's position would know or reasonably should know that such assertion is meritless." Thus, the statute on its face contemplates and proposes consideration of both "subjective bad faith" and objective bad faith (i.e., whether "a reasonable actor … would know or reasonably should know that such assertion is meritless").

Despite the fact that Idaho's statute expressly references both subjective bad faith and

---

[8] Longhorn twists the Legislature's words ("Patent holders have every right to enforce their patents when they are valid and infringed ….") to suggest that the statute forbids a patentholder from ever filing a losing suit (MTD at 10), but this is not correct. Idaho's statute clearly focuses only on patent assertions made in bad faith. *See, e.g.*, §§ 48-1701, 1703.

MICRON'S OPPOSITION TO
LONGHORN'S MOTION TO DISMISS

objective bad faith, Longhorn criticizes the statute for failing to expressly require proof of both subjective and objective bad faith.  MTD at 12.  Longhorn likewise criticizes Factor (2)(f) for being phrased in the disjunctive.  *Id*.  These criticisms misconstrue the law regarding evaluation of a statute's constitutionality.  What matters for purposes of evaluating constitutionality is how the statute is ***applied***.  Numerous decisions, including recent decisions specifically discussing other states' bad faith assertion statutes, make this point.

For instance, a decision last year upholding North Carolina's bad faith assertion statute is instructive.  *NAPCO* involved a bad faith patent assertion statute structured similarly to Idaho's: it provides a non-limiting list of factors that a court can consider in determining bad faith, but does not state on its face that courts must find both subjective and objective bad faith as elements of the state law claim.  *NAPCO*, 555 F. Supp. 3d. at 210.  In a careful, 64-page decision, the court there found that "a state need not explicitly write into a statute the elements of objective and subjective bad faith to avoid preemption."  *Id*. at 211 (collecting a long list of cases).  The court explained:

> The Act contains factors to consider in finding "bad faith" but does not specify that these factors show <u>objective</u> bad faith.  Rather, these factors may be considered in relation to the subjective bad faith inquiry permitted under federal law without presenting any conflict.  In light of the General Assembly's intent not to conflict with federal law and the canon that statutes will be interpreted in a manner that is constitutional where possible, the court concludes that these factors relate to subjective bad faith, rather than objective baselessness, and the statute is not preempted on those grounds.

*Id*. at 211-12 (emphasis in original).  The court then denied the patentholder's motion to dismiss the bad faith assertion counterclaim that had been made there.  *Id*. at 214.

Other courts that have considered this issue have ruled similarly.  For instance, the District of Oregon upheld Oregon's bad faith assertion statute, which is also structured similarly to Idaho's.  In doing so, the court applied a presumption against preemption and reasoned that, "[t]o avoid preemption, these elements [subjective and objective bad faith] must be alleged and proven as part of the claim, ***even if they are not set forth under state law***."  *Landmark Tech.*, 2020 WL 1430088, at *3 (internal citations omitted, emphasis added); *see also Triple7Vaping.com*, 2017 WL

5329874, at *6-7 (denying motion to dismiss based on preemption arguments for Maryland statute); *Puritan Med. Prods.*, 188 A.3d 853 (rejecting preemption arguments and upholding Maine's bad faith assertion statute, but granting summary judgment for patentholder due to insufficient evidence of bad faith).[9] Just as these statutes survived scrutiny and unfounded attacks that they, like Longhorn alleges here, "lower[] the burden of proof for 'bad faith'" (MTD at 9), so too should Idaho's statute survive.

Tellingly, Longhorn cites none of these cases, even though they are directly applicable here. Instead, Longhorn relies on old preemption cases, dating back as far as the 1940s and 1960s, that oftentimes do not involve bad faith assertion claims or even patents.[10] MTD at 14-15. The closest that Longhorn comes to citing a recent case is *Building Innovation Indus., L.L.C. v. Onken*, 473 F. Supp. 2d 978, 986-88 (D. Ariz. 2007), but that case involved preemption of an Arizona state statute that permitted prevailing parties in **contract** cases to recover fees in certain circumstances. It has nothing to do with Idaho's tort law.

Longhorn also cites **no** case law or other support for many of its conclusory complaints about Idaho's statute. For instance, without a single citation, Longhorn says that a presumption of good faith must be written into the statute. MTD at 11. Relatedly, Longhorn (with an inapplicable citation) decries the Idaho Legislature's failure to write a "clear and convincing evidence" standard into the Idaho statute, but the court in *NAPCO* definitively rejected that very argument. 555 F. Supp. 3d at 210. Likewise, Longhorn complains about the presence of non-limiting safe harbor factors that Idaho courts can consider as evidence of **good faith**. MTD at 11. It is unclear why those factors are objectionable to Longhorn at all, much less relevant to the constitutionality of the

---

[9]   There are a few decisions questioning in dicta whether state law bad faith assertion statutes can survive, but—to Micron's knowledge—no court has struck down any such statute as unconstitutional. *See, e.g.*, *Summer Infant (USA), Inc. v. Tomy Int'l, Inc.*, No. 17-cv-549, 2019 WL 5540224, at *2 (D.R.I. Oct. 25, 2019) (discussing Rhode Island statute); *MPJH Tech. Invs., LLC v. Sorrell*, 108 F. Supp. 3d 231, 243 (D. Vt. 2015) (allowing declaratory judgment challenge to Vermont's statute to proceed).

[10]   Vermont was the first state to pass a bad faith patent assertion statute. It did so in 2013. Vt. Stat. Ann. tit. 9 § 4195, *et seq.* (West 2022).

statute, since they are designed to protect patentholders making good faith assertions of infringement and ensure balanced consideration of all facts by a court. One can only conclude that these factors simply do not benefit Longhorn here because Longhorn has unequivocally ***not*** acted in good faith.

**B.     Longhorn's Kitchen Sink Of Other Constitutional Complaints Fares No Better**

Throughout its motion, Longhorn makes passing and vague mention of a number of other constitutional arguments, often with little to no support. None of these arguments has any merit.

For instance, Longhorn suggests that the Idaho statute is problematic because it permits an injunction as a remedy. MTD at 9, 14; *see* § 48-1706(1)(a). Longhorn does not explain how this objection rises to constitutional proportions, and Longhorn cites no cases that take issue with injunctive relief in this context. Nor is it objectively clear how or why an injunctive remedy could be unconstitutional: if a patentee is sending letters, or filing suits, without having a good faith belief that its patents are valid or infringed, a court ***should*** have the power to put a stop to that conduct before damages are incurred by victims of bad faith assertion conduct. *See Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291-92 (9th Cir. 2013) (affirming injunction preventing future tortious conduct in the face of constitutional arguments). Although Longhorn points to the federal patent statutes themselves as providing a remedy for misguided patent assertions (*see* MTD at 7), that does not mean that the states have no power to provide redress for conduct that constitutes a state law tort. This is particularly so because the federal remedies to which Longhorn points as supposedly adequate are ones that delay relief until the conclusion of the case. But it can take years to reach that point and, when a wrongly-targeted company gets to that point, its damages have already been incurred. The sanction is often empty at that point because the patentee cannot or will not pay it.[11] It is too late.

Longhorn also complains about the Idaho statute's inclusion of a "complaint" as a type of

---

[11]   Moreover, the remedy in patent law would be against the party to the infringement suit—here, the shell Katana—and would not reach a parent company like Longhorn. But a claim ***can*** be made against a shell parent like Longhorn under Idaho law.

MICRON'S OPPOSITION TO
                                          LONGHORN'S MOTION TO DISMISS

actionable bad faith communication.  MTD at 10.  In support of this argument, Longhorn quotes cases that say that states cannot regulate "constitutionally-protected petitioning activity" (*id.*), but Longhorn ignores that ***filing a suit in bad faith is not constitutionally protected***.  Indeed, Longhorn's logic here is completely backwards.  Patentholders used to complain that *Noerr-Pennington* immunity applied only to petitioning activity (e.g., the filing of complaints) and not to pre-suit demand letters sent to private parties.  In the face of those arguments, federal courts made clear that *Noerr-Pennington* principles do extend to pre-suit letters but—just as with suits themselves—that activity will not be considered protected activity if the communications are made in bad faith.  *United States v. Koziol*, 993 F.3d 1160, 1171 (9th Cir. 2021) ("Indeed, the 'established sham exception ... provides ... protection against baseless claims asserted in prelitigation settlement letters.'") (quoting *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 936 (9th Cir. 2006)).  Now, Longhorn seeks to turn this logic on its head and suggest that all litigation activity is protected.  This is clearly wrong.  Just as states may proscribe bad faith letters, states may also prohibit bad faith litigation filings.  *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 537-38 (9th Cir. 2022) (setting forth the circumstances in which the "sham" exception applies to deprive a party of *Noerr* immunity, which, as applicable here, boil down to objective and subjective bad faith).  And, in fact, Idaho is not alone in prohibiting bad faith assertions of infringement through a complaint: many other states do so as well.  *More on State Patent Troll Laws*, PATENT PROGRESS (Nov. 19, 2015) http://www.patentprogress.org/2015/11/19/state-patent-troll-laws-video/ (listing eleven states "where a lawsuit can trigger patent troll law" under "lawsuit can trigger" tab).

Under the guise of arguing preemption, Longhorn also points out that the definition of "person" in the Idaho statute is broad—apparently too broad for Longhorn.  MTD at 9-10.  It is unclear how this argument ties to preemption, and Longhorn cites nothing outside of the language of the statute to support its position, nor does it explain what it wants the Court to do with this argument, making it difficult for Micron to respond.  That said, this Court has a mandate to construe the statute to preserve constitutionality, *see Pub. Citizen*, 491 U.S. at 466, and if Longhorn's complaint is that the definition of "Idaho person" cross-references the general

MICRON'S OPPOSITION TO
LONGHORN'S MOTION TO DISMISS

definition of "person" in § 48-602, it is still nevertheless clear that "Idaho" modifies the word "person." § 48-1702(2).

Finally, in assessing the safe-harbor provisions listing types of evidence of ***good faith*** that courts may consider, Longhorn complains that the second good-faith factor (§ 48-1703(3)(b)) focuses on the bad faith asserters' activities—i.e., whether the asserter has made "a substantial investment in the use of the patent or in the production or sale of a product or item covered by the patent." Longhorn reads this as discriminating against individual inventors (although Longhorn acknowledges it does not fit that description itself) and says—without citation—that "[f]ederal law does not permit such discrimination." MTD at 11. Preliminarily, this argument ignores the actual language of the statute, which permits courts in appropriate circumstances to consider investment in "use" of the asserted patent (e.g., arguably through good faith licensing and assertion activities). Setting that aside, however, and interpreting this argument as an attempt to invoke the Equal Protection Clause, courts soundly rejected such arguments even when they are presented more cogently. *See, e.g.*, *NAPCO*, 555 F. Supp. 3d. at 222 n.17 (concluding that purpose of North Carolina statute was properly to "reduce bad faith patent assertions specifically by entities with limited assets" and this did not violate the Equal Protection Clause).

## C.    A Rule 12(b)(6) Motion Is Not The Right Platform To Strike Down A State Statute

If the Court gives credence to Longhorn's preemption arguments, which Micron submits that it should not (as discussed above), then full briefing regarding preemption will be needed. This briefing should occur after the parties have progressed beyond the motion-to-dismiss stage, and it should allow other parties to be heard.[12] *See, e.g.*, *Courthouse News Serv. v. Omundson*, No. 1:21-cv-305, 2022 WL 1125357, at *7 n.10 (D. Idaho Apr. 14, 2022) ("[A]t the motion to dismiss stage, the Court is unwilling to go outside the pleadings and make concrete findings on

---

[12]   The Idaho Attorney General has sixty days to intervene to brief this issue. Fed. R. Civ. P. 5.1(c). Additionally, at least one other case (*Sahara Case, LLC v. BelAir Elecs., Inc*., No. 1:22-cv-96-BLW) is pending in this District that presents claims under the statute in question, and those parties may wish to be heard before the carpet could be dragged out from under them.

constitutionality based on potential factual disagreements between the parties."); *Keene v. Smith*, 569 F. Supp. 1513, 1519 (E.D. Cal. 1983) ("A motion to dismiss for failure to state a claim is not an appropriate vehicle to obtain an adjudication of the constitutionality of a statute.").

## V. MICRON'S CLAIMS ARE MORE THAN SUFFICIENT TO STATE A PLAUSIBLE CLAIM THAT LONGHORN HAS ACTED WITH OBJECTIVE AND SUBJECTIVE BAD FAITH

### A. Micron's Allegations Are Detailed And Thorough

Despite 25+ pages of allegations detailing the facts supporting Micron's claim, Longhorn nevertheless seeks dismissal of Micron's Complaint under Rule 12(b)(6) because it supposedly lacks "plausible factual support for the requisite bad faith." MTD at 15. In doing so, Longhorn ignores and trivializes Micron's assertions that, if proven true, would more than plausibly support a finding that Longhorn made bad faith assertions of patent infringement in violation of § 48-1703.

Micron's allegations are notably directed to issues of both ***subjective*** and ***objective*** bad faith. For instance, with respect to subjective bad faith, Micron:

- Described Longhorn's history of filing baseless suits, including through shell subsidiaries, and past situations where Longhorn has harassed Micron through meritless claims of infringement. Micron Complaint at ¶¶ 7, 28-38. For instance, Micron identified a Longhorn portfolio entity, Lone Star,[13] that targeted Micron with a baseless patent infringement suit in 2016 in Texas. *Id.* at ¶¶ 6-7, 29-39. Micron additionally identified a number of facts showing that (a) Lone Star is a Longhorn portfolio entity (*id.* at ¶ 19); (b) Micron prevailed over Lone Star's infringement claims in the district court (*id.* at ¶ 32); and (c) many of Lone Star's patent claims were invalidated by the Patent Trial and Appeal Board ("PTAB") (*id.* at ¶ 34). As further evidence of Longhorn's history of filing baseless suits, Micron pointed to a specific example of explicit judicial criticism of Longhorn's practices—namely, Judge Alsup criticizing Lone Star for engaging in a "litigation gimmick" and misrepresenting that it was the sole owner of the asserted patents. *Id.* at ¶ 32.

- Described Longhorn's history of attempting to manipulate jurisdiction to further its efforts to extract unmerited settlements from its litigation targets. *Id.* at ¶¶ 20-25, 31.

- Described the organization and capitalization (or lack thereof) of Longhorn's business, its use of shell subsidiaries, and its other business practices that are

---

[13] In its motion to dismiss, Longhorn refers to this entity as "a company called Lone Star," apparently to distance itself from that entity. MTD at 15. But Longhorn's own website lists Lone Star as one of Longhorn's portfolio entities. Micron Complaint at ¶ 19.

indicative of bad faith trolling activity undertaken to evade consequences or any accounting. *Id.* at, e.g., ¶¶ 6, 18-20, 26-27.

- Described Longhorn's pattern and practice of making seriatim threats of infringement suits, including against Micron with the Carthage, Hamilcar, and Trenchant Blade portfolios. *Id.* at ¶¶ 9, 51.

- Identified instances for the asserted patents where Longhorn and Katana failed to provide claim charts or otherwise describe the basis for their claims of infringement and/or made confusing, inconsistent, and/or unwarranted allegations of infringement. *Id.* at, e.g., ¶¶ 40, 46.

- Identified communications where Longhorn suggested that it would provide Micron with an unreasonably short amount of time to consider Longhorn's licensing demand. For instance, Micron alleges that Mr. Fekih-Romdhane offered Micron licensing terms under an "early bird special," implying that licensing demands would increase if Micron did not quickly accept these terms. *Id.* at ¶ 50.

- Identified communications between Micron and Longhorn where Micron informed Longhorn that its infringement theory was exceptionally weak and subject to numerous challenges, including invalidity and non-infringement challenges. *Id.* at ¶¶ 8, 47, 49, 52-55, 59, 68-70, 75-77, 82-83. Longhorn cannot claim to be ignorant of the weakness of its assertions when Micron was telling Longhorn all along that its claims had no merit.

- Described failures by Longhorn to identify the expiration dates and marking efforts relevant to any assertion of infringement claims and assessment of damages. *Id.* at ¶¶ 8, 42-46, 56, 60-63, 71.

- Identified efforts by Longhorn to prevent its bad faith conduct from coming under public scrutiny. As Micron identified, Longhorn's demand letter included language that asserted that the factual contents of the demand letter were protected under FRE 408 and Longhorn initially refused to share information about its claims without a non-disclosure agreement. *Id.* at ¶¶ 41, 47.

And, with respect to objective bad faith, Micron:

- Explained that Longhorn, through Katana, makes unequivocal allegations that Micron is currently infringing the three asserted patents, even though all had long since expired at the time that the Katana Complaint was filed. *Id.* at ¶¶ 8, 42, 56, 60-63, 71. No reasonable litigant would have ignored this point, on which the law is unambiguous.[14]

- Explained that Longhorn did not allege patent marking in either its pre-suit correspondence or the Katana Complaint, even though pre-suit damages would be

---

[14] Without citation, Longhorn now claims that its allegation of continuing infringement was supposedly "an obvious drafting error." MTD at 18. But this Court cannot adjudicate Longhorn's intent in resolving a motion to dismiss. Moreover, Longhorn has not amended the Katana Complaint to fix this "obvious drafting error."

severely circumscribed without marking. *Id.* at ¶¶ 43-46. No reasonable litigant would have ignored this point, on which the law is unambiguous.

- Alleged that Longhorn's claims regarding the asserted patents are exceptionally weak. *Id.* at ¶ 57.

- In this regard, for the '806 patent, identified facts that show that Longhorn had failed to sufficiently investigate whether Micron's products infringe. For example, Micron explained that the asserted claim of the '806 patent requires that Micron's accused products be "sealed with a resin." *Id.* at ¶ 65. Micron specifically identified portions of Katana's Complaint that erroneously identified portions of Micron's products as a "resin" that are not actually "resin" to show that Longhorn failed to perform even a facially sufficient and good faith analysis of Micron's products before filing suit. *Id.* at ¶ 66. No reasonable litigant acting in good faith could expect success on the assertion of the '806 patent in these circumstances.

- For the '879 patent, identified facts that show that Longhorn made misrepresentations about the patent in Katana's Complaint in an apparent attempt to improperly re-frame the patent in a manner beneficial to Longhorn. Micron specifically identified particular claim language in asserted patent claim 1 of the '879 patent that Longhorn improperly reads inconsistently across the claim in clear contravention of the basic principles of patent law. *Id.* at ¶ 73.[15] No reasonable litigant acting in good faith could expect success on the assertion of the '879 patent in these circumstances.

- For the '013 patent, identified facts that show that Longhorn failed to take proper care in identifying its infringement theory in the Katana Complaint. For example, Longhorn mapped two mutually exclusive claim limitations onto the same part of Micron's accused product, creating an impossibility under patent law. *Id.* at ¶ 81.[16] No reasonable litigant acting in good faith could expect success on the assertion of the '013 patent in these circumstances.

In short, Micron has alleged in its Complaint facts that, if proven, should result in liability

---

[15] Longhorn argues that these deficiencies are, again, only a "minor typographical error" and claims that Micron is not reading the claim correctly. MTD at 19-20. A patent claim's language defines its scope, and it is not reasonable for Longhorn to announce—without any evidence—that a claim limitation should be read to mean something other than what that claim limitation says. Additionally, regardless of whether the relevant language is a "typo" (as Longhorn now contends) or not (as Micron believes), Longhorn acted in objective bad faith by ignoring and attempting to hide what it now says is just an "error" when it filed the Katana Complaint as part of an attempt to make its infringement claims appear stronger than they actually are. This, too, will be evidence of Longhorn's bad faith when the case proceeds.

[16] Even Longhorn now concedes that "Katana's illustrations may need to distinguish the support pattern from the wiring patterns more precisely." MTD at 20. Again, Longhorn and Katana seem to have knowingly structured their Complaint against Micron in a manner designed to obscure the weakness of their infringement allegation. This, too, will be evidence of Longhorn's bad faith when the case proceeds.

for Longhorn under Idaho's statute.  Therefore, Micron more than meets the pleading standard.

**B.    None Of Longhorn's Attempts To Undercut Micron's Detailed Showing Of Bad Faith Move The Needle**

In the face of these detailed allegations, Longhorn makes fact-dependent arguments that cannot be the basis for a motion to dismiss.  More specifically, Longhorn argues that the Lone Star patents are not similar to the Katana patents (MTD at 15-16), that Longhorn is not the kind of patent troll the Idaho statute targets (MTD at 17), and that it (Longhorn) believes that it will prevail on the Katana infringement claims (MTD at 17-20).

As a whole, Longhorn's arguments are not directed to the question of whether, taken individually or collectively, Micron's allegations are sufficient to support a claim under Rule 12(b)(6), which is the question this Court must evaluate at this stage.  *Lafky Properties, LLC v. Glob. Credit Union*, No. 1:19-cv-413, 2020 WL 4736296, at *3 (D. Idaho Aug. 14, 2020) (court must view complaint as a whole when evaluating motion to dismiss).  Rather, Longhorn seems to view a Rule 12(b)(6) motion as a mechanism to debate the merits of the case.

Turning to Longhorn's specific arguments, Micron pointed to Longhorn's history of asserting the Lone Star patents to make the point that Longhorn has a pattern and business practice of asserting baseless claims.  Micron Complaint at ¶¶ 7, 29-39.  Micron explained the history of the Lone Star case, which involved the assertion of numerous patents in Texas, transfer of the case to California, dismissal of the California case, multiple IPRs, and threats of baseless appeals.  *Id.*  In short, Longhorn lost its case against Micron on the Lone Star portfolio in spectacular fashion, before then settling for a pittance.  *Id.* at ¶¶ 35-39.  The point of that chronology is not so much the similarity of technical subject matter in the two cases (although there is material overlap), but instead that the bread-and-butter of Longhorn's business model is asserting worthless patents to extort settlements.  *Id.* at ¶¶ 29-39.  This is obviously relevant to Longhorn's subjective intent in now asserting the Katana patents against Micron.  Longhorn's debate of the technical similarity of the Lone Star and Katana patents (MTD at 15-16) misses the point of both Micron's allegations and Rule 12(b)(6).

Longhorn then turns to weak arguments as to how it supposedly acted in good faith.  These arguments also introduce new "facts" without any evidence and are improper in the context of a Rule 12(b)(6) motion.  *Hartman*, 2021 WL 4847426, at *3 (D. Idaho Oct. 18, 2021) ("In ruling on a Rule 12(b)(6) motion, the Court may not consider any material beyond the pleadings.").  For instance, Longhorn claims that Katana has only asserted three of the many patents that it acquired from Sharp against Micron.  MTD at 17.  This information is far outside Micron's allegations and, in any event, is certainly not determinative of whether Micron has sufficiently pleaded (or can prove) bad faith assertion with respect to any of the three patents that Longhorn chose to assert.

Longhorn likewise presents arguments about how its business model falls outside the misconduct that the Idaho Legislature intended to target (without any citation about what the Legislature intended), pointing to a list of actions that Micron has not alleged that Longhorn has taken.  *Id*.  But it is (generously put) more than a stretch to suggest that Micron's claims are not "plausible" merely because there are ***other*** bad faith actions that Longhorn could have taken and supposedly did not.[17]  There is no requirement that Micron must plead every factor and fact that a court can consider under § 48-1703(2) to establish bad faith.  Nor is it right for Longhorn to suggest that this Court should ignore the well-pleaded allegations of the Complaint here in favor of accepting Longhorn's conclusion on the merits that "the circumstances of this case do not match the behavior of patent trolls that the Idaho statute seeks to address."  MTD at 17.  Such an approach runs counter to Rule 12(b)(6).  This Court should not accept Longhorn's attempts to speak for the Legislature in ways that contradict the plain language of the statute.

Longhorn's final argument, at pages 17-20 of its motion, is that Micron did not sufficiently plead objective bad faith, something that is required to avoid preemption.  In evaluating this

---

[17]  Even Longhorn's list of types of bad faith conduct that Longhorn contends Micron did not allege is wrong.  For instance, Longhorn says that Micron did not allege that Longhorn "failed to explain the basis for its infringement read."  MTD at 17.  To the contrary, however, Micron alleged exactly that for Longhorn's 2018 demand letters.  Micron Complaint at ¶¶ 40-46.  Likewise, Longhorn says that Micron did not allege that Longhorn "asserted the patents against a large volume of businesses to achieve hurried settlements."  MTD at 17.  But Micron did.  Micron Complaint at ¶¶ 25, 40, 50.

argument, it is important to recognize that Longhorn tacitly acknowledges that the substantive discussion of the merits of Longhorn's infringement case, at ¶¶ 59-84 of Micron's Complaint, are allegations directed squarely at Longhorn's objective bad faith.    MTD at 17-20.    These allegations—summarized above—well surpass those that were found to pass muster in the closest comparable case, *NAPCO*.  *Compare* Micron Complaint, at, e.g., ¶¶ 47, 49, 52-54, 87(c)-(e) *with NAPCO*, 555 F. Supp. 3d at 213 (discussing allegations of a failure to perform a "reasonable investigation" as a basis for sufficient objective bad faith allegations).

Moreover, after tacitly acknowledging that Micron pleaded facts going to the heart of the objective bad faith determination, Longhorn's strategy is to **debate the merits of those facts**, rather than to consider whether they are sufficiently pleaded.  For instance, Longhorn dismisses the irrefutable fact that it wrongly alleged infringement of an expired patent as "petty" and an "obvious drafting error."  MTD at 18.  But Longhorn alleged continuing infringement of an expired patent, Micron Complaint at ¶ 60, and that is a baseless allegation as a matter of law.  *See, e.g.*, *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 451 (2015) ("[W]hen the patent expires, the patentee's prerogatives expire too, and the right to make or use the article, free from all restriction, passes to the public.").  For the '806 patent, Longhorn tries to argue the merits and then ultimately accuses Micron of failing to provide supporting evidence of noninfringement, which is not Micron's burden at this stage.[18]  MTD at 19.  For the '879 patent, Longhorn again resorts to the excuse that the patent has a "minor typographical error" that—when corrected—explains why its infringement theory is not made in bad faith.  *Id.* at 20.  But this makes no sense.  There is a procedure at the Patent and Trademark Office ("PTO") for correcting "minor typographical errors," and Longhorn did not use this procedure—nor could it have, since the PTO will not make an edit that affects claim meaning under this procedure.  35 U.S.C. § 255 (standard for correction); 37 C.F.R. § 1.323 (process for correction); MPEP § 1481 (9th ed. Rev. 10, June 2020) (process for correction not available when the proposed correction would "materially affect the scope or meaning of the

---

[18]  But Micron did provide such evidence with its bond motion.  Dkt. 15-2 (Stephenson Declaration, No. 1:22-cv-273) at ¶¶ 5-6.

MICRON'S OPPOSITION TO
LONGHORN'S MOTION TO DISMISS

patent").[19]  For the '013 patent, Longhorn's arguments do not make sense and are entirely divorced from the required claim language (MTD at 20), as explained at pages 12-13 and 19 of Micron's memorandum in support of its bond motion.  Dkt. 15 (No. 1:22-cv-273).  Longhorn invites the Court to err in asking it to resolve factual disputes like this in the context of a motion to dismiss.

## C.    If The Court Believes That Micron Has Not Adequately Pleaded Good Faith, Leave To Amend Should Be Granted

Longhorn concludes by asking the Court to dismiss Micron's claim with prejudice.  MTD at 20.  Micron submits that its Complaint contains more than sufficient detail to survive any Rule 12(b)(6) challenge.   To the extent that the Court disagrees, however, any dismissal should be without prejudice.  *Nakota Trucking, LLC v. HUB Int'l Mountain States Ltd.*, No. 1:22-cv-41, 2022 WL 2702535, at *3 (D. Idaho July 12, 2022) (stating, in the context of a motion to dismiss, that "[l]eave to amend should be 'freely given'" absent undue delay, prejudice, or futility); *see also Landmark Tech.*, 2020 WL 1430088, at *5 (dismissing complaint alleging bad faith patent assertion **with leave to amend** due to inadequate pleading of bad faith).  Longhorn provides no support for any result to the contrary.

---

[19]  Longhorn cites to *Pavo Sols. LLC v. Kingston Tech. Co.*, 35 F.4th 1367 (Fed. Cir. 2022), to suggest that this Court can simply ignore "obvious typos."  But the typo in that case created a physical impossibility whereas, here, no such conundrum exists.  The relevant '879 patent claim clearly articulates its requirements, and it does so in a way that *is* physically possible.  There is no reason for this Court to guess that a different meaning supposedly must have been intended when the Patent Office standards would not allow the correction that Longhorn asks the Court to make.

MICRON'S OPPOSITION TO
LONGHORN'S MOTION TO DISMISS

DATED: August 1, 2022.                    **PERKINS COIE LLP**

                                          By:*/s/ Daniel Graham*_____
                                          David Krueck, Bar No. 6246
                                          DKrueck@perkinscoie.com
                                          Daniel Graham, Bar No. 11506
                                          DGraham@perkinscoie.com
                                          PERKINS COIE LLP
                                          1111 West Jefferson Street, Suite 500
                                          Boise, Idaho 83702-5391
                                          Telephone: 208.343.3434
                                          Facsimile: 208.343.3232

                                          Amanda Tessar, admitted *pro hac vice*
                                          Colorado Bar No. 33173
                                          ATessar@perkinscoie.com
                                          PERKINS COIE LLP
                                          1900 Sixteenth Street
                                          Suite 1400
                                          Denver, CO 303.291.2357
                                          Facsimile: 303.291.2457

                                          **ATTORNEYS FOR PLAINTIFFS,
                                          MICRON TECHNOLOGY, INC.,
                                          MICRON SEMICONDUCTOR PRODUCTS, INC.,
                                          AND MICRON TECHNOLOGY TEXAS, LLC**

MICRON'S OPPOSITION TO
LONGHORN'S MOTION TO DISMISS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been served upon all counsel of record, via the Court's CM/ECF system on this the 1st day of August, 2022.


*/s/ Daniel Graham*